Abby L. Dennis, DC Bar No. 994476
Peter Richman, CA Bar # 149107
Ashley Masters, TX Bar # 24041412
Abigail Wood, DC Bar # 242239

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381

*adennis@ftc.gov; prichman@ftc.gov;*
*amasters@ftc.gov; awood@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

**FEDERAL TRADE COMMISSION,**

        Plaintiff,

    v.

**INTERCONTINENTAL EXCHANGE, INC.**

and

**BLACK KNIGHT, INC.,**

        Defendants.

Case No.

**COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(B) OF THE FEDERAL TRADE COMMISSION ACT**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court to enter a stipulated temporary restraining order and grant a preliminary injunction enjoining Defendants Intercontinental Exchange, Inc. ("ICE") and Black Knight, Inc. ("Black Knight"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships and joint ventures, from consummating their proposed acquisition ("Acquisition"). Plaintiff seeks this provisional relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b).  Absent such relief, ICE and Black Knight (collectively, "Defendants") have represented that they will close the Acquisition immediately following a vote of Black Knight shareholders scheduled for April 28, 2023.

Plaintiff requires the aid of this Court to maintain the status quo and prevent interim harm to competition during the pendency of an administrative proceeding on the merits.  The Commission has already initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on March 9, 2023.  The administrative hearing on the merits will begin on July 12, 2023.  That administrative hearing will determine the legality of the Acquisition and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Acquisition.

## NATURE OF THE CASE

1.      A vast majority of homebuyers in the United States rely on mortgages to finance their home purchases.  Homebuyers obtain mortgages from a variety of mortgage lending institutions, including small and large banks, credit unions, and independent mortgage banks. When ready to purchase a home, homebuyers can choose among these lenders to find the most favorable interest rates and mortgage terms.

2.      To finance a home purchase through a mortgage, a homebuyer typically submits a mortgage application to a lender.  The lender then begins the mortgage loan origination process. Mortgage origination involves many steps between the application and the closing of the loan. Those steps include processing information from the mortgage application, determining the loans

and interest rates for which the homebuyer qualifies, locking the interest rate, underwriting the loan, funding the loan, then closing the loan and preparing it to be serviced.

3.      Mortgage lenders, regardless of type and size of lender, rely on mortgage loan origination system ("LOS") software as their primary tool to manage the residential mortgage loan origination process.  The LOS serves as the lender's system of record for each loan and is used to manage their workflow and to perform the various commercial, legal, and compliance tasks required during the lending process.

4.      ICE's Encompass LOS ("Encompass") is the dominant LOS in the United States and processes nearly half of all residential mortgages originated across the nation each year. Black Knight's Empower LOS ("Empower") is the second largest LOS in the United States.

5.      ICE and Black Knight compete vigorously to provide their respective LOSs to the same mortgage lender customers.  As stated by Black Knight's CFO, "[W]e have one primary competitor in each business. . . .  In [o]rigination, it's ICE . . . ."  This competition has resulted in tangible benefits for lenders and the marketplace more generally, including lower LOS prices, greater discounting, and efforts to provide a robust array of features.

6.      As a mortgage moves from application to close, it touches on tens to hundreds of services ("ancillary services") necessary to process, underwrite, fund, and close a loan. Ancillary services are offered by LOS providers, including ICE and Black Knight, as well as third-party vendors that do not provide LOSs.  Most ancillary services connect to an LOS via software integration.  The LOS coordinates and automates many of the interactions between lenders and these ancillary services.  This provides a significant benefit to the LOS's lender customers, reducing the burden on each lender's own personnel and minimizing the risk of human data entry error while ensuring compliance with the complex web of federal, state, and local mortgage-related regulations.

7.      ICE and Black Knight each offer a broad array of ancillary services in addition to their LOSs, and directly compete for customers for a number of these services.  Most notably, Black Knight owns the Optimal Blue product pricing and eligibility engine ("PPE").  A PPE is

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

software that allows a lender to identify potential loan rates for a borrower, determine the borrower's eligibility for a given loan, and lock in the loan's terms for the borrower.  Each of these functions is an important step in originating a residential mortgage.  Software integration between a lender's PPE and LOS enables and automates many of the PPE's features for the lender.  Black Knight's Optimal Blue is the clear industry leader, serving lenders that originate as much as 40% of the nation's residential mortgages each year.  Second to Optimal Blue is its close competitor, ICE's Encompass Product and Pricing Service PPE ("EPPS"), currently available only to lenders who use the Encompass LOS.

8.     Like the competition between ICE's and Black Knight's LOSs, the competition between ICE's EPPS and Black Knight's Optimal Blue also benefits lenders and the marketplace more generally.  Defendants' efforts to win PPE customers from one another have led to discounting and other price concessions as well as competition to offer the best PPE with the richest features.

9.     For example, prior to agreeing to acquire Black Knight, ICE launched what it termed ███████████████ in response to a perceived ████████████████████ ████████████████████████████ According to internal ICE documents, ICE named ██████████████████████████████████ ████████████████████████████ was a major ICE initiative to develop ████████████████████

10.     Through its ████████████, ICE planned to develop ████████████ ████████████████████████████████████ ████████████████████████████████████ ICE further considered making ███████████████████████████ However, the day ICE announced the Acquisition, its executives began the process of ████████████████████████████████ ████████████████████████████████████ ████████████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

11.     Defendants' Acquisition will reduce competition in one or more lines of commerce.  ICE's internal documents reflect an ethos that seeks to ███████████ ███████████████ If the Acquisition proceeds, the loss of competitive pressure from Black Knight will allow ICE to further increase prices for its LOSs.  ICE's incentives to improve features on Encompass also will diminish.

12.     The Acquisition similarly will reduce competition for ancillary services, including PPEs.  Indeed, it has already done so, as evidenced by ICE's ██████████████ ████████████████████████ Moreover, ICE's anticipated "████████ ██████" from the Acquisition make explicit that ICE plans to ████████████████ █████████████████████

13.     Post-Acquisition price increases for LOSs and ancillary services, including PPEs, likely will be passed on to consumers in the form of higher mortgage origination costs.  Given that origination costs remain relatively constant regardless of the amount of a mortgage, an increase in origination costs will result in a proportionally larger price increase for a homebuyer seeking a $200,000 mortgage than for a homebuyer that can afford a $1,000,000 mortgage.  Similarly, increased origination costs will affect homebuyers who must finance their home purchases to a greater degree than wealthier homebuyers who may pay cash.  Put simply, higher origination costs will disproportionately harm lower-income and first-time homebuyers.

14.     The Acquisition also will increase ICE's incentive to harm third-party ancillary service providers.  With the Acquisition, ICE will stand to earn more revenue by diverting customers to its own ancillary services, such as Optimal Blue.  Additionally, by acquiring Black Knight's business and its ancillary services, ICE will have fewer gaps in its own ancillary services portfolio, making it less reliant on third-party providers to fill those gaps.  Because of ICE's dominant LOS market share and the dependency of PPEs and other ancillary service providers on LOS integration, ICE will be in a position to act on those incentives by disadvantaging existing and potential competing ancillary service providers, including competing PPE providers, by foreclosing or impeding LOS access.  The Acquisition also may accelerate an

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

ongoing trend toward vertical integration and consolidation in, and raise barriers to entering, the relevant antitrust markets.

