1  Abby L. Dennis, DC Bar # 994476
   Peter Richman, CA Bar # 149107
2  Ashley Masters, TX Bar # 24041412
   Abigail Wood, DC Bar # 242239
3
   Federal Trade Commission
4  600 Pennsylvania Avenue, NW
   Washington, DC 20580
5  Tel: (202) 326-2381
6  *adennis@ftc.gov; prichman@ftc.gov;*
   *amasters@ftc.gov; awood@ftc.gov*
7
   [Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]
8
9              **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
10                **SAN FRANCISCO DIVISION**

11 **FEDERAL TRADE COMMISSION**,

12          Plaintiff,

13     v.                                   Case No. 3:23-CV-01710-AMO

14 **INTERCONTINENTAL EXCHANGE, INC.**       **PLAINTIFF FEDERAL TRADE**
                                             **COMMISSION'S MEMORANDUM OF**
15 and                                       **POINTS AND AUTHORITIES IN**
                                             **SUPPORT OF MOTION FOR A**
16 **BLACK KNIGHT, INC.**,                   **PRELIMINARY INJUNCTION**

17          Defendants.                      **REDACTED VERSION OF DOCUMENT**
                                             **SOUGHT TO BE SEALED**
18
19
20
21
22
23
24
25
26
27
28
   PLAINTIFF'S MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF MOT. FOR PRELIM. INJUNCTION
   CASE NO. 3:23-CV-01710-AMO

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 25, 2023, Plaintiff Federal Trade Commission ("FTC" or "Commission") shall move and hereby does move the Court for a preliminary injunction against Defendants Intercontinental Exchange, Inc. ("ICE") and Black Knight, Inc. ("Black Knight") pursuant to 15 U.S.C. § 53(b) and Civil L.R.7-2. Plaintiff respectfully requests that this Court issue a preliminary injunction that will preserve the status quo and prevent ICE from consummating its proposed acquisition of Black Knight ("Acquisition") while the Commission adjudicates whether the Acquisition is unlawful in an administrative proceeding. The Commission initiated the administrative proceeding regarding the legality of the Acquisition pursuant to §§ 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and § 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on March 9, 2023. The administrative hearing will begin on July 12, 2023. Plaintiff's motion is based on this Notice of Motion; the Memorandum of Points and Authorities in support filed concurrently; the declaration of Ashley Masters and the attachments thereto; all other pleadings on file in this action; and any other written or oral argument that the FTC may present to the Court.

## ISSUE TO BE DECIDED

Whether the Court should grant a preliminary injunction to preserve the status quo and prevent Defendants from consummating the Acquisition until the Commission has had an opportunity to adjudicate the Acquisition's legality in an administrative proceeding when (1) the Commission has found reason to believe that the Acquisition may substantially lessen competition, or tend to create a monopoly, in one or more relevant markets; (2) the FTC is likely to succeed on the merits; and (3) the balance of the equities favors the FTC.

TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ..................................................................... i

ISSUE TO BE DECIDED ........................................................................................ i

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 1

I.      INTRODUCTION ......................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................ 2

III.    ARGUMENT ................................................................................................ 4

        A.      The FTC Is Likely to Succeed on the Merits in the Administrative Proceeding .......... 5

                1.      The Acquisition Is Presumptively Illegal and Likely to Cause Anticompetitive Effects in the Markets for Commercial LOSs and All LOSs ........................................ 7

                        a)      Commercial LOSs and All LOSs Are Relevant Product Markets ........ 7

                        b)      The Acquisition Creates a Presumptively Illegal Increase in Concentration in the Relevant LOS Product Markets ........................ 10

                        c)      There Is a Reasonable Probability that the Acquisition Will Result in Anticompetitive Effects in the Relevant LOS Product Markets ..... 11

                2.      The Acquisition Is Presumptively Illegal and Reasonably Likely to Cause Anticompetitive Effects in the Relevant PPE Product Markets ........... 12

                        a)      PPEs for Encompass Users and All PPEs Are Relevant Product Markets ................................................................................. 12

                        b)      The Acquisition Creates a Presumptively Illegal Increase in Concentration in the Relevant PPE Product Markets ........................ 14

                        c)      There Is a Reasonable Probability that the Acquisition Will Result in Anticompetitive Effects in the Relevant PPE Product Markets ..... 15

                                i.      The Acquisition Will Eliminate Head-to-Head PPE Competition Between ICE and Black Knight ........................ 15

                                ii.     The Acquisition Will Increase ICE's Ability and Incentive to Foreclose Competition from Other PPE Providers ............. 19

                3.      Defendants Cannot Rebut Plaintiff's *Prima Facie* Case ............................ 22

                        a)      Defendants Cannot Demonstrate that the Proposed Divestiture Will Restore Competition in the Relevant Product Markets ............. 22

                                i.      The Divestiture Does Not Remedy Competitive Harms in PPE Markets ................................................................... 24

                                ii.     The Divestiture Conveys an Incomplete Business ................. 24

                                iii.    The Divestiture Would Create Ongoing Entanglements and Render Constellation Dependent Upon ICE ........................... 26

1

        iv.    The ███████ Purchase Price of the Divestiture Assets
            Reflects ████████████████ ..................................................... 27

      b)    Defendants Cannot Demonstrate that Entry Will Be Timely,
           Likely, and Sufficient to Counteract the Acquisition's
           Anticompetitive Effects ................................................................. 29

      c)    Defendants Cannot Establish Cognizable, Merger-Specific
           Efficiencies that Outweigh the Acquisition's Anticompetitive
           Effects ........................................................................................... 29

  B.     The Equities Support a Preliminary Injunction ......................................... 30

CONCLUSION.................................................................................................................... 30

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

**Cases**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................... 8, 12, 13, 19

*California v. Am. Stores Co.*, 872 F.2d 837 (9th Cir. 1989), *rev'd on other grounds*,
    495 U.S. 271 (1990)............................................................................... 6

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)........................................ 7, 23

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ................................... 4

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ....................... 14

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) .......................... 5

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ................................... 6

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ......................... 5, 6, 10, 30

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d. Cir. 2022) ................ 11

*FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2023 WL 2346238
    (N.D. Cal. Feb. 3, 2023) ................................................................. 8, 23

*FTC v. Nat'l Tea Co.*, 603 F.2d 694 (8th Cir. 1979) .......................................... 5

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020)...................... 30

*FTC v. ProMedica Health Sys. Inc.*, 3:11 CV 47, 2011 WL 1219281
    (N.D. Ohio Mar. 29, 2011) ................................................................. 30

*FTC v. Staples, Inc.*, 190 F. Supp. 3d 100 (D.D.C. 2016) ............................... 23

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) ............................ 23

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)............................... *passim*

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)................... 4, 5, 6, 30

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ................... 5, 6, 7, 9

*In re Illumina, Inc.*, Dkt. No. 9401, 2023 WL 2946882 (FTC Mar. 31, 2023) ............. 19, 23

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775
    (9th Cir. 2015) ......................................................................... *passim*

*Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991 (9th Cir. 2008) ............ 9

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ......................... *passim*

*United States v. Alum. Co. of Am.*, 377 U.S. 271 (1964) ................................. 7

*United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966
(N.D. Cal. Jan. 8, 2014) ............................................................................. 6, 29

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ........................................ 7

*United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316 (1961) ........................................ 23

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974) .................................................... 6, 7

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ................................................. 6, 14, 15

*United States v. UnitedHealth Grp. Inc.*, No. 1:22-CV-0481 (CJN), 2022 WL 4365867
(D.D.C. Sept. 21, 2022) ................................................................................. 23

**Statutes**

15 U.S.C. § 18 ........................................................................................... i, 4, 5

15 U.S.C. § 21 ................................................................................................... i

15 U.S.C. § 45 ................................................................................................... i

15 U.S.C. § 53(b) ........................................................................................... i, 4

**Other Authorities**

Antitrust Div., U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies
(2004) ................................................................................................... 24

Antitrust Div., U.S. Dep't of Justice, Policy Guide to Merger Remedies (2011) ........................ 28

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) .......... *passim*

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

    In 2021, Black Knight's Chief Financial Officer told analysts: "[W]e have one primary

4   competitor in each business. . . . In [o]rigination, it's ICE . . . ." PX2316 (Black Knight) at 56.

5   ICE now proposes to eliminate this competition by acquiring Black Knight. The combination of

6   these two giants of the mortgage origination software industry is likely to raise prices and

7   reduce choice for mortgage lenders, resulting in higher prices for American homebuyers.

