Kalpana Srinivasan, Bar No. 237460
ksrinivasan@susmangodfrey.com
Michael Gervais, Bar No. 330731
mgervais@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Shawn L. Raymond, *pro hac vice*
sraymond@susmangodfrey.com
Alexander L. Kaplan, *pro hac vice*
akaplan@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

J. Clayton Everett Jr., *pro hac vice*
clay.everett@morganlewis.com
Ryan M. Kantor, *pro hac vice*
ryan.kantor@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

*Attorneys for Defendant Intercontinental Exchange, Inc.*

Elliot R. Peters, Bar No. 158708
epeters@keker.com
R. James Slaughter, Bar No. 192813
rslaughter@keker.com
Khari J. Tillery, Bar No. 215669
ktillery@keker.com
**KEKER, VAN NEST & PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Jonathan M. Moses, *pro hac vice*
jmmoses@wlrk.com
Adam L. Goodman, *pro hac vice*
algoodman@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendant Black Knight, Inc.*

(Additional counsel appear on signature page)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

INTERCONTINENTAL EXCHANGE, INC. and BLACK KNIGHT, INC.

Defendants.

Case No. 3:23-cv-01710-AMO

**DEFENDANTS' MEMORANDUM OF AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

July 25, 2023, 9 a.m.
Judge: Hon. Araceli Martínez-Olguín

**PUBLIC REDACTED**

**Table of Contents**


Statement of Issue to Be Decided ..... vii

Introduction ..... 1

Factual Background ..... 5

Legal Standard ..... 7

Argument ..... 9

I. The FTC Cannot Demonstrate Anticompetitive Effects in any LOS Market ..... 9

A. Constellation Is an Ideal Buyer for Empower ..... 11

B. Constellation Is Buying All of Empower, Not Part ..... 11

C. Constellation's Empower Will Be an Independent Competitor to Encompass ..... 13

D. Constellation Got a Good Deal Because It Had All the Leverage ..... 15

II. The FTC Cannot Demonstrate Anticompetitive Effects in Any PPE Market ..... 16

A. The FTC Fails to Allege and Cannot Pursue a Single-Brand Market Claim ..... 16

B. EPPS and Optimal Blue Are Not in the Same Relevant Product Markets ..... 17

1. EPPS and Optimal Blue Are Functionally Different ..... 18

2. EPPS and Optimal Blue Are Used by Different Kinds of Customers ..... 19

3. Optimal Blue and EPPS Are Priced Differently ..... 19

C. The Transaction Will Not Substantially Lessen Competition in PPE Markets ..... 20

D. ICE Will Continue to Offer Both EPPS and Optimal Blue ..... 22

E. The Government Cannot Prove an Actual Potential Competition Claim ..... 24

III. The FTC's Vertical Foreclosure Theory Lacks Merit ..... 25

IV. The Court Should Not Grant an Injunction for Unconstitutional Agency Adjudication ..... 27

Conclusion ..... 30

# Table of Authorities

## Cases

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) ..... 17

*Axon Enter., Inc. v. FTC*,
143 S. Ct. 890 (2023) ..... *passim*

*Axon Enter., Inc. v. FTC*,
986 F.3d 1173 (9th Cir. 2021) ..... 28, 30

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ..... 7, 17, 19

*California v. Sutter Health Sys.*,
84 F. Supp. 2d 1057 (N.D. Cal. 2000) ..... 17, 21

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) ..... 16, 17

*Equifax, Inc. v. FTC*,
618 F.2d 63 (9th Cir. 1980) ..... 17

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) ..... 30

*FTC v. Affordable Media*,
179 F.3d 1228 (9th Cir. 1999) ..... 7

*FTC v. Arch Coal*,
329 F. Supp. 2d 109 (D.D.C. 2004) ..... 8, 9

*FTC v. Arch Coal Inc.*,
No. 1:04-cv-534-JDB, ECF No. 67 (D.D.C. July 7, 2014) ..... 10

*FTC v. Atl. Richfield Co.*,
549 F.2d 289 (4th Cir. 1977) ..... 24

*FTC v. Exxon Corp.*,
636 F.2d 1336 (D.C. Cir. 1980) ..... 8

*FTC v. Great Lakes Chem. Corp.*,
528 F. Supp. 84 (N.D. Ill. 1981) ..... 8

*FTC v. Lab. Corp.*,
2011 WL 3100372 (C.D. Cal. Feb. 22, 2011) ..... 8

*FTC v. Meta Platforms Inc.*, 2023 WL 2346238 (N.D. Cal. Feb. 3, 2023) .......... 5, 8, 24, 25

*FTC v. Occidental Petroleum Corp.*, 1986 WL 952 (D.D.C. Apr. 29, 1986) .......... 2

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) .......... *passim*

*FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) .......... 24

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .......... 7, 8

*Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 421 F. Supp. 274 (N.D. Cal. 1976) .......... 22

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485 (2d Cir. 2004) .......... 19, 20

*Gorlick Dist. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019 (9th Cir. 2013) .......... 17

*Heller v. Doe*, 509 U.S. 312 (1993) .......... 28

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) .......... 30

*In re Murchison*, 349 U.S. 133 (1955) .......... 27

*In the Matter of Illumina, Inc. and Grail, Inc.*, Docket No. 9401 .......... 28

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022) .......... 29

*Malaney v. UAL Corp.*, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) .......... 21, 22

*Munaf v. Geren*, 553 U.S. 674 (2008) .......... 8

*Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal. 2022) .......... 16

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) .......... 30

*Tenneco, Inc. v. FTC*,
689 F.2d 346 (2d Cir. 1982) ........ 25

*Times-Picayune Pub. Co. v. United States*,
345 U.S. 594 (1953) ........ 17

*United States v. Anthem*,
236 F. Supp. 3d 171 (D.D.C. 2017) ........ 9

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) ........ 9

*United States v. Baker Hughes, Inc.*,
908 F.2d 981 (D.C. Cir. 1990) ........ 8, 9, 11

*United States v. Marine Bancorp, Inc.*,
418 U.S. 602 (1974) ........ 7, 8, 24

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ........ 21

*United States v. U.S. Sugar Corp.*,
2022 WL 4544025 (D. Del. Sept. 28, 2022) ........ 9

*United States v. UnitedHealth Grp. Inc.*,
2022 WL 4365867 (D.D.C. Sept. 21, 2022) ........ *passim*

*Williams v. Pennsylvania*,
579 U.S. 1 (2016) ........ 27

**Statutes**

5 U.S.C. § 7521 ........ 30

15 U.S.C. § 18 ........ 2, 7

15 U.S.C. § 45 ........ 27, 29

15 U.S.C. § 53(b) ........ *passim*

**Regulations**

16 C.F.R. § 3.42(a), 3.54(b) ........ 29

16 C.F.R. § 3.43 ........ 29

16 C.F.R. § 3.54(b) ........ 29

**Table of Exhibits to Defendants' Memorandum**

| Exhibit | Evidence |
|---|---|
| DX1 | Transcript Excerpts of Deposition of Richard Gagliano (Black Knight) |
| DX2 | Transcript of Deposition of Gage Green (American Bancshares) |
| DX3 | Transcript Excerpts of Depositions of Bonnie Wilhelm (Constellation) |
| DX4 | Constellation Presentation, CWS FTC0003554 |
| DX5 | Internal ICE Correspondence, ICEPROD-14529974 |
| DX6 | Internal Constellation Document, CWS FTC0007639 |
| DX7 | Transcript Excerpts of Deposition of Ryan Hubbard (Truist) |
| DX8 | Excerpts of Initial Expert Report of Andrew R. Dick, PhD |
| DX9 | Correspondence Between ICE and Customer, ICEPROD-02925962 |
| DX10 | Correspondence Between ICE and Lender, ICEPROD-01734697 |
| DX11 | Transcript Excerpts of Deposition of Ed Batt (Black Knight) |
| DX12 | Transcript Excerpts of Deposition of Jeremy Moreno (Black Knight) |
| DX13 | Polly Presentation, PEX-006303 |
| DX14 | Transcript Excerpts of Deposition of Kevin McMahon (Black Knight) |
| DX15 | Internal ICE Presentation, ICEPROD-03087074 |
| DX16 | Encompass Platform Overview Brochure, ICEPROD-04189264 |
| DX17 | Encompass Website, https://www.icemortgagetechnology.com/products/encompass |
| DX18 | Transcript Excerpts of Deposition of Robert Hart (ICE) |
| DX19 | Transcript Excerpts of Deposition of Jeffrey Sprecher (ICE) |
| DX20 | Transcript Excerpts of Deposition of George Brady (LoanDepot) |
| DX21 | Transcript Excerpts of Deposition of Eduardo Perez, Jr. (Equity Prime Mortgage) |
| DX22 | Declaration of Konstantinos Ligris (Stavvy, Inc.) |
| DX23 | Transcript Excerpts of [redacted] |
| DX24 | 16 C.F.R. Parts 0-4, Revisions to Rules of Practice |
| DX25 | Bryan Koenig, *For DOJ and FTC, Clearing Deals Remains a Gray Area*, Law360 |
| DX26 | [redacted] |
| DX27 | Transcript Excerpts of Deposition of Tom Lyons (ICE) |
| PX1132 | Correspondence Between ICE and Customer, ICEPROD-02802450 |
| PX1411 | Correspondence Between ICE and Customer, ICEPROD-03397786 |
| PX1452 | Correspondence Between ICE and Customer, ICEPROD-03406700 |
| PX6012 | Transcript of Investigative Hearing Deposition of Joseph Tyrell (ICE) |
| PX6025 | Transcript of Deposition of Keith Anderson (Black Knight) |
| PX6026 | Transcript of Deposition of Jonas Moe (ICE) |
| PX6032 | Transcript of Deposition of Tom George (Constellation) |
| PX6033 | Transcript of Deposition of Kirk Larsen (Black Knight) |

| Exhibit | Evidence |
|---|---|
| PX6035 | Transcript of Deposition of Brian Kittredge (Umpqua Bank) |
| PX6036 | Transcript of Deposition of Rebecca Roberts (ICE) |
| PX6039 | Transcript of Deposition of Scott Happ (Black Knight) |
| PX6041 | Transcript of Deposition of Randy Brown (SouthPoint Bank) |
| PX6042 | Transcript of Deposition of David Clifton (ICE) |
| PX6043 | Transcript of Deposition of Adam Carmel (Polly) |
| PX6044 | Transcript of Deposition of Erin Wester (Black Knight) |
| PX6045 | Transcript of Deposition of Eric Connors (ICE) |
| PX6046 | Transcript of Deposition of Joseph Tyrrell (ICE) |
| PX6053 | Transcript of Deposition of Steven Eagerton (Black Knight) |

**Statement of Issue to Be Decided**

The FTC seeks a preliminary injunction, under Section 13(b) of the Federal Trade Commission Act, to prevent Intercontinental Exchange, Inc. and Black Knight, Inc. from closing their pending merger transaction so that the FTC can pursue its challenge to the transaction in its internal administrative adjudication process. To obtain preliminary injunctive relief under Section 13(b), the FTC bears the burden to establish a "likelihood of ultimate success," 15 U.S.C. § 53(b), on its claim under Section 7 of the Clayton Act, which prohibits acquisitions where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

The issue presented is whether the Court, exercising its independent judgment, should grant preliminary injunctive relief in favor of the FTC's administrative adjudication process when (1) the FTC's primary theory of alleged competitive harm is premised on a transaction that will never occur, and any purported concerns are more than adequately addressed by a comprehensive divestiture; (2) the FTC's fallback claim is based on an improperly defined antitrust product market and, regardless, the FTC cannot carry its burden to show the transaction would substantially lessen competition in any cognizable market; and (3) the FTC's internal adjudication process violates numerous fundamental constitutional protections.

**Introduction**

Intercontinental Exchange, Inc. ("ICE") is an American innovation story, a company that dates to 1997, when its founder (Jeff Sprecher, the current Chair and CEO) paid $1,000 to acquire a platform for electricity trading. He envisioned modernizing a dated technology to create a transparent trading market where prices were accurate, accessible, and openly distributed. Since that modest beginning, ICE has successfully employed the same core strategy—"to digitize the analog"—to benefit market participants and consumers across various industries. ICE has used its expertise in technology and data management to enable transformational and procompetitive changes in global markets for energy, commodities, climate related products, and corporate equities (by modernizing the New York Stock Exchange).

Recently, ICE expanded into the U.S. mortgage technology industry. It owns Encompass, a loan origination platform used by mortgage lenders. Through its open architecture, Encompass integrates with hundreds of third-party companies that provide software products and applications to ICE's lender customers. ICE seeks to revolutionize the mortgage industry through the same modernization and automation efforts it has successfully executed in other industries, with the fundamental aim to streamline the unnecessarily cumbersome process of securing, closing, and servicing a mortgage—a process that ICE believes takes longer and costs more than it should.

The transaction at issue is key to that plan. Through ICE's proposed acquisition of Black Knight, ICE seeks to connect its Encompass loan *origination* platform with Black Knight's loan *servicing* platform to create a "life of loan" platform—an aspect of the transaction the FTC notably does not challenge in any respect. Integrating origination and servicing platforms would be a major innovation, creating efficiencies and opportunities that will lower costs for homeowners.

The FTC, instead, presents an inaccurate picture of the law and facts. It seeks to narrow this Court's focus, portraying its request for injunctive relief as merely seeking to preserve the status

quo pending adjudication in its administrative process. But that is not the reality. This preliminary injunction proceeding will decide the merger's fate. If the Court denies the injunction, the FTC's consistent practice is to abandon its merger challenge. But if the Court grants the injunction, it will effectively block the transaction because the FTC's administrative process will not conclude until long after the November 4 termination date (almost certainly well into 2024, if not beyond), and "[n]o substantial business transaction could ever survive" that long. *FTC v. Occidental Petroleum Corp.*, 1986 WL 952, at *13 (D.D.C. Apr. 29, 1986) (denying injunction). That is why the actual standard requires this Court to exercise its independent judgment, not defer to agency adjudication.

The FTC is not entitled here to the extraordinary relief of a preliminary injunction. Injunctive relief under Section 13(b) of the FTC Act is proper only if the FTC can show a "likelihood of ultimate success," 15 U.S.C. § 53(b), on its claim that the effect of the transaction "may be substantially to lessen competition," 15 U.S.C. § 18. The FTC cannot carry its burden.

***First***, the FTC's primary argument regarding alleged anticompetitive effects in the Loan Origination System ("LOS") market is a strawman. The FTC asserts anticompetitive harm from the potential combination of ICE's LOS business ("Encompass") with Black Knight's LOS business ("Empower"). *But that combination will never happen.* In response to the FTC's concerns, ICE and Black Knight agreed to divest Empower (and more) to Constellation Software, a large and financially strong public company with deep experience in mortgage technology. From day one, Constellation will compete in the LOS business as the owner of Empower, with the entire Black Knight Empower leadership team moving to Constellation. The divestiture of Black Knight's Empower moots the FTC's principal challenge to the transaction and primary claim for relief. Tellingly, the FTC's brief is devoid of actual concerns raised by customers post-divestiture about the union of ICE and Black Knight or the divestiture to Constellation.

***Second***, the FTC cannot show likelihood of success on its fallback argument concerning

Product Pricing Engines ("PPEs"). The FTC claims the transaction will result in anticompetitive effects if ICE owns both its existing PPE, called "EPPS," and Black Knight's "Optimal Blue" PPE. But this claim fails at the first step: market definition. The FTC improperly seeks to define the relevant market as the market for PPEs *on Encompass*, a single LOS platform. But this "single-brand market" approach has been repeatedly rejected, including two months ago by the Ninth Circuit in the *Epic/Apple* case, and the FTC here did not even plead, let alone try to prove, the factors required for this highly disfavored approach.

Even without that error, the FTC cannot prevail under either PPE market definition. The FTC's claim requires EPPS and Optimal Blue be in the same relevant antitrust product market. They are not. Optimal Blue and EPPS are dramatically different in numerous material respects and do not competitively constrain one another. Optimal Blue is a highly specialized, advanced, and feature-rich product available for sale to users of *any* LOS; EPPS is a basic pricing program available as a native feature only on Encompass. Optimal Blue and EPPS are used by fundamentally different lender customers, with customers paying between [REDACTED] more for Optimal Blue than EPPS. Optimal Blue and EPPS are not interchangeable and thus not in the same relevant antitrust product market. That ends the inquiry. But the FTC also cannot show the transaction will substantially lessen competition, both because of the substantial differentiation between Optimal Blue and EPPS, and because PPEs operate in a highly competitive environment with significant new investments, expansion, and entry.

***Third***, the FTC's theory of purported *vertical* harm is also unsupported. The FTC speculates ICE will close Encompass to PPEs other than Optimal Blue. But the FTC cites no evidence of any such plan because there is none. Closing Encompass to third-party PPEs, or disadvantaging them, would fundamentally change ICE's longstanding and consistent business strategy that relies on Encompass's open platform as a key differentiator against many strong LOS competitors. ICE has

always maintained an open LOS platform, which includes offerings from hundreds of third-party providers, many of which directly compete with various ICE solutions. The FTC cannot show a likelihood of success on the merits when its theory depends on conjecture about ICE changing a longstanding, effective, and core business strategy.

***Finally***, the Court should not grant injunctive relief in favor of the FTC's administrative adjudication process because that process is unconstitutional. It violates due process by depriving ICE and Black Knight of a fair proceeding before an impartial tribunal—the FTC cannot act as prosecutor, judge, and jury in its own case. It violates equal protection and due process because the decision to assign this case to the FTC, rather than the DOJ (in which case, the merging parties' rights would be adjudicated in an Article III court), has no statutory basis and was made in secret by an informal, unwritten, black-box "clearance" process that is impermissibly arbitrary. It violates Article I because the FTC's discretion to decide whether to proceed in its administrative process or an Article III court is an unconstitutional delegation of legislative power. And it violates Article II because the FTC's ALJ and Commissioners exercise executive powers, but enjoy for-cause-only removal protections that improperly insulate them from accountability to the President—and ultimately the People. The Supreme Court's recent decision in *Axon* establishes this Court's jurisdiction to prevent these constitutional injuries, because they are "impossible to remedy once the proceeding is over." *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 903 (2023).

The FTC asks this Court to look beyond these dispositive problems because the FTC says it is likely to prevail in its own administrative process. But the FTC's chance of success in its biased (and unconstitutionally structured) internal adjudication system, in which FTC Commissioners who voted to file this complaint and direct its prosecution make the ultimate merits decision *in their own case*, is not the touchstone. Rather, this Court—an impartial Article III court—must "exercise independent judgment," hold the FTC to its burden "to provide more than mere questions or

speculations supporting its likelihood of success on the merits," and "decide the motion based on all the evidence before it, from the defendants as well as from the FTC." *FTC v. Meta Platforms Inc.*, 2023 WL 2346238, at *8 (N.D. Cal. Feb. 3, 2023). The FTC must prove its "likelihood of *ultimate* success," 15 U.S.C. § 53(b) (all emphasis in this brief added unless otherwise noted), not merely success before *itself*. It cannot meet that burden.

**Factual Background**

***The American mortgage industry is siloed, not streamlined***. Lenders ferry borrowers and loans through a series of disconnected steps—application, qualification, eligibility, pricing, origination, hedging, closing, secondary market trading, and servicing—on often incompatible systems, which creates inefficiencies and increases the costs to Americans looking to buy a home. ICE sees a solution: an end-to-end platform that would eliminate communication errors among those disparate systems, reduce the costs of moving loans through their lifecycle, and, critically, provide borrowers with on-going servicing and loan monitoring options (*e.g.*, refinancing) that will save them money.

***This transaction will help***. ICE cannot offer an end-to-end solution today, primarily because it does not have a mortgage servicing platform—the product that handles customer service, payment processing, escrow administration, and other post-closing needs. Black Knight, however, owns a successful mortgage servicing platform called MSP that is ideally suited for acquisition by ICE because ICE can use its technology platform experience to enable MSP's strong functionality to work with an LOS. Today, origination costs range from $7,500 to $8,500 regardless of loan size (a $100,000 loan has the same cost burden as a $1,000,000 loan), most of which is passed on to the homebuyer. By removing the silos with an end-to-end platform and providing better data to all parties, ICE can help reduce the costs of a mortgage and improve access to mortgages for everyone. Merging the two companies will create the end-to-end mortgage platform ICE needs to streamline

the mortgage process and reduce costs for homebuyers.

***The proposed transaction***. On May 4, 2022, ICE and Black Knight agreed that ICE would acquire all of Black Knight. That is no longer the parties' agreement. The FTC expressed concerns about the transaction, primarily ICE's acquisition of Black Knight's Empower LOS and the potential consolidation in the LOS market. In response, the parties amended their merger agreement to remove Empower and additional integrated products and to divest those assets to Constellation Software—a large, publicly traded company with deep industry experience. This divestiture [REDACTED]. DX1 30:1–6, 188:7–12. [REDACTED]. *See, e.g.*, DX20 42:13–17.

***The products at issue***. The FTC nevertheless alleges that the ICE/Black Knight merger will substantially lessen competition (1) among LOS providers and (2) for PPEs:

**(1)** ***LOSs facilitate loan origination***. They digitize and often automate the substantial paperwork generated during loan origination and verification. Some lenders create their own LOS; others choose from among the many commercial LOS offerings, including those by Accenture (Mortgage Cadence), Blue Sage, Byte, Calyx (Point, Point Central, Path, and Zenly), Finastra (MortgageBot), Fiserv (Mortgage Director), MeridianLink, and Wipro (NetOxygen).

The FTC's concern about consolidation in the LOS market is a vestige of the original merger agreement, which the parties subsequently amended to divest all of Black Knight's Empower LOS to Constellation. That fully resolves the FTC's consolidation concern.

**(2)** ***PPEs streamline pricing and eligibility determinations for homebuyers***. Most LOS systems have a built-in "native" PPE feature—a simple pricing tool designed to replace the historic daily "rate sheets" that financial institutions previously provided lenders, typically by fax, and to organize that information based on borrower eligibility. Those native PPEs are embedded features of a single LOS, rather than a stand-alone product available to numerous LOSs. ICE's Encompass

Product and Pricing Service ("EPPS") is the native PPE on Encompass. PX6045 138:14–17. Black Knight's Empower has its own native PPE that will go to Constellation as part of the divestiture.

Native PPEs are not the only game in town. There are also feature rich, highly customizable, PPE products that are LOS agnostic, meaning a lender can use them on any LOS platform. Black Knight's Optimal Blue is an example. It includes an automated worst-case pricing tool, embedded locking functionality, post-lock automation, data analytics, access to a broad pool of investors, and many other features not available on EPPS or other native PPEs. DX27 154:18–157:14. Given their limited functionality, EPPS and other native PPEs are substantially less expensive—customers often view them as "█████," DX2 75:19–76:6; PX6041 36:2–15—and they appeal to smaller lenders that close fewer loans and either do not want or cannot afford the additional functionality and customization that Optimal Blue and its competitors like Polly and Mortech offer at a higher price.

**Legal Standard**

***Injunctive Relief***. Section 7 of the Clayton Act prohibits acquisitions where the effect "may be *substantially to lessen competition*, or to tend to create a monopoly." 15 U.S.C. § 18. On that question, the government must show a "likelihood of ultimate success." 15 U.S.C. § 53(b); *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (the FTC must show "there is a reasonable probability that the merger will substantially lessen competition" in a relevant antitrust market). To meet that standard, the government must show "probabilities," not "ephemeral possibilities," and is required to prove the substantial lessening of competition will be "sufficiently probable and imminent" to warrant relief. *United States v. Marine Bancorp, Inc.*, 418 U.S. 602, 618, 622 & n.22 (1974).

The FTC is quick to point out that it faces a different threshold for preliminary injunctive relief than private parties, but "Section 13(b)'s public interest standard nevertheless demands rigorous proof to block a proposed merger or acquisition." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1,

23 (D.D.C. 2015). An FTC-sought preliminary injunction remains "an extraordinary and drastic remedy." *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980). That is because, like here, it "may prevent the transaction from ever being consummated." *Sysco*, 113 F. Supp. 3d at 23; *see also FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 86 (N.D. Ill. 1981) (confirming FTC faces "substantial burden" because "the grant of a temporary injunction in a Government antitrust suit is likely to spell the doom of an agreed merger"). "Given the stakes, the FTC's burden is not insubstantial, and a showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief." *FTC v. Arch Coal*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004) (cleaned up).

The FTC also claims that it can satisfy its burden to show a likelihood of success on the merits merely by raising "questions" about whether it will succeed in proving the transaction may substantially lessen competition. Br. at 5. That is not correct. Rather, courts must "exercise independent judgment." *Meta*, 2023 WL 2346238, at *8. The "FTC is therefore required to provide more than mere questions or speculations supporting its likelihood of success on the merits." *Id.* The Supreme Court has been clear: merely raising "serious" or "difficult" questions "is, of course, no reason to grant a preliminary injunction." *Munaf v. Geren*, 553 U.S. 674, 690 (2008). The standard is "likelihood of success on the merits." *Id.*; *see also FTC v. Lab. Corp.*, 2011 WL 3100372, at *15 (C.D. Cal. Feb. 22, 2011) ("serious question" standard does not eliminate "FTC's need to demonstrate a likelihood of success on the merits").

***Burden Shifting Framework***: Courts use the three-step approach established in *United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990), to evaluate the government's likelihood of success under Section 7 of the Clayton Act.

***First***, the government has the burden to establish a *prima facie* case "that a transaction will lead to undue concentration in the market for a particular product." *Id.* at 982. That requires the government to establish a proper relevant antitrust product market. *See Marine Bancorp.*, 418 U.S.

at 618 (determining relevant market is "necessary predicate" to showing a Section 7 violation).

***Second***, only if the government carries its burden at step 1 to show a *prima facie* case of substantial anticompetitive effect, does the burden then shift to defendants to provide evidence the *prima facie* case "inaccurately predicts the relevant transaction's probable effect on competition." *United States v. Anthem, Inc*., 855 F.3d 345, 349 (D.C. Cir. 2017). Defendants' burden at step 2 is light because the burden of persuasion "remains at all times with the plaintiff." *Baker Hughes*, 908 F.2d at 991 (rejecting argument that defendant is required to "clearly" disprove future anticompetitive effects because defendants' burden is not meant to be "unduly onerous"); *see also United States v. Anthem*, 236 F. Supp. 3d 171, 213 (D.D.C. 2017) ("[Q]uantum of evidence defendants must produce to shift the burden back is relatively low.").

***Third***, after the defendants carry their relatively low burden at step 2, then "the burden of producing additional evidence of anticompetitive effect shifts [back] to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Baker Hughes Inc.*, 908 F.2d at 983. "Ultimately, the government must prove by a preponderance of the evidence that there is a reasonable probability the proposed merger will substantially lessen competition." *United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *19 (D. Del. Sept. 28, 2022). A "failure of proof in any respect will mean the transaction should not be enjoined." *Arch Coal*, 329 F.Supp.2d at 116.

## Argument

### I. The FTC Cannot Demonstrate Anticompetitive Effects in any LOS Market

The FTC's primary claim challenges a combined ownership of the Encompass and Empower LOS products that will not occur. ICE and Black Knight agreed, before the FTC filed this lawsuit, to sell all of Black Knight's Empower (and more) to Constellation, a large company with experience in mortgage technology and a proven track record with divested assets. Empower

will continue to compete with ICE's Encompass from day one: [REDACTED]. This comprehensive divestiture moots the FTC's principal challenge—that the acquisition will substantially lessen LOS competition—by ensuring that the two LOS products, Empower and Encompass, remain competitors in the market for LOS services.

The FTC must carry its burden of showing a substantial lessening of competition as to the *actual transaction it seeks to enjoin*—with Constellation (not ICE) acquiring Empower. That is "the relevant transaction" at step 1. But the FTC ignores the divestiture at step 1 and instead tries to build its *prima facie* case solely on the *pre*-divestiture agreement. This is a "fictional transaction" with "fictional market shares" that will never occur. *United States v. UnitedHealth Grp. Inc.*, 2022 WL 4365867, at *10 n.5 (D.D.C. Sept. 21, 2022). The FTC cannot try to minimize its *prima facie* burden by analyzing the acquisition and divestiture in separate steps, and the failure to challenge the actual transaction at issue is fatal to the FTC's *prima facie* case. *See id.*; *see also FTC v. Arch Coal Inc.*, No. 1:04-cv-534-JDB, ECF No. 67 at 7 (D.D.C. July 7, 2014) (holding that whether the "challenged transaction may substantially lessen competition . . . requires the Court to review the *entire* transaction in question." (emphasis in original)). The FTC never attempts to carry its "burden to demonstrate a highly concentrated post-merger market" in LOS services *after* accounting for the divestiture. *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 310 (D.D.C. 2020) (evaluating post-divestiture market at step 1). That is reason enough to reject this claim.

Instead of making out a *prima facie* case based on the actual transaction, the FTC jumps right to arguing that Constellation's Empower will be so inferior to Black Knight's Empower as to substantially lessen competition in the LOS market, and claiming defendants bear the burden of disproving that claim. But that is the FTC's burden at step 1, and contrary to the FTC's suggestion

that defendants have the ultimate burden of showing the adequacy of the divestiture, the burden of persuasion "remains with the government at all times." *Baker Hughes Inc.*, 908 F.2d at 983; *see also UnitedHealth*, 2022 WL 4365867, at *8 (rejecting the government's proposed burden-shifting but concluding that "the evidence leads to the same result under either standard" where evidence showed the divestiture "will restore the competitive intensity lost because of the acquisition"). Ultimately, whether at step 1 or step 3, the FTC has the burden to show the actual transaction will substantially lessen competition and it cannot do so because Constellation is (a) an ideal buyer, (b) acquiring all (not part) of Empower, and (c) will independently compete against ICE for LOS customers. *See UnitedHealth*, 2022 WL 4365867, at *11.

### A. Constellation Is an Ideal Buyer for Empower

The FTC ignores a key factor for courts evaluating a divestiture: whether Constellation has "the experience necessary to compete." *RAG-Stiftung*, 436 F. Supp. 3d at 304. It does.

- ***Constellation has a demonstrated record of success with divested assets***. Since 2013, Constellation's Perseus Group has completed [REDACTED], and it runs each of those companies as successful businesses today. DX26 ¶¶ 4–5.

- ***Constellation already competes successfully in the mortgage business***. Constellation owns three successful mortgage software companies, including an LOS, that together form Constellation Mortgage Solutions. PX6032 117:8–17, 118:14–17.

- ***Constellation has the resources and strategy to compete***. Constellation has [REDACTED], *see* PX6053 108:15–19; PX6042 120:10–13, and it operates with a [REDACTED]," PX6032 19:8–20:4, 114:3–12; DX3 143:19–144:7, 161:22–162:9; DX4-003–05. One of Empower's largest customers confirmed, testifying that Constellation is [REDACTED]." DX20 39:9–22.

Constellation's "wealth of experience is an important component" to preserve LOS competition. *RAG-Stiftung*, 436 F. Supp. 3d at 305.

### B. Constellation Is Buying All of Empower, Not Part

The FTC challenges the divestiture because Constellation will "receive only a fragment of

Black Knight's business." Br. at 24–25. But that misstates the standard and the facts. Every divestiture would fail the FTC's test because they necessarily involve only a portion of the combined companies. The actual test is whether the "scope of the proposed divestiture" will allow the acquirer to "effectively run[] the [business]." *RAG-Stiftung*, 436 F. Supp. 3d at 305. Courts ask whether the buyer will have the right people, and whether those people are confident they will have the right assets to succeed as a standalone business. *UnitedHealth*, 2022 WL 4365867, at *13; *RAG-Stiftung*, 436 F. Supp. 3d at 305. Here, the answer is yes. [REDACTED].

First, "a large team of individuals with extensive experience managing [Empower] will continue to work with the business post-divestiture." *UnitedHealth*, 2022 WL 4365867, at *13. Black Knight's Richard Gagliano has run Empower for years. [REDACTED]. DX1 10:3–8, 14:18–15:3, 24:4–16, 198:12–17; DX3 161:1–162:9, 173:18–174:15. Thus, Constellation will have the right people to run the business effectively post-divestiture—[REDACTED].

Second, Empower can operate as a standalone business within Constellation. Mr. Gagliano confirmed that Empower currently operates as its own business within Black Knight and that Empower [REDACTED]." DX1 188:7–12, 198:19–199:8. The "[REDACTED]" on which products (in addition to Empower) went into the divestiture package was [REDACTED]." *Id.* 30:1–6. For this reason, the current Empower management team is [REDACTED]

[REDACTED]." *Id.* 196:22–197:4. That is dispositive. *See UnitedHealth*, 2022 WL 4365867, at *13 (finding "scope of divestiture" "sufficient to preserve competition" because "a core aspect of TPG's due diligence was determining whether the divestiture package was sufficient to operate ClaimsXten on a standalone basis" (cleaned up)).

Moreover, Constellation will receive [REDACTED]. DX1 33:20–34:1 ("[REDACTED]."). Constellation will thus have everything "to run a stand-alone business," which is more than enough to "preserve the competition that would have been lost through the merger." *RAG-Stiftung*, 436 F.3d at 305–06. And, in any event, the law "does not require [Constellation] to become [Black Knight]'s alter ego; it merely requires [Constellation] to preserve the level of competition that existed in the relevant market before the merger." *UnitedHealth*, 2022 WL 4365867, at *14. Constellation will have [REDACTED] to do just that.

Despite this evidence, the FTC speculates that Constellation's Empower will be unable to compete because Constellation is not also buying the Optimal Blue PPE. Br. at 25. Ownership of Optimal Blue is beside the point because Constellation will be able to sell Optimal Blue to Empower customers at "[REDACTED]." DX1 46:3–14. And, in any event, the FTC presents no evidence that Constellation must *own* Optimal Blue to compete. History proves otherwise. Empower was a successful LOS for years *before* Black Knight purchased Optimal Blue in 2020, and Black Knight's acquisition of Optimal Blue [REDACTED]. PX6033 59:20–60:5; PX6044 119:18-24. Thus, the FTC cannot show a substantial lessening of competition simply because Constellation will not own Optimal Blue.

**C. Constellation's Empower Will Be an Independent Competitor to Encompass**

The FTC argues that the divestiture "create[s] myriad contractual entanglements" between

Constellation and ICE. Br. at 26. There is no bogeyman under that bed: [REDACTED]. *See* DX3 381:12–18; PX6032 76:23–77:3, 143:16–144:12. The Commercial Services Agreement ("CSA") makes Constellation stronger, not weaker, because it [REDACTED].

The FTC nonetheless hypothesizes that ICE "may" or "could" take actions with undefined consequences to Constellation. Br. at 27. The court in *RAG-Stiftung* rejected nearly identical predictions because there was "no reason to question whether UI will be an independent competitor in the Pacific Northwest" despite the FTC's argument that "it has ongoing commercial relationships with [the merging companies] as a customer," including leasing land from the acquirer. 436 F.Supp.3d at 306. Here, as in *RAG-Stiftung*, there is no evidence to support the FTC's vague predictions of *possible* future conduct that could impede Constellation. *Id*. at 306–07 & n.23.

Constellation and the Empower team view the CSA ([REDACTED]) as a *benefit*. It [REDACTED] and [REDACTED]. DX3 179:21–180:18; PX6032 128:8–129:5; DX1 61:19–62:10. The FTC cannot replace Constellation's considered business judgment with the FTC's unsupported preference for how Constellation might do business.

Moreover, the FTC does not cite testimony from any customer that Constellation's post-merger contractual relationship with ICE will make Constellation a less effective competitor. To the contrary, customers have testified that they "[REDACTED]" the divestiture, believe Constellation is a "[REDACTED]" for Empower, and have "[REDACTED]" about Empower's ability to compete post-divestiture. *See, e.g.*, DX20 36:10–18, 42:13–17; DX21 144:7–10; DX3 152:12–15 ("[REDACTED].").

Lacking customer evidence, the FTC cites snippets from Constellation's pre-divestiture due diligence to suggest Constellation still lacks confidence in its ability to compete. Br. at 27. But those excerpts show only that Constellation [REDACTED]. As Tom George, co-president of Constellation's Romulus group, explained:

> [REDACTED]

PX6032 129:19–130:18. Over the course of "[REDACTED]," Constellation [REDACTED]. *Id.* The FTC has no evidence that Constellation's business judgment is wrong.

### D. Constellation Got a Good Deal Because It Had All the Leverage

The FTC asserts that Empower's $[REDACTED] sale price reflects Constellation's "[REDACTED]" of its "[REDACTED]." Br. at 27. That ignores basic negotiation principles. [REDACTED] when the government challenges a merger because it has "enormous leverage"—the buyer "knows the seller must divest the asset quickly to proceed with the merger." *RAG-Stiftung*, 436 F. Supp. 3d at 307. [REDACTED].

The FTC also ignores the real-world valuation dynamics: Constellation determined that Empower [REDACTED]. DX3 45:2–24, 46:7–48:2, 171:22–172:8. That [REDACTED] created by the FTC's approval process made $[REDACTED]." *Id.*; PX6053 87:16–25; DX7 181:11–182:10, 182:22–183:11; PX6042 123:21–124:10; *see* DX6-001. There is

no reason to assume that Constellation's executives secretly believe Empower is doomed to fail. The truth is much simpler: Constellation believes it can successfully compete in the LOS market with Empower and it therefore acquired the business at the best price it could achieve.

## II. The FTC Cannot Demonstrate Anticompetitive Effects in Any PPE Market

The FTC's fallback argument focuses on *one* integrated product: PPEs. The FTC contends that there will be anticompetitive effects (a) in a market for "PPEs for Encompass Users" and (b) in a market for all PPEs if ICE owns both EPPS and Optimal Blue. Br. at 15–21. The first market definition is an unsustainable single-market claim that the FTC does not sufficiently allege and cannot sustain. And for both alleged markets the FTC ignores the overwhelming evidence that Optimal Blue and EPPS are not interchangeable and so are not in the same antitrust product market. Optimal Blue is a highly specialized product with substantial functionality available on *any* LOS. That is fundamentally different than EPPS, a basic pricing program available as a native feature only on the Encompass LOS that is effectively free to Encompass users. And even if Optimal Blue and EPPS were in the same relevant antitrust market (they are not), the FTC cannot show that the proposed transaction is likely to substantially lessen competition.

### A. The FTC Fails to Allege and Cannot Pursue a Single-Brand Market Claim

The FTC asserts that "PPEs for Encompass Users" is a viable antitrust product market. Br. at 12. But the FTC cannot sustain this cramped market definition. "It is an understatement to say that single-brand markets are disfavored." *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022). In only rare instances, "the relevant market for antitrust purposes can be an aftermarket—where demand for a good is entirely dependent on the prior purchase of a durable good in a foremarket." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (9th Cir. 2023) (rejecting single-brand market). Here, the FTC is attempting this disfavored theory without making it clear. It claims Encompass acts as the foremarket good (LOS) and "PPEs for Encompass Users" are the

aftermarket goods, available (either natively or through integration) to those who purchase Encompass. But single-brand markets are proper only in limited circumstances upon a showing of four factors.[1] Because the FTC does not plead or provide evidentiary support to meet any of those factors, its alleged market of "PPEs for Encompass Users" fails.

### B. EPPS and Optimal Blue Are Not in the Same Relevant Product Markets

"Identification of a relevant [product] market is a 'necessary predicate' to a successful challenge under the Clayton Act and thus to establishing a likelihood of ultimate success for preliminary injunction purposes." *California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1081 (N.D. Cal. 2000), *aff'd sub nom.*, 217 F.3d 846 (9th Cir. 2000). Products belong in the same product market if they are "reasonably interchangeable, such that there is cross-elasticity of demand," *Gorlick Dist. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013), *i.e.*, "consumers would respond to a slight increase in the price of one product by switching to another product," *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999).[2] The Supreme Court in *Brown Shoe* identified several "practical indicia" to help determine whether products are reasonably interchangeable, such as "the product's peculiar characteristics and uses," "distinct customers," "distinct prices," and "sensitivity to price changes." 370 U.S. at 325.

Here, the FTC cannot meet its burden to show that EPPS and Optimal Blue are reasonably interchangeable (and hence in the same antitrust product market) because they are dramatically different functionally and used by fundamentally different customers, who pay between

---

[1] The FTC "must show: (1) the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase; (2) significant information costs prevent accurate life-cycle pricing; (3) significant monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic Games*, 67 F.4th at 981 (internal quotation marks omitted).

[2] The relevant product market must "exclude any other product to which . . . only a limited number of buyers will turn." *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 613 n.31 (1953). An overbroad market with products that are not reasonably interchangeable is legally erroneous and must be rejected. *Equifax, Inc. v. FTC*, 618 F.2d 63, 66 (9th Cir. 1980).

[redacted] for Optimal Blue than EPPS. It is thus no surprise that [redacted]—from the basic EPPS to the advanced Optimal Blue once their business has matured such that the more sophisticated (and expensive) option is necessary.

### 1. EPPS and Optimal Blue Are Functionally Different

EPPS is a basic pricing engine, available only within a single LOS (Encompass), that performs rudimentary functions around loan pricing. As third-party Umpqua Bank (an EPPS customer) testified, EPPS has "[redacted]." PX6035 27:13–19. Optimal Blue, in contrast, is a highly configurable, feature-rich, standalone PPE that offers vastly more functionality than EPPS, such as the "[redacted]."[3] *Id*. at 29:8–18; DX2 150:10–23 ([redacted]). The chart below illustrates material functional differences between EPPS and Optimal Blue (*see*, *e.g.*, DX8 ¶ 126):

| EPPS | Optimal Blue PPE |
|---|---|
| Only Available on the Encompass LOS | Available on Numerous LOSs |
| No Post-Lock Automation | Post-Lock Automation |
| Limited Margin Management | Sophisticated/Dynamic Margin Management |
| Limited Reporting Tools | Advanced Reporting and Data Analytics |
| No Embedded Lock Desk Functionality | Embedded Lock Desk Functionality |
| Limited Rate Display Options | Extensive/Customizable Rate Display Options |
| No Ability to Automate Generation and Distribution Rate Sheets | Ability to Automate Generation and Distribution of Rate Sheets |
| Limited Secondary Capital Markets Functions | Full Secondary Capital Markets Suite |

These functional differences are material to customers. Although EPPS is built into

[3] The FTC claims Umpqua Bank [redacted]. Br. at 16 n.6. But Umpqua's Brian Kittredge admitted that [redacted] PX6035 29:8–30:24, 39:18–22, 53:9–54:3, 66:5–12.

Encompass, only % of Encompass customers even use it (as of January 2023) because EPPS . *See, e.g.*, DX8 ¶ 26. Rather, Encompass customers like . *See, e.g.*, DX2 22:16–21, 104:14–105:2, 150:10–23. Encompass customers use at least seven other integrated PPEs instead of EPPS because . DX8 ¶ 118.[4] Tellingly, the FTC does not engage with the functional differences between EPPS and Optimal Blue, and instead simply treats all PPEs the same.

**2. EPPS and Optimal Blue Are Used by Different Kinds of Customers**

Given these significant functional differences, EPPS and Optimal Blue are used by fundamentally different types of customers. *See Brown Shoe Co.*, 370 U.S. at 325 ("distinct customers" is a factor in determining accuracy of the proposed market). EPPS customers are When compared to Optimal Blue's customers, . DX8 ¶¶ 144–48. The few Optimal Blue customers who move to EPPS are ." DX11 120:14–122:10. The Chief Information Officer for LoanDepot, . DX20 82:2–18.

**3. Optimal Blue and EPPS Are Priced Differently**

Optimal Blue is between % and % more expensive than EPPS on a per user basis, and between % and % more expensive than EPPS on a per closed loan basis. *See, e.g.*, DX8 ¶¶ 19(c), 136–38. That proves EPPS and Optimal Blue are not reasonably interchangeable. *Geneva*

[4] *See also* DX9-001 ( ); DX10-007 ).

*Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496–97 (2d Cir. 2004) (holding that "Coumadin's substantially higher prices is evidence of a distinct customer group").

Indeed, if EPPS and Optimal Blue were reasonably interchangeable, as the FTC contends, then basic economic theory would predict that an increase in the price of one would lead customers to switch to the other. Real world evidence proves otherwise. During 2021 and 2022, the price of Optimal Blue relative to EPPS [REDACTED]. *See, e.g.*, DX8 ¶¶ 20(b), 153–57. Yet lenders did *not* switch [REDACTED]. Instead, even though [REDACTED]. *Id.* ¶ 155; DX2 175:12–20 ([REDACTED]).[5] Overall, Encompass customers are nearly [REDACTED] to switch [REDACTED] than the other way around. *See* DX8 ¶¶ 21(a), 154–57.

**C. The Transaction Will Not Substantially Lessen Competition in PPE Markets**

Even if EPPS and Optimal Blue were in the same product market (they are not), the FTC cannot show that the transaction will substantially lessen competition. On top of the fact that the two products are highly differentiated and do not constrain one another, *see supra* Part II.B, Optimal Blue [REDACTED] from many other PPEs that are integrated into Encompass and other LOSs, including Polly, Lender Price, and Mortech.

The FTC argues that the proposed transaction will "lead to a clear presumption of illegality" because "Defendants' combined post-Acquisition PPE market share" will purportedly exceed 30%. Br. at 14–15. But this calculation is meaningless: those "shares" are in a "market" that does not

[5] This data proves why the FTC cannot establish that Optimal Blue and EPPS are in the same relevant market under the hypothetical monopolist test, which provides that "[a] proper product market should include the available [products] (and other alternatives) that a significant number of [consumers] would turn to in the event of a small but significant non-transitory increase in price . . . by a hypothetical monopolist." *Golden Boy*, 2017 WL 460736, at *11.

exist. The FTC failed to carry its burden that EPPS and Optimal Blue operate within the same relevant market. *See California*, 84 F. Supp. 2d at 1081. This is doubly true for the alleged single-brand market of "PPEs for Encompass Users." Regardless, "[a] high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors." *United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990). Indeed, market share alone is not conclusive of anticompetitive effects; analyzing a transaction "requires looking into factors such as the characteristics of the customers, trends towards competition or concentration in the industry, the existence of small but significant competitors, or the barriers to entry." *Malaney v. UAL Corp.*, 2010 WL 3790296, at *6 (N.D. Cal. Sept. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011).

Contrary to the FTC's portrayal, PPE markets are dynamic, ever evolving, and highly competitive. The space has seen significant new and ongoing investments, expansion, and entry by new PPE competitors. *See, e.g.*, DX8 ¶¶ 57(f), 173–87 (noting Polly [REDACTED] [REDACTED]" and describing several recent PPE entrants, [REDACTED] [REDACTED]). Indeed, Polly, Lender Price, and Mortech (among others) all are strong competitors in the PPE space, have features that compete with Optimal Blue, and [REDACTED]. *See, e.g.*, DX8 ¶¶ 173–87.

Polly has been a particularly aggressive and [REDACTED] competitor against Optimal Blue, with an approximately [REDACTED] increase in annual recurring revenue from Q4 2021 to Q4 2022. *See* PX6043 41:13–17. According to Optimal Blue's President, Polly has [REDACTED] [REDACTED]. PX6025 83:5–10; 83:16–84:8. Indeed, Optimal Blue now competes with Polly [REDACTED] [REDACTED]." DX12 61:17–21. [REDACTED] recently stayed with Optimal Blue only after it [REDACTED] [REDACTED]

[REDACTED]." *See* DX2 147:11–148:1; *see also* DX13-033, 35–38 ([REDACTED]).

Indeed, competition with pricing engines like Polly has only amplified over time, which has led to a [REDACTED]—facts not reflected in the FTC's current market share analyses. Since November 2022, Optimal Blue has [REDACTED]. *See, e.g.*, PX6039 44:1–5, 45:7–46:2, 78:22–81:22. And Polly is not Optimal Blue's only robust competitor. Zillow's Mortech PPE has more than [REDACTED] and is integrated with numerous LOSs. DX8 ¶ 178. Optimal Blue has [REDACTED]. DX11 124:2–4. Lender Price similarly competes for "[REDACTED]," *Id.* 123:17–20, serves more than [REDACTED] PPE customers, and is integrated with several LOSs, including Encompass, DX8 ¶ 181. And the PPE market continues to grow: Milos, LoanNEX, and LoanPASS are all new entrants, proving the PPE space is dynamic and evolving. *Id.* ¶¶ 184–87.

In short, competition among Optimal Blue and its feature-rich PPE peers is intense. Therefore, the FTC cannot establish that ICE, post-merger, could raise prices without facing significant competition or customer losses. *See, e.g.*, *Malaney*, 2010 WL 3790296 at *6; *see also Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 421 F. Supp. 274, 292 (N.D. Cal. 1976) ("While Motorola may have a large market share today, it is apparent from the competitive nature of the industry that if it attempted to raise prices or reduce the quality of its equipment or service, its market share would rapidly diminish.").

**D. ICE Will Continue to Offer Both EPPS and Optimal Blue**

The FTC argues the transaction will substantially lessen competition among PPEs because ICE plans to discontinue EPPS once it owns Optimal Blue. *See* Br. at 18–19. That is wrong. No

such plan exists. *See* PX6012 177:9–11 ("[redacted].”); PX6036 153:20–21 [redacted]”); DX5-001 ("[redacted]”).

It would make no sense for ICE to do what the FTC hypothesizes. EPPS customers use EPPS because they [redacted]. *See* PX6036 80:6–8 [redacted]”); DX14 127:18–20 ("[redacted]”). ICE is incentivized to continue serving customers who want EPPS, and do not want and will not pay for Optimal Blue, Polly, Lender Price, Mortech, or the other feature-rich PPEs. Otherwise, those customers will move to one of Encompass's many LOS competitors that offer their own native PPEs at a fraction of the price.

The FTC points to an ICE [redacted], insisting it means that [redacted]. Br. at 18–19. That is not what it shows. The [redacted].” PX6046 142:21–23. ICE's Joe Tyrrell [redacted].” PX6012 168:14–16; *see id.* 173:16–24. But ICE [redacted].” *Id.* 174:14–19. And ICE [redacted].

**E. The Government Cannot Prove an Actual Potential Competition Claim**

The FTC points to [REDACTED] [REDACTED], but this only confirms EPPS and Optimal Blue are not in the same product market today. [REDACTED] [REDACTED] [REDACTED]. The FTC says [REDACTED] [REDACTED], but misses the import: [REDACTED] [REDACTED].

The FTC nevertheless uses [REDACTED] in an apparent attempt to raise an "actual potential competition" claim. The theory would be that the acquisition deprives the market of the competition that would have arisen from ICE's independent entry into the specialized PPE market (and hence "actual potential competition"). *See Meta Platforms*, 2023 WL 2346238, at *20. But the FTC has not won on this notoriously speculative theory in the last 50 years. *See id.* (denying injunction); *FTC v. Steris Corp.*, 133 F. Supp. 3d 962 (N.D. Ohio 2015) (same); *FTC v. Atl. Richfield Co.*, 549 F.2d 289 (4th Cir. 1977) (same). Here, the FTC fails on every element:

***First, the FTC cannot show this is an oligopolistic market***. The many configurable, feature-rich PPEs, *see* PX6025 73:18–74:2, 81:12–20 [REDACTED] [REDACTED]), preclude finding the required oligopolistic market, *Marine Bancorp.*, 418 U.S. at 630–31 (limiting doctrine to oligopolistic markets where "the dominant participants" are "engaging in interdependent or parallel behavior").

***Second, the FTC cannot show reasonably probable entry by ICE***. ICE [REDACTED] [REDACTED]. *See* PX6045 85:20–21 ("[REDACTED]."); PX6036 108:3–15, 142:11–24, 149:6–8 ([REDACTED]); DX15-006 ([REDACTED]

[REDACTED]). Thus, the FTC cannot show that, but for the transaction, ICE would have entered the market *de novo*. *See Meta*, 2023 WL 2346238, at *22.

***Third, the FTC cannot show ICE would have entered the market quickly***. The FTC insists it would take "as much as [REDACTED] years to build a product truly competitive with Optimal Blue's pricing tool." Br. at 29. That timeframe is fatal to any potential competition claim, which requires potential entry "in the near future." *Tenneco, Inc. v. FTC*, 689 F.2d 346, 352 (2d Cir. 1982).

**III. The FTC's Vertical Foreclosure Theory Lacks Merit**

The FTC's last theory is based on purported vertical harm. It alleges that if ICE owns Optimal Blue, it could foreclose competing third-party PPE providers from integrating on Encompass. Br. at 19. Vertical merger challenges like this are subject to an exacting standard: the FTC must make a "fact-specific showing that the proposed merger is likely to be anticompetitive." *United States v. AT&T, Inc.*, 310 F. Supp. 3d 161, 192 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). The government has not succeeded on the merits of a vertical merger challenge in decades, *id*. at 193–94, and this case should be no different. The FTC cannot show a likelihood of success in proving that ICE's acquisition of Optimal Blue will produce vertical anticompetitive effects, or otherwise create an "ability and incentive" for ICE to discriminate against third-party PPEs on Encompass. *See* Br. at 19.

The FTC speculates that ICE will close Encompass to non-Optimal Blue PPEs or otherwise make it more expensive or difficult for third-party PPEs to integrate on Encompass. The FTC cites no evidence of any plan to close Encompass or disadvantage third-party PPEs, and there is no such plan because ICE's business strategy is premised on giving lenders choices among third-party vendors, including PPEs, on an "open network." Encompass has been an open platform since its founding in 2004, and ICE has been and remains strongly incentivized to keep operating it in the same manner. *See, e.g.*, DX16-009 ("At ICE Mortgage Technology, partnerships are in our DNA.

They have been from the start and continue to this day as we team with organizations up and down the mortgage ladder to help the industry stay efficient, connected, and innovative."). Encompass uses its open network—and more than 300 current integration partners—to both attract and retain customers.[6] The FTC's claim thus fails because it depends on the unsupported assumption that ICE will make a fundamental change in its longstanding business strategy. *AT&T*, 310 F. Supp. 3d at 241 n.51 ("I am hard pressed to conclude that AT&T would (much less could) retreat from the commitment in light of the apparent reputational costs of doing so . . . ."); *UnitedHealth*, 2022 WL 4365867 at *16 (rejecting government theory because "for it to be likely that the proposed acquisition would substantially lessen competition, United would have to uproot its entire business strategy and corporate culture; intentionally violate or repeal longstanding . . . policies; flout existing contractual commitments; and sacrifice significant financial and reputational interests").

The FTC's theory is also undermined by basic economic incentives. The Encompass LOS generates substantially more revenue than what Optimal Blue could generate for ICE post-acquisition, both at the product level and on a per customer basis. As a result, loss in revenue from an existing LOS customer that leaves for a different LOS, or a potential new customer that does not join Encompass in the first place, would cost more to ICE in lost revenue than the incremental gain in revenue even the FTC hypothesizes, even if ICE had an interest in foreclosing a third-party PPE that competes with Optimal Blue. PX6044 117:23–119:24.[7]

Finally, the FTC also claims that ICE possesses "the technical ability to disadvantage

[6] *See, e.g.*, DX17-009 ("What makes our platform different? Everything that matters to you: . . . Open and extensible: Access APIs, private data lakes, and the largest partner network in the industry"); DX18 33:17–34:2 ("[W]e integrate multiples of those service to give our customers choice in who they're selecting," the "process that they want," and which "partner they want"), *see also id.* 35:5–9, 36:9–37:1; DX19 10:21–11:2; PX6026 176:24–177:6; PX6045 112:5–20.

[7] *See, e.g.*, DX22-002 ¶ 11 ("[REDACTED] ); DX21 74:7–15 ([REDACTED] . ); DX23 112:6–10.

competing PPEs," and cites to instances where ICE planned to integrate additional PPEs on Encompass instead of prioritizing integration enhancements with Optimal Blue. Br. at 20. This undermines, rather than supports, the FTC's theory: Even with EPPS, ICE has added PPEs to Encompass, to provide *more* choices to its LOS customers. *See* PX1132, PX1452, PX1411. It has not foreclosed third-party PPEs to favor EPPS. That is competition-*enhancing* conduct.

## IV. The Court Should Not Grant an Injunction for Unconstitutional Agency Adjudication

The FTC seeks a preliminary injunction to pursue its claims in the FTC's internal administrative process. But the FTC's adjudication process violates fundamental constitutional protections, and the Supreme Court's decision in *Axon* establishes this Court's jurisdiction to prevent those injuries before they are inflicted. This Court should not grant injunctive relief in favor of the FTC's unconstitutional proceeding.

***First***, the FTC's adjudication process violates due process by depriving ICE and Black Knight of a fair proceeding before an impartial tribunal. *See* ECF 57 at 30 (first and second affirmative defenses); *id.* ¶¶ 10–15. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). The FTC's process violates that basic requirement. The FTC improperly acts as investigator, prosecutor, and judge: the FTC investigated the transaction, voted to file the complaint, and directs its prosecution; the FTC's appointed ALJ will conduct an administrative trial and make a "recommendation" to the Commission; but only the Commission can enter a decision. Thus, the FTC Commissioners, who decided to sue defendants, get to make the ultimate merits decision *in their own case*. This one-sided system, constrained only by limited appellate review—when the FTC commands substantial deference to its "findings," *see* 15 U.S.C. § 45(c) (factual findings "conclusive" if "supported by evidence")—does not afford due process. "[A]n unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).

Unsurprisingly, the FTC fares remarkably well with its home-field advantage. As the Ninth Circuit noted in *Axon*, "the FTC has not lost an administrative proceeding trial in the past quarter-century." *Axon Enter., Inc. v. FTC*, 986 F.3d 1173, 1177 (9th Cir. 2021), *cert. granted in part*, 142 S. Ct. 895 (2022), *and rev'd and remanded*, 143 S. Ct. 890 (2023). Notably, the FTC did suffer a setback after the Ninth Circuit's opinion in *Axon*, when an ALJ ruled for the merging parties after a five-week administrative trial. *See In the Matter of Illumina, Inc. and Grail, Inc.*, Docket No. 9401. But the FTC ensured that setback was only temporary. On "appeal," the FTC *reversed* the ALJ's decision, disregarded his factual findings, and entered an order finding for the FTC.

Worse, after *Illumina* and while *this* case has been before this Court, with the FTC arguing for deference to its chance of success in its own merits process, the FTC quietly changed its administrative rules (without notice and comment) to further entrench the one-sided nature of its proceedings. The FTC's ALJ, the only theoretical independent check, will no longer even issue an "initial decision" that can become the decision of the Commission absent an appeal. Rather, the ALJ will now make only a "recommended decision" that will automatically be reviewed by the Commission, which may reject the recommendation "in whole or in part, and issue its own decision adopting different findings of fact or conclusions of law." DX24-003–04.

***Second***, the fact that this transaction is being challenged by the FTC in its internal administrative adjudication process, as opposed to by the DOJ in an Article III case in federal court, violates defendants' equal protection and due process rights. *See* ECF 57 at 30 (third affirmative defenses), ¶¶ 10–12; *Heller v. Doe*, 509 U.S. 312, 320 (1993) (differential treatment violates equal protection when there is no "rational relationship between the disparity of treatment and some legitimate government purpose"). The decision to assign this case to the FTC, rather than the DOJ, was made as part of an informal, nonpublic, black-box "clearance" process that sometimes involves the flip a coin to determine which agency will pursue an action. DX25-001. That arbitrary

assignment decision has major consequences:

- DOJ-led merger challenges occur exclusively in federal court, from complaint through final judgment. They are decided by independent Article III judges, who apply the Federal Rules of Evidence and Civil Procedure and make *de novo* factual findings that cannot simply be rejected and replaced by the factual findings of a different, non-judicial body that did not observe any witnesses.

- By contrast, parties under FTC review are subject to an administrative process in which the FTC acts as investigator, prosecutor, and judge. The appointed ALJ conducts the trial applying the FTC's rules, *see* 16 C.F.R. § 3.43, not the Federal Rules of Evidence or Civil Procedure. The ALJ makes a "recommendation" but a decision is only rendered by the FTC Commissioners, who can and do reject the ALJ's findings in favor of their own preferred findings for which they demand deference on appellate review. *See* 15 U.S.C. §§ 45(b)–(c), 53(b); 16 C.F.R. § 3.42(a), 3.54(b).

There is no rational basis for these stark and often outcome-determinative differences.

***Third***, the FTC's unfettered discretion to decide whether to bring enforcement actions in its administrative process rather than in Article III courts, *see* 15 U.S.C. §§ 45(b), 53(b), violates Article I. The "power to assign disputes to agency adjudication" is a "legislative power," and Congress cannot delegate legislative power to an executive agency unless it "provides an 'intelligible principle' by which the [agency] can exercise it." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). In *Jarkesy*, the court held that Congress failed to provide an intelligible principle by granting the SEC "absolute discretion to decide whether to bring securities fraud enforcement actions within the agency instead of in an Article III court," without "indicating how the SEC should make that call in any given case." *Id.* at 462. The same is true of the FTC, which Congress gave the same unlimited discretion to decide whether to bring antitrust enforcement cases in administrative proceedings rather than in Article III courts. *Cf. Axon*, 143 S. Ct. at 897 (equating FTC and SEC authority in this respect). The FTC initiated its administrative process in this case (which it now seeks equitable relief in favor of) under an unconstitutional delegation of legislative power. *See* ECF 57 (fifth affirmative defense).

***Fourth***, the structure of the FTC's adjudicatory process violates Article II. The FTC's ALJs

and Commissioners exercise executive powers but enjoy for-cause removal protections that improperly insulate them from accountability to the President. *See* ECF 57 at 31 (fourth affirmative defense); *id.* ¶¶ 16–22; *see also Axon*, 986 F.3d at 1188 ("Axon raises substantial questions about whether the FTC's dual-layered for-cause protection for ALJs violates the President's removal powers under Article II."). That protection violates Article II because the modern FTC no longer represents the "'quasi-legislative' and 'quasi-judicial'" body described in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), but rather is primarily an enforcement agency: deciding which actions to bring and then prosecuting those actions for injunctive and monetary relief, "a quintessentially executive power." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020). Thus, the traditional limits on restricting the President's power to remove executive officers govern, and the for-cause protection for FTC Commissioners violates Article II. *See id.*, 140 S. Ct. at 2192 (removal restrictions on CFPB director violated Article II).[8]

Given these constitutional defects,[9] the Court should not grant a preliminary injunction in favor of the FTC's administrative adjudication. That would inflict on ICE and Black Knight the "here-and-now injury," *Seila Law*, 140 S. Ct. at 2196, of subjection "to an illegitimate proceeding, led by an illegitimate decisionmaker," *Axon*, 143 S. Ct. at 903. As the Supreme Court recognized in *Axon*, that injury "is impossible to remedy once the proceeding is over, which is when appellate review kicks in." *Id.*

**Conclusion**

The Court should deny the FTC's motion for preliminary injunction.

---

[8] That problem is compounded for the FTC's ALJs who can only be removed for "good cause" by the FTC Commissioners, *see* 5 U.S.C. § 7521(a), (b)(1), who are, in turn, only removable for cause. Such dual layered removal protection is unconstitutional. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483, 492–93 (2010) (holding similar multi-layer protections unconstitutional).

[9] The FTC's administrative process also improperly adjudicates private rights without trial by jury and the safeguards of an Article III court. *See* ECF 57 at 31 (seventh and eighth affirmative defense); *id.* ¶¶ 23–29.

Dated: June 16, 2023

SUSMAN GODFREY L.L.P.

By: */s/ Kalpana Srinivasan*
Kalpana Srinivasan


Kalpana Srinivasan, Bar No. 237460
ksrinivasan@susmangodfrey.com
Michael Gervais, Bar No. 330731
mgervais@susmangodfrey.com
Jesse-Justin Cuevas, Bar No. 307611
jcuevas@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Shawn L. Raymond, *pro hac vice*
sraymond@susmangodfrey.com
Alexander L. Kaplan, *pro hac vice*
akaplan@susmangodfrey.com
Adam Carlis, *pro hac vice*
acarlis@susmangodfrey.com
Michael C. Kelso, *pro hac vice*
mkelso@susmangodfrey.com
Abigail Noebels, *pro hac vice*
anoebels@susmangodfrey.com
Alejandra C. Salinas, *pro hac vice forthcoming*
asalinas@susmangodfrey.com
Krisina Zuñiga, *pro hac vice*
kzuniga@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Michelle Park Chiu, Bar No. 248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, Bar No. 259005
minna.naranjo@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

J. Clayton Everett Jr., *pro hac vice*
clay.everett@morganlewis.com
Ryan M. Kantor, *pro hac vice*
ryan.kantor@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**

1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

John C. Dodds, *pro hac vice*
john.dodds@morganlewis.com
Zachary M. Johns, *pro hac vice*
zachary.johns@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
Facsimile: (212) 309-6001

Harry T. Robins, *pro hac vice*
harry.robins@morganlewis.com
Susan Zhu, *pro hac vice*
susan.zhu@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Attorneys for Defendant Intercontinental Exchange, Inc.*

and

Elliot R. Peters, Bar No. 158708
epeters@keker.com
R. James Slaughter, Bar No. 192813
rslaughter@keker.com
Khari J. Tillery, Bar No. 215669
ktillery@keker.com
**KEKER, VAN NEST & PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Jonathan M. Moses, *pro hac vice*
jmmoses@wlrk.com
Adam L. Goodman, *pro hac vice*
algoodman@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendant Black Knight, Inc.*

**Local Rule 5-1(h)(3) Attestation**

Pursuant to N.D. Cal. Local Rule 5-1(h)(3), the undersigned attests that each of the other signatories to this document have concurred in the filing of this document.

Dated: June 16, 2023

By: /s/ *Kalpana Srinivasan*

Kalpana Srinivasan
SUSMAN GODFREY L.L.P.

*Attorney for Defendant Intercontinental Exchange, Inc.*