1  Abby L. Dennis, DC Bar # 994476
   Peter Richman, CA Bar # 149107
2  Ashley Masters, TX Bar # 24041412
   Abigail Wood, DC Bar # 242239
3
   Federal Trade Commission
4  600 Pennsylvania Avenue, NW
   Washington, DC 20580
5  Tel: (202) 326-2381

6  *adennis@ftc.gov; prichman@ftc.gov;*
   *amasters@ftc.gov; awood@ftc.gov*
7
   [Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]
8
                    **UNITED STATES DISTRICT COURT**
9                **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
10

11 **FEDERAL TRADE COMMISSION**,

12            Plaintiff,                         Case No. 3:23-CV-01710-AMO
        v.
13                                               **PLAINTIFF FEDERAL TRADE**
                                                 **COMMISSION'S REPLY IN SUPPORT**
14 **INTERCONTINENTAL EXCHANGE, INC.**           **OF MOTION FOR A PRELIMINARY**
                                                 **INJUNCTION**
   and
15                                               **REDACTED VERSION OF**
   **BLACK KNIGHT, INC.**,                       **DOCUMENT SOUGHT TO BE**
16                                               **SEALED**
            Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S REPLY IN SUPPORT OF MOT. FOR PRELIM. INJUNCTION
CASE NO. 3:23-CV-01710-AMO

1

2

**TABLE OF CONTENTS**

3

4

I.      INTRODUCTION ...................................................................................................1

5

II.     ARGUMENT..........................................................................................................2

6

A.     Defendants Urge the Court to Adopt an Erroneous Legal Standard..................2

7

B.     Defendants Concede a Likelihood of Success on the Merits in LOS
       Markets ........................................................................................................3

8

C.     Defendants Bear the Burden to Show the Divestiture Restores
       Competition...................................................................................................3

9

D.     The Divestiture Is a Poor Remedy that Fails to Restore Competition...............4

10

       1.   Defendants Overstate Constellation's Experience...............................4

11

       2.   The Divestiture Will Create ██████ Dependency upon ICE .......................5

12

       3.   Defendants Ignore Disadvantages of Split Ownership of Black Knight's
            Services .................................................................................................6

13

       4.   Constellation's ████████ Raises Concerns About Empower's Future ............7

14

E.     The Market for PPEs for Encompass Users Is Not a Single-Brand Market .......7

15

F.     Defendants Ignore Evidence of EPPS' and Optimal Blue's
       Interchangeability ..........................................................................................8

16

G.     Defendants Overstate EPPS and Optimal Blue Price Differences.....................9

17

H.     Defendants Fail to Overcome a Legal Presumption of Harm..........................10

18

I.      Defendants Cannot Distance Themselves from ICE's Plans to ███████
       ██████████████████████████████ .........................................11

19

20

J.      Defendants Ignore Evidence Reflecting ICE's Increased Ability and
       Incentive to Disadvantage PPE Competitors Post-Acquisition ......................12

21

K.     Defendants' Constitutional Arguments Are Irrelevant—And Have No
       Merit...........................................................................................................13

22

III.    CONCLUSION...................................................................................................15

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Ash Grove Cement Co. v. FTC*, 577 F.2d 1368 (9th Cir. 1978) ..................................................14

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .........................................................8, 10

*CFPB v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022) ............................................................15

*Collins v. Yellen*, 141 S. Ct. 1761 (2021)..............................................................................15

*Decker Coal Co. v. Pehringer*, 8 F.4th 1123 (9th Cir. 2021) ...................................................15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) .......................................7

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023)...............................................7, 8

*FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511 (9th Cir. 1987) ..............................................15

*FTC v. AT&T Mobility LLC*, 883 F.3d 848 (9th Cir. 2018)......................................................14

*FTC v. Cement Inst.*, 333 U.S. 683 (1948) ...........................................................................14

*FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2023 WL 2346238
    (N.D. Cal. Feb. 3, 2023) .......................................................................................2, 8, 9

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ...................................................4, 5

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015).................................................................5

*FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156 (9th Cir. 1984).....................................................2

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ..................................................8

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)...........................3, 8

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ...................................................15

*In re Illumina, Inc.*, No. 9401, 2023 WL 2946882 (FTC Mar. 31, 2023) ..........................3, 4, 12

*Kaufmann v. Kijakazi*, 32 F.4th 843 (9th Cir. 2022)...............................................................15

*Munaf v. Geren*, 553 U.S. 674 (2008).........................................................................................2

*Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197 (N.D. Cal. 2013).......................................3

*Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal. 2022).......................................................8

*Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086 (C.D. Cal. 2007) ...........7

*TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ...........................................................15

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ...........................................4, 5, 7

*United States v. AT&T, Inc.*, 310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029
(D.C. Cir. 2019) ...................................................................................................... 12

*United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ............................................. 2

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ..................................................................... 8

*United States v. U.S. Sugar Corp.*, No. 21-1644, 2022 WL 4544025
(D. Del. Sept. 28, 2022) ........................................................................................... 2

*United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-0481, 2022 WL 4365867
(D.D.C. Sept. 21, 2022) ........................................................................................ 4, 6

*William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3*, 695 F.3d 960
(9th Cir. 2012) ...................................................................................................... 14

*Withrow v. Larkin*, 421 U.S. 35 (1975) ......................................................................................... 14

**<u>Statutes</u>**

15 U.S.C. § 18a ................................................................................................................................. 3

16 C.F.R. § 4.7(b) ......................................................................................................................... 14

5 U.S.C. § 554(d)(2) ...................................................................................................................... 14

1    **I.    INTRODUCTION**

2              In its initial Brief (ECF 109, "Br."), the FTC laid out why it is likely to succeed in

3    showing in an administrative proceeding that the merger of Intercontinental Exchange, Inc.

4    ("ICE") and Black Knight, Inc. ("Black Knight")—the two leading LOS and PPE providers in

5    the United States—may substantially lessen competition in violation of the Clayton Act. Perhaps

6    sensing that the law and facts are not on their side, Defendants have responded with a litany of

7    straw men. In their Opposition (ECF 145, "Opp."), Defendants propose that the FTC must satisfy

8    the elements of a seldom-utilized and wholly irrelevant "single-brand market" doctrine (Opp. 16)

9    and the also-inapplicable "actual potential competition" doctrine (Opp. 24). Defendants propose

10   that the Court ignore that this action is one for a preliminary injunction under § 13(b) of the FTC

11   Act, and invite legal error by seeking to import the evidentiary burdens of the ultimate merits

12   proceeding. *E.g.*, Opp. 8-9. Defendants seek to cast the FTC's allegations of harm to markets for

13   PPEs for Encompass users and all PPEs as a "fallback argument," perhaps in the hope that the

14   Court will overlook competitive concerns in those markets as Defendants did when proposing a

15   slapdash Divestiture relating only to their LOSs.[1] *E.g.*, Opp. 16.

16             Defendants also ask the Court to improperly shift the burden of proving the effects of the

17   Divestiture to the FTC, but in doing so wholly ignore, and thereby concede, the FTC's

18   allegations of competitive harm in LOS markets arising from ICE's Acquisition of Black Knight.

19   Having conceded this harm, Defendants cannot establish that their last-minute Divestiture is

20   anything more than window dressing on an obviously anticompetitive deal.

21             Finally, Defendants introduce their own "fallback argument," claiming the

22   congressionally created administrative process for litigating merger legality before an ALJ

23   deprives them of constitutional rights. These arguments run contrary to precedent, and are not a

24   basis for denying a preliminary injunction here.

25             For these reasons, and the reasons set forth in the FTC's initial Brief, the Court should

26   enjoin Defendants from merging until the underlying administrative proceeding has concluded.

27
     _____

28   [1] For purposes of this Reply, the FTC refers to ICE's acquisition of Black Knight as originally
     proposed as the "Acquisition," and the subsequent arrangement to sell Empower to Constellation
     Web Solutions Inc. ("Constellation") as the "Divestiture."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    ARGUMENT

### A.    Defendants Urge the Court to Adopt an Erroneous Legal Standard

The FTC satisfies its burden of showing a likelihood of success if it raises questions on the merits adequate to make them "fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." Br. 5 (quoting *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1162 (9th Cir. 1984)).[2] Because the issue of whether the FTC has raised sufficient questions about the Acquisition is a "narrow one," the Court need not "resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *Warner Commc'ns*, 742 F.2d at 1164. Defendants seek to avoid application of this standard by arguing that the Court should instead demand the heightened showings discussed in *United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990), *United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017), and *United States v. U.S. Sugar Corp.*, No. 21-1644, 2022 WL 4544025 (D. Del. Sept. 28, 2022). Opp. 8-9. Each of those cases was an action to obtain a *permanent* injunction—in other words, the ultimate merits proceeding. Here, the FTC seeks only a *preliminary* injunction under § 13(b) of the FTC Act; the Court's task is to assess the FTC's likelihood of success in the merits proceeding under the standard noted in *Warner Commc'ns*, 742 F.2d at 1162. Defendants' assertions regarding the FTC's burden drawn from *Baker Hughes*, *Anthem*, and *U.S. Sugar Corp.* are wrong as a matter of law in the preliminary injunction context.

Defendants also suggest that the Court should apply a heightened standard because if they are preliminarily enjoined from merging, they may not see a final resolution of the matter before their self-imposed "November 4 termination date." Opp. 2. Defendants' consideration of how long they will wait to merge is a private concern outweighed by public interests in effective

---

[2] This standard remains the law. *E.g.*, *FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2023 WL 2346238, at *8 (N.D. Cal. Feb. 3, 2023) ("*Meta*"). In arguing that serious questions about the Acquisition's legality do not justify an injunction, Defendants mischaracterize the Supreme Court's holding in *Munaf v. Geren*, 553 U.S. 674 (2008). Opp. 8. There, the Court, in holding that questions about the lower court's jurisdiction over a *habeas* petition were not adequate to justify an injunction, explicitly distinguished those jurisdictional questions from a "likelihood of success on the merits," such as the question in the case at bar. *Id.* at 690-91. In other words, *Munaf* suggests precisely the opposite of what Defendants have cited it for.

1  enforcement of the antitrust laws. *E.g.*, *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d

2  27, 73-74 (D.D.C. 2018). The Court should decline to apply a heightened standard on this basis.

3        **B.**      **Defendants Concede a Likelihood of Success on the Merits in LOS Markets**

4        In their Opposition, Defendants argue that the FTC cannot show that their sale of

5  Empower to Constellation will lessen LOS competition. In doing so, Defendants wholly ignore

6  and effectively concede the FTC's allegations that: (1) commercial LOS and all-LOS markets are

7  relevant product markets in which to evaluate the Acquisition; and (2) the FTC is likely to

8  succeed on the merits in showing that the Acquisition without the Divestiture may substantially

9  lessen competition or tend to create a monopoly in those markets in violation of § 7 of the

10  Clayton Act. Br. 7-12; *e.g.*, *Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 & n.7

11  (N.D. Cal. 2013) (issue not addressed in opposition is waived).

12        **C.**      **Defendants Bear the Burden to Show the Divestiture Restores Competition**

13        Although Defendants sought antitrust approval under the Hart-Scott-Rodino Antitrust

14  Improvements Act ("HSR Act") for ICE's Acquisition of all of Black Knight's assets, they now

15  propose the FTC should have to prove the effects of their deal to offload Black Knight's

16  Empower to Constellation. This is not the law. Defendants bear the burden to show the

17  Divestiture will restore lost competition.

18        The HSR Act requires merging parties to file notification of transactions exceeding

19  certain thresholds. 15 U.S.C. § 18a. In enacting the HSR Act, one goal of Congress was to give

20  the FTC advance notice of an impending merger, to provide a "meaningful chance to carry its

21  burden of proof, and win a preliminary injunction against a merger that appears to violate

22  [Clayton Act] section 7." H.R. Rep. No. 94-1373, at 8 (1976).

23        One tactic used by merging parties to push an anticompetitive transaction through

24  regulatory review is to "litigate the fix." By proposing an eleventh-hour modification to a

25  merger, defendants may hope to avoid litigating the transaction as initially filed. Rewarding this

26  tactic would frustrate the purpose of the HSR Act to provide the FTC with the opportunity to

27  thoroughly investigate potential transactions and create perverse incentives, as recognized by the

28  Commission in *In re Illumina, Inc.*, No. 9401, 2023 WL 2946882, at *53 (FTC Mar. 31, 2023):

1
2
3
4

> [I]t is Respondents' burden to show that their offered remedy would actually be effective. Putting the burden on Complaint Counsel would create a perverse incentive for merging parties to propose so-called fixes that leave some portion of competitive harm unremedied, requiring the government to keep up with shifting proposals . . . and forcing the public to live with partial remedies that do not fully restore competition.

5   For that reason some courts recognize that when merging parties propose a divestiture to address

6   antitrust concerns, they are proposing a remedy to problems created by the merger rather than a

7   wholly new transaction, and thus bear the burden of showing the remedy will restore

8   competition. *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 59-60 (D.D.C. 2017); Br. 23-24.

9          The precedent Defendants cite to argue that the FTC should have to show that the sale of

10   Empower to Constellation may substantially lessen competition undermines their position.

11   Defendants rely on *United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-0481, 2022 WL

12   4365867 (D.D.C. Sept. 21, 2022), and characterize that decision as "rejecting the government's

13   proposed burden-shifting." Opp. 11. However, the judge in that case *adopted* the government's

14   standard and placed the burden on the defendants to establish their divestiture would replace the

15   competitive intensity lost as a result of their transaction. *UnitedHealth Grp.*, 2022 WL 4365867

16   at *10.[3] Defendants similarly cite *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020), but

17   the court in *RAG-Stiftung*, like the court in *UnitedHealth*, placed the burden on the defendants.

18   436 F. Supp. 3d at 304. In short, because the FTC has shown, and Defendants conceded, a

19   likelihood of success in establishing that the Acquisition may substantially lessen competition in

20   commercial LOS and LOS markets, Defendants bear the burden to prove that the Divestiture

21   restores competition. *Aetna*, 240 F. Supp. 3d at 59-60; *In re Illumina*, 2023 WL 2946882, at *53.

22          **D.      The Divestiture Is a Poor Remedy that Fails to Restore Competition**

23          **1.  Defendants Overstate Constellation's Experience**

24          In their Opposition, Defendants suggest that Constellation is a buyer with experience to

25   operate a competitive LOS. Opp. 11. This is an overstatement. Constellation has ▮▮▮▮▮

26

27   [3] In dicta, the court in *UnitedHealth Group* expressed dissatisfaction with the approach it
ultimately adopted. *Id.* at *9-10. Even then, however, the court acknowledged that the
28   government's position—defendants should bear the burden of establishing that a proposed
divestiture restores competition—"admittedly finds support in this District's case law." *Id.* at *9.

1   ███████████████████████████████████████████████████

2   ████████████████. *Compare* DX1 (Gagliano (Black Knight) Dep.) at 24:9-13 *with* PX6032

3   (George (Constellation) Dep.) at 20:12-22:11; PX6062 (Wilhelm (Constellation) Dep.) at 342:2-

4   11, 343:5-10; *see also* PX8001 (Sacher (FTC) Rebuttal) ¶ 254. Though Constellation already

5   owns an LOS, that LOS has managed to capture ███████████████ of either alleged

6   LOS market. PX8000 (Sacher (FTC) Rep.) at Tables 9-13.

7        **2.  The Divestiture Will Create ████████ Dependency upon ICE**

8        The main problem with the Divestiture is not the identity of the buyer, but its structure

9   that will make Constellation dependent on ICE ████████████. Br. 26-27. Defendants argue

10  that "████████████████████████████████" (Opp. 14), citing █████████

11  ████████████████████████████████████████████. This

12  ████████ is irrelevant to the legal question of whether the Court should endorse a remedy that

13  would render Constellation dependent on its future competitor. Rather, "[c]ourts are skeptical of

14  a divestiture that relies on a 'continuing relationship between the seller and buyer of divested

15  assets' because that leaves the buyer susceptible to the seller's actions—which are not aligned

16  with ensuring that the buyer is an effective competitor." *Aetna*, 240 F. Supp. 3d at 60 (quoting

17  *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 77 (D.D.C. 2015)). Indeed, the court in *Sysco Corp.*

18  rejected ████████████████████████████, finding that ongoing

19  entanglement between the merged company and divestiture buyer rendered them "not . . . truly

20  independent." 113 F. Supp. 3d at 77-78

21       Defendants cite *RAG-Stiftung*, 436 F. Supp. 3d at 306-07, to suggest that the Court should

22  nevertheless tolerate Constellation's ████████ dependency on ICE. Opp. 14. *RAG-Stiftung* is

23  distinguishable: there, testimony of the divestiture buyer's executive helped to dispel any "notion

24  of undue influence." 436 F. Supp. 3d at 306. Here, ████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████. Br. 27 (citing, *e.g.*, PX4138

27  (Constellation) at 5-6 ("████████████████████████")); PX4099

28  (Constellation) at 1 ("████████████████████████████

1 ██████ "); PX6062 (Wilhelm (Constellation) Dep.) at 290:21-291:9 (discussing PX4099).

2 **3. Defendants Ignore Disadvantages of Split Ownership of Black Knight's Services**

3 Defendants assert that "Constellation Is Buying All of Empower, Not Part" (Opp. 11),

4 setting up a straw man to assail, rather than addressing head-on the FTC's argument that splitting

5 ownership of Empower from many integrated services on which its users rely will limit

6 Constellation's ability to ████████████████████████████████████████

7 ██████████████████████████████. Br. 24-26.

8 Black Knight's ownership of services integrated with Empower ████████████

9 ██████████████████████████████████████████████

10 ██████████████████████. Br. at 25. Splitting ownership of Empower from

11 Black Knight's full suite of products means Constellation will lack ████████████

12 ██████████████████████████████. Br. 25-26.[4]

13 The Divestiture thus will not "preserve the level of competition that existed in the relevant

14 market for the merger." Opp. 13 (citing *UnitedHealth Grp.*, 2022 WL 4365867, at *14).

15 Defendants' assertion that "Constellation's Empower Will Be an Independent Competitor

16 to Encompass" (Opp. 13), similarly is belied by ██████████████. *E.g.*, PX4142

17 (Constellation) at 4 ("████████████████████████████████████

18 ████████████████"); PX4224 (Constellation) at 1 ("████████████

19 ████████████████"). Defendants try to minimize ████████████

20 ████████████████████████████████████████

21 ██████████████████████████. Opp. 15. However,

22 some of these ████████████████████████████████████

23 ██████████. *See, e.g.*, PX4138 (████████); PX4142 (████████). It strains

24 credulity to claim ████████████████████████.

25 ────────────────

26 [4] Defendants' suggestion that Constellation will ████████████████████
██████" (Opp. 14) is fiction. In reality, Black Knight ████████████████████

27 ████████████. PX8001 (Sacher (FTC) Rebuttal) ¶¶ 233-35.

28 *Id.* Rather, ████████████████████████████████████████
██████████. *Id.* ¶ 235.

**4. Constellation's ████████ Raises Concerns About Empower's Future**

Turning to ██████████████████████████, Defendants ask the Court to disregard precedent holding that "[a]n extremely low purchase price reveals the divergent interest between the divestiture purchaser and the consumer: an inexpensive acquisition could still produce something of value to the purchaser even if it does not become a significant competitor and therefore would not cure the competitive concerns." *Aetna*, 240 F. Supp. 3d at 72 (quotation marks omitted). Defendants argue, with little evidentiary support, that Constellation's ████████████████████████████████████████████████████████████

██████████████████████████████████████. Opp. 15-16. ████████████████████████

contradict Defendants' position outright, and reflect that ████████████████████████

██████████████████████████████. *E.g.*, PX4222 (Constellation) at 1

("████████████████████████████████████████████████████████████");

PX6029 (Wilhelm (Constellation) Dep.) at 48:17-19; 58:2-3 ("████████████████████

████████████████████████████████████████████████"). In short,

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████.

**E.      The Market for PPEs for Encompass Users Is Not a Single-Brand Market**

Defendants seek to recast the FTC's alleged market of PPEs for Encompass users as a "single-brand market claim."[5] Opp. 16. This is a thinly disguised effort by Defendants to interpose inapposite legal standards where the facts and law are against them. For example, Defendants write that the FTC "must show . . . [that] the challenged aftermarket restrictions are not generally known when consumers make their foremarket purchase." Opp. 17 n.1 (quoting *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023)). They do not explain what "challenged aftermarket restrictions" means in the context of this case. Defendants' arguments

---

[5] Single-brand markets may be implicated when the seller of a durable product (e.g., photocopiers) charges high prices for aftermarket service or replacement parts for the specific brand product based on unsophisticated consumers being locked into the brand by their original purchase. *E.g.*, *Epic Games*, 67 F.4th at 977 (discussing *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992)); *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1094 (C.D. Cal. 2007). This paradigm does not apply in this merger case.

1  on this point are nonsensical because the cases they cite—*Epic Games*, 67 F.4th 946, and *Reilly*

2  *v. Apple Inc.*, 578 F. Supp. 3d 1098 (N.D. Cal. 2022)—are conduct cases dealing with Sherman

3  Act claims and have no bearing on what the FTC must show to establish a likelihood of success

4  in an administrative proceeding to block a merger under the Clayton Act.

5       PPEs for Encompass users is a properly defined submarket within the broader PPE

6  market. Br. 12-14. "[A]ntitrust markets can be based on targeted customers." *Wilh. Wilhelmsen*

7  *Holding*, 341 F. Supp. 3d at 46. A hypothetical monopolist of PPEs for Encompass users could

8  profitably increase prices for targeted PPE customers: here, Encompass users. Br. 13-14;

9  PX8000 (Sacher (FTC) Rep.) ¶¶ 202-215. Because this market satisfies the hypothetical

10  monopolist test, and finds support in qualitative evidence (*e.g.*, PX1640 (ICE) at 8), it is an

11  appropriate relevant product market. *E.g.*, *Wilh. Wilhelmsen Holding*, 341 F. Supp. 3d at 46-47.

12  Moreover, at the preliminary injunction stage, the FTC need not prove the exact delineations of a

13  market, and rather must only "rais[e] some question of whether [the candidate market] is a well-

14  defined market." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036-37, 1041 (D.C. Cir.

15  2008). The FTC has met its burden here.

16      **F.**     **Defendants Ignore Evidence of EPPS' and Optimal Blue's Interchangeability**

17      Defendants' argument that feature differences between EPPS and Optimal Blue preclude

18  them from being in the same product market (Opp. 18) flies in the face of significant evidence of

19  interchangeability and head-to-head competition (Br. 15-18). As Defendants' expert recognizes

20  and case law holds, "███████████████████████████████████████

21  ███████" PX8002 (Dick (Def.) Rep.) ¶ 124; *e.g.*, *United States v. Cont'l Can Co.*, 378 U.S. 441,

22  449-53 (1964). While product differences are a factor for the Court to consider, the ultimate goal

23  of the inquiry is to determine whether and where competition exists. *Brown Shoe Co. v. United*

24  *States*, 370 U.S. 294, 326 (1962) ("This is not to say . . . that 'price/quality' differences . . . are

25  unimportant in analyzing a merger . . . but the boundaries of the relevant market must be drawn

26  with sufficient breadth to include the competing products of each of the merging companies and

27  to recognize competition where, in fact, competition exists."); *Meta*, 2023 WL 2346238, at *9.

28      While EPPS and Optimal Blue may not offer identical "████████████," both offer the

1    core functionalities of a PPE. *E.g.,* PX6041 (█████ (SouthPoint) Dep.) at 25:4-15. Rather than

2    reflecting that ████████████████████████████████ (Opp. 18),[6]

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ██████████████████████████████████. PX8001 (Sacher (FTC) Rebuttal) ¶ 64 (citing,

6    *e.g.,* PX1205 (ICE) at 2). Further, as discussed at II.I *infra*, ICE views EPPS and Optimal Blue as

7    interchangeable: ███████████████████████████████████████.

8    Black Knight's ██████████████ paints a similar picture: ████████████████

9    ████████████████████████████████. PX8000 (Sacher (FTC)

10    Rep.) ¶¶ 431-38; PX8001 (Sacher (FTC) Rebuttal) ¶ 187. Similarly, Black Knight's ███████

11    indicates ██████████████████████████████████████.

12    PX8001 (Sacher (FTC) Rebuttal) ¶ 192. This ██████████ squarely contradicts Defendants'

13    argument that ████████████████████████████████████████████

14    ███████. Defendants' argument based on ████████████████████████████

15    (Opp. 19) likewise ignores that ████████████████████████████████████

16    ████████████████████████. PX8001 (Sacher (FTC) Rebuttal) ¶¶ 66-104. While not every

17    PPE customer may choose EPPS, it competes ███████████████████████ with Optimal

18    Blue.[7] This head-to-head competition leads to the conclusion that EPPS and Optimal Blue are

19    properly in the same product market. *Meta*, 2023 WL 2346238, at *9; Br. 16-17.

20    **G.    Defendants Overstate EPPS and Optimal Blue Price Differences**

21    Defendants argue that a difference in Optimal Blue and EPPS prices proves that they do

---

[6] Contrary to Defendants' assertion ████████████████████████████████████████
Umpqua's representative, ██████████████, testified: "████████████████████
████████████████████████████████████████" PX6035 (██████████ (Umpqua) Dep.)
at 27:20-28:3. When asked ███████████████████████████████████████████████
████████████████████████████████████████████████████." *Id.* at 97:24-98:6.

[7] Despite this evidence of *existing* PPE competition, Defendants draw on ████████████████
████████████████ to try to frame the FTC's PPE allegations as relating only to *potential*
competition, and thereby seek to impose a host of irrelevant pleading requirements. Opp. 24-25.
However, ████████████████ was a manifestation of existing feature competition, and█████
████████████████████████████████████████████. Br. 17-18.

1    not compete within the same relevant product market. Opp. 19. Far from it. Again, as *Brown*

2    *Shoe* makes clear, though price differences may inform market definition, the crux of the inquiry

3    is whether and where competition exists. 370 U.S. at 326. ███████████████████

4    ████████████████████████████████████████████████

5    ████████. Br. 16-17 & n.7. Further, Defendants build their price-based argument on a flawed

6    analysis of their retained expert, Dr. Dick. Opp. 19-20. In seeking to draw conclusions ████████

7    ████████████████████████████████████.

8    ██████, Dr. Dick fails to account ████████████████████████████████

9    ████████████████████████████████████

10   ████████████████████████████████████████████

11   ████████████████████. PX8001 (Sacher (FTC) Rebuttal) ¶¶ 107-117. Dr. Dick also

12   overstates price differences between EPPS and Optimal Blue ████████████████

13   ████████████████████████████████████. *Id.* ¶¶

14   118-122, 141-155. For these and other reasons, Dr. Dick's analysis of EPPS and Optimal Blue

15   price differences is inadequate to support any conclusion regarding the state of competition.

16           **H.        Defendants Fail to Overcome a Legal Presumption of Harm**

17           Defendants argue that the Court should disregard well-supported presumptions of

18   competitive harm resulting from high PPE market shares and a significant increase in

19   concentration caused by the Acquisition. *Compare* Opp. 20-22 *with* Br. 14-15. Defendants write:

20   "[A]nalyzing a transaction requires looking into factors such as the characteristics of the

21   customers, trends towards competition or concentration in the industry, the existence of small but

22   significant competitors, or the barriers to entry." Opp. 21 (quotation marks omitted). These

23   factors reinforce, rather than rebut, the applicable presumptions of competitive harm.

24           For example, Defendants themselves have led a substantial trend toward concentration of

25   PPEs: Since 2019, Black Knight has acquired Compass and Optimal Blue to supplement

26   Empower's native PPE, and now seeks to combine with its most significant PPE competitor. Br.

27   3, 15-16. In seeking to minimize the competitive harms of the Acquisition, Defendants overstate

28   the competition they face from third-party PPE providers. Opp. 21-22. No PPE besides EPPS

1 and those owned by Black Knight has captured more than ██████████ of either alleged

2 PPE market. PX1640 (ICE) at 8. As discussed in II.F *supra*, Optimal Blue and EPPS encounter

3 each other in head-to-head competition ████████████████████████████

4 ████████ any new PPE would face high barriers to entry—████████████████████

5 ███████████████████████████. Br. 29. Post-Acquisition, ICE also will have

6 an increased ability and incentive to make life more difficult for any PPE hopeful. Br. 19-22. The

7 factors cited by Defendants confirm that the Acquisition threatens real competitive harm, and

8 presumptions based on a significant increase in concentration apply with full force.

9   **I.**  **Defendants Cannot Distance Themselves from ICE's Plans to** ███████

10 ████████████████████████

11   Defendants seek to dismiss evidence that ICE █████████████████████

12 ████████████████████████████ as mere "hypothesi[s]" by the FTC. Opp. 23.

13 To the contrary, evidence of this approach comes not from the FTC's imagination, but from

14 ██████████████████████. In connection with the Acquisition, ICE

15 prepared an █████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████. PX1100 (ICE) at 4; PX6046 (Tyrrell (ICE) Dep.) at

18 141:20-142:13 (discussing PX1100). In its ██████████████████████, ICE

19 stated that ████████████████████████████████.

20 PX1102 (ICE) at 90-91 (citing PX1100). ICE now seeks to distance itself from its ██████

21 claiming ██████████████████████████████

22 ██████. Opp. 23 (emphasis added). This is a startling admission from ICE that ████████

23 ████████████████████████████████████

24 ████████████████████████

25   Further, examination of ICE's ████████████ contradicts its current position ████

26 ████████████████████████████████████████

27 ████████████████████████. PX6046 (Tyrrell (ICE) Dep.)

28 at 148:17-149:10 (███████████), 153:17-154:12 (███████████), 154:13-156:19

1   (███████████████████); PX1100 (ICE) at 3. ICE's ███████████████████

2   ███████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████████

4   ████████████. PX1100 (ICE) at 3 (███████████). The Court should not credit ICE's *post hoc*

5   attempts to distance itself from its ████████████████████████████████.

      **J.**        **Defendants Ignore Evidence Reflecting ICE's Increased Ability and**

               **Incentive to Disadvantage PPE Competitors Post-Acquisition**

8   In contesting the vertical harms arising from the Acquisition, Defendants again conflate

9   evidentiary burdens in this *preliminary* injunction suit with burdens in the ultimate merits

10   proceeding by relying on *permanent* injunction case law. Opp. 25 (quoting *United States v.*

11   *AT&T, Inc.*, 310 F. Supp. 3d 161, 192 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019)).

12   Defendants also question the viability of vertical merger challenges, writing "[t]he government

13   has not succeeded on the merits of a vertical merger challenge in decades." Opp. 25. They are

14   wrong. Complaint counsel prevailed on the merits of a vertical merger challenge as recently as

15   March of this year. *In re Illumina*, 2023 WL 2946882. Precedent undergirding challenges to

16   vertical mergers is settled and not in dispute. *E.g.*, *Brown Shoe Co.*, 370 U.S. at 317.

17   Defendants seek to dismiss evidence that the Acquisition will increase ICE's incentive to

18   limit Encompass access for competing PPE providers as mere speculation. Opp. 25. Far from

19   speculative, the FTC's allegations are supported by sound economic analysis and evidence from

20   Defendants themselves. By acquiring the industry-leading Optimal Blue, ICE can recapture a

21   greater portion of the business and revenues lost by third-party PPEs integrated with Encompass,

22   and thus will have a greater economic incentive to disadvantage those PPEs. Br. 22; PX8000

23   (Sacher (FTC) Rep.) ¶¶ 494-505. Again, ICE's ███████████████████████

24   ███████████████████████████████████████████████████████

25   ████████████████████████████, which is inconceivable without ICE taking steps

26   █████████████████████████████████. Br. 21-22.

27   Defendants' acknowledgment that after Black Knight's acquisition of Optimal Blue,

28   "ICE planned to integrate additional PPEs on Encompass instead of prioritizing integration

enhancements with Optimal Blue" (Opp. 27), reflects an instance of ICE picking winners and losers among PPEs integrated with Encompass based on competitive concerns. Defendants argue that this shows ICE benefitting, rather than disadvantaging, certain PPEs (Opp. 27), but these instances are actual evidence—not speculation—that ICE can and will take steps to influence how PPEs compete for Encompass users. Just as ICE has taken its competition into account ████████████████████████████████████████, it can be expected to do so after the Acquisition.[8] But after the Acquisition, its incentives will shift to prioritizing Optimal Blue over third-party PPEs integrated with Encompass. PX8000 (Sacher (FTC) Rep.) ¶¶ 494-505.

Last, Defendants argue that ICE would not disadvantage competing PPEs on Encompass because it would not want to lose customers to other LOSs. Opp. 26. However, ████████████ ██████ and the analysis of the FTC's expert both recognize that LOSs are "stickier" than PPEs. *E.g.*, PX1070 (ICE) at 6; PX8000 (Sacher (FTC) Rep.) ¶¶ 208, 509. In other words, switching LOSs is more burdensome than switching PPEs, and lenders are less likely to switch LOSs if ICE disadvantages competing PPE providers on Encompass than they are to switch to another PPE—e.g., Optimal Blue—on Encompass. PX8000 (Sacher (FTC) Rep.) ¶¶ 507-514.

**K.      Defendants' Constitutional Arguments Are Irrelevant—And Have No Merit**

At the outset of this case, Defendants sought a prompt hearing on the FTC's motion for a preliminary injunction and agreed to defer their constitutional counterclaims, explaining that this approach may avoid the need to "rul[e] on the substantial constitutional issues raised by the FTC's administrative proceeding." ECF 72 at 17. The Court should follow that path. As the FTC explained in its motion to strike, the constitutional arguments are not relevant to the analysis of whether to grant a preliminary injunction under § 13(b). ECF 95 at 4-7. In any event, they are baseless and contrary to Supreme Court and Ninth Circuit precedent, which Defendants ignore.

***Separation of functions.*** Defendants argue that the FTC's administrative adjudications violate due process because the agency both prosecutes and adjudicates cases. Opp. 27. But, to

---

[8] While Defendants tout Encompass's "open network" policy (Opp. 25-26), ████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ *See* PX1394 (ICE) at 1; PX1392 (ICE) at 1 ("█████████████████████████████████████████████████████████████").

1    show a due process violation, a party must overcome "a presumption of honesty and integrity on

2    the part of the decisionmaker" and show that *"undue prejudice did occur." Ash Grove Cement*

3    *Co. v. FTC*, 577 F.2d 1368, 1376 (9th Cir. 1978) (emphasis added). Defendants do not attempt

4    such a showing, nor could they. The Supreme Court has rejected the idea "that the combination

5    of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in

6    administrative adjudication." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). The Ninth Circuit has

7    held that an agency may perform both prosecutorial and adjudicative functions when, as here, it

8    maintains "an ethical wall that prevents attorneys representing the [prosecutorial staff] from

9    supervising attorneys who advise the [adjudicator] or sharing case information with them."

10   *William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3*, 695 F.3d 960, 965-66 (9th Cir.

11   2012). Because FTC staff responsible for prosecuting the case are forbidden from *ex parte*

12   contact with the ALJ or the Commissioners once a complaint issues (5 U.S.C. § 554(d)(2); 16

13   C.F.R. § 4.7(b)), the administrative forum provides full due process.

14           ***Equal protection.*** Defendants' claim that their equal protection rights are violated

15   because the FTC brought administrative proceedings when the DOJ could instead have filed suit

16   in federal court is meritless. Opp. 28-29. As Defendants concede, this distinction is subject to

17   "rational basis" review. *Id.* at 29. The Supreme Court has explained that Congress endowed the

18   FTC and DOJ with "cumulative remedies" that are not "confine[d] . . . within narrow, mutually

19   exclusive limits." *FTC v. Cement Inst.*, 333 U.S. 683, 694-95 (1948). The Ninth Circuit, sitting

20   *en banc*, has recognized that this concurrent authority "makes sense, as different federal agencies

21   bring to the table discrete forms of expertise and specific enforcement powers." *FTC v. AT&T*

22   *Mobility LLC*, 883 F.3d 848, 862 (9th Cir. 2018) (en banc). Given their overlapping jurisdiction,

23   it was not irrational, much less unconstitutional, for the FTC and DOJ to allocate cases among

24   themselves to save resources, avoid duplicative proceedings, and develop industry-specific

25   expertise. For that reason—and many others—Defendants' equal protection argument fails.

26           ***Nondelegation.*** Congress did not improperly delegate legislative powers by granting the

27   FTC authority to enforce the law through proceeding either in its administrative court or in

28   federal court. Opp. 29. Such decisions are core *executive* functions under Article II of the

Constitution, not a legislative power Congress itself should have performed—and are therefore not subject to a nondelegation analysis.[9] *See TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021) ("[T]he choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch . . . .").

***Removal of Commissioners and ALJ.*** Defendants attack the for-cause removal restrictions of the FTC Commissioners (Opp. 29-30), but the Supreme Court blessed those restrictions almost 90 years ago in *Humphrey's Executor v. United States*, 295 U.S. 602, 626-32 (1935), and the Ninth Circuit has rejected Defendants' argument that *Humphrey's Executor* is no longer binding because the agency now brings enforcement cases in federal court, *see FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1514 (9th Cir. 1987). The removal restrictions on the ALJ likewise are constitutional since he performs "quasi judicial" duties, *see Humphrey's Executor*, 295 U.S. at 629, and "there is a long history of adjudication by ALJs free from political influence," *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1136 (9th Cir. 2021).

In any event, Defendants do not dispute that the ALJ and Commissioners were "properly *appointed*," which means "there is no reason to regard any actions taken by [those officials] . . . as void." *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021). To prevail, Defendants must show how the allegedly "unconstitutional removal provision *actually harmed*" them. *CFPB v. CashCall, Inc.*, 35 F.4th 734, 743 (9th Cir. 2022) (quoting *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022)). This requires showing that (1) the President expressed a desire to remove the Commissioners or ALJ but could not do so, and (2) the President's inability to remove those officials resulted in the challenged actions. *See id*. Defendants make no such allegations here, so their arguments fail.

## III.   CONCLUSION

For the foregoing reasons and those stated in its opening Brief, the FTC respectfully requests that the Court grant the FTC's Motion for a Preliminary Injunction.

---

[9] The Fifth Circuit's decision in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), is contrary to *TransUnion* and other Supreme Court cases, and the SEC has petitioned for Supreme Court review. In any event, this case differs from *Jarkesy*, which turned on the fact that the defendant had a jury trial right in federal court. *Id.* at 453-55, 465. Defendants have no such right here.

1      Dated: June 23, 2023            Respectfully submitted,

2                                */s/ Abby L. Dennis*
                                 Abby L. Dennis

3                                Peter Richman

                               Ashley Masters

4                                Abigail Wood

5                                Daniel Aldrich

                               Laura Antonini

6                                Catharine Bill

7                                Caitlin Cipicchio

                               Steven Couper

8                                Janet Kim

                               Christopher Lamar

9                                Christopher Megaw

                               Lauren Sillman

10                               Neal Perlman

11                               Nicolas Stebinger

                              Nina Thanawala

12                               Taylor Weaver

13                               Federal Trade Commission

                              600 Pennsylvania Avenue, NW

14                               Washington, DC 20580

                              Tel: (202) 326-2381

15

16                               *Counsel for Plaintiff Federal Trade Commission*

17

18

19

20

21

22

23

24

25

26

27

28