15.     New entry will not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition.  Significant barriers exist for potential new LOS or PPE entrants.  The development of a new LOS or PPE is an expensive, significant undertaking. Further, any entrant will face steep barriers in attracting new customers.

16.     Defendants cannot show cognizable, merger-specific efficiencies that would offset the reasonably probable and substantial competitive harm resulting from the Acquisition.

17.     On March 9, 2023, by a 4-0 vote, the Commission found reason to believe that the Acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.  On the same day, the Commission commenced an administrative proceeding on the antitrust merits of the Acquisition before an Administrative Law Judge, with the merits trial scheduled to begin on July 12, 2023. The ongoing administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony.  *See* 16 C.F.R. § 3.41.  The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

18.     The parties have stipulated to a temporary restraining order preventing ICE and Black Knight from consummating the Acquisition until after 11:59 p.m. Eastern Time on the second business day after the court rules on the Commission's motion for a preliminary injunction pursuant to Section 13(b), or until after the date set by the District Court, whichever is later.  Such a temporary restraining order is necessary to preserve the status quo and protect competition while the Court considers the Commission's application for a preliminary injunction.

19.     Preliminary injunctive relief is similarly necessary to preserve the status quo and protect competition during the Commission's ongoing administrative proceeding.  Allowing the Acquisition to proceed while the Commission is assessing whether the Acquisition's potential

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

anticompetitive effects would harm consumers would undermine the Commission's ability to remedy the anticompetitive effects of the Acquisition if it is found unlawful after a full trial on the merits and any subsequent appeals.

## JURISDICTIONAL STATEMENT

### A. Jurisdiction

20.    This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under the Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

21.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

> Whenever the Commission has reason to believe—
>
> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—
> the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. . . .

22.    Defendants and their relevant operating entities and subsidiaries are, and at all relevant times have been, engaged in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**B. Venue**

23.     Defendants have consented to personal jurisdiction in the Northern District of California.  In addition, personal jurisdiction exists where service is effected pursuant to a federal statute.  Fed. R. Civ. P. 4(k)(1)(C).  The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process.  Defendants are therefore subject to personal jurisdiction in the Northern District of California.  Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 53(b).

**C. Intradistrict Assignment**

24.     Assignment to the San Francisco Division is proper.  This action arises in Alameda County because a substantial part of the events giving rise to these claims occurred in Alameda County, where Defendant ICE's Mortgage Technology business unit is headquartered.

## THE PARTIES AND THE PROPOSED ACQUISITION

25.     Plaintiff, the Commission, is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

26.     Defendant Intercontinental Exchange, Inc. is a publicly traded corporation incorporated in Delaware, with its headquarters in Atlanta, Georgia.  ICE provides market infrastructure, data services, and technology solutions in three segments: exchanges (including the New York Stock Exchange), fixed income and data services, and mortgage technology.  In 2016, ICE acquired Mortgage Electronic Registration Systems, Inc., owner of the Mortgage Electronic Registration System electronic database for mortgage loan ownership.  In 2019, ICE acquired Simplifile, an e-recording and closing software firm.  In 2020, ICE acquired Ellie Mae, including its industry-leading Encompass LOS.  Today, ICE operates these and its other mortgage-related businesses through its ICE Mortgage Technology business unit, which is headquartered in Pleasanton, California.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

27.     Defendant Black Knight, Inc. is a publicly traded corporation incorporated in Delaware, with its headquarters in Jacksonville, Florida.  Black Knight is a provider of software, data, and analytics for the mortgage, real estate, and consumer loan markets.  Black Knight's mortgage technology products include Empower, the Mortgage Servicing Platform, Compass Analytics, which Black Knight acquired in 2019, and Optimal Blue, which Black Knight acquired in 2020.

28.     On May 4, 2022, ICE and Black Knight signed an Agreement and Plan of Merger ("Merger Agreement"), whereby ICE agreed to acquire 100% of Black Knight for approximately $13.1 billion.

29.     Unless temporarily restrained and preliminarily enjoined by this Court, Defendants have represented that they will close the Acquisition immediately following a vote of Black Knight shareholders scheduled for April 28, 2023.

## RESIDENTIAL MORTGAGE ORIGINATION

30.     Purchasing a home is one of the most important and financially significant decisions Americans make.  The overwhelming majority of homebuyers rely on a mortgage to finance that purchase.  In 2021, over 4,300 mortgage lending institutions, including small banks, large banks, credit unions, and independent mortgage banks, reviewed 23.3 million mortgage applications and originated 15 million mortgages.

31.     The LOS is the foundational technology that mortgage lenders use to originate the vast majority of home mortgages.  LOSs are systems of record that enable lenders to manage their workflow, to perform the various commercial, legal, and compliance tasks required for loan origination, and to preserve important loan information.  The LOS also integrates and automates interactions between the lender and the ancillary services used by the lender at each stage of the origination process.

32.     LOSs come in two forms: those licensed from third party providers ("commercial LOSs") and those developed and maintained in-house by lenders ("proprietary LOSs").  The vast majority of lenders rely on commercial LOSs, in large part due to the costs of designing and

maintaining a compliant proprietary LOS.  Commercial LOSs benefit from efficiencies generated by having a third party serve multiple lenders, such as supporting federal agencies' requirements and maintaining compliance requirements.  By outsourcing the operation of the LOS, lenders can also focus their resources on other parts of the business.

33.     A proprietary LOS is designed specifically for and around the needs and workflows of a particular lender.  The result is a highly customized, lender-specific system.  Only lenders with resources, expertise, and scale across which to spread fixed costs can build a proprietary LOS, and even then, high maintenance costs and regulatory compliance requirements may discourage lenders from pursuing an in-house LOS.  Lenders typically do not license their proprietary LOSs for use by other lenders.

34.     In addition to the LOS, lenders also rely on many ancillary services, such as document vendors, point-of-sale systems for interacting directly with borrowers, and PPEs for generating loan pricing terms based on borrower criteria that determine eligibility for various loan programs.  Those ancillary services generally must interoperate with an LOS.  Some LOS providers, like ICE and Black Knight, own a number of ancillary services that they offer to their LOS lender customers.  LOS providers with ancillary services often bundle those services with the LOS, either as products included in the LOS functionality or as add-ons.

35.     One of the most important ancillary services is the PPE, which is a tool that lenders use to determine how to price a mortgage and structure its terms.  PPEs help a lender manage product pricing, create rate sheets, and lock in the interest rate for a particular loan.  To accomplish its core task of pricing a loan, a PPE typically first collects rate sheets from the lender or other investors.  The PPE then draws mortgage application data from the LOS, such as a borrower's credit score and debt-to-income ratio.  The PPE compares the rate sheets with data from the borrower's application to determine what loan products are available for the borrower and at what rates.  The PPE then locks the rate for a period of time to ensure that the borrower's interest rate does not change prior to closing on the sale of the residential property.

36.     Integration with an LOS enables a PPE's full functionality for lenders.  LOS integration allows PPEs to send and receive data directly to and from the LOS.  Without LOS integration, a lender would be required to manually enter loan and application data multiple times into the LOS, PPE, and related ancillary services, leading to inefficiency and creating opportunities for human error, regulatory risk, and financial risk.

## THE RELEVANT ANTITRUST MARKETS

37.     Defendants compete to provide LOSs used by lenders to originate residential mortgages.  Defendants also compete to offer a range of origination-related ancillary services, including PPEs.  Relevant antitrust markets in which there is a reasonable probability that the Acquisition will lead to anticompetitive effects are: (1) commercial LOSs; (2) LOSs; (3) PPEs for users of Encompass; and (4) PPEs.  The relevant geographic market in which the Acquisition will lead to anticompetitive effects for each relevant product market is the United States.

### A.     The Commercial LOS Market

38.     Commercial LOSs constitute a relevant antitrust product market in which to evaluate the competitive effects of the Acquisition.  The market consists of LOSs, like ICE's Encompass and Black Knight's Empower, that are licensed by third-party providers to lenders, and excludes proprietary LOSs.

39.     Commercial LOSs have peculiar characteristics and uses.  Lenders often operate across multiple states or nationwide.  Further, mortgage origination workflows may vary from lender to lender.  Commercial LOSs therefore are complex software systems that not only process large volumes of data and must constantly evolve to keep pace with technological developments; they also must stay up to date with the myriad federal, state, and local regulations that affect lenders wherever they may be located across the United States, and must be adaptable to lenders' varying workflows and requirements.  These programming and compliance tasks require significant investment and expertise, and thus vendors such as ICE and Black Knight specialize in developing, optimizing, maintaining, and providing commercial LOSs.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

40.     Commercial LOSs also target distinct customers: mortgage lenders that lack the ability and/or the desire to devote substantial resources and software engineering expertise to develop and maintain a proprietary LOS in compliance with the ever-changing technological and regulatory landscape.  Failing to adequately maintain a proprietary LOS exposes a lender to unacceptable business and regulatory risk.

41.     Indeed, even some of the nation's largest lenders with the means to buy or develop a proprietary LOS have determined that the benefits of using a commercial LOS outweigh those of purchasing or developing an LOS in-house, and would not switch to a proprietary LOS.  As Black Knight stated in its Form 10-K for 2021: "In an effort to reduce origination costs, we believe lenders are increasingly shifting from in-house solutions to third-party solutions that provide a more comprehensive and efficient solution."  Ellie Mae's COO agreed, noting in a public analyst call regarding ICE's acquisition of Ellie Mae: "[W]e've got a really great pipeline where even these largest entities are starting to realize that it's time to look at a commercial application like ours."  Most mortgage lenders thus license commercial LOSs to manage their origination workflows, and would not consider using a proprietary LOS.

42.     Industry participants, including Defendants, recognize commercial LOSs as a distinct category among LOSs.  As phrased by Black Knight in preparation for a public earnings call Q&A session ████████████████████████████████████████ ████████████████████████████████████████████

43.     No commercially reasonable substitute for commercial LOSs exists for most mortgage lenders.  Other mortgage origination services cannot replicate the functionality of LOSs, which serve as the authoritative source of information regarding the status of a loan as the loan moves from application toward closing and integrate and automate interactions between the lender and the ancillary services used by the lender at each stage of the origination process.  No other mortgage service provides those functions.

44.     Nor can most lenders rely on manual processes to manage their origination workflows.  Originating a residential mortgage loan is a complex, multi-step process that

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

requires voluminous information and data transfer and storage, compliance with multiple

regulatory frameworks, and the use of numerous distinct ancillary services.  Attempting to

perform these tasks through manual processes—for example, by using spreadsheet software,

email, or pen and paper—would be prohibitively burdensome and costly for lenders.  Moreover,

mortgage lending is a highly regulated industry that poses substantial risk for lenders in the event

of oversights or errors.  By automating the origination workflow, the LOS reduces opportunity

for human error while enabling thorough, systematic review for compliance with frequently

updated local, state, and federal regulatory requirements.

45.    Further, because of the difficulty, expense, and risk associated with developing

and maintaining a proprietary LOS, most mortgage lenders would not consider using a

proprietary LOS, rather than a commercial LOS, in their businesses.

46.    A hypothetical monopolist of commercial LOSs profitably could impose a small

but significant and nontransitory increase in price ("SSNIP").  In the event of a SSNIP for

commercial LOSs, lenders would not switch to proprietary LOSs or to alternative methods to

perform the core origination functions facilitated by LOSs in sufficient volumes to render the

price increase unprofitable.

47.    Among commercial LOSs, Encompass is the market leader, followed by

Empower.  No other commercial LOS can claim more than a single-digit share of the market.

**B.    The LOS Market**

48.    The LOS market comprises all LOSs that lenders use to originate residential

mortgages.  This broader market includes both commercial LOSs—like ICE's Encompass and

Black Knight's Empower—and proprietary LOSs.

49.    LOSs are used by a distinct group of customers: mortgage lenders.  Mortgage

lenders of all sizes and types rely on LOSs to originate residential mortgage loans.  Then-

President of ICE Mortgage Technology ███████████████████████████████

███████████████

50.     LOSs also have distinct functionality.  Different LOSs may offer different features, but all LOSs—whether commercial LOSs or proprietary LOSs—provide certain basic functions.  First, an LOS serves as a lender's system of record.  The LOS tracks information entered by a borrower on their mortgage application or by a loan officer, as well as data returned from the myriad ancillary services integrated with the LOS.  The mortgage lender relies on the LOS as its authoritative source of information regarding the status of a loan as the loan moves from application to closing.  Second, the LOS serves as gatekeeper to the various supplemental functions required to complete the loan origination process, often completed through LOS integrations with third-party ancillary service providers.  No other mortgage origination service can or does provide these functions.

51.     Industry participants, including Defendants, recognize LOSs as a distinct market and separate economic entity in the ordinary course of their business.  Public observers, including media and analysts, likewise recognize LOSs as a distinct market.

52.     For the reasons stated above with respect to commercial LOSs, other mortgage origination services are not a substitute for LOSs.  Nor are manual processes.

53.     A hypothetical monopolist of LOSs profitably could impose a SSNIP.  In the event of a SSNIP for LOSs, lenders would not switch to alternative methods to perform the core origination functions facilitated by LOSs in sufficient volumes to render the price increase unprofitable.

54.     Even within the broader LOS market, ICE's Encompass remains the market leader, followed by Black Knight's Empower.

**C.     The Market for PPEs for Users of Encompass**

55.     PPEs for users of Encompass is another relevant antitrust product market for evaluating the competitive effects of the Acquisition.

56.     PPEs are products with peculiar characteristics and uses.  PPEs perform the core origination-related functions of pricing a residential mortgage loan, determining a borrower's eligibility for a given loan, and locking the loan for the borrower.  Other ancillary services

1    cannot and do not replicate this functionality.  Moreover, although some functions of a PPE

2    could be accomplished using paper, fax, email, or spreadsheet software, performing the

3    multitude of tasks required to price, determine eligibility for, and lock a loan using manual

4    processes without the automation enabled by a PPE would be prohibitively expensive and time-

5    consuming for most lenders.

6          57.    Because mortgage lenders seek the benefits of LOS-PPE integration, lenders

7    using Encompass rely on a specialized group of PPE providers whose PPEs are already

8    integrated with Encompass.  Though it is technically possible for additional PPEs to integrate

9    with Encompass, integration of a new PPE is a significant software engineering undertaking.

10   Moreover, ICE requires ███████████████████████████████████████████

11   ██████████████████████████████████████████ in addition to ██████████████

12   ████████████████████████████████████████████████████████

13   ███████████████████████ ICE also controls numerous other technical and contractual aspects

14   of the integration process that can affect a PPE provider's timing and ability to provide PPE

15   services to users of Encompass.  Given the time and expense required to integrate a new PPE

16   with Encompass, most mortgage lenders that use Encompass find themselves functionally

17   limited to selecting among PPEs that are already integrated with Encompass.

18         58.    PPEs available to users of Encompass are used by a distinct group of customers:

19   mortgage lenders who use Encompass.

20         59.    In evaluating its PPE strategy, ICE itself has recognized PPEs used by customers

21   of Encompass ██████████████████████████████████████████████████

22   ████████████████████████████████████

23         60.    The existence of an Encompass-only PPE market is further supported by a SSNIP

24   analysis.  A hypothetical monopolist of PPEs used by customers of Encompass profitably could

25   impose a SSNIP.  As discussed in more detail in paragraph 137 below, switching among LOSs is

26   an expensive, lengthy, and resource-intensive undertaking.  In the event of a SSNIP for PPEs for

27   users of Encompass, lenders would not switch to alternative LOSs, PPEs not integrated with

28

Encompass, or alternative methods of performing the core origination-related functions for which they use PPEs in sufficient volumes to render the price increase unprofitable.

61. ███████████████████████████████████████████████████

████████████████████████████████████ Other PPE providers exist and have some sales on proprietary and non-Defendant LOSs, but none have more than ████████ among Encompass users.

**D.  The PPE Market**

62. The broader PPE market comprises the provision or license of all PPEs for residential mortgage loan origination.

63. As mentioned above with respect to the market for PPEs for users of ICE's Encompass, PPEs are products with peculiar characteristics and uses.  No other ancillary service can or does provide the functionality of PPEs.  Further, performing each of these functions manually and without the aid of a PPE introduces opportunities for human error.  According to an analyst presentation quoting the ███████████████ and considered by ███████████ ████████████████████████████████████████████████████████ ███████████████████████

64. PPEs are provided by specialized vendors.  PPEs are complex software systems that require sophisticated knowledge of the mortgage lending industry for their design and implementation.  Further, PPE vendors must maintain relationships and software integration with each customer's LOS to provide full functionality and automation to a lender.  Finally, PPEs for lenders who intend to sell their loans once originated must maintain relationships with investors whose pricing and eligibility requirements are incorporated into the PPE's pricing.  For these reasons, PPEs are provided by specialized software companies with mortgage industry expertise and relationships, such as ICE and Black Knight.

65. Industry participants, including Defendants, recognize PPEs as a distinct market and a separate economic entity in the ordinary course of their business.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

66.     A hypothetical monopolist of PPEs profitably could impose a SSNIP.  In response to a SSNIP, lenders would not switch to alternative methods to price, determine eligibility for, or lock residential mortgage loans in sufficient volumes to render the price increase unprofitable.

67.     Black Knight's Optimal Blue has long been the market leader among all PPEs.

**E.     The Relevant Geographic Market Is the United States**

68.     The United States is the relevant geographic market in which to assess the competitive effects of the Acquisition with respect to each of the relevant antitrust product markets.  LOS and PPE competition occurs at the national level, as lender customers frequently operate in more than one locale or nationwide.  Lenders tend to use a single LOS and a single PPE to originate all of their residential mortgages, whether they originate mortgages in only some states or in every state.  Because of the complex web of federal, state, and local regulations, lenders require LOSs and PPEs tailored specifically for use in originating residential mortgages within the United States and for residential properties within the United States.  While state and local regulations may vary, the underlying framework of the origination process is the same.  Industry participants also recognize the United States as a market with respect to LOSs and to PPEs.

## MARKET CONCENTRATION AND THE ACQUISITION'S PRESUMPTIVE ILLEGALITY

69.     The Acquisition will lead to significant increases in concentration in multiple markets that exceed the threshold for presumptive illegality.

70.     The 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") employ a metric known as the Herfindahl-Hirschman Index ("HHI") to assess market concentration.  The Merger Guidelines explain that an acquisition is presumptively unlawful if it leads to (i) a post-acquisition HHI above 2,500 points and (ii) an HHI increase of more than 200 points.

71.     The Home Mortgage Disclosure Act ("HMDA") requires financial institutions that originate a number of residential mortgage loans exceeding certain thresholds to maintain,

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

report, and publicly disclose loan-level information about their mortgages. The compiled HMDA data is used by lenders and regulators to evaluate loan volumes. Defendants regularly estimate and assess LOS market shares based on ███████████████████████████.

72.     Based on Defendants' ██████████████████████████████████ ██████, the Acquisition will result in a HHI for commercial LOSs above 5,000 points with an increase greater than 1,000 points, making the Acquisition presumptively illegal.

73.     In the broader LOS market, the Acquisition will result in a HHI above 2,500 points with an increase greater than 500 points, making the Acquisition presumptively illegal.

74.     In the market for PPEs for users of Encompass, the Acquisition will result in a HHI above 8,000 points, with an increase greater than 3,500 points, making the Acquisition presumptively illegal.

75.     In the broader PPE market, the Acquisition will significantly increase the concentration of firms and result in a combined market share exceeding 40%, making the Acquisition presumptively illegal.

## EVIDENCE OF REASONABLY PROBABLE ANTICOMPETITIVE EFFECTS

### A.     Anticompetitive Effects in LOS Markets

76.     There is a reasonable probability that the Acquisition will substantially lessen competition, or tend to create a monopoly, in both the U.S. market for commercial LOSs and the U.S. market for LOSs.

77.     ICE and Black Knight not only provide the two largest commercial LOSs in the United States; they are one another's closest competitors. Head-to-head competition between ICE and Black Knight manifests through competition to offer lower LOS prices and to deliver a rich set of LOS features.

78.     The Acquisition will eliminate this head-to-head rivalry. There is a reasonable probability that this diminished competition will increase the cost of originating mortgages (including the ultimate cost paid by homebuyers), stifle innovation, and reduce choice and quality of LOSs available across the United States.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### i. ICE and Black Knight Are Each Other's Closest Head-to-Head Competitors

79.     ICE and Black Knight each view the other as their closest competitor in the provision of LOSs to mortgage lenders.  Black Knight's former CEO and current chairman described Encompass developer Ellie Mae, just prior to its 2020 acquisition by ICE, as ████  ███████████████████████████████████████████  After ICE acquired Ellie Mae, Black Knight's CFO ██████: "In origination, I say Ellie Mae is our most significant competitor.  They have 40 plus percent market share.  We have low double digit."  Reacting to Black Knight's public projections that it anticipated gaining customers for Empower, ICE Mortgage Technology's President noted: ██████████████████████████████████ ████████████████████████████████  An internal 2021 ICE Encompass Business Review presentation ███████████████████████████████ ████████████████████  Defendants' rank-and-file employees also regularly ████████ ████████████████████.  For example, shortly after it was acquired by ICE, an Ellie Mae employee wrote in an internal e-mail that ████████████████████ ████████████████

80.     Ellie Mae, before its acquisition by ICE in 2020, prepared ████████████ ██████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████.

81.     ICE (and Ellie Mae as owner of Encompass before ICE) and Black Knight aggressively target the same customers.  As one Encompass account executive observed in 2019: ██████████████████████████████  Black Knight ██████ noted in preparation for a 2021 earnings call: ███████████████████████████████ ███████████████████████████████████

82.     When possible, Black Knight has tracked the █████████████████

█████████████████████████████

83.     ICE, for its part, has sought to attract the █████████████████

██████████████████     For example, one element of ICE's ██████████

████ , launched in response to █████████████████████████

██████████████████████████ . Because larger lenders are more likely to

require secondary market features such as loan trading, analytics, and hedging services, ████

█████████████████████████████████████

██████████████████████

84.     Black Knight maintains competitive tracking data that shows ██████████

██████████████████████████     Black Knight's ██████████

█████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

██████████████

**ii.   There Is a Reasonable Probability That the Acquisition Will Eliminate**

**LOS Price Competition Between ICE and Black Knight**

85.     The close head-to-head competition between Defendants' LOSs has benefited

their customers, including in the form of lower prices.

86.     Defendants offer discounts and price concessions to win or protect business from

one another.  For example, Black Knight offered ███████████████████████

███████████████████████████████████████

████████████████████████████████████     More recently,

ICE has █████████████████████████████████

███████████████████████████████████████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Black Knight ███████ has offered ███████████████████████████████████
███████████████████████████

87.    By removing competitive pressure from Black Knight, the Acquisition will eliminate ICE's need to consider Black Knight's pricing when setting list prices for its own Encompass LOS or to discount against Black Knight, freeing ICE to raise LOS prices aggressively.  When given the opportunity, ICE has demonstrated that it will act ████ ███████████████████████████ For example, ICE has ███████████████ ████████████████████████████████████████ ████████████████ and has succeeded in ████████████████████████ ███ ICE's enthusiasm for ████████ is evident in its internal documents, ████████████ ███████████████████████████████████████████ ████████████████████████████████████████ ███████████████████

1

2

3

4

5

6

7

8

9

10

11

### iii. There Is a Reasonable Probability That the Acquisition Will Eliminate Competition for LOS Features and Integrations

88.     Lenders use ancillary services to perform many of the functions involved with the mortgage origination workflow, such as point-of-sale systems for the borrower to directly input application information, PPEs for pricing and eligibility determinations, document services to coordinate the execution of forms, compliance services to track and ensure the lender's compliance with federal, state, and local regulations, and fee services to calculate and coordinate payment of the various fees associated with closing a property purchase.

89.     In addition to competing on price, ICE and Black Knight compete against each other to attract LOS customers by offering the best and broadest array of ancillary services integrated with their respective LOSs.

90.     Black Knight's acquisition of PPE providers Compass Analytics and Optimal Blue and integration of those products with Empower are examples of such feature competition. Black Knight believed that adding ████████████████████████████████ ████████████████████

91.     ICE similarly has sought to compete with Black Knight through the range of ancillary services available to Encompass users.  For instance, and as described in greater detail below, ICE ███████████████████████████████████████████████ ███████████████████.  ICE similarly views ████████████████████████ ████████████████████████████.

92.     By eliminating competitive pressure to provide a robust suite of ancillary services integrated with its LOS, the Acquisition will reduce ICE's incentive to build and improve its own ancillary service offerings.

**B.      Anticompetitive Effects in PPE Markets**

93.     There is a reasonable probability that the Acquisition will substantially lessen competition, or tend to create a monopoly, in both the U.S. market for PPEs for users of Encompass and the broader U.S. market for PPEs.

94.     ICE and Black Knight compete to offer the two most widely-used commercial PPEs in the United States.

95.     ICE's CFO described the leading positions of ICE and Black Knight when reacting to Black Knight's acquisition of Optimal Blue, explaining that when Ellie Mae evaluated potential acquisitions in the mortgage technology space, it considered three approaches: "[I]s it more valuable to just partner and do a rev[enue] share, or to build a competitive offering[,] or to take that competitive offering out through M&A[?]"  Before Black Knight acquired Optimal Blue, Ellie Mae had considered buying Optimal Blue itself.  However, as ICE's CFO noted to analysts on an investors conference call after the Black Knight-Optimal Blue acquisition, "Well, as it happens, we ultimately concluded why pay a massive multiple to buy that business when guess who the number two is?  Ellie.  Ellie is the number two in the product pricing engine, let's just build and make that better."

96.     After two years of working to challenge Black Knight's Optimal Blue by making EPPS better, however, ICE reconsidered.  ICE resolved, as phrased by its CFO, simply "to take that competitive offering out through M&A."  The result of the Acquisition thus will be not only

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

to consolidate ownership of the two leading PPEs in the United States, but also to put an end to ICE's efforts to bolster EPPS with new features and functionality.

**i.    There Is a Reasonable Probability That the Acquisition Will Eliminate Head-to-Head PPE Competition Between ICE and Black Knight**

97.    The Acquisition will eliminate significant head-to-head PPE price and feature competition between Defendants.  Indeed, it already has.  Since the announcement of the Acquisition, ICE has ███████████████████████████████████████ ██████████████████████████████████

98.    ICE and Black Knight are two of only a few competitors offering PPEs in what ICE has called ███████████████████.  Black Knight itself has participated in this trend toward industry consolidation and vertical integration.  Though Black Knight's Empower previously incorporated its own native PPE functionality, Black Knight also has acquired once-independent Compass Analytics and Optimal Blue, and has integrated those PPEs with Empower.

99.    Black Knight's Optimal Blue is the clear PPE market leader in the United States, serving lenders that originate as much as 40% of the nation's mortgages each year.

100.    Black Knight ████████████████████████████.  Black Knight's Optimal Blue is used in over ████ of PPE transactions processed through Encompass.

101.    ICE's EPPS comes in ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████.  ICE currently offers EPPS only to users of Encompass.

102.    In 2019, Black Knight personnel believed that ████████████████ ██████████████████████████████████████ ██████  Black Knight thus acquired PPE provider Compass Analytics in an effort to ██████████████████████████████████████

1

2

3  103.   In 2020, Black Knight further consolidated the PPE space when it acquired

4  Optimal Blue.  Optimal Blue was and is considered the premier PPE solution.  Black Knight

5  viewed the acquisition of Optimal Blue as an opportunity to further grow both LOS and PPE

6  share and to cross-sell its other origination-related services.

7  104.   Both before and after Black Knight's acquisition of Optimal Blue, competition

8  between Optimal Blue and EPPS has resulted in discounting and savings for mortgage lenders.

9  EPPS has typically                                              .  To sway Encompass users

10  who are on the fence about their PPE selection,

11                         Optimal Blue's CEO described

12

13                                            With regard to one specific lender

14  considering

15

16  And indeed,                                              .

17  105.   Optimal Blue's practice of pricing aggressively to compete against EPPS has

18  persisted up to and through its acquisition by Black Knight.  For example, in 2020, before Black

19  Knight acquired Optimal Blue, a lender

20  That lender                                          In response,

21  Optimal Blue                                    Since acquiring

22  Optimal Blue, Black Knight has continued

23      As recently as 2022, Black Knight offered a lender

24                                              ICE

25  responded

26

27

28

106.    After its acquisition of Optimal Blue, Black Knight also began to aggressively promote the integration of Empower and Optimal Blue as delivering superior accuracy and automation to lenders.  Black Knight's LOS sales teams began ███████████████████ ████████████████████████████████████.  Since the acquisition of Optimal Blue, the overwhelming majority of ███████████████████ ██████████████████████████  At the same time, Black Knight has █████████████████████████████████████.  In a 2021 earnings call, Black Knight's CEO touted the success of this "bidirectional . . . cross-selling."

107.    In response to Black Knight's acquisition of Optimal Blue, ICE ███████ ████████████████████████████████████ One way ICE planned to achieve this goal ███████████████████████ ██████████████████████████████████ ███████████  ICE also considered ██████████ ██████████████████████████████ ██████████████████████████████ ████████████████

108.    ██████████████████████████ ICE even considered ██████████████████████ ████████████████

109.    While ICE was working to ████████████████ ███████, it considered other ways to ████████████████ ██████████████████████████████ ████████████████████████  In particular, ICE strategized to enable ████████ ██████████████████████████████ ████████████████

110.    ICE continued work on the ████████████████████████████ ███████████████████████████████████████████████████████ In January 2022, ICE Mortgage Technology's President wrote that one of the company's ████████████ ███████████████████████████████████████████████████████. As recently as April 2022, ICE continued to ███████████████████, and planned to ████ ████████████████████████████████████

111.    However, on May 4, 2022, ICE announced its agreement to acquire Black Knight. ICE managers immediately discussed the ██████████████████████████████████████ █████████████   On the day of the Acquisition's announcement, ICE Mortgage Technology's Chief Operating Officer wrote ████████████████████████████████████████████████ █████████████   By August 2022, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████

112.    ████████████████████████████ illustrates not only the sort of lost feature and price competition that is likely to occur as a result of the Acquisition; it demonstrates that the Acquisition *already* has harmed, and will continue to harm, competition.  ICE has ████ ████████████████████████████████████████████████████████ in favor of simply ████████████████████████████████

113.    ICE anticipates certain ████████████████ from the Acquisition.  Rather than competing to provide more PPE features and lower PPE prices, as ICE did prior to agreeing to purchase Black Knight, ICE intends to use the Acquisition ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ ICE has projected that ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████  ICE anticipates ████████████████████████████████████████

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

27

1

2

3        **ii.   There Is a Reasonable Probability That the Acquisition Will Increase**

4               **ICE's Ability and Incentive to Foreclose Competition from Other PPE**

5               **Providers**

6       114.   In addition to eliminating head-to-head competition between the two dominant

7  PPE providers, the Acquisition will increase the likelihood that ICE will disadvantage competing

8  third-party PPE providers by technical means and by contract.  It also will contribute to an

9  existing trend toward concentration among PPEs and vertical integration of PPEs with LOSs.

10  Black Knight's acquisition of previously-independent Compass Analytics and Optimal Blue, and

11  integration of those PPEs with Black Knight's Empower, consolidated substantial PPEs with a

12  single LOS operator.  The Acquisition will further consolidate ownership of those PPEs with

13  ICE's EPPS, combining multiple formerly competing PPEs and LOSs under the ownership of a

14  single, dominant LOS provider.  As a result, there is a reasonable probability that the Acquisition

15  will harm competition by further increasing prices for PPEs and by reducing PPE options

16  available to lenders.

17        **a.   ICE Can Disadvantage PPE Competitors by Degrading or Restricting**

18             **LOS Integration**

19       115.   As previously discussed, mortgage lenders use PPEs to price residential mortgage

20  loans, determine a borrower's eligibility for a particular loan, and lock the loan.

21       116.   Lenders prefer PPEs that integrate with their LOSs.  An LOS-integrated PPE

22  allows a lender to perform mortgage-related tasks on a single system, rather than requiring the

23  lender to interact with an additional, wholly separate PPE system and interface.  LOS integration

24  also facilitates core back-end functions of PPEs, such as pricing and rate-locking, by enabling the

25  fast, reliable transfer of data between the LOS and PPE.  PPE providers thus rely on LOS

26  integration to market and operate their PPEs.

27

28

117.    ICE can disadvantage rival PPEs by not allowing them on its market-leading Encompass LOS.  And even for those PPEs that it chooses to integrate with Encompass, ICE has technological tools at its disposal to affect the nature and degree of each PPE's integration with Encompass.  ICE also possesses significant leverage in negotiations over the technical terms under which PPE providers integrate with Encompass.  Cognizant of these tools, ICE is in a position to pick winners and losers among the PPE providers integrated with its LOS—and to bar rivals from Encompass entirely.

118.    One recent example of ICE strategizing to pick winners and losers on Encompass through technological means involves ▮▮▮▮▮▮▮▮▮  In response to ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮  ICE developed ▮▮▮▮▮▮▮ that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮  An internal ICE presentation ▮▮▮▮▮▮▮▮▮▮:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

119.    Black Knight ▮▮▮▮ has used varying levels of integration with Empower to promote its own origination-related services while disadvantaging competing ancillary service providers who serve lenders on Empower.  One Black Knight executive described ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Black Knight also has ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮

120.    ICE has contractual means to disadvantage competing PPE providers.

121.    The lopsided bargaining position between ICE and third-party ancillary service providers has allowed ICE to ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ in some cases ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  For

example, before Black Knight acquired Optimal Blue, Optimal Blue was independent of an LOS. ██████████████████████████████. However, after Black Knight acquired Optimal Blue, ICE increased ███████████████ charged to Optimal Blue for serving users of Encompass.  These fees can hinder competing ancillary service providers' profitability and ultimately lead to higher origination and mortgage costs.

122.    In addition to charging high fees to its competitors, ICE can use contracts to control how PPE providers conduct business and interact with lenders.  For example, some ICE contracts ███████████████████████████████████ ICE also ███████████████████ ████████████████████████████████████ ████████

123.    Ellie Mae, developer of the Encompass LOS acquired by ICE in 2020, ████████ ████████████████████████████████ ███████████████████

███████████████████████████████
███████████████████████████████
███████████████████████████████

### b. Post-Acquisition, ICE Will Have a Greater Incentive to Foreclose Competition for PPEs

124.    The Acquisition will create a greater incentive for ICE to maximize its profits by disadvantaging competing PPE providers on Encompass and Empower, because ICE will stand to capture a greater proportion of revenue diverted from those providers.

125.    ICE currently receives ███████████████ from Black Knight's Optimal Blue and other third-party PPEs in connection with serving customers that use Encompass.  However, after the Acquisition, ICE will receive 100% of the revenue associated with use of Optimal Blue by users of Encompass and Empower.  In other words, for each customer that leaves a competing

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1    PPE provider for Optimal Blue *or* EPPS, ICE will go from receiving ███████████ from

2    its competitor to receiving 100% of the PPE revenue via its own PPEs.

3         126.    Optimal Blue not only claims ███████████ of the U.S. PPE market, but also

4    ███████████ of business from lenders who use Encompass.  Post-Acquisition, ICE will

5    control PPEs used to process over ████ of transactions on Encompass.  ICE therefore will be in a

6    position to capture a proportionally large share of any business lost by or diverted from other

7    PPE providers who serve customers using Encompass.

8         127.    Indeed, ICE's deal analysis documents █████████████████████

9    ████████████████████████████████████████████████████████

10   Because each customer typically █████████████████████████, ICE anticipates that

11   ████████████████████████████████████████████████████████

12   ███████████████████████

13        128.    Accordingly, as the new owner of Optimal Blue, ICE would stand to benefit by

14   gaining greater revenues than before the Acquisition as a result of disadvantaging PPE

15   competitors by raising price for, foreclosing access to, or otherwise complicating their

16   integrations with ICE's LOSs.

17        **C.    Anticompetitive Effects in Other Relevant Antitrust Markets for Ancillary**

18             **Services**

19        129.    ICE and Black Knight offer numerous ancillary services in addition to PPEs.

20   Many of these ancillary services, like PPEs, rely on LOS integration to conduct business with

21   their customers and for aspects of their technical functionality.  LOS integration therefore is a

22   critical input for many ancillary services.  The Acquisition, however, will increase ICE's ability

23   and incentive to foreclose competition for these services, whether through inferior LOS

24   integration, onerous contractual terms, denying LOS integration altogether, or other means.

25        130.    Both ICE and Black Knight are historically acquisitive companies.  ICE plans to

26   continue an industry trend toward consolidation and vertical integration by acquiring Black

27   Knight's various ancillary services to round out ICE's own offerings.  As ICE accumulates

28

additional ancillary services, its incentive to disadvantage third-party vendors will increase as its need to do business with third parties who currently provide those services to users of Encompass and Empower will diminish.

131.    The Acquisition also will increase ICE's incentive to disadvantage additional competing ancillary service providers by growing the revenue ICE stands to capture by diverting business to its own ancillary services from third-party providers across the broader range of services the combined firm will offer post-Acquisition.

132.    For example, Black Knight currently offers the Ernst fee service.  Fee services provide data and calculations relating to a wide array of mortgage, tax, and other fees to enable loan estimate and disclosure workflows in the mortgage origination process.  ██████████ ██████████████████████████████████████████ ██████████████████  ICE, on the other hand, does not currently offer a competitive fee service solution.  Rather, ICE and Encompass users rely on third-party fee service providers to fill this service gap.  Post-Acquisition, as owner of the Ernst fee service, ICE will gain an incentive to disadvantage third-party fee service providers serving customers who use Encompass today, and to divert their business to the Ernst fee service.

133.    Similarly, ICE currently offers the Mavent regulatory compliance service, one of the leading regulatory compliance services in the United States.  Black Knight offers the Regulatory Assist regulatory compliance service, ████████████████████ ████████  and most ████████████████████ ██████████████  ICE has ██████████████████████ ████████████████████  Post-Acquisition, ICE will gain the incentive and ability to ██████ disadvantage competing regulatory service providers who currently serve users of Black Knight's Empower, and to divert their business to Mavent.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1

## **LACK OF COUNTERVAILING FACTORS**

2
3      134.    New entry will not be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition in any relevant antitrust market.

4      135.    LOS entry will not replace LOS competition lost should the Acquisition proceed.
5   The development of a commercial LOS is lengthy and expensive, and unlikely to occur in a
6   timely manner to offset the competitive effects of the Acquisition in the market for commercial
7   LOSs or in the market for LOSs.  Black Knight itself has estimated that to develop a new
8   commercial LOS would cost at least ███████ and take at least ███████.

9      136.    Beyond the investment in engineering a new software platform, a new
10  commercial LOS also must provide or integrate with the ancillary services necessary for
11  residential mortgage loan origination.  Defendants estimate that ████████████████████
12  █████████████████████████████████████████████████.  On the
13  other hand, establishing partnerships with third-party ancillary service providers would require
14  those providers to invest time and resources in developing software integrations before the new
15  LOS even has any customers to make it worth the ancillary service providers' while.  As noted
16  by Black Knight's CFO, Black Knight's accumulated offerings and vendor partnerships serve as
17  a "key differentiator" for Black Knight.  A new entrant would lack this competitive advantage.
18  The difficulty in assembling the array of ancillary services necessary to offer a marketable LOS
19  thus poses a substantial barrier to entry.

20     137.    Any LOS entrant or existing LOS competitor seeking to reposition to replace
21  competition lost as a result of the Acquisition also must overcome lenders' high switching costs,
22  lengthy switching timelines, and general reluctance to switch to untested LOSs.  ICE has
23  estimated that a lender's cost of switching LOSs would be roughly ███████ in the first year.
24  Lenders also may be reluctant to switch to a new, untested LOS.

25     138.    Users of commercial LOSs are unlikely to develop their own proprietary LOSs in
26  numbers adequate to offset the anticompetitive effects of the Acquisition.  Developing or
27  acquiring a proprietary LOS is cost-prohibitive for all but the largest lenders and requires

28

1    specialized software expertise outside of the experience of most lenders.  Further, maintaining a

2    proprietary LOS requires compliance with a constantly evolving technological and regulatory

3    landscape; failing to ensure compliance poses significant risk for a lending institution.  Most

4    lenders, including some of the nation's largest lenders, therefore would not consider the use of a

5    proprietary LOS.

6          139.    Repositioning by lenders with proprietary systems is unlikely to offset

7    anticompetitive effects of the Acquisition.  Though some large lenders have implemented their

8    own internal LOSs, the investment needed to provide a commercial LOS for third parties is

9    greater, requiring the development of a software and sales-oriented organization that would

10   benefit little from a lender's core banking expertise.  Further, providing a proprietary LOS to

11   another lender would mean exposing one's own proprietary technology and operations to a

12   competitor.  Perhaps for these reasons, lenders with proprietary LOSs typically do not offer their

13   LOSs for use by other lenders.

14         140.    PPE entry or repositioning similarly is unlikely to replace competition lost as a

15   result of the Acquisition.  Developing a new PPE is a costly, lengthy process that will not restore

16   lost competition in a timely manner.  Black Knight has estimated that ████████████████████

17   ████████████████████████████████████████████ Nor is developing a

18   successful PPE simply a matter of making the necessary investment in technology.  Black

19   Knight's CEO noted on an earnings call that, though the "[t]echnology is easier to create,"

20   Optimal Blue's place in the market was "a very difficult thing to create," thus Black Knight

21   decided to acquire Optimal Blue rather than undertake the development of a comparable PPE.

22   Indeed, Black Knight already owned two PPE technologies—the Empower native PPE and

23   Compass Analytics—when it made the decision to acquire industry-leading Optimal Blue.  Even

24   with access to financial resources, a new PPE or a PPE seeking to reposition post-Acquisition

25   thus would face significant hurdles to commercial success.

26         141.    The Acquisition also will make entry by a PPE provider more difficult by

27   exacerbating a trend toward concentration and vertical integration, as well as increasing the need

28

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

34

for two-level entry.  Today, independent PPE providers are able to offer their products to lenders using Encompass via software integration between their PPEs and the LOS.  However, were ICE to acquire Optimal Blue, its incentive to foreclose or disadvantage competing PPE providers on Encompass would increase.  Because LOS-PPE integration is crucial to enable a PPE's full functionality, PPE providers unable to serve lenders on Encompass after the Acquisition may find themselves facing a heightened entry requirement of needing to offer an both an alternative LOS and an integrated PPE to attract customers.

142.    Further, as reflected in Black Knight's ███████████████████ ███████████████ and as recognized by ICE ███████████████ ███████████████████████████████████, a company offering both an LOS and a PPE can coordinate bundling and cross-selling to entice additional customers.  Because the Acquisition would increase ICE's ability to bundle and cross-sell its LOS and PPE offerings, entry by competing PPE providers who lack a similar capacity to bundle and cross-sell their own LOS and PPE combinations would become more difficult.

143.    Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to rebut the presumption and evidence of the Acquisition's likely anticompetitive effects.

**DEFENDANTS' PROPOSED REMEDY WILL NOT FIX**
**THE ACQUISITION'S ANTICOMPETITIVE EFFECTS**

144.    Black Knight has proposed divesting Empower as well as certain ancillary products—but *not* Optimal Blue—to Constellation Web Solutions, Inc. ("Constellation") in an attempt to remedy the anticompetitive effects of the merger.  This proposed remedy, which is conditioned upon the closing of the Acquisition and is subject to approval by Black Knight's shareholders, contemplates that, in addition to acquiring Empower, Constellation will act as a reseller for certain Black Knight ancillary services obtained by ICE through the Acquisition, including Optimal Blue.  In connection with this proposal, Defendants also have reduced the purchase price of Black Knight to approximately $11.7 billion.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

145.    Defendants cannot meet their burden of showing that the proposed remedy will restore competition.  The proposed remedy does not attempt to address the reasonably probable anticompetitive effects in the relevant PPE markets that will arise from ICE's acquisition of Optimal Blue.  Even with respect to the relevant LOS markets, the proposed remedy fails to provide Constellation with the ability, resources and incentive to replace the intensity of the competition between ICE and Black Knight.  Among other things, the proposed remedy fails to transfer a standalone business to Constellation and would require Constellation to rely on its post-Acquisition competitor, ICE, to supply many ancillary services to Empower customers via a resale agreement.  This arrangement would create a risk of continuing entanglements and conflict between ICE and Constellation, and it would limit the flexibility with which Constellation could innovate, discount, and offer the array of services Black Knight operates in conjunction with Empower today. Lenders and American consumers benefit from the competition between ICE and Black Knight, and they should not be forced to bear the risk of a divestiture that fails to maintain this competition.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

146.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding.  In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the equities, using a sliding scale.  The principal equity in cases brought under Section 13(b) is the public's interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interests cannot tip the scale against a preliminary injunction.

147.    The Commission is likely to succeed in proving that the effect of the Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

of the Clayton Act or Section 5 of the FTC Act, and that the Merger Agreement and Acquisition constitute unfair methods of competition in violation of Section 5 of the FTC Act.

148.    Preliminary relief is warranted and necessary.  Should the Commission rule, after the full administrative proceeding, that the Acquisition is unlawful, reestablishing the status quo would be difficult, if not impossible, if the Acquisition has already occurred in the absence of preliminary relief.  Allowing the Acquisition to close before the completion of the administrative proceeding would cause irreparable harm by, among other things, enabling the combined firm to begin altering Black Knight's operations and business plans, accessing Black Knight's sensitive business information, eliminating key Black Knight personnel, changing Black Knight's product development efforts, and divesting certain Black Knight assets to Constellation.  In the absence of relief from this Court, substantial harm to competition would occur in the interim, even if suitable divestiture remedies were obtained later.

149.    Accordingly, the equitable relief requested here is in the public interest. The Commission respectfully requests that the Court:

1.  Enter the parties' stipulated temporary restraining order and preliminarily enjoin Defendants from consummating the Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

2.  Retain jurisdiction and maintain the *status quo* until the administrative proceeding initiated by the Commission is concluded; and

3.  Award such other and further relief as the Court may determine is appropriate, just, and proper.

COMPLAINT FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Dated: April 10, 2023

Respectfully submitted,

/s/ Abby L. Dennis
_____

Of counsel:

ABBY L. DENNIS
Senior Trial Counsel

HOLLY VEDOVA
Director
Bureau of Competition

PETER RICHMAN
Assistant Director

PATTY BRINK
Acting Deputy Director
Bureau of Competition

ASHLEY MASTERS
Acting Deputy Assistant Director

SHAOUL SUSSMAN
Associate Director for Litigation
Bureau of Competition

Abigail Wood
Daniel Aldrich
Catherine Bill
Caitlin Cipicchio
Steven Couper
Kurt Herrera-Heintz
Janet Kim
Christopher Lamar
Laura Antonini
Lauren Sillman
Neal Perlman
Nicolas Stebinger
Nina Thanawala
Taylor Weaver

Attorneys

Bureau of Competition