8       ICE and Black Knight operate the two largest commercial mortgage loan origination

9   systems ("LOSs") in the United States, which are relied upon by residential mortgage lenders to

10  process their loan origination workflows. ICE and Black Knight also compete to provide an

11  array of ancillary services used by mortgage lenders with their LOSs. One key service is

12  product pricing and eligibility engine ("PPE") software used to price, determine eligibility for,

13  and lock mortgage loan rates. ICE's Encompass Product and Pricing Service ("EPPS") PPE

14  competes directly with Black Knight's industry-leading Optimal Blue PPE. As the two

15  dominant LOS and PPE providers in the United States, the increase in concentration alone

16  renders the Acquisition, on its face, presumptively illegal in multiple relevant product markets.

17      The anticompetitive effects of the Acquisition are far from hypothetical. ICE already has

18  begun ███████████████████████████████████████████████

19  ███████████ Since announcing the Acquisition, ICE has ███████████████████

20  ███████████████████████████████████████████. ICE has projected

21  █████████████████████████████████████████████████

22  ███████████████████████████████████████████████████

23  ███████████████████████████████. In other words, one of ICE's ███████

24  █████████████████████████████████████████████

25      In an eleventh-hour attempt to salvage this anticompetitive transaction, Defendants

26  arranged a ████████ of a portion of Black Knight's assets, including Empower, to third party

27  Constellation Web Solutions Inc. (together with its affiliates, "Constellation"). Defendants,

28

however, cannot satisfy their burden of establishing that this haphazard divestiture would cure the Acquisition's harms to competition. Most glaringly, because it does not include Optimal Blue, the proposed divestiture fails to address in any way the elimination of competition among PPEs that will result from the Acquisition. Further, Defendants' plan would split ownership of Black Knight's current offerings and put Constellation at the mercy of its most significant competitor, unable to compete with the intensity Black Knight does today. This might explain why ███████████████████████████████████████████████████████████████████
███████████████████. Defendants' proposed divestiture thus wholly fails to salvage the Acquisition.

Because the FTC is likely to succeed in establishing that the Acquisition is illegal, and because the balance of the equities weighs in favor of the public's interest in enforcement of the antitrust laws, the Court should grant Plaintiff's request for a preliminary injunction.

## II.   FACTUAL BACKGROUND

Mortgage lenders of all sizes rely on LOSs to organize and track their mortgage origination workflows. As a mortgage moves from application to close, it touches on tens to hundreds of ancillary services necessary to process, underwrite, fund, and close a loan. *E.g.*, PX0042 (ICE) at 18-19. Examples of such ancillary services include PPE, regulatory compliance, point-of-sale, fee, recording, title, and document handling services. The LOS coordinates and automates many of the interactions between lenders and these ancillary services. *E.g.*, PX6047 (Sahi (ICE) Dep.) at 25:7-27:10. The LOS also acts as a lender's system of record, assembling mortgage application information provided by a borrower and data returned to the LOS from ancillary services. PX6046 (Tyrrell (ICE) Dep.) at 17:20-24; PX6037 (█████████ (Blend) Dep.) at 18:17-19:17.

ICE's Encompass LOS is the largest LOS in the United States and processes ████████ of all mortgages originated across the nation each year. PX1046 (ICE) at 6. Black Knight's Empower LOS is the second-most-used commercial LOS. PX1046 (ICE) at 6. Although Black Knight ████████████████████████████████████████████████████████████████████
███████████████. PX2521 (Black Knight) at 10. ICE and Black Knight compete vigorously for the

LOS business of many of the same lender customers. *See* § III.A.1.c, *infra*.

ICE and Black Knight also compete to provide broad arrays of ancillary services in conjunction with their LOSs. Where they do not themselves develop a given service, Defendants may partner with third-party providers to integrate that service into their LOSs. *E.g.*, PX6046 (Tyrrell (ICE) Dep.) at 19:13-21:25. ICE or Black Knight alternatively may acquire ancillary service providers, over time resulting in a pattern of consolidation as Defendants acquire the services that they opt not to develop internally. *E.g.*, PX2522 (Black Knight) at 12; PX1694 (ICE) at 8. Black Knight's CFO described this approach on an earnings call: "[W]e've taken [our] business from being a loan origination system and a vendor network to really an end-to-end origination software suite, both through internal innovation as well as through acquisition . . . ." PX2316 (Black Knight) at 24.

PPEs provide an example of competition and consolidation in ancillary services. Mortgage lenders rely on PPEs to collect loan rates from investors, compare application data with loan requirements to determine a borrower's eligibility, and lock an interest rate for the borrower pending closing of the loan. *E.g.*, PX6021 (Lyons (ICE) Dep.) at 47:14-48:11. ███
██████████████████████████████████████████████████████████████
███████ Black Knight acquired the Compass Analytics PPE in 2019 (PX2313 (Black Knight) at 11), and the industry-leading Optimal Blue PPE in 2020 (PX2157 (Black Knight) at 4-5; PX2316 (Black Knight) at 43). ICE ███████████████████████████████████
████████████ responded by ████████████████████████████████████
█████████████████████████████████. *E.g.*, PX1116 (ICE) at 4, 7. However, in mid-2022, ICE determined that the best way to compete ██████████
███████████████████ was not to compete at all. On May 4, 2022, ICE announced its intention to acquire Black Knight for roughly $13.1 billion. PX1695 (ICE) at 1.

When it became clear in early 2023 that the FTC might challenge the Acquisition, ICE and Black Knight hastily arranged a sale of Black Knight's Empower LOS to Constellation, conditioned on closing of the Acquisition. PX4219 (Constellation) at 1; PX1696 (ICE) at 2-3.

1  ICE and Black Knight, however, refused to sell to Constellation many of the Black Knight-
2  owned ancillary services integrated with Empower today, including Optimal Blue, which will
3  force Constellation to rely on ████████ contracts with ICE to provide these services to
4  Empower customers. PX4097 (Constellation) at 100, 117-19. Although ICE previously ████
5  ████████████████████████████ (PX6042 (Clifton (ICE) Dep.) at 212:14-22) and
6  Defendants agreed to reduce their deal price by roughly $1.4 billion to account for the spinoff
7  (PX1697 (ICE) at 2), ███████████████████████████████████ (PX6029
8  (Wilhelm (Constellation) Dep.) at 72:17-21.

9  ## III.   ARGUMENT

10         This action involves a merger of the two dominant providers of mortgage origination
11  technology in the United States. Section 7 of the Clayton Act prohibits such transactions, where
12  the effect of the transaction "may be substantially to lessen competition, or to tend to create a
13  monopoly." 15 U.S.C. § 18. The Commission therefore has commenced an administrative
14  proceeding to adjudicate the legality of the Acquisition. The FTC seeks from this Court a
15  preliminary injunction to preserve the status quo until the administrative proceeding has run its
16  course, to preserve the Commission's ability to order effective relief and enforce the antitrust
17  laws of the United States.

18         Section 13(b) of the FTC Act "allows a district court to grant the Commission a
19  preliminary injunction '[u]pon a proper showing that, weighing the equities and considering the
20  Commission's likelihood of ultimate success, such action would be in the public interest.'" *FTC*
21  *v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting 15 U.S.C. § 53(b)). The
22  statute "places a lighter burden on the Commission than that imposed on private litigants by the
23  traditional equity standard." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir.
24  1984). "Under this more lenient standard, 'a court must 1) determine the likelihood that the
25  Commission will ultimately succeed on the merits and 2) balance the equities.'" *Affordable*
26  *Media*, 179 F.3d at 1233 (quoting *Warner Commc'ns Inc.*, 742 F.2d at 1160).

27         In weighing the equities under § 13(b), "public equities receive far greater weight" than

28

1  private concerns. *Warner Commc'ns Inc.*, 742 F.2d at 1165. These public considerations include

2  effective enforcement of the antitrust laws and ensuring the Commission's ability to obtain

3  adequate relief if it ultimately prevails on the merits. *Id.* Preliminary injunctions under § 13(b)

4  "are meant to be readily available to preserve the status quo while the FTC develops its ultimate

5  case." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008).

6  **A.      The FTC Is Likely to Succeed on the Merits in the Administrative Proceeding**

7          In evaluating the FTC's likelihood of success on the merits, the Ninth Circuit has

8  explained that the FTC satisfies its burden if it raises questions going to the merits adequate to

9  make them "fair ground for thorough investigation, study, deliberation and determination by the

10  FTC in the first instance and ultimately by the Court of Appeals." *Warner Commc'ns*, 742 F.2d

11  at 1162 (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 698 (8th Cir. 1979)). The Court's task "is

12  not 'to determine whether the antitrust laws have been or are about to be violated.'" *FTC v.

13  CCC Holdings Inc.*, 605 F. Supp. 2d 26, 67 (D.D.C. 2009) (quoting *Whole Foods Mkt.*, 548

14  F.3d at 1042 (Tatel, J., concurring)). "That adjudicatory function is vested in the FTC in the first

15  instance." *Id.* Rather, this Court is required only to consider the likelihood that "after an

16  administrative hearing . . . the Commission will succeed in proving that the effect of the

17  [proposed] merger 'may be substantially to lessen competition, or to tend to create a monopoly'

18  in violation of section 7 of the Clayton Act." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C.

19  Cir. 2001) (quoting 15 U.S.C. § 18).

20          "[A] section 7 violation is proven upon a showing of reasonable probability of

21  anticompetitive effect." *Warner Commc'ns*, 742 F.2d at 1160. In the merits proceeding—in

22  other words, the administrative proceeding—the FTC "must first establish a prima facie case

23  that a merger is anticompetitive." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.,

24  Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) ("*St. Alphonsus*"). The FTC may make this showing "by

25  establishing that the merger would produce a 'firm controlling an undue percentage share of the

26  relevant market, and results in a significant increase in the concentration of firms in that

27  market.'" *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at

28

*64 (N.D. Cal. Jan. 8, 2014) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963)). "Such a showing establishes a 'presumption' that the merger will substantially lessen competition." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015). This presumption of illegality will be dispositive unless Defendants "clearly show[]" that the Acquisition "is not likely to have such anticompetitive effects." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 497 (1974) (quoting *Phila. Nat'l Bank*, 374 U.S. at 363). If, and only if, Defendants make such a showing, the FTC may nevertheless carry its burden by presenting "additional evidence of anticompetitive effect." *Bazaarvoice, Inc.*, 2014 WL 203966, at *64 (quoting *H.J. Heinz Co.*, 246 F.3d at 715).

Under § 13(b), this Court's task is simply to determine the FTC's likelihood of success under this burden-shifting framework, *Sysco Corp.*, 113 F. Supp. 3d at 23, and "at this preliminary phase [the FTC] just has to raise substantial doubts about a transaction." *Whole Foods Mkt., Inc.*, 548 F.3d at 1036. Because the issue of whether the FTC has presented evidence to raise substantial doubts about the Acquisition is a "narrow one," the Court need not "resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *Warner Commc'ns Inc.*, 742 F.2d at 1164; *see also California v. Am. Stores Co.*, 872 F.2d 837, 841 (9th Cir. 1989) ("At this stage, we do not resolve conflicts in the evidence."), *rev'd on other grounds*, 495 U.S. 271 (1990). "[D]oubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (citing *Phila. Nat'l Bank*, 374 U.S. at 362-63).

Here, the FTC is likely to succeed at the administrative hearing in proving that the effect of the Acquisition may be substantially to lessen competition or to tend to create a monopoly. Although the standard at this preliminary stage requires only that the FTC raise "substantial doubts" about Defendants' Acquisition, the evidence here indicates that the Acquisition is in fact likely to lessen competition in the commercial LOS and all-LOS markets by combining the

1  two dominant LOSs in the United States.[1] *See United States v. Alum. Co. of Am.*, 377 U.S. 271,

2  273-77 (1964) (affirming holding that "insulated aluminum conductor" was a valid market, then

3  holding "bare and insulated aluminum conductor" also a valid broader market). The Acquisition

4  similarly is likely to lessen competition in the markets for PPEs for Encompass users and all

5  PPEs by combining ownership of the two leading PPEs in the United States. *See, e.g.*, *Ford*

6  *Motor Co. v. United States*, 405 U.S. 562, 570 (1972). Finally, by cementing ICE's dominant

7  LOS and PPE position, the Acquisition will increase ICE's ability and incentive to disadvantage

8  competing PPE providers who depend upon access to Encompass to serve their own customers.

9  Defendants thus cannot "clearly show" that the Acquisition "is not likely to have such

10  anticompetitive effects," *see Gen. Dynamics Corp.*, 415 U.S. at 497, let alone dispel the

11  "substantial doubts" raised by the ample evidence. *See Whole Foods Mkt.*, 548 F.3d at 1036.

12       **1.  The Acquisition Is Presumptively Illegal and Likely to Cause Anticompetitive**

13            **Effects in the Markets for Commercial LOSs and All LOSs**

14            **a)  Commercial LOSs and All LOSs Are Relevant Product Markets**

15       "Determination of the relevant product and geographic markets is a necessary predicate

16  deciding whether a merger contravenes the Clayton Act." *St. Alphonsus*, 778 F.3d at 783.[2] A

17  relevant product market consists of "products that have reasonable interchangeability for the

18  purposes for which they are produced—price, use and qualities considered." *United States v.*

19  *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). In defining relevant product

20  markets, courts evaluate "such practical indicia as industry or public recognition of the [relevant

21  market] as a separate economic entity, the product's peculiar characteristics and uses, unique

22  production facilities, distinct customers, distinct prices, sensitivity to price changes, and

23
24  [1] As discussed in § III.A.3.a *infra*, the Court should not consider the effect of Defendants' proposed divestiture until after it has determined that the FTC is likely to succeed in the administrative proceeding, although the divestiture is inadequate under any legal framework.

25  [2] There is no dispute that the appropriate geographic market is the United States. *See* PX1102
26  (ICE) at 57 ███████████████████████████████; PX0021 (Black Knight) at 63 ████████████
27  ████████████████████████████████████████.

28

specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *accord, e.g.*, *FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2023 WL 2346238, at *9 (N.D. Cal. Feb. 3, 2023). Courts also can look to quantitative evidence of interchangeability derived from the hypothetical monopolist test. *E.g.*, *Sysco Corp.*, 113 F. Supp. 3d at 27, 33-34. In this case, the *Brown Shoe* practical indicia and hypothetical monopolist test both reflect that markets comprising (1) commercial LOSs and (2) all LOSs are appropriate product markets in which to evaluate the Acquisition.

Both commercial LOSs, and LOSs more generally, are products with peculiar characteristics and uses. LOSs are complex software systems on which lenders rely as their system of record and to coordinate their workflows with the many ancillary services they use in connection with loan origination. PX6046 (Tyrrell (ICE) Dep.) at 17:20-18:9, 23:4-13; PX6047 (Sahi (ICE) Dep.) at 25:7-26:4. As such, LOSs process large volumes of data and must evolve to keep pace not only with technological developments, but also with changes to the myriad regulations that affect mortgage lending across the United States. PX6046 (Tyrrell (ICE) Dep.) at 129:2-132:7; PX2022 (Black Knight) at 8. No other software serves the same purpose. PX6043 (████ (Polly) Dep.) at 116:19-117:17. ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████ Industry participants, including Defendants, routinely recognize LOSs as a distinct market in the ordinary course of their business. *E.g.*, PX2525 (Black Knight) at 7; PX1706 (ICE) at 2.

Most mortgage lenders rely on commercial LOSs, rather than LOSs they have developed themselves ("proprietary LOSs"). PX2022 (Black Knight) at 8. Firms such as ICE and Black Knight specialize in developing, optimizing, and maintaining LOSs. *E.g.*, PX2523 (Black Knight) at 3; PX6046 (Tyrrell (ICE) Dep.) at 128:18-132:19. ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████. As Black Knight itself has recognized:

1

2   ████████████████████████████████████ PX2316 (Black Knight) at 221. The

3   trend even among the few lenders with the resources to operate a proprietary system has been to

4   move toward commercial LOSs. PX1709 (ICE) at 8; PX6046 (Tyrrell (ICE) Dep.) at 67:7-68:2.

5   In practical terms, that most mortgage lenders rely on commercial LOSs reflects that these

6   customers have unique needs and preferences satisfied by commercial LOSs. *See, e.g.*, *Whole*

7   *Foods Mkt.*, 548 F.3d at 1037-40 ("In short, a core group of particularly dedicated distinct

8   customers paying distinct prices may constitute a recognizable submarket.").

9          Further, both the commercial LOS market and the broader market for all LOSs satisfy

10   the hypothetical monopolist test. This test asks whether a hypothetical monopolist of products

11   within a proposed market could profitably impose a small but significant and nontransitory

12   increase in price ("SSNIP"). Merger Guidelines § 4.1.1[3]; *see also Theme Promotions, Inc. v.*

13   *News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008). As discussed in the expert report of

14   Dr. Seth Sacher, because of the challenges associated with developing and operating a

15   proprietary LOS, a SSNIP by a hypothetical monopolist of commercial LOSs would not be

16   defeated by lenders switching to proprietary LOSs. PX8000 (Sacher (FTC) Rep.) ¶¶ 154-59.

17   Consistent with this conclusion, ████████████████████████████

18   ████████ (PX1711 (ICE) at 5; PX2319 (Black Knight) at 7) ████████████████

19   ████████████████. *E.g.*, PX6046 (Tyrrell (ICE) Dep.) at 36:17-24; PX1096 (ICE)

20   at 13. Similarly, because mortgage lenders lack an adequate substitute for LOSs, a hypothetical

21   monopolist of LOSs could profitably impose a SSNIP, such that the broader market for all

22   LOSs constitutes a relevant antitrust market. PX8000 (Sacher (FTC) Rep.) ¶¶ 129-146.

23

24   ─────────────────

25   [3] The U.S. Department of Justice and FTC Horizontal Merger Guidelines ("Merger Guidelines") outline the principal analytical techniques, practices, and enforcement policy to be applied with

26   respect to mergers and acquisitions involving competitors under the federal antitrust laws. The Merger Guidelines apply in FTC administrative proceedings and are persuasive authority in

27   federal court. *E.g.*, *St. Alphonsus*, 778 F.3d at 784 n.9.

28

### b) The Acquisition Creates a Presumptively Illegal Increase in Concentration in the Relevant LOS Product Markets

In assessing a proposed merger's effects on competition, courts commonly employ a statistical measure of market concentration called the Herfindahl-Hirschman Index ("HHI").[4] "Mergers that increase the HHI more than 200 points and result in highly concentrated markets are 'presumed to be likely to enhance market power.' Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive." *St. Alphonsus*, 778 F.3d at 786 (quoting Merger Guidelines § 5.3 and *H.J. Heinz,* 246 F.3d at 716).

███████████████████████████████████████████, the best measure of LOS market share is Home Mortgage Disclosure Act ("HMDA") reporting data. *See, e.g.*, PX1091 (ICE) at 1 ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████); PX6026 (Moe (ICE) Dep.) at 69:22-25, 72:13-20; PX2319 (Black Knight) at 7.[5] ██████████████ estimates of LOS shares based on HMDA loan counts place ICE's share of the commercial LOS market ███████ and its share of the LOS market ████████ PX1046 (ICE) at 6; PX2319 (Black Knight) at 7; PX8000 (Sacher (FTC) Rep.) Tables 9-12. Black Knight's share of the commercial LOS market ████████ and its share of the LOS market is ████████ PX1046 (ICE) at 6; PX2319 (Black Knight) at 7; PX8000 (Sacher (FTC) Rep.) Tables 9-12.

Based on HMDA data and Defendants' own documents, the Acquisition will result in an

---

[4] "HHI is 'calculated by summing the squares of the individual firms' market shares,' which 'gives proportionately greater weight to the larger market shares.'" *St. Alphonsus*, 778 F.3d at 786 (quoting Merger Guidelines § 5.3). An HHI of below 1,500 represents an unconcentrated market; between 1,500 and 2,500 represents a moderately concentrated market; and over 2,500 represents a highly concentrated market. Merger Guidelines § 5.3.

[5] HMDA requires financial institutions that originate a number of mortgage loans exceeding certain thresholds to maintain, report, and publicly disclose loan-level information about their mortgages. *See generally About HMDA*, Consumer Fin. Protection Bureau, https://www.consumerfinance.gov/data-research/hmda/ (accessed May 31, 2023).

HHI of at least ██████ and an increase of at least ██████ points in the commercial LOS market. PX8000 (Sacher (FTC) Rep.) Tables 11-12. In the broader all-LOS market, the Acquisition will result in an HHI of at least ████ and an increase of at least ██ points. *Id*. at Tables 9-10. In both markets, the Acquisition therefore leads to a highly concentrated market and a presumption of illegality. *See St. Alphonsus*, 778 F.3d at 786; Merger Guidelines § 5.3.

### c) There Is a Reasonable Probability that the Acquisition Will Result in Anticompetitive Effects in the Relevant LOS Product Markets

The presumption of illegality based on market concentration for the relevant LOS product markets is reinforced by ample evidence demonstrating that the Acquisition will eliminate head-to-head LOS competition that benefits Defendants' customers today. *See, e.g.*, *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 173 (3d. Cir. 2022).

ICE and Black Knight each view the other as ████████████████████. Black Knight's former CEO and current chairman described Encompass developer Ellie Mae, just prior to its 2020 acquisition by ICE, as ████████████████████████████████ ██████████████ PX2033 (Black Knight) at 19; *see also* PX6033 (Larsen (Black Knight) Dep.) at 39:21-40:7; PX6053 (Eagerton (Black Knight) Dep.) at 105:19-106:5. That head-to-head competition between Encompass and Empower has resulted in concrete benefits to specific LOS customers. *See, e.g.*, PX1077 (ICE) at 10-11 (████████████████████ ████████████████████████████████████); PX1012 (ICE) at 4 (████████████ ████████████████████████████); PX1059 (ICE) at 2 (████████████████████ ████████████████████████████); *see also, e.g.*, PX2524 (Black Knight) at 2-3. The combination of ICE and Black Knight will eliminate this direct, frequent, head-to-head competition to provide better prices, features, and options for their LOS customers.

The diminished competitive pressure on ICE post-Acquisition also will allow it to act more freely on ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████

1    ███████. PX1096 (ICE) at 9-13. ██████████████████████████████████

2    ███████████████████ PX1096 (ICE) at 13; PX6046 (Tyrrell (ICE) Dep.) at 34:15-18, 36:7-24.

3    ICE's enthusiasm for ████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████████████████████

5    ████████████████████ PX1365 (ICE) at 10-11. ████████████████████████

6    ██████████████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████████████████████

8    ██████████████████████████████████████

9          In sum, the Acquisition is presumptively illegal because of the increase in concentration

10   in the commercial LOS and all LOS markets. Beyond this presumption, the Acquisition will

11   eliminate head-to-head LOS competition that directly benefits Defendants' customers today.

12          **2.  The Acquisition Is Presumptively Illegal and Reasonably Likely to Cause**

13              **Anticompetitive Effects in the Relevant PPE Product Markets**

14          **a)  PPEs for Encompass Users and All PPEs Are Relevant Product Markets**

15          The markets for PPEs for Encompass users and all PPEs both exhibit multiple *Brown*

16   *Shoe* practical indicia. Market participants recognize PPEs as a distinct product with peculiar

17   characteristics and uses. *See* PX7007 ███████████████████████████████████████

18   ██████████████████████████████████████████████████████████ Mortgage

19   lenders use PPEs to determine how to price a mortgage and to lock the mortgage. PX6026 (Moe

20   (ICE) Dep.) at 122:4-10. First, a loan officer or borrower inputs the borrower's financial,

21   property, and other application data via an LOS, POS, or PPE interface. The PPE then analyzes

22   that data and returns products (i.e., mortgage terms, such as fixed or adjustable rates for

23   different terms) and prices (i.e., interest rates) for which the borrower is eligible. PX6035

24   ██████████████████████████████████; PX6038 ████████████████████████████

25   ████. Once a borrower has settled on mortgage terms, the loan officer can use the PPE to lock in

26   the interest rate pending closing of the underlying real estate transaction. PX6021 (Lyons (ICE)

27   Dep.) at 47:22-48:18. Part of PPEs' value proposition is that they "████████████████████████

28

██████████████████████████████████████████████████

███████████." PX6013 (Happ (Black Knight) IH) at 49:25-50:22, 52:22-53:2.

Other *Brown Shoe* indicia support the market for PPEs for users of ICE's Encompass

LOS. Software integration between a PPE and a lender's chosen LOS enables a PPE's full

functionality, enabling loan and application data to flow automatically between an LOS, PPE,

and other ancillary services. PX6021 (Lyons (ICE) Dep.) at 32:25-33:16; PX6025 (Anderson

(Black Knight) Dep.) at 68:25-70:1; PX6007 (████ (LenderPrice) IH) at 147:19-149:12.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

Integrating a PPE with an LOS, however, is a significant software engineering

undertaking that can ██████████████. *See* PX1701 (ICE) at 1. ███████████████

██████████████████████████████████████████████████

█████████████████████████████████. And, because the cost of switching LOSs is so

high (as described at § III.A.3.b *infra*), ████████████████████████████████

████████████████████████████████████████. PX1698 (ICE) at 3-

5. In other words, ██████████████████████████████████████

█████████████████████████████████████████.

PPEs integrated with Encompass thus exhibit peculiar characteristics and uses—namely

offering the functionality of a PPE and integration with Encompass—and are furnished by a

limited selection of specialized vendors integrated with Encompass, which supports a finding

that PPEs for users of Encompass constitute a relevant product market. *See Brown Shoe Co.*,

370 U.S. at 325. Indeed, ██████████████████████████████████

██████████████████████████████████████████████████

███████████████████. PX1640 (ICE) at 8.

The hypothetical monopolist test confirms that PPEs for users of Encompass constitute a relevant product market. ███████████████████████████████████████████████████████ ████████████████████████████ Thus, in the event of a SSNIP for PPEs for users of ICE's Encompass LOS, lenders would not switch to alternative LOSs, PPEs not integrated with Encompass, or alternative methods of performing the core origination-related functions for which they use PPEs in sufficient volumes to render the price increase unprofitable. PX8000 (Sacher (FTC) Rep.) ¶¶ 202-215. Likewise, in the event of a SSNIP on all PPEs by a hypothetical monopolist, lenders would not switch to alternate methods of pricing and locking loans in sufficient numbers to render the price increase unprofitable. *Id.* ¶ 201; *see also* PX6044 (Wester (Black Knight) Dep.) at 65:2-8. Qualitative evidence supports this result: Industry participants, including Defendants, recognize the PPE market as a distinct market in the ordinary course of their business. *See, e.g.*, PX1166 (ICE) at 42; PX2259 (Black Knight) at 8.

### b)  The Acquisition Creates a Presumptively Illegal Increase in Concentration in the Relevant PPE Product Markets

"[A] merger which significantly increases the share and concentration of firms in the relevant market is 'so inherently likely to lessen competition' that it must be considered presumptively invalid and enjoined in the absence of clear evidence to the contrary." *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 52 (D.D.C. 1998) (quoting *Phila. Nat'l Bank*, 374 U.S. at 363). In *Philadelphia National Bank*, the Supreme Court wrote: "Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." 374 U.S. at 364.

The PPE market shares at issue take this case well beyond the thresholds discussed in *Philadelphia National Bank*, and lead to a clear presumption of illegality. ██████████████ █████████████████████████████████████████████████████████████████████ PX1042 (ICE) at 8, 10; PX6046 (Tyrrell (ICE) Dep.) at 71:22-72:25. ███████████████████████ Optimal Blue commands a ████████████████████ on Encompass and ICE's EPPS claims ███████. *See* PX8000 (Sacher (FTC) Rep.) ¶¶ 259-62 & Table 15; *accord* PX1270 (ICE) at 1

("███████████████████████████████

█████"). These shares result in a combined post-Acquisition market share of ████ with an

HHI over ████ and an increase of more than ████ points (PX8000 (Sacher (FTC) Rep.)

Table 15), far in excess of the thresholds that create a presumption of enhanced market power

and illegality. *See St. Alphonsus*, 778 F.3d at 786, 788; Merger Guidelines § 5.3.

The same is true of the broader market for all PPEs, where Black Knight estimates that

its Optimal Blue boasts a ████ market share. PX2311 (Black Knight) at 5. Although EPPS is

available only to users of Encompass, Encompass's dominance combined with ████████████

████████████████████████████████ in an all-PPE

market. PX1166 (ICE) at 42. Defendants' combined post-Acquisition PPE market share thus

significantly exceeds the combined shares found sufficient to trigger a presumption of undue

concentration and illegality under *Philadelphia National Bank* and its progeny.

### c)   There Is a Reasonable Probability that the Acquisition Will Result in Anticompetitive Effects in the Relevant PPE Product Markets

#### i.   The Acquisition Will Eliminate Head-to-Head PPE Competition Between ICE and Black Knight

Defendants cannot rebut the presumption that the increase in PPE concentration

resulting from the Acquisition will harm competition. To the contrary, the Acquisition will

eliminate significant, head-to-head PPE competition that benefits Defendants' customers today.

This reduction in competition not only will affect the choice and quality of PPEs in the future—

it already has. ████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

ICE and Black Knight are two of few competitors offering PPEs in what ICE has called

a space that is "████████████" due to acquisitions and consolidation. PX1640 (ICE) at 6.

Since 2019, Black Knight has driven this consolidation through its acquisitions of the

1  previously independent Compass Analytics and Optimal Blue PPEs. PX0021 (Black Knight) at

2  108. The Acquisition would result in combining under one owner the PPEs currently used in

3  roughly ███ of transactions on Encompass. *See* PX1640 (ICE) at 8.

4         The PPE competition between ICE and Black Knight that the Acquisition will eliminate

5  concretely benefits their customers today. *See, e.g.*, PX6039 (Happ (Black Knight) Dep.) at

6  98:5-14. Defendants' documents reflect ███████████████

7  ███████████████, which has resulted in ███████ and other value for lenders. For

8  example ███████████████

9  ███████████. In 2021, ICE informed ███████████████

10 ███████████████████ In response, ███████

11 ███████████████████. To retain

12 ███████████████████████

13 ███████████████████

14 ███████████ *see infra* at 17-18—███████████████

15 ███████████████████

16 ███████████[6]

17        ███ provides another example of ███████████ between ICE and Black

18 Knight. In August 2021, a Black Knight business development manager asked ███████

19 ███████████████████████"

20 PX2212 (Black Knight) at 2. ███ responded that Black Knight would need to "███████

21 ███████" *Id.* Optimal Blue's VP of Sales wrote to the manager: "███████

22 ███████" *Id.* at 1. ███████████████

23 ███████████████. *Id.* at 2; PX2218 (Black Knight) at 12. Although

24 _____

25 [6] ███████████████████████

26 ███████████████████████

27 ███████████████████

28

1   ██████████████████, ICE personnel hoped that "████████████████" during

2   ██████████████████ might ultimately "████████████████."

3   PX1236 (ICE) at 2.

4          Additional examples of head-to-head PPE competition between ICE and Black Knight

5   abound, demonstrating that competitive pressure each Defendant asserts on the other has a real,

6   significant, and beneficial effect on the terms under which lenders can obtain PPE services.[7]

7   Consistent with this direct evidence of head-to-head competition, ████████████████

8   ██████████ analyzed by the FTC's economic expert ████████████████

9   ████████████████ PX8000 (Sacher (FTC) Rep.) ¶¶ 433-

10   37. ██████████████, Dr. Sacher modeled that PPE prices for Encompass users

11   may increase ██████████ post-Acquisition due to the elimination of competition between

12   EPPS and Optimal Blue, depending on the methodology and assumptions applied. *Id.* ¶¶ 32-38.

13          The Court need not look to economic modeling to understand the competitive harm

14   posed by the Acquisition, however. The loss of competitive pressure on ICE has already

15   manifested in ████████████████. In mid-2020, Black Knight

16   acquired Optimal Blue, ████████████████

17   ██████████. PX1553 (ICE) at 8-10. In response, ████████████████

18   ████████████████" (PX1556 (ICE) at 1), to

19   "████████████████" from Black Knight. PX1553 (ICE) at 10. One pillar

20   of ████████████████

21   ████████████████

22   ██████████. PX1553 (ICE) at 15-19; PX1116 (ICE) at 4;

23   PX6036 (Roberts (ICE) Dep.) at 91:17-93:23; PX6045 (Connors (ICE) Dep.) at 46:5-8; PX6047

---

[7] Additional examples of PPE competition between EPPS and Optimal Blue involving ████
████████████: ████████ (PX2131 (Black Knight) at 1-2;
PX2123 (Black Knight) at 1-2); ████████ (PX2098 (Black Knight) at 1-5; PX2509
(Black Knight) at 1-2); ████████ (PX2092 (Black Knight) at 1-2); and ████████
████ (PX2094 (Black Knight) at 1-2).

1   (Sahi (ICE) Dep.) at 91:16-92:16; PX6027 (Davis) (ICE) Dep.) at 49:23-50:10. Beginning in

2   2021, ████████████████████████████████████████████████████████████

3   ███████████████████████████████. PX1116 (ICE) at 7; PX1588 (ICE) at 4;

4   PX6027 (Davis (ICE) Dep.) at 55:22-56:3. ████████████████████████████

5   ██████████████████████████████████████████████████████

6   ████████████████████ (PX1238 (ICE) at 1), and ████████████████

7   ████████████████████████████████████████████████████████

8   ████ (*e.g.*, PX1718 (ICE) at 1; PX6035 (████████████████████████).

9           ████████████████████████████████████   On May 4, 2022—the

10   day ICE announced its agreement to acquire Black Knight—the Chief Operating Officer of

11   ICE's Mortgage Technology division wrote ████████████████████████████

12   ████." PX1267 (ICE) at 2. ████████████████████████████████████████

13   PX6027 (Davis (ICE) Dep.) at 55:22-56:3, 56:18-57:2, 57:8-13. By October 2022, ████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████   PX1588 (ICE) at 3;

16   *see also* PX1096 (ICE) at 42; PX1241 (ICE) at 1. ██████████████████████████

17   illustrates the feature and price competition already lost as a result of the Acquisition.

18           ████████████████████   further illustrate that price increases resulting from reduced PPE

19   competition are not speculative. ████████████████████████████████

20   ██████████████████  ██████████████████████████  ██████████████

21   ██████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   PX1102 (ICE) at 91 (citing PX1100 (ICE)). This █████ relies on an assumption that, ████

24   ████████████████████████████████████████████████████████

25   ████████████████████████. PX1100 (ICE) at 4; PX6046 (Tyrrell (ICE) Dep.) at

26   141:20-142:13 (discussing PX1100 (ICE)). In other words, ██████████████████████

27   ██████████████████████████████████████████████. ████████████████

28

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████████████

3       In light of the evidence of head-to-head PPE competition that will cease to exist post-

4  Acquisition, coupled with ████████████████████████████████████████

5  ████████████████████, Defendants cannot overcome the presumption of competitive

6  harm from the consolidation of the markets for PPEs for Encompass users and all PPEs.

7                  **ii.**    **The Acquisition Will Increase ICE's Ability and Incentive to Foreclose**

8                       **Competition from Other PPE Providers**

9       The Acquisition is also likely to harm competition in the relevant PPE markets because

10 it will increase ICE's ability and incentive to disadvantage competing third-party PPE

11 providers. *In re Illumina, Inc.*, Dkt. No. 9401, 2023 WL 2946882 at *35, *39-43 (FTC Mar. 31,

12 2023) (examining "whether a transaction is likely to increase the ability and/or incentive of the

13 merged firm to foreclose rivals" from critical inputs). It also will contribute to an existing trend

14 toward concentration among PPEs and vertical integration of PPEs with LOSs. *Brown Shoe Co.*,

15 370 U.S. at 331-32 (evidence of a "trend towards concentration in the industry" or a "trend

16 towards vertical integration" can be "important factor[s]" when assessing a merger with vertical

17 implications). Black Knight's acquisitions of Compass Analytics and Optimal Blue, and

18 integration of those PPEs with Empower, consolidated major PPEs under a single LOS

19 operator. PX2316 (Black Knight) at 43; PX1640 (ICE) at 6, 8. The Acquisition will further

20 consolidate the PPE market, combining multiple formerly competitive PPEs (Compass, Optimal

21 Blue, and EPPS) under ICE's ownership.

22      As discussed *supra* § III.A.2.a, PPEs depend on LOS integration to automate and enable

23 aspects of PPE functionality. Via the LOS, PPEs retrieve lender and mortgage application data,

24 search for rates, return results to the LOS or their customers, and lock a loan. PX6007 (███

25 (LenderPrice) IH) at 147:19-149:12. ████████████████████████████████

26 ████████████████████. PX6048 (████████████████████████

27 ████████████████████████████████████████. Indeed, in

28

1   response to ████████████████████████████████████████████████████

2   ████████████████████████████████████████████████████████ (*e.g.*,

3   PX1700 (ICE) at 2; PX1132 (ICE) at 1). These and the other third-party PPE providers

4   integrated with Encompass today ████████████████████████████████████████████

5   ████████████████████ PX6007 (████████████████████████████████████████

6   After acquiring Black Knight and Optimal Blue, however, ICE's ███████████████████

7   ███████████████████████████████████████, freeing ICE to disadvantage competing

8   PPEs that rely on integration with Encompass.

9        ICE currently possesses the technical ability to disadvantage competing PPEs integrated

10   with Encompass. For example, in the aftermath of ████████████████████████████,

11   ICE strategized to ████████████████████████████████████████████

12   ████████████████████████. PX1553 (ICE) at 11; *see also* PX1704 (ICE) at 2

13   ("████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ██████████████████████████████████████████. PX1132

16   (ICE) at 1 ("████████████████████████████████████████████████

17   ████████████████████████████████████."); PX1452 (ICE) at 1

18   (discussing ICE outreach to lender ████████████████, and scheduling call "███████

19   ████████████████████████████████"); PX1411 (ICE) at 2).

20        ICE also has contractual levers to disadvantage competing PPEs who rely on Encompass

21   integration. For example, ICE can increase the transaction fees or revenue shares it charges to

22   PPE providers for integration. Indeed, after the ████████████████████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████. PX1224 (ICE) at

25   1-2; PX6046 (Tyrrell (ICE) Dep.) at 140:25-141:3. Raising fees and revenue shares to PPE

26   providers affects their bottom lines and ability to reinvest into their services. The higher costs

27   may ultimately affect whether ████████████████████████████████████████

28

1   ██████████████████████████████████████████. *E.g.*, PX6043 (████████████████)

2   █████████████; PX6007 (███████████████████████████. For their part, because PPE

3   providers ██████████████████████████████████████████████

4   ████████████████████. *E.g.*, PX6007 (████████████████████████████

5   ████████████████████████████████████████

6   █████████████████); PX6043 (███████████████████████[8]

7       Until this point—aside from its reaction to ████████████████████—

8   ICE has ██████████████████████████████████████. The reason is

9   simple: ████████████████████████████████████████████.

10  ████████████████████████████████████████████. By eliminating

11  Black Knight's Optimal Blue as a competitive threat, however, the Acquisition will remove the

12  current competition that has motivated ICE to █████████████████████. As post-

13  Acquisition owner of Optimal Blue, which includes a broader range of PPE features in addition

14  to secondary market and hedging tools, ICE will have █████████████████████

15  ██████████████████████████████████   Rather, ICE will be free to disadvantage or

16  even wholly foreclose LOS integration to competing PPE providers and divert competitors'

17  business to Optimal Blue. In fact, ICE's █████████████████████████████

18  ████████████   *See* § III.A.2.c.i *supra*; PX1102 (ICE) at 91 (citing PX1100 (ICE) at 4). ICE's

19  ███████████████████████████████████████████████████

20  ███████████████████████████████████████████████████

21  ███████████████████████████████████████████████████

22

23  ────────────────────────

    [8] Post-Acquisition, ICE also may disadvantage competing PPE providers through other onerous
    contractual terms. For example, ██████████████████████████████████████

24  ███████████████████████████████████████. *E.g.*, PX1705 (ICE) at 2;
    PX2526 (Black Knight) at 15. As ICE's personnel have recognized, ████████████████

25  █████████████████████████. PX1026 (ICE) at 7 (██████████████████

26  ██████████████████████████████). ICE also has ████████████

27  ███████████████████████. PX6043 (████████████████████████████████.

28

████████       *See* PX6046 (Tyrrell (ICE) Dep.) at 141:20-142:6 (discussing PX1100 (ICE) at

4). This outcome could not be achieved without ICE—through technological, contractual, or

other means—████████████████████████████████████████████

████████████████████████

The Acquisition will also amplify ICE's financial incentives to disadvantage competing

Encompass-integrated PPEs. Currently, ████████████████████████████████

█████████████████████████████████████████ doing business with

customers of Encompass. *E.g.*, PX6012 (Tyrrell (ICE) IH) at 321:6-9; PX6046 (Tyrrell (ICE)

Dep.) at 140:25-141:3; PX6043 ████████████████████. When lenders use a product

that ICE owns, however, ICE receives ██████████████████. PX6012 (Tyrrell (ICE)

IH) at 254:7-24. Post-Acquisition, ICE anticipates receiving ████████████████████

██████████ (PX1093 (ICE) at 15), ████████████████████████████████

████████████████. PX6012 (Tyrrell (ICE) IH) at 170:2-9, 254:7-24. Because of

Optimal Blue's significant market share, after the Acquisition ICE will stand to recapture a

much larger proportion of business lost by competing PPE providers as a result of any

foreclosure or other disadvantages that ICE may inflict. PX8000 (Sacher (FTC) Rep.) ¶¶ 494-

505. When a third-party PPE's customer switches to Optimal Blue after the Acquisition, ICE

will realize ████████████ associated with the customer's PPE use. Because ICE

stand to gain a larger proportion of third-party PPE providers' lost business and revenue after

the Acquisition, its incentive to disadvantage those PPE competitors will increase. *Id.* ¶ 505.

### 3. Defendants Cannot Rebut Plaintiff's *Prima Facie* Case

Under the Section 7 burden-shifting framework, once the FTC establishes its *prima facie*

case, the burden shifts to Defendants to rebut that case. *St. Alphonsus*, 778 F.3d at 783. For the

reasons explained *supra* at III.A.1.c and III.A.2.c, they cannot do so in light of the

overwhelming evidence of likely anticompetitive effects in the relevant LOS and PPE markets.

### a) Defendants Cannot Demonstrate that the Proposed Divestiture Will Restore Competition in the Relevant Product Markets

1  When a merger violates § 7, an injunction prohibiting the merger is the "default

2  remedy." *In re Illumina, Inc.*, 2023 WL 2946882, at *55; *see also United States v. E.I. du Pont

3  *de Nemours & Co.*, 366 U.S. 316, 329 (1961) ("The very words of § 7 suggest that an undoing

4  of the acquisition is a natural remedy."). Further, "it is well settled that once the Government

5  has successfully borne the considerable burden of establishing a violation of the law, all doubts

6  as to the remedy are to be resolved in its favor." *St. Alphonsus*, 778 F.3d at 793 (quoting *du

7  Pont*, 366 U.S. at 334).

8  The Court should not entertain Defendants' proposed divestiture of certain Black Knight

9  services and assets. As an initial matter, the Court's consideration of a remedy should come

10  only after a determination of the reasonably likely competitive effects of the Acquisition. *In re

11  Illumina, Inc.*, 2023 WL 2946882, at *52 .[9] While some courts have inquired into the merits of a

12  divestiture at the rebuttal stage of the § 7 burden-shifting analysis, *see United States v. Aetna

13  Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017), under either approach, Defendants bear the heavy

14  burden to establish that their proposed divestiture would "'restore competition,' 'eliminate the

15  effects' of the Acquisition, and replace the lost competitive intensity." *In re Illumina, Inc.*, 2023

16  WL 2946882, at *53 (quoting *Ford Motor Co.*, 405 U.S. at 573 & n.8); *accord FTC v. Staples,

17  Inc.*, 190 F. Supp. 3d 100, 137 (D.D.C. 2016).[10]

18  "Restoring competition requires replacing the *competitive intensity* lost as a result of the

---

19

20  [9] The Court should give weight to the Commission's interpretation of the applicable law when
deciding Plaintiff's request for a preliminary injunction. *See FTC v. Meta Platforms, Inc.*, No.

21  5:22-CV-04325-EJD, 2023 WL 2346238, at *21 (N.D. Cal. Feb. 3, 2023) ("[T]he FTC has
clearly endorsed this theory by filing this case, and the administrative law judge will be

22  employing it during the proceeding . . . . Accordingly, in deciding the likelihood of success on
the merits, the Court will assume the validity of this doctrine." (quoting *FTC v. Steris Corp.*,

23  133 F. Supp. 3d 962, 966 (N.D. Ohio 2015))).

24  [10] Despite this weight of authority, one district court has expressed in dictum that the
government should account for a proposed divestiture in its *prima facie* case (*see* Dkt. 57 (ICE's

25  Answer, Defenses & Counterclaims) at 32), while acknowledging that this would contradict the
approach taken in other cases. *United States v. UnitedHealth Grp. Inc.*, No. 1:22-CV-0481

26  (CJN), 2022 WL 4365867, at *8-9 (D.D.C. Sept. 21, 2022). However, even that court ultimately

27  considered the merits of the proposed divestiture at the rebuttal stage. *Id.* at *11.

28

merger rather than focusing narrowly on returning to premerger HHI levels." *Sysco Corp.*, 113 F. Supp. 3d at 72 (quoting Antitrust Div., U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 5 (2004)).[11] To assess whether merging parties have met their burden to establish that a remedy will restore competition, courts have considered factors including whether a divestiture (1) transfers an intact business or "some lesser set of assets," (2) results in a continuing entanglement between the seller and divestiture buyer, or (3) involves a low purchase price. *Aetna*, 240 F. Supp. 3d at 60, 72-73.

Here, Defendants cannot make the required showing that the proposed divestiture will restore competition. Most glaringly, Defendants have not attempted to address competitive harms in the PPE markets arising from ICE's acquisition of Optimal Blue. Moreover, all of the aforementioned factors weigh against a finding that the proposed divestiture will restore competition: The divestiture would transfer only an incomplete business to Constellation, create ongoing entanglements requiring Constellation to rely on ICE to serve its own customers for as long ▇▇▇▇▇▇▇▇, and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

### i.    The Divestiture Does Not Remedy Competitive Harms in PPE Markets

Defendants' proposed divestiture fails outright as a remedy because it does not address the anticompetitive harms the Acquisition likely will cause in the markets for PPEs for Encompass users and for all PPEs. As explained above, the Acquisition is likely to result in competitive harms in these PPE markets largely as a result of ICE's acquisition of Black Knight's Optimal Blue PPE. *See* III.A.2.c, *supra*. The proposed divestiture, however, does not include Optimal Blue. Defendants thus have not even attempted to remedy the likely harms in the relevant PPE markets. For this reason alone, the proposed divestiture fails.

### ii.    The Divestiture Conveys an Incomplete Business

Because Constellation would receive only a fragment of Black Knight's business, the

---

[11] "Like the Merger Guidelines, the Remedies Guide is frequently used by courts to guide their analysis, although it is not binding law." *Aetna*, 240 F. Supp. 3d at 60.

divestiture would fail to replace the competitive intensity lost as a result of the Acquisition. Today, Black Knight offers Empower bundled or sold in combination with a broad suite of mortgage technologies, including its industry-leading PPE, Optimal Blue. *E.g.*, PX2023 (Black Knight) at 5. Owning a broad portfolio of mortgage technologies that can be sold together with Empower allows Black Knight to ████████████████████████████████████████ ████████████████████████ PX6040 (Dugan (Black Knight) Dep.) at 23:14-25:14. A competitor offering only a subset of these services may not be able to do the same.

The threat of Black Knight's ability to ████████████████████ has prompted competitive responses from ICE, such as ██████████████████████████████████████ ███████████████████████████. *E.g.*, PX1085 (ICE) at 3 ("[████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████."). Bundling mortgage technologies also appeals to lenders because it simplifies their pricing, contracts, and vendor management. PX6040 (Dugan (Black Knight) Dep.) at 94:25-95:13; *see also id.* at 112:20-23 ("████████████████████████████████████████████████ ███████████████████████████████████████████").

Under the terms of the proposed divestiture, Constellation, unlike Black Knight, will not own many of the ancillary products integrated with Empower, and can only resell, ██████ ██████████, some of those products under a Commercial Agreement with ICE. *See generally* PX4097 (Constellation) at 100, 104, 117-19, 128-33 ("Commercial Agreement"). Also unlike ICE, Constellation can resell those products██████████████████████████████), whereas Black Knight currently sells them to customers of third-party LOSs. Finally, Constellation ██████████████████████████████████████ (*id.* at 104, 128-33), which means that Constellation will lack the commercial flexibility that Black Knight possesses today ██████████████████████████████████████████████. Constellation's founder and president recognized ████████████████████████████████████

1

2

3          ██████████████████████████." PX4189 (Constellation) at 1.

4          Although Constellation would acquire some of the Black Knight services integrated with

5   Empower through the divestiture, it would rely on contracts with ICE to provide the remainder,

6   including the industry-leading Optimal Blue PPE. Constellation will be unable to offer the

7   single point of contact for pricing, contracts, and vendor management that Black Knight

8   currently leverages to compete against ICE. ████████████████████████

9   ██████████████████████████████████████████

10  ████████████████████████████████████. PX6029

11  (Wilhelm (Constellation) Dep.) at 124:4-125:5; PX6032 (George (Constellation) Dep.) at 83:17-

12  22; PX4097 (Constellation) at 100, 107, 122-27. Between its diminished flexibility to discount

13  Empower bundles and its inability to provide lenders the convenience of a single point of

14  contact, Constellation will be unable to replicate Black Knight's current competitive intensity.

15          iii.     **The Divestiture Would Create Ongoing Entanglements and Render**

16                   **Constellation Dependent Upon ICE**

17          Defendants' proposed divestiture also is fundamentally flawed because it would create

18  myriad contractual entanglements between ICE and Constellation ███████████. "Courts are

19  skeptical of a divestiture that relies on a 'continuing relationship between the seller and buyer of

20  divested assets' because that leaves the buyer susceptible to the seller's actions—which are not

21  aligned with ensuring that the buyer is an effective competitor." *Aetna*, 240 F. Supp. 3d at 60

22  (quoting *Sysco Corp.*, 113 F. Supp. 3d at 77).

23          As part of the proposed divestiture, Defendants and Constellation contemplate executing

24  an array of ongoing agreements. Of particular concern, Constellation will depend on a

25  Commercial Agreement with ICE to provide its customers with many Empower-integrated

26  services that Black Knight owns today but that ICE will own after the Acquisition, including

27  Optimal Blue. PX4097 (Constellation) at 100, 117-19. Because ICE will retain ownership of

28

PLAINTIFF'S MEM. OF POINTS AND AUTHORITIES IN SUPPORT OF MOT. FOR PRELIM. INJUNCTION
CASE NO. 3:23-CV-01710-AMO

26

these key Empower-integrated services, Constellation and its customers will depend on ICE for

████████████████████████████████████. *Id.* at 100, 107, 122-27. Further,

the Commercial Agreement provides Constellation the ability to package ICE-owned services

with Empower to new customers for ██████████████████. *Id.* at 109 § 14.1. For

████████████████████████████████████████████████

████████████████████████. *Id.* at 109 § 14.2. At the expiry of that ████

████████████████████████████████████

   Constellation executives have acknowledged that these agreements will ████████

████████████████ (PX4138 (Constellation) at 5) and ██████████████████

██████████████████. PX6032 (George (Constellation) Dep.) at 76:14-

25, 88:18-24; PX4142 (Constellation) at 4 ("[████████████████████████

████████████████████████ PX4224 (Constellation) at 1 (after

the deal closes, Constellation will be "████████████"); PX6062 (Wilhelm

(Constellation) Dep.) at 253:22-256:2 (same). ICE would be in a position to influence the

experience of Constellation's customers immediately following the divestiture, and could

eventually cut off those customers' access to services. ██████████████████

████████████████████████████████. PX4097

(Constellation) at 105 §§ 9.5-9.6; PX6032 (George (Constellation) Dep.) at 82:14-83:7. In this

case, the Court should not endorse a divestiture that is so likely to ensure that the buyer never

becomes a credible competitive threat. *Sysco Corp.*, 113 F. Supp. 3d at 77-78 (rejecting

divestiture buyer as "not . . . truly independent" where ongoing entanglements included 3-year

food service licensing arrangement and 5 to 10-year database license).

   **iv.   The ████ Purchase Price of the Divestiture Assets Reflects ████**

   ████████████████████████████████

   "An extremely low purchase price reveals the divergent interest between the divestiture

purchaser and the consumer: an inexpensive acquisition could still 'produce something of value

to the purchaser' even if it does not become a significant competitor and therefore would not

1  'cure the competitive concerns.'" *Aetna*, 240 F. Supp. 3d at 72 (quoting Antitrust Div., U.S.

2  Dep't of Justice, Policy Guide to Merger Remedies 9 (2011)). Constellation has agreed to pay

3  ███████████ for Empower and the other divestiture assets, though ███████████

4  ███████████████" (PX6032 (George (Constellation) Dep.) at 29:19-22;

5  PX6042 (Clifton (ICE) Dep.) at 212:14-22), and the amended merger agreement (accounting for

6  divestiture of Empower) reduces the purchase price by about $1.4 billion (PX1697 (ICE) at 2).

7  ███████████████████

8  ███████████████████

9  ██████████████. One executive at Constellation, and co-lead

10 of the team negotiating the divestiture purchase, quipped to another executive: "███████

11 ███████████" PX4224 (Constellation) at 1; PX6029 (Wilhelm (Constellation) Dep.) at

12 36:1-3; PX6062 (Wilhelm (Constellation) Dep.) at 239:18-21, 250:15-18.

13     Fundamentally, Defendants' goal in marketing the divestiture assets was ███████

14 ███████████. Rather, it was ███████████

15 ███████████████

16 ███████████ *See* PX4116 (Constellation) at 8; PX4220 (Constellation) at 1;

17 PX4219 (Constellation) at 1. ███████████

18 ███████████████████

19 ███████ (*see, e.g.*, PX6029 (Wilhelm (Constellation) Dep.) at 48:11-19),

20 ███████████████████

21 ███████████████

22 ███████████████████ even as

23 Constellation was negotiating the divestiture. PX6032 (George (Constellation) Dep.) at 69:1-

24 70:8. ███████████████

25 ███████████████

26 ███████████," *Aetna*, 240 F. Supp. 3d at 72, and thus the divestiture is

27 unlikely to restore lost competition. *See id.*

### b) Defendants Cannot Demonstrate that Entry Will Be Timely, Likely, and Sufficient to Counteract the Acquisition's Anticompetitive Effects

Defendants also cannot rebut the FTC's *prima facie* case by showing that entry will be timely, likely, and sufficient to counteract the competitive harms of the Acquisition. *See Bazaarvoice*, 2014 WL 203966, at *71. LOS and PPE markets are characterized by high barriers to entry. Black Knight has estimated that to develop a new commercial LOS would cost at least ███████ and take at least ████████. PX0021 (Black Knight) at 95-97. Any LOS entrant or existing provider seeking to reposition also must overcome lenders' high switching costs, lengthy switching timelines, and general reluctance to switch to untested LOSs. *E.g.*, PX1158 (ICE) at 4-6; PX8000 (Sacher (FTC) Rep.) ¶¶ 567-69, 575-80.

New entry or repositioning of PPEs is similarly unlikely. Black Knight estimates that it would take approximately ███████ and ██████████ to develop a commercial pricing tool comparable to Optimal Blue, and as much as ████████ to build a product truly competitive with Optimal Blue's pricing tool. PX0021 (Black Knight) at 101-02. For its part, ICE committed over ████████████████████████████████████ ████████████████████████████████████ ████████████████████ PX1116 (ICE) at 5-7. Defendants thus cannot establish that PPE entry will be timely, likely, or sufficient to counter harms arising from the Acquisition.

### c) Defendants Cannot Establish Cognizable, Merger-Specific Efficiencies that Outweigh the Acquisition's Anticompetitive Effects

The "Supreme Court has never expressly approved an efficiencies defense to a § 7 claim," and the Ninth Circuit "remain[s] skeptical about the efficiencies defense in general and about its scope in particular." *St. Alphonsus*, 778 F.3d at 788-90. Indeed, the FTC is aware of no court that has ever relied on efficiencies to rescue an unlawful acquisition. Nevertheless, the burden would be on Defendants to "clearly demonstrate" proof of "extraordinary efficiencies" that are merger-specific and verifiable. *Id.* at 790-91.

Here, ICE has claimed a shifting set of loosely-defined efficiencies of varying amounts

that fail to satisfy the applicable standard. Joe Tyrrell, former President of ICE's Mortgage

Technology division, was "████████████████████████████████████████████████

████████████████████." PX1102 (ICE) at 91-92. Tyrrell has testified that much of the basis for

"████████████████████████████," PX6046 (Tyrrell (ICE) Dep.) at 158:24-159:6, ████████

████████████████████" *Id.* at 162:6-9. ICE's analysis of ████████ is only a "████

████████████████████████████████████. PX6034

(Jackson (ICE) Dep.) at 120:19-121:18. These "████████" and "████████████" do not clearly

demonstrate proof of extraordinary, merger-specific, verifiable efficiencies.

**B.      The Equities Support a Preliminary Injunction**

Under Section 13(b), this Court must also "balance the equities." *Warner Commc'ns*,

742 F.2d at 1165. If the FTC has shown a likelihood of success, "a countershowing of private

equities alone does not justify denial of a preliminary injunction." *Id.* The "principal public

equity" favoring a preliminary injunction is "the public interest in effective enforcement of the

antitrust laws." *H.J. Heinz*, 246 F.3d at 726. Without preliminary relief, the Commission may

face the "daunting and potentially impossible task" of "unscrambling the eggs" if the proposed

Acquisition is ultimately deemed unlawful. *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d

865, 918 (E.D. Mo. 2020). As such, "[n]o court has denied relief to the FTC in a 13(b)

proceeding in which the FTC has demonstrated a likelihood of success on the merits." *FTC v.

ProMedica Health Sys. Inc.*, 3:11 CV 47, 2011 WL 1219281, at *60 (N.D. Ohio Mar. 29, 2011).

Here, the equities support entry of a preliminary injunction pending resolution of the

administrative proceeding. Defendants cannot establish harm merely from waiting for the

administrative process, with a hearing set to begin on July 12, 2023, to play out. On the other

hand, allowing Defendants to merge could prevent the FTC from ordering relief to preserve

competition and enforce the antitrust laws were it to prevail in the administrative proceeding.

## <u>CONCLUSION</u>

For the foregoing reasons, the FTC respectfully requests that the Court grant the FTC's

Motion for a Preliminary Injunction.

Dated: June 2, 2023                              Respectfully submitted,

                                                 */s/ Abby L. Dennis*
                                                 Abby L. Dennis
                                                 Peter Richman
                                                 Ashley Masters
                                                 Abigail Wood
                                                 Daniel Aldrich
                                                 Laura Antonini
                                                 Catharine Bill
                                                 Caitlin Cipicchio
                                                 Steven Couper
                                                 Jessica S. Drake
                                                 Janet Kim
                                                 Christopher Lamar
                                                 Lauren Sillman
                                                 Neal Perlman
                                                 Nicolas Stebinger
                                                 Nina Thanawala
                                                 Taylor Weaver

                                                 Federal Trade Commission
                                                 600 Pennsylvania Avenue, NW
                                                 Washington, DC 20580
                                                 Tel: (202) 326-2381

                                                 *Counsel for Plaintiff Federal Trade Commission*