1  Kalpana Srinivasan, Bar No. 237460
   ksrinivasan@susmangodfrey.com
2  Michael Gervais, Bar No. 330731
   mgervais@susmangodfrey.com
3  **SUSMAN GODFREY L.L.P.**
   1900 Avenue of the Stars, Suite 1400
4  Los Angeles, California 90067-6029
   Telephone: (310) 789-3100
5  Facsimile: (310) 789-3150

6  Shawn L. Raymond, *pro hac vice*
   sraymond@susmangodfrey.com
7  Alexander L. Kaplan, *pro hac vice*
   akaplan@susmangodfrey.com
8  **SUSMAN GODFREY L.L.P.**
   1000 Louisiana, Suite 5100
9  Houston, Texas 77002-5096
   Telephone: (713) 651-9366
10 Facsimile: (713) 654-6666

11 J. Clayton Everett Jr., *pro hac vice*
   clay.everett@morganlewis.com
12 Ryan M. Kantor, *pro hac vice*
   ryan.kantor@morganlewis.com
13 **MORGAN, LEWIS & BOCKIUS LLP**
   1111 Pennsylvania Avenue, NW
14 Washington, D.C. 20004-2541
   Telephone: (202) 739-3000
15 Facsimile: (202) 739-3001

16 *Attorneys for Defendant*
   *Intercontinental Exchange, Inc.*
17
   (Additional counsel appear on signature page)
18

Elliot R. Peters, Bar No. 158708
epeters@keker.com
R. James Slaughter, Bar No. 192813
rslaughter@keker.com
Khari J. Tillery, Bar No. 215669
ktillery@keker.com
**KEKER, VAN NEST & PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Jonathan M. Moses, *pro hac vice*
jmmoses@wlrk.com
Adam L. Goodman, *pro hac vice*
algoodman@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendant*
*Black Knight, Inc.*

19            **UNITED STATES DISTRICT COURT**

20          **NORTHERN DISTRICT OF CALIFORNIA**

21              **SAN FRANCISCO DIVISION**

22
   FEDERAL TRADE COMMISSION,                    Case No. 3:23-cv-01710-AMO
23
                 Plaintiff,                     **DEFENDANTS' PROPOSED PRE-**
24                                              **HEARING FINDINGS OF FACT AND**
   vs.                                          **CONCLUSIONS OF LAW**
25
   INTERCONTINENTAL EXCHANGE, INC.              July 24, 2023, 9 a.m.
26 and BLACK KNIGHT, INC.,                      July 25, 2023, 9 a.m.
                                                July 26, 2023, 9 a.m.
27               Defendants.                    Judge:   Hon. Araceli Martínez-Olguín
28
                                                PUBLIC REDACTED

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ............................................................................ iii

TABLE OF EXHIBITS .................................................................................... viii

INTRODUCTION ............................................................................................. 1

PROPOSED FINDINGS OF FACT ................................................................ 1

    I.     The Merging Parties and the Proposed Transaction ............................... 1

    II.    The Transaction Rationale ....................................................................... 4

        A.    This Merger Will Connect Disparate Parts of the Mortgage Business ................................................................................................. 4

        B.    LOS Platforms Help Turn Loan Applications into Closed Mortgages ............................................................................................ 5

        C.    Lenders Use PPEs to Collect Market Pricing Data for Potential Loans .................................................................................................. 7

        D.    After Closing, LSPs Connect Lenders and Borrowers for Servicing Activities ........................................................................... 13

    III.   The Empower Divestiture ...................................................................... 14

        A.    Black Knight and ICE Sought an Experienced and Well-Capitalized Technology Solutions Provider for Empower ...................... 14

        B.    Constellation Was the Winning Bidder .................................................. 16

        C.    The Deal Terms Ensure that Constellation Will Be Ready to Have Empower Continue to Compete ...................................................... 18

    IV.   Industry Outlook .................................................................................... 21

        A.    Competition for LOSs Will Not Decrease Due to the Merger ................ 21

        B.    Competition for PPEs Will Not Decrease Due to the Merger ................ 22

        C.    The Merger Will Significantly Benefit Mortgage Consumers ................ 24

        D.    Enjoining the Merger Would Kill the Transaction and Prevent Industry Efficiencies ........................................................................... 26

        E.    The FTC Did Not Offer Credible Evidence of Customer Concerns Regarding Competition ......................................................... 27

PROPOSED CONCLUSIONS OF LAW ...................................................... 29

    I.     Legal Standards ..................................................................................... 29

II.   The FTC Has Failed to Show That It Is Likely to Succeed on the Merits ........... 32

   A.   The Merger Will Not Harm Competition in the Alleged LOS Markets ....................................................................................... 32

   B.   The FTC's Alleged PPE Markets Are Flawed .......................................... 34

   C.   The Merger Will Not Harm Competition in the Alleged PPE Markets ....................................................................................... 36

   D.   The FTC Did Not Prove Its Vertical Foreclosure Theory ....................... 39

III.   The FTC's Internal Administrative Procedures Are Unconstitutional ................ 40

   A.   The FTC's Adjudication Process Violates Due Process ........................... 40

   B.   The "Clearance Process" Violates Equal Protection, Due Process, and Article I ................................................................... 42

   C.   The FTC's Adjudicatory Process Violates Article II .............................. 43

   D.   The FTC Adjudicatory Process Violates Article III and the Seventh Amendment ..................................................................... 45

IV.   The Equities Weigh Against a Preliminary Injunction ......................................... 45

CONCLUSION ..................................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
    181 F.3d 216 (2d Cir. 1999)...................................................................................... 35

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
    141 F.3d 947 (9th Cir. 1998)............................................................................... 30, 31

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) .................................................................. 31

*Auburn News Co. v. Providence Journal Co.*,
    659 F.2d 273 (1st Cir. 1981) ................................................................................... 39

*Axon Enter., Inc. v. Fed. Trade Comm'n*,
    986 F.3d 1173 (9th Cir. 2021), *cert. granted in part*, 142 S. Ct. 895 (2022) .................. 41, 43

*Axon Enterprises, Inc. v. FTC*,
    143 S. Ct. 890 (2023) ............................................................... 40, 41, 43, 45

*Bankers Life & Cas. Co. v. Crenshaw*,
    486 U.S. 71 (1988) ................................................................................................. 42

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ................................................................... 30, 35, 36

*California v. Sutter Health Sys.*,
    84 F. Supp. 2d 1057 (N.D. Cal. 2000) ............................................................ 34, 37

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004).................................................................................. 31

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ................................................................................. 34

*F.T.C. v. Libbey, Inc.*,
    211 F. Supp. 2d 34 (D.D.C. 2002) ........................................................................ 30

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010)............................................................................................... 44

*FTC v. Affordable Media*,
    179 F.3d 1228 (9th Cir. 1999)............................................................................... 29

*FTC v. Arch Coal, Inc.*
    329 F. Supp. 2d 109 (D.D.C. 2004) ............................................................. *passim*

*FTC v. Cardinal Health, Inc.*,
   12 F. Supp. 2d 34 (D.D.C. 1998) ........................................................................ 38

*FTC v. Evans Prods. Co.*,
   775 F.2d 1084 (9th Cir. 1985) ........................................................................... 46

*FTC v. Exxon Corp.*,
   636 F.2d 1336 (D.C. Cir. 1980) ................................................................. 29, 46

*FTC v. Foster*,
   2007 WL 1793441 (D.N.M. May 29, 2007) ...................................................... 30

*FTC v. Great Lakes Chem. Corp.*,
   528 F. Supp. 84 (N.D. Ill. 1981) ....................................................................... 45

*FTC v. Lab. Corp. of Am.*,
   2011 WL 3100372 (C.D. Cal. Mar. 11, 2011) .......................................... 29, 46

*FTC v. Meta Platforms Inc.*,
   2022 WL 16637996 (N.D. Cal. Nov. 2, 2022) ................................... 29, 31, 45

*FTC v. Occidental Petroleum Corp.*,
   No. 86-900, 1986 WL 952 (D.D.C. 1986) ......................................................... 26

*FTC v. RAG-Stiftung*,
   436 F. Supp. 3d 278 (D.D.C. 2020) ......................................................... 31, 32, 33

*FTC v. Simeon Mgmt. Corp.*,
   532 F.2d 708 ...................................................................................................... 46

*FTC v. Staples*,
   190 F. Supp. 3d 100 (D.D.C. 2016) .................................................................. 45

*FTC v. Tenet Health Care Corp.*,
   186 F.3d 1045 (8th Cir. 1999) ........................................................................... 29

*FTC v. Warner Commc'ns Inc.*,
   742 F.2d 1156 – 60 (9th Cir. 1984) (per curiam) ................................. 29, 31, 46

*FTC v. World Wide Factors, Ltd.*,
   882 F.2d 344 (9th Cir. 1989) ............................................................................. 29

*Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*,
   421 F. Supp. 274 (N.D. Cal. 1976) .................................................................... 38

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
   386 F.3d 485 (2d Cir. 2004) .............................................................................. 36

*Gibson v. Berryhill*,
   411 U.S. 564 (1973) ........................................................................................... 40

*Gorlick Dist. Ctrs., LLC v. Car Sound Exhaust Sys.*, Inc.,
   723 F.3d 1019 (9th Cir. 2013).................................................................................. 35

*Heller v. Doe*,
   509 U.S. 312 (1993)................................................................................................. 42

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 – 21 (9th Cir. 2018).......................................................................... 31

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935)................................................................................................. 44

*In re Murchison*,
   349 U.S. 133 (1955)................................................................................................. 40

*In the Matter of Illumina, Inc. and Grail, Inc.*,
   201 F.T.C. 0144 (2023)....................................................................................... 26, 41

*In the Matter of Illumina, Inc. and Grail, Inc.*,
   Docket No. 9401 ...................................................................................................... 41

*Jarkesy v. SEC*,
   34 F.4th 446 (5th Cir. 2022) *cert. granted* (June 30, 2023) (U.S. No. 22-859)..................... 43

*Malaney v. UAL Corp.*,
   No. 3:10-CV-02858-RS, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010),
   *aff'd*, 434 F. App'x 620 (9th Cir. 2011);................................................................... 38

*Montgomery v. Louisiana*,
   577 U.S. 190 (2016)................................................................................................. 42

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
   545 U.S. 462 (2011)................................................................................................. 45

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022) .................................................................. 34

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
   140 S. Ct. 2183 (2020)........................................................................................ 44, 45

*Tennessee v. Lane*,
   541 U.S. 509 (2004)................................................................................................. 42

*Tull v. United States*,
   481 U. S. 412 (1987)................................................................................................ 45

*United States v. AT&T, Inc.*,
   310 F.Supp.3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) ........................... 39

*United States v. AT&T, Inc.*,
  916 F.3d 1029 (D.C. Cir. 2019) ........................................................................ 30

*United States v. Baker Hughes, Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ........................................... 4, 30, 31, 32, 36

*United States v. Gen. Dynamics Corp.*,
  415 U.S. 486 (1974) ............................................................................................ 4

*United States v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) .................................................................. 30

*United States v. Marine Bancorporation, Inc.*,
  418 U.S. 602 (1974) .................................................................... 29, 31, 38

*United States v. Raddatz*,
  447 U.S. 667 (1980) .......................................................................................... 45

*United States v. UnitedHealth Grp. Inc.*,
  No. 1:22-cv-0481, 2022 WL 4365867 (D.D.C. Sept. 21, 2022) ................ 30, 33, 39

*United States v. Windsor*,
  570 U.S. 744 (2013) .......................................................................................... 42

*USAirways Grp., Inc. v. Brit. Airways PLC*,
  989 F. Supp. 482 (S.D.N.Y. 1997) .................................................................. 30

*Williams v. Pennsylvania*,
  579 U.S. 1 (2016) .............................................................................................. 41

**Statutes**

5 U.S.C. § 7521 ........................................................................................................ 44

15 U.S.C. § 18 .................................................................................................. *passim*

15 U.S.C. § 41 ........................................................................................................ 44

15 U.S.C. § 45 ...................................................................................... 40, 43, 44

15 U.S.C. § 46 ........................................................................................................ 40

15 U.S.C. § 53 ................................................................................................ 29, 43

18 U.S.C. § 45 .................................................................................................. 41, 45

FTC Act § 13(b) .............................................................................. 4, 29, 31

Hart-Scott-Rodino Antitrust Improvements Act .......................................... 2

Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law

**Regulations**

16 C.F.R. § 3.42(a) ........................................................................................................ 43

16 C.F.R § 3.54(b) ......................................................................................................... 43

16 C.F.R. § 0.14 ............................................................................................................. 40

16 C.F.R. § 0.16 ............................................................................................................. 40

16 C.F.R. § 3.11 ............................................................................................................. 40

16 C.F.R. § 3.43 ............................................................................................................. 42

16 C.F.R. § 3.51(b) ........................................................................................................ 40

16 C.F.R. § 3.52 ...................................................................................................... 40, 41

16 C.F.R. § 3.54 ............................................................................................................. 41

**Constitional Provisions**

U.S. Const. amend. V, §1 .............................................................................................. 42

U.S. Const. amend. VII ............................................................................................ 44, 45

U.S. Const. amend. XIV, §1 .......................................................................................... 42

U.S. Const., art. II, §1 ................................................................................................... 44

U.S. Const. art. III, § 1 .................................................................................................. 44

Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law

1

**TABLE OF EXHIBITS**

2

| Exhibit | Evidence |
|---------|----------|
| DX1 | Excerpted Transcript of Richard Gagliano Deposition (as cited in prior submissions) |
| DX2 | Excerpted Transcript of Gage Green Deposition (as cited in prior submissions) |
| DX3 | Excerpted Transcript of Bonnie Wilhelm Deposition (as cited in prior submissions) |
| DX5 | Internal ICE Correspondence |
| DX6 | Internal Constellation Correspondence |
| DX11 | Excerpted Transcript of Ed Batt Deposition (as cited in prior submissions) |
| DX12 | Excerpted Transcript of Jeremy Moreno Deposition (as cited in prior submissions) |
| DX14 | Excerpted Transcript of Kevin McMahon Deposition (as cited in prior submissions) |
| DX15 | Internal ICE presentation |
| DX16 | Encompass Platform Overview Brochure |
| DX24 | 16 C.F.R. Parts 0-4, Revisions to Rules of Practice |
| DX25 | Law360 Article by Bryan Koenig, entitled *For DOJ and FTC, Clearing Deals Remains a Gray Area* |
| DX28 | Equity Purchase Agreement among Constellation, ICE, and Black Knight |
| DX33 | Internal Truist Document |
| DX34 | Excerpted Transcript of the IH of Joseph Tyrrell (as cited in prior submissions) |
| DX36 | Correspondence between ICE and customer |
| DX37 | Correspondence between ICE and customer |
| DX38 | Correspondence between ICE and customer |
| DX41 | Excerpted Transcript of Kirk Larsen Deposition (as cited in prior submissions) |
| DX42 | Excerpted Transcript of Rebecca Roberts Deposition (as cited in prior submissions) |
| DX43 | Excerpted Transcript of Scott Happ Deposition (as cited in prior submissions) |
| DX45 | Excerpted Transcript of Erin Wester Deposition (as cited in prior submissions) |
| DX46 | Excerpted Transcript of Eric Connors Deposition (as cited in prior submissions) |
| DX50 | Excerpted Deposition Transcript of Randy Brown (as cited in prior submissions) |
| DX51 | Excerpted Deposition Transcript of Adam Carmel (as cited in prior submissions) |
| DX55 | Amendment No. 1 to the Agreement and Plan of Merger |
| DX72 | Presentation to the FTC re ICE acquisition of BK |
| DX202 | Correspondence between ICE and Truist |
| DX203 | Correspondence between ICE and Truist |
| DX209 | Witness Statement of Jeffrey Sprecher (ICE) |
| DX210 | Witness Statement of Joseph Tyrrell (ICE) |
| DX211 | Witness Statement of Tim Bowler (ICE) |
| DX212 | Witness Statement of Robert Hart (ICE) |
| DX213 | Witness Statement of Rebecca Wade (ICE) |

| Exhibit | Evidence |
|---------|----------|
| DX214 | Witness Statement of Richard Gagliano (Black Knight) |
| DX215 | Witness Statement of Kirk Larsen (Black Knight) |
| DX216 | Witness Statement of Bonnie Wilhelm (Constellation) |
| DX217 | Witness Statement of David Clifton (ICE) |
| DX219 | Initial Expert Report of Michael Katz |
| DX220 | ICE Correspondence and Presentation Regarding ICE-Black Knight Transaction |
| DX270 | Internal Black Knight Correspondence |
| DX282 | Internal Black Knight Correspondence and Spreadsheet Attachments |
| DX411 | U.S. DOJ & FTC, Horizontal Merger Guidelines |
| DX412 | Witness Statement of Erin Wester (Black Knight) |
| DX413 | Designated Deposition Transcript of Shashank Shekhar (InstaMortgage) |
| DX414 | Witness Statement of Ed Batt (Black Knight) |
| DX415 | Witness Statement of Scott Happ (Black Knight) |
| DX416 | Witness Statement of Kevin McMahon (Black Knight) |
| DX418 | Designated Deposition Transcript of James Ryan Hubbard (Truist Securities) |
| DX444 | Designated Deposition Transcript of Tom George (Constellation) |
| DX454 | Internal Black Knight Correspondence and Spreadsheet Attachments |
| DX462 | Initial Expert Report of Andrew Dick, PhD |
| DX471 | Internal Black Knight Correspondence and Spreadsheet Attachments |
| DX489 | Rebuttal Expert Report of Andrew Dick, PhD |
| DX498 | Designated Deposition Transcript of Dawar Alimi (Lender Price) |
| DX499 | Internal Black Knight Correspondence |
| DX501 | Internal Black Knight Correspondence and Spreadsheet Attachment |
| DX502 | Internal Black Knight Correspondence and Spreadsheet Attachments |
| DX509 | Internal Black Knight Correspondence and Spreadsheet Attachments |
| DX512 | Internal Black Knight Correspondence and Spreadsheet Attachments |
| DX521 | Internal ICE Correspondence |
| DX526 | Internal ICE Presentation |
| DX539 | ICE Presentation to the FTC Regarding ICE-Black Knight Transaction |
| DX559 | Sagent Advocacy Proposal |
| DX566 | Sagent/Warburg Meeting Minutes |
| DX567 | Email Thread between Jay Nadler and Sagent and Warburg Pincus executives |
| DX568 | Indication of Interest from Sagent and Warburg Pincus re Empower |
| DX586 | Sagent/Warburg Pincus Memorandum |
| DX591 | Internal ICE Correspondence and Presentation Attachment |
| DX592 | Internal Sagent/Warburg Correspondence |

| Exhibit | Evidence |
|---------|----------|
| DX598 | Sagent/Warburg Correspondence |
| DX601 | Correspondence Between Sagent, Harrington HC, and FTC |
| DX610 | Sagent/Warburg Correspondence |
| DX611 | Sagent/Warburg Correspondence |
| DX612 | Statement of Work |
| DX613 | Sagent–FTC Correspondence |
| DX614 | Sagent Text Message Thread |
| DX615 | Sagent Text Message Thread |
| DX616 | Sagent Text Message Thread |
| DX617 | Sagent Text Message Thread |
| DX618 | Sagent Text Message Thread |
| DX619 | Sagent Text Message Thread |
| DX620 | Sagent Text Message Thread |
| DX621 | Sagent Text Message Thread |
| DX622 | Sagent Text Message Thread |
| DX626 | Sagent Text Message Thread |
| DX627 | Sagent Text Message Thread |
| DX628 | Sagent Text Message Thread |
| DX629 | Sagent Text Message Thread |
| DX630 | Sagent Text Message Thread |
| DX631 | Sagent Text Message Thread |
| DX632 | Sagent Text Message Thread |
| DX633 | Sagent Text Message Thread |
| DX640 | Designated Deposition Transcript of George Brady (LoanDepot) |
| DX643 | Designated Deposition Transcript of Jeffrey Gillis (Carrington Mortgages Services) |
| DX645 | Designated Deposition Transcript of Gage Green (American Bancshares Mortgage) |
| DX648 | Designated Deposition Transcript of Brian Kittredge (Umpqua Bank) |
| DX652 | Designated Deposition Transcript of Eduardo G. Perez, Jr. (Equity Prime Mortgage) |
| DX664 | Designated Deposition Transcript of Todd Sheinin (Homespire) |
| DX666 | Sagent/Warburg Pincus Discovery Response |
| DX670 | FTC Letter to Black Knight Counsel |
| DX671 | FTC Letter to Black Knight Counsel |
| DX672 | FTC Notice of Deposition to Black Knight |
| DX673 | FTC Notice of Deposition to ICE |
| DX674 | FTC Notice of Deposition to Black Knight |
| DX675 | FTC Notice of Deposition to ICE |

1

| Exhibit | Evidence |
|---------|----------|
| DX676 | FTC Notice of Deposition to Black Knight |
| DX677 | ICE Presentation to FTC Re ICE–Black Knight Transaction |
| DX678 | Charles River Associates Presentation Re ICE-Black Knight Transaction |
| DX679 | ICE Presentation to FTC Re ICE-Black Knight Transaction |
| DX680 | ICE Presentation to FTC Re ICE-Black Knight Transaction |
| DX681 | ICE Presentation to FTC Re ICE-Black Knight Transaction |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

This Court, having considered the evidence, including exhibits, direct testimony submitted by witness statements, and live testimony, as well as the briefing and arguments, concludes that the Federal Trade Commission ("FTC" or the "Commission") has failed to demonstrate its probable success in showing that the proposed merger between Intercontinental Exchange, Inc. ("ICE") and Black Knight, Inc. ("Black Knight") is likely to substantially lessen competition. 15 U.S.C. § 18. Further, the balance of the equities and the public and private interests weigh against preliminarily enjoining the merger. Accordingly, the FTC's Motion for a Preliminary Injunction is **DENIED**.

**PROPOSED FINDINGS OF FACT**

**I.      The Merging Parties and the Proposed Transaction**

1.      Defendant ICE is a publicly traded corporation incorporated in Delaware. ICE's business model is to optimize market, data, and technology infrastructure across industries, largely by automating outdated manual processes and developing common industry approaches and standards. *See, e.g.*, DX209 ¶¶2–4 [Sprecher]. ICE operates in three primary segments: exchanges, fixed income and data services, and mortgage technology.

2.      Through its subsidiary ICE Mortgage Technology ("IMT"), ICE entered the mortgage industry by a series of acquisitions in 2016, 2018, and 2020 of existing mortgage technology providers, including Ellie Mae, a loan origination services platform connecting mortgage lenders and loan investors. *See, e.g.*, DX209 ¶¶8–18 [Sprecher]. ICE subsequently built on these acquisitions to create new products benefiting lenders, borrowers, and other industry participants. *See* DX209 ¶18 [Sprecher].

3.      ICE has been transforming the mortgage industry through the same modernization it has successfully implemented in other areas, with the basic goal of streamlining the unnecessarily cumbersome process of securing, closing, and servicing a mortgage—a process that ICE believes takes longer than it should, costs more than it should, and disadvantages less sophisticated and low-income customers. DX209 ¶8 [Sprecher]; DX211 ¶¶15–20 [Bowler].

4.      ICE currently owns a loan origination service platform ("LOS") called Encompass. DX212 ¶7 [Hart]. Encompass is a platform for lenders that facilitates the mortgage origination

process when their customers (prospective homebuyers) want to apply for a mortgage. DX209 ¶16 [Sprecher]; DX212 ¶7 [Hart]. Encompass uses an open architecture, which means it is integrated with hundreds of third-party companies that also provide various software products and applications to Encompass's customers. DX212 ¶8 [Hart], DX213 ¶45 [Wade]. In addition, Encompass integrates with other products owned by ICE, and Encompass itself contains native features within the platform, including a basic product and pricing engine ("PPE") called Encompass Product and Pricing Service, or "EPPS." DX213 ¶12 [Wade]; DX212 ¶18 [Hart]. ICE does not have a loan servicing product.

5.      Defendant Black Knight provides a variety of software solutions, data, and analytics to customers in the mortgage and real estate industries, including software platforms and products used to manage loan servicing and origination. Black Knight's flagship product is its Mortgage Servicing Platform ("MSP"), a system to manage transactions, reports, and information related to post-closing mortgage servicing. DX215 ¶7 [Larsen]. Black Knight also has an LOS called Empower, which includes its own native PPE tool ("Empower PPE"). DX214 ¶10 [Gagliano]. Black Knight offers a separate, standalone PPE called "Optimal Blue," which is commercially available to users of many LOSs. DX416 ¶11 [McMahon].

6.      On May 4, 2022, ICE agreed to acquire Black Knight ████████████████ ██████████████████████████

7.      The planned merger was reported to the FTC, as required under the Hart-Scott-Rodino Antitrust Improvements Act ("HSR Act"), on May 18, 2022. Shortly after the merger was announced, the FTC commenced a nearly year-long investigation, in which Defendants produced over 6 million documents and attended numerous meetings with the FTC.

8.      The FTC expressed during the investigation that its primary concern with the transaction as announced on May 4, 2022 was the potential anticompetitive effects flowing from ICE owning Empower in addition to its own Encompass LOS. DX215 ¶10 [Larsen]. That is consistent with how the FTC's complaint is pled.

9.      ICE and Black Knight took the questions expressed by the FTC seriously. In response to what the FTC identified as its primary concern (consolidation of LOS products), ICE

and Black Knight agreed to divest from the proposed transaction the Black Knight Empower LOS business. *See, e.g.*, DX215 ¶¶10–12 [Larsen].

10. On March 7, 2023, ICE and Black Knight agreed to sell Empower to Constellation Software, Inc. ("Constellation"), a highly qualified, well-capitalized third-party experienced in software, including in mortgage, real estate, and financial services markets. *See* DX215 ¶19 [Larsen] (citing DX28); DX216 ¶¶6–9, 11–16, 31–32 [Wilhelm]. Specifically, Black Knight will sell to Constellation the assets that are ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. *See infra* ¶72.

11. ██████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ DX217 ¶12 [Clifton]. This is the transaction set to close by November 4, 2023. DX209 ¶28 [Sprecher]; DX55.

12. On March 9, 2023, the FTC filed an administrative complaint challenging the merger, alleging that it violates Section 7 of the Clayton Act, 15 U.S.C. § 18. To date, Defendants collectively produced more than 6.5 million documents from more than 120 custodians, had Defendants' witnesses sit for 10 investigational hearings and 24 depositions (some witnesses sitting twice), and provided five presentations to the FTC. *See, e.g.*, DX670–DX 671; DX672–DX676; DX677–DX681; DX72-005 (presentation to FTC outlining transaction rationale).

13. On April 10, 2023, the FTC filed this action, seeking a temporary restraining order and preliminary injunction barring the acquisition pending a trial before a hearing, decision, and appeal of the FTC's administrative complaint. ECF 1.

**II.     The Transaction Rationale**

14.     A robust understanding of the trajectory of the mortgage software industry is essential to assess the competitive effects of the proposed merger. *See, e.g.*, DX411-019–20 [*Horizontal Merger Guidelines*] § 5.2. The Supreme Court has directed that "only examination of the particular market—its structure, history, and probable future—can provide the appropriate setting for judging the probable anticompetitive effects of the merger." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 (1962)); *see also United States v. Baker Hughes, Inc.*, 908 F.2d 981, 989–92 (D.C. Cir. 1990) (noting the Supreme Court's shift away from presumptions and structural analysis to focus on real-world facts and economic analysis). This effort is fact intensive as well as forward looking. "Antitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record evidence relating to the market and its probable future." *FTC v. Arch Coal, Inc.* 329 F. Supp. 2d 109, 116–17 (D.D.C. 2004).

**A.  This Merger Will Connect Disparate Parts of the Mortgage Business**

15.     In today's multi-billion-dollar residential mortgage market, lenders ferry borrowers and loans through a series of disconnected steps—application, qualification, eligibility, pricing, origination, hedging, closing, secondary market trading, and servicing—often on numerous incompatible technology systems, which increases the chances for error and the costs to Americans looking to buy a home.

16.     Costs associated with closing a mortgage transaction today are significant: it costs approximately $6,000 to $9,000 for a lender to originate a mortgage, regardless of the loan size, with most of the cost being passed on to the home buyer. DX209 ¶13 [Sprecher]. That means that a person taking out a $100,000 loan pays the same origination costs as a person with a $1,000,000 loan, *id.*, and these transaction costs can make refinancing a loan prohibitive, even when interest rates fall.

17.     When technology systems do not communicate with each other, borrowers are not notified when they would qualify for savings. For example, extra costs like private mortgage

insurance (for borrowers with less than a 20% down payment) can follow a borrower for years unnoticed, even when the homeowner has met the minimums for removal. DX209 ¶24 [Sprecher].

18.     ICE sees a solution to reduce those costs and inefficiencies: an end-to-end loan platform that will eliminate communication errors among systems, reduce the costs of moving loans through their lifecycle, and, critically, provide borrowers with ongoing monitoring and options (e.g., refinancing or removal of mortgage interest) that will save them money. *See* DX209 ¶¶20–22 [Sprecher]; DX220-09. ICE is committed to open systems like this, which allow for "data standardization" so that the mortgage industry's digital products can communicate with one another using common standards. DX209 ¶12 [Sprecher]. This is a commitment that ICE has carried out consistently across its other main industries of focus. *Id.*

19.     A principal purpose of the proposed transaction is ICE's desire to connect its Encompass LOS origination platform with Black Knight's MSP loan servicing platform to create a "life-of-loan" platform. DX209 ¶¶20–21 [Sprecher]; DX220-009. By linking data between the two systems, ICE expects to bring widespread benefits to U.S. mortgage customers. DX209 ¶20 [Sprecher]. For example, a linked system would allow lenders to more efficiently recognize when a borrower is eligible to refinance on a loan and streamline the process to do so. DX209 ¶24 [Sprecher]. ICE considered multiple options for developing this end-to-end platform, and ultimately determined that the most viable and efficient means to reach that goal was through an acquisition, specifically of Black Knight and MSP. DX 217 ¶18 [Clifton].

**B. LOS Platforms Help Turn Loan Applications into Closed Mortgages**

20.     An LOS is a platform that automates residential loan processing, replacing older manual and paper processes and acting as a system of record that lenders and brokers use to originate new home loans for home buyers. It brings together lenders or brokers with other service providers, industry participants, and investors to provide services that complement the origination process. *See, e.g.*, DX214 ¶¶5–6 [Gagliano]; DX412 ¶21 [Wester].

21.     ICE's LOS platform is called Encompass. DX212 ¶7 [Hart] Black Knight's is called Empower. Both are commercial LOS platforms, meaning that they are available for purchase and

use by any lending institutions. *See, e.g.*, DX214 ¶5 [Gagliano]. Under the proposed transaction, Black Knight's Empower LOS will be acquired by Constellation. It will not be owned by ICE.

22.     Encompass and Empower are by no means the only LOS providers. *See* DX212 ¶¶23–24 [Hart] (listing more than 50 LOS vendors). There is robust competition in the LOS market as lenders can and do switch among LOS providers depending on their needs. *See, e.g.*, ████

████  at 8:23–9:08, 9:13–18, 10:03–11:07 (████████████████████████

████████████████████████████████████████████████

████); DX212 ¶26 [Hart] (discussing how Encompass won and lost opportunities and how ICE currently is engaging with an Encompass customer who is considering changing to Blue Sage LOS).

23.     Revenue models vary, but an LOS typically charges its lender or broker customers subscription-based and/or transaction-based fees (e.g., a price per loan closed). *See, e.g.*, ████

████  at 10:03–11:07. LOSs can include certain features at no additional cost or charge additional fees for optional and supplemental features. LOSs may also charge fees to ancillary service providers.

24.     There are generally four types of LOS options for lenders with different levels of sophistication: (1) proprietary, *i.e.*, developed in-house; (2) custom, *i.e.*, developed by a commercial provider to meet specific requirements of a particular lender; (3) configurable, *i.e.*, a commercial product that allows the lender to change aspects of the workflow; and (4) broker, *i.e.*, a basic system focused only on the initial loan application and not the full origination. DX210 ¶7 [Tyrrell]. ICE's Encompass competes in the "configurable" LOS category. *Id.* ¶4. Other configurable LOS systems include Mortgage Cadence, Mortgage Builder, Lending QB, and a number of other providers. DX210 ¶8 [Tyrrell].

25.     Encompass's primary customer focus is on lending institutions, which can be brokers, banks, and independent mortgage banks. DX212 ¶3 [Hart]. Encompass has an estimated ████  customers. DX212 ¶10 [Hart].

26.     Encompass is an open network, meaning that third parties can develop their own mortgage-related products and make them available for sale to ICE customers on Encompass

through integration. DX212 ¶¶28–29 [Hart]. Third-party providers include providers of mortgage insurance, point of sale technology, PPEs, marketing software, secondary platforms, and other customer or investor software. DX213 ¶45 [Wade]. This open network platform benefits ICE, lenders, and third-party providers by enabling ICE to retain Encompass customers even when those customers may prefer to use the ancillary services of a non-ICE provider. DX213 ¶47 [Wade]; DX212 ¶11 [Hart].

27.     ICE customers can pick and choose the third-party providers they want, and these customers are never disadvantaged if they choose to use a third-party's ancillary service within Encompass instead of ICE's own similar ancillary service. DX213 ¶49 [Wade]; *see also* DX212 ¶¶11–13 [Hart]. ICE takes a "neutral" position when it comes to which mortgage products Encompass customers choose to use (even when ICE has its own competing product available) and does not endorse one integrated partner product over another. DX212 ¶30 [Hart]; *see also* ██████ ██████ at 111:20–112:11 (████████████████████████████████████████████ ████████████████████████████████████████████████████████████████); ████████████ at 154:22–155:16. Instead, ICE created a "Partner Success" program that categorizes third-party vendors based on whether they offer certain features (can demo their integration with a user guide, have customer support, etc.) and use best practices. DX212 ¶31 [Hart].

### C.  Lenders Use PPEs to Collect Market Pricing Data for Potential Loans

28.     Pricing a loan for a customer historically was a manual, paper-driven process. That changed with the introduction of automated PPE systems. PPEs enable lenders to aggregate loan products and prices offered by investors into electronic "rate sheets," search those rate sheets, generate different loan pricing scenarios based on a borrower's credit history and other factors, and lock in a rate for a specific period of time. DX414 ¶6 [Batt]. Thus, a PPE must at a baseline allow a lender to determine a price it can offer for a loan based on the characteristics of the borrower and lock in that price so that the lender can finalize the mortgage process. DX412 ¶9 [Wester].

29.     There is a wide variety of PPEs available to lenders, depending on their business needs and requirements. DX213 ¶10 [Wade], *see also* DX415 ¶9 [Happ]; ████████████ at

Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law

124:14–124:24, 125:01–06. Features among PPEs vary greatly from mere basic reporting of prices for certain products only, to sophisticated functionality that might include the ability to automatically lock a rate and see a wide variety of loan products and investors. DX415 ¶9 [Happ]. As with LOS software, PPEs can be developed as proprietary to a lender, but many PPEs are commercially available. A lender can choose from use a variety of different PPE solutions depending on the size, complexity, and nature of their business. DX414 ¶7 [Batt]. And some lenders (primarily smaller lenders) do not use a PPE at all, and instead use spreadsheets and other manual processes. DX489 ¶86 [Dick].

30.     Among commercial PPEs—that is, PPEs developed for use by third-party customers—there are both "native" and "standalone" options. *See* DX412 ¶10 [Wester]. Native PPEs are built directly into a LOS, tend to only offer rudimentary price retrieval, and do not have access to a full set of investors and portfolio products. DX415 ¶32 [Happ]; DX416 ¶¶10–11 [McMahon]. They lack post-lock functionality to automatically alter loan terms post-lock and pre-close. DX415 ¶32 [Happ]. They are typically packaged as "free" components of the LOS, cannot be purchased separately from a specific LOS, cannot be used on other LOS platforms, and generally are not billed separately. *Id.* ¶34; *see also* ███████ at 78:08–78:25 (██████████████ ██████████████████████); ██████████ at 36:2–15.

31.     Standalone commercial PPEs are sold independently and can be integrated with any LOS or other third-party mortgage technology, making them a viable option for a much larger percentage of the mortgage lending market. *See* DX 414 ¶14 [Batt]; DX415 ¶¶36–37 [Happ].

32.     ICE's EPPS is a native-only feature of the Encompass LOS. DX213 ¶12 [Wade]. Customers can only use EPPS on Encompass—it is not available on any other LOS. DX212 ¶18 [Hart]. EPPS provides only the most basic functionality of collecting and displaying mortgage rate terms available from a small number of certain investors, loan lock requests, and integration with Encompass. DX210 ¶21 [Tyrrell]; DX213 ¶12 [Wade]; *see also* DX415 ¶¶32–33 [Happ]. Accordingly, only a small fraction (███) of Encompass customers use the integrated EPPS because of its limited functionality, and the vast majority of Encompass LOS customers choose to use an

1   alternative, third-party PPE. *See, e.g.*, DX462 ¶26 [Dick], 118; DX645 [Green] at 22:16–21,

2   104:14–105:2, 150:10–23; DX212 ¶18 [Hart].

3       33.    Those Encompass customers selecting EPPS tend to be smaller lenders who, due to

4   their size, have lower loan origination volumes and fewer clients than customers who use the more

5   sophisticated PPEs available on Encompass or on other LOSs. DX212 ¶18 [Hart]; DX210 ¶22

6   [Tyrrell]. EPPS users do not need the additional tools or broader investor network available on

7   other PPEs. *See, e.g.,* DX414 ¶24 [Batt] (citing DX499) (█████████████████████

8   ████████████████████████████████████████████████████████████████

9   ██████████████); *id.* at ¶31 (citing DX270) (████████████████████████

10  ███████████████████████████████████████████████████); *id.* at ¶32

11  (citing DX282) (████████████████████████████████████████████████

12  ████████████████████████████).

13      34.    Black Knight has two relevant PPE products: (1) Empower PPE and (2) Optimal

14  Blue's PPE. Empower PPE is an integrated, native PPE available only to users of Empower LOS.

15  As part of the planned divestiture, Constellation will receive Black Knight's Empower PPE. DX28-

16  117.

17      35.    Optimal Blue's PPE is Black Knight's feature-rich, standalone commercial PPE

18  solution, which Black Knight acquired in 2020. DX414 ¶¶10, 5 [Batt]; DX214 ¶9 [Gagliano]. It is

19  █████ more expensive and sophisticated PPE and perceived as the "███████████." DX416

20  ¶9 [McMahon]; DX213 ¶11 [Wade]; DX412 ¶11 [Wester] (citing DX512). Optimal Blue operates

21  as a separate business unit within the company. DX214 ¶10 [Gagliano].

22      36.    In contrast to the strictly native options of EPPS and Empower PPE, Optimal Blue's

23  PPE can be used on more than a dozen different LOS platforms, including ICE's Encompass, Black

24  Knight's Empower, Finstra's Mortgagebot, Calyx's Point, Accenture's Mortgage Cadence,

25  Constellation's Mortgage Builder, and Blue Sage. DX414 ¶14 [Batt]. Optimal Blue's PPE is also

26  currently integrated with over █ third-party software platforms. DX415 ¶24 [Happ].

27      37.    Optimal Blue has a much more robust pricing engine than EPPS or other native

28  PPEs, providing much broader functionality and is aimed at lenders active in the secondary

mortgage market. DX412 ¶¶21–23 [Wester]. Some key functional abilities of Optimal Blue's PPE that are not available on EPPS include: • post-lock automation, • dynamic markups with custom margins, • instantly-available historical pricing, • pricing concession approvals, and • custom fields. *See, e.g.*, DX414 ¶19 [Batt] (citing DX509-008); DX416 ¶6 [McMahon]; DX412 ¶¶12–19, 22 [Wester]. Optimal Blue's PPE also connects nearly ███ lenders or originators with more than ███ investors. DX412 ¶¶9, 19 [Wester]; DX416 ¶7 [McMahon]. These stand out features make Optimal Blue's PPE a "premium product," DX415 ¶19 [Happ], and Black Knight emphasizes them in its marketing materials and in sales meetings with customers. DX414 ¶22 [Batt].

38. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

39.    Optimal Blue does not have the only standalone, feature-rich PPE on the market. DX412 ¶25 [Wester]. Polly is a newer entrant in the market and a key competitor of the Optimal Blue PPE, along with Lender Price and Mortech. DX412 ¶25 [Wester]; DX 415 ¶39 [Happ]; DX416 ¶¶10, 22–25 [McMahon]. Each of these companies offer PPE solutions that have specialty features to compete with Optimal Blue's PPE, like dynamic margin management, post-lock automation, margin management, and sophisticated reporting and analytics tools. DX415 ¶41 [Happ]; DX416 ¶9 [McMahon]; ███████████████ at 12:12–13:20 (███████████████████████████████████ ███).

40.    ████████████████████████████████████████████████████ DX412 ¶28 [Wester]; DX 415 ¶¶39, 43–47 [Happ]; *see also* DX416 ¶22 [McMahon]. Polly boasts of features that are similar to those offered by Optimal Blue's PPE. DX213 ¶13 [Wade]. Polly touts its user interface as advanced yet approachable and user-friendly, ███████████████████████

1  ██████████████████████. DX412 ¶29 [Wester]; DX416 ¶24 [McMahon]. Polly's features have

2  been developed, and its customer base expanded, in recent years ████████████████████

3  ████████████████████████. DX412 ¶13 [Wade]; *see also* DX415 ¶47 [Happ]. Polly

4  is available on the Encompass LOS. DX212 ¶40 [Hart].

5      41.    ███████████████████████████████████████████████

6  █████████████████████. *See, e.g.*, DX43 44:1–5, 45:7–46:2, 78:22–81:22; DX412 ¶30

7  [Wester]; DX415 ¶¶48–56 [Happ]; DX416 ¶40 [McMahon]. Polly's marketing efforts have

8  targeted Optimal Blue's client base alleging superior functionality and lower cost, and ████

9  ████████████████████████████████████████████████████████████

10  ███████████████ DX416 ¶¶26–33, 47–57 [McMahon]; *see also* ████████████ 128:19–

11  129:24 (████████████████████████████████████████████████).

12      42.    Mortech, Zillow's PPE, has been a PPE competitor to Optimal Blue's PPE for many

13  years. DX213 ¶14 [Wade]. Mortech services mid-sized and large lenders such as Rocket Mortgage,

14  Guaranteed Rate, and Hunt Mortgage. *Id*. Mortech offers a suite of add-ons that compete with

15  Optimal Blue, including a ███████████ lead quoting tool. *Id*. Mortech also offers an integration

16  with Lending Tree that allows lenders to display their rates on Lending Tree's website. DX213 ¶14

17  [Wade]; DX412 ¶26 [Wester].

18      43.    Lender Price, another PPE, ████████████████████████████████████████

19  ███████████████████████. DX213 ¶15 [Wade]. It already boasts over ███

20  PPE customers and integrations with several LOS platforms. DX412 ¶26 [Wester]. █████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████ DX416 ¶38

23  [McMahon] (citing DX454-002); *see also* ████████████ at 18:01–18:19, 20:08–09 (████

24  ████████████████████████████████████████████████████████████

25  █████████████); ██████████████ at 76:18–77:19 (████████████████████████

26  ██).

27      44.    ███████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████

45.     The differences in functions among PPE options lead to significantly different pricing. Optimal Blue's PPE is ███████ more expensive than EPPS. Optimal Blue's PPE is between ████ and ████ more expensive than EPPS on a per user basis, and between ████ and ████ more expensive than EPPS on a per loan closed basis. *See, e.g.*, DX462 ¶¶19(c), 136–38.

46.     EPPS and Optimal Blue have not been and are not close substitutes. DX212 ¶19 [Hart]; DX489 ¶143 [Dick]. ████████████████████████████████ ███████████████████ at 36:24–38:25; *see also* ███████████ at 82:02–82:18; ███ ███ at 33:18–34:10 █ ███████████████████████████████████ at 125:23–126:20, 138:21–139:03.

47.     ███████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████ DX462 ¶163 [Dick]; DX213 ¶22 [Wade]; DX212 ¶20 [Hart] *see, e.g.,* ███████████ at 27:10–28:05, 29:08–30:07, 30:14– 31:07, 32:11–32:13 (███████████████████████████████████████ ██████████████████████████████████); ███████████ at 14:08– 17 (████████████████████████████████████████████████ ███████████████████████).

1 ███████████████████████████████████████████████████████

2 ██████████████████████████████████████████ DX414 ¶28 [Batt] (citing DX501).

3 ████████████████████████████████████████████████████████

4 DX213 ¶22 [Wade]; DX 414 ¶¶28–33 [Batt] (citing DX502, ███████████████

5 █████████████████████████████).

**D.  After Closing, LSPs Connect Lenders and Borrowers for Servicing Activities**

48.    A Loan Servicing Platform ("LSP") automates the loan-servicing process that takes place after a mortgage is issued: typically including initial setup, customer service, payment processing, escrow administration, and default management. *See, e.g.,* DX215 ¶¶7–8 [Larsen]; DX219 ¶27 [Katz]. Among other functions, an LSP helps lenders and servicers manage the process of ensuring that a borrower's monthly loan payments are made and manages the proceeds, which are often distributed to multiple parties. *Id.*

49.    LSPs are multitasked platforms. DX219 ¶27 [Katz]. An LSP brings together mortgage servicers, investors, and other service providers (often including federal housing regulators and government-sponsored entities). *Id.*

50.    An LSP typically charges its lender or servicer customers subscription-based and/or transaction-based fees (e.g., price per loan serviced). *Id.* An LSP can include certain features at no additional cost, or else charge additional fees for optional features. LSPs may also charge fees to ancillary-service providers. *Id.*

51.    LSPs can be proprietary or commercial. Currently, Black Knight owns MSP, and ICE does not own an LSP. *See, e.g.*, DX215 ¶7 [Larsen]; DX210 ¶36 [Tyrrell]. Constellation owns an LSP called Mortgage Builder LSS. Under the proposed transaction, ICE will acquire MSP.

52.    MSP is an industry-leading LSP platform ███████████████████ ███████ DX215 ¶7 [Larsen]. Approximately ███████ active loans are currently serviced on MSP, █████████████████████████████████, and it has long been considered the industry's gold standard for servicing home loans. DX215 ¶8 [Larsen].

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.   The Empower Divestiture**

   **A.  Black Knight and ICE Sought an Experienced and Well-Capitalized Technology Solutions Provider for Empower**

53.      After the FTC raised questions with ICE acquiring Black Knight's Empower LOS business, ICE and Black Knight determined that divesting Empower would solve any potential concern about competition among LOS providers, because then ICE would not be acquiring an LOS.

54.      ICE and Black Knight determined that the divested assets would include the core Empower LOS, ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████ DX215 ¶12 [Larsen]; DX214 ¶16 [Gagliano]. ███████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████. DX217 ¶31 [Clifton].

55.      On January 1, 2023, ICE and Black Knight engaged ██████, an investment bank, to identify potential bidders for the Empower divestiture ██████████████████████████ ████████████████████████████ DX214 ¶36 [Gagliano]; DX217 ¶¶36–46 [Clifton]. The objective of the transaction was to find a buyer who was invested in the long-term, sustainable growth of the Empower business. DX418 [Hubbard] at 152:15–22.

56.      ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████. DX217 ¶¶38–41 [Clifton]; DX418 [Hubbard] at 188:18–189:21, 209:24–210:8; *see also* DX33-002-03 (listing all potential buyers).

57.      ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9  DX214 ¶¶38–39 [Gagliano].

10  ████  DX217 ¶42 [Clifton] (citing DX203 and DX 202).

11  58.  ███████████████████████████████████████████

12

13

14

15

16

17

18  ████

19  59.  ███████████████████████████████████████████

20

21

22  60.  ███████████████████████████████████████████

23

24

25  ██████████████████████████████████

26  61.  ███████████████████████████████████████████

27

28

1 █████████████████████████████████████████████████

2 ████████████████████████████████████████████

3    62.   ████████████████████████████████████████████

4 █████████████████████████████████████████████████

5 █████████████████████████████████████████████████

6 █████████████████████████████████████████████████

7 █████████████████████████████████████████████████

8 █████████████████████████████████████████████████

9    63.   Several buyers submitted proposals to acquire the Empower assets: █████

10 █████████████████████████████████████████████████

11 █████████████████████████████████████████████████

12 █████████████████████████████████████████████████

13 █████████████████████████████████████████████████

14 █████████████████████████████████████████████████

15 █████████████████████████████████████████████████

16 █████████████████████████████████████████████████

17 █████████████████████████████████████████████████

18 ████████████████████████

19    **B. Constellation Was the Winning Bidder**

20    64.   On March 7, 2023, Constellation was announced as the winning bidder, and the

21 parties executed the Equity Purchase Agreement ("EPA"). DX28; DX214 ¶41 [Gagliano]. █

22 █████████████████████████████████████████████████

23 ███████████████████████████████████████

24    65.   Constellation is a global, publicly-traded company, headquartered in Canada █

25 █████████████████████████████████████████████████

26 █████████████████████████████████████████████████

27 █████████████████████████████████████████████████

28 █████████████████████████████████████████████████

1

2

3     66.

4

5

6

7

8

9     67.

10

11

12

13

14

15

16

17    68.

18

19

20

21

22

23

24

25

26

27

28

█████████████████████████████████████████████████████████████████████

███████████████████████████

### C. The Deal Terms Ensure that Constellation Will Be Ready to Have Empower Continue to Compete

69.     The divestiture to Constellation consists of not only the Empower LOS platform and its native PPE, but also ████████ additional software products that are integrated with Empower: ██

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████. DX28-117; DX217 ¶55 [Clifton]; DX215 ¶20 [Larsen]; DX216 ¶19 [Wilhelm]. ██████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ DX217 ¶57 [Clifton]; DX216 ¶19 [Wilhelm]; DX215 ¶15 [Larsen]; DX214 ¶¶9, 24 [Gagliano]. █████████████████████████████

██████████████████████████████████████████ DX214 ¶25 [Gagliano]; *see also* DX215 ¶¶13–14 [Larsen]; DX216 ¶20 [Wilhelm].

70.     ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

1  █████████████████████████████████████████████████████

2  ████████████████████████████████████████

3      71.   █████████████████████████████████████████████

4  █████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████

6  █████████████████████████████████████████████████████

7  ████████████████████████

8      72.   █████████████████████████████████████████████

9  █████████████████████████████████████████████████████

10  █████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████

12  █████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████

14  *See* DX214 ¶27 [Gagliano]; DX216 ¶36 [Wilhelm]. As a result, the CSA effectively has a total

15  term of 12 years. *Id.* ████████████████████████████████████████

16  █████████████████████████████████████████████████████

17  ████████████████████ DX216 ¶34 [Wilhelm]; *see also* DX444 [George] at 144:13–145:25.

18      73.   █████████████████████████████████████████████

19  █████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████

21  █████████████████████████████████████████████████████

22  █████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████

25  █████████████████████████████████████████████████████

26  █████████████████████████████████████████████████████

27  █████████████████████████████████████████████████████

28  █████████████████████████████████████████████████████

Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law



74.

DX216 [Wilhelm] (citing DX28 at ¶¶4.1(b), 11.1(d), 12.1); *id.* at 123–27 ( ).

DX214 [Gagliano ¶46, citing DX28 §§ 8.2, 8.3].

75.

76.

1

2

3    **IV.    Industry Outlook**

4         **A.   Competition for LOSs Will Not Decrease Due to the Merger**

5         77.    After the transaction involving ICE, Black Knight, and Constellation, there is not

6    likely to be a substantial lessening of horizontal competition in the provision of either all LOSs, or

7    commercial LOSs. *See* DX462 ¶¶86–110 [Dick]. That is because the FTC's concerns about ICE

8    acquiring an additional LOS will not be realized. ICE's competitive position in LOSs will not

9    change. *See id.* ¶¶12, 58–85. Mortgage lenders in every size class will continue to have access to

10   many different providers of LOS after the transaction. *See id.* ¶¶16, 86. The only change in the LOS

11   market is that the ownership of the Empower LOS will transfer to Constellation as a result of the

12   acquisition.

13        78.    The transaction will not meaningfully increase concentration in either of the FTC's

14   alleged markets for LOSs specified in the Complaint. ICE's expert Andrew Dick performed a

15   Herfindahl Hirschman Index ("HHI") analysis, and calculated that the transaction is associated with

16   a possible change in the HHI of only 3 to 15 points. *Id.* ¶¶13, 60–61. This is a *de minimis* change

17   that falls well short of the screening thresholds found in the FTC's Horizontal Merger Guidelines.

18   *Id.* ¶62.

19        79.

20

21

22

23

24

25

26

27        80.    Existing Empower customers confirm that they do not see competitive harm from

28   Constellation's ownership of Empower. *See, e.g.*, ███████████ at 31:11–36:18 (████████

1

2

3 ).

4

5

6

7 **B. Competition for PPEs Will Not Decrease Due to the Merger**

8     81.     The transaction will also not cause a substantial lessening of horizontal competition

9 in the provision of PPE systems, either overall or for customers who use ICE's Encompass LOS.

10     82.     ICE has no plans to shut down EPPS after the merger. DX212 ¶¶21–22 [Hart];

11 DX213 ¶44 [Wade]; DX210 ¶¶43–45 [Tyrell]. Instead, ICE will offer Optimal Blue's PPE and

12 EPPS as complimentary products available to users of Encompass. DX210 ¶¶43–45 [Tyrrell]. ICE

13 has been making that commitment to its customers ever since the transaction was announced. *See*

14 *id.*

15

16

17

18

19

20

21     83.     ICE also has no plans to transition Encompass to a closed network and is committed

22 to keeping the platform open, allowing third-party PPE integration.

23

24

25              DX209 ¶12 [Sprecher]. This is how ICE has always run Encompass, and it has no

26 plans to remove or degrade any third-party partner's access to Encompass. DX212 ¶¶14–16 [Hart];

27

28



84. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

85. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

86. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████ Encompass users have ample choice for which PPE provider they want to use, and can make that choice based on their own specific needs. *See, e.g.,* *id.*; DX 462 ¶¶173–188 [Dick]. That will also be true post-transaction.

87. ██████████████████████████████████████████████████
██████████████████████████████████████████████████████ PPEs benefit from having access to a broad set of LOSs, from being LOS-agnostic, and from providing the same value regardless of the LOS. *Id.* Those are all features of Optimal Blue's PPE, but not of EPPS.

88. ICE will not change EPPS into a full-featured PPE like Optimal Blue's PPE, regardless of whether the transaction closes. ███████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████

89. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

### C. The Merger Will Significantly Benefit Mortgage Consumers

90.     The proposed transaction will result in substantial procompetitive benefits for U.S. consumers, including specific quality improvements, cost savings, increased access to residential mortgages, and more. *See, e.g.*, DX220-009; DX209 ¶¶24–26 [Sprecher]. Consumers that will benefit include mortgage borrowers, existing and potential homeowners, and mortgage lenders, because the transaction will enable greater automation, integration of different systems, and product improvements that will lower the costs of originating, selling, and servicing mortgages and improve the quality of those services. *Id*. These tangible benefits will especially benefit the large number of first-time, often cash-constrained, homebuyers and improve homeownership outcomes, particularly in underserved communities.

91.     **Reduce Closing Costs:** ICE will be able to reduce closing costs by further automating loan processing workflows, reducing data entry errors, shorten the closing timeframe, and allow for greater human interaction by lenders to focus on helping a borrower find the right mortgage product. DX211 ¶24 [Bowler]; DX539.

92.     **Increase Access to Credit in Lower Wealth Communities:** Integration with Black Knight will aid ICE's efforts to expand underwriting automation based on alternative qualification criteria. ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ DX211 ¶25 [Bowler]; DX539.

93.     **Expand Lending Capacity:** ICE supports new and existing community focused lenders by providing solutions with better workflow management and tools to on-board new

Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law

borrowers. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ DX211 ¶26 [Bowler]; DX539.

94. **Increase Access to Refinancing in Underserved Communities:** Integration with Black Knight's MSP will allow ICE to build on its efforts to ensure that all borrowers are proactively informed of opportunities to refinance or to remove risk-based charges, like mortgage interest. Refinancing is a key way that homeowners can lower their monthly payments by taking advantage of favorable changes in interest rates, and data from the loan servicing process is critical to achieving this goal. ICE would be able to proactively notify borrowers of an opportunity to refinance and provide them with a reliable estimate of the monthly savings they could achieve by refinancing. DX211 ¶27 [Bowler]; DX539. And if closing costs decrease, the cost benefits of refinancing will be even easier to achieve.

95. **Integrate and Automate Lending Processes:** The merger will help ICE digitize and streamline what remains a deeply analogue process and create an end-to-end homebuying and mortgage lending solution. The result will be a mortgage process that is materially more efficient for borrowers, lenders, and other stakeholders in the mortgage market and that ultimately decreases costs and expands homeownership to more people than ever before. DX211 ¶28 [Bowler]; DX539.

96. The merged firm will benefit from the combined knowledge of ICE and Black Knight personnel. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ DX219 ¶¶11, 47 [Katz].

97. ICE's vision for MSP also includes implementing common standards to facilitate deeper integration of MSP with other products, which will give rise to greater benefits for lenders, servicing companies, borrowers, and other industry participants. DX219 ¶¶11, 33–45 [Katz]. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

███████████████████ DX209 ¶22 [Sprecher]. The improvements associated with the greater integration of MSP with other products will reduce lenders' costs, which will create incentives for lenders to lower their prices to borrowers. These improvements will also facilitate and incentivize the creation of new products and features. DX219 ¶¶46–49 [Katz].

### D.  Enjoining the Merger Would Kill the Transaction and Prevent Industry Efficiencies

98.     For more than 20 years, no merger in which the FTC has first sought preliminary injunctive relief in federal court has then been fully adjudicated in an FTC administrative trial.

99.     If the Court enjoins this merger, the final closing date will pass on November 4, 2023, and commercial imperatives will force the merging parties to terminate their merger agreement because they cannot wait until the administrative proceeding and subsequent appeals conclude. *See FTC v. Occidental Petroleum Corp.*, No. 86-900, 1986 WL 952, at *13 (D.D.C. 1986) (Because of the "glacial pace of an FTC administrative proceeding," the FTC's burden for injunctive relief is a heavy one as "[e]xperience seems to demonstrate that … the grant of a temporary injunction in a Government antitrust suit is likely to spell the doom of an agreed merger."). The FTC administrative process ordinarily takes years to resolve. In the most recent example, *In the Matter of Illumina, Inc. and Grail, Inc*., 201 F.T.C. 0144 (2023), it took over 19 months from the time of the administrative trial (August 24, 2021) to when the Commission issued its opinion (April 3, 2023). The matter is now on appeal with the Fifth Circuit. A similar timeline in this case would mean that final resolution would not occur before 2026. In any event, the ALJ presiding over the administrative trial already told the parties that he will not be in a position to issue his ruling before the merger's cliff date in November 2023—and that was before the administrative trial was continued until September 25, 2023.

100.     ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

1　████████████████████████████████████████████████

2　████████████████████████████████████████████████

3　████████████████████████████████

4　101.　████████████████████████████████████

5　████████████████████████████████████████████████

6　████████████████████████████████████████████████

7　████████████████████████████████████████████████

8　████████

9　102.　██████████████████████████████████

10　████████████████████████████████████████████████

11　████████████████████████████████████████████████

12　████████████████████████████████████████████████

13　████████████████████████████████████████████████

14　██████████████████████

### E. The FTC Did Not Offer Credible Evidence of Customer Concerns Regarding Competition

103.　The record does not reflect customer concerns about either the proposed merger and divestiture plan or Constellation's ownership of Empower. ████████████████████ ██████████████████████

104.　The record also does not reflect that PPE customers view EPPS and Optimal Blue as substitutes or raise concerns about ICE attempting to eliminate EPPS. Rather, testimony and documentary record shows that customers do not view the products as interchangeable or have credible concerns that ICE would disadvantage PPEs on its platform. *See supra* ¶¶27, 33.

105.　To the contrary, those who have criticized the deal are competitors (not customers) who had other motivations – including hoping they would be the subject of the proposed acquisition or who wanted to impede their competitors. *See, e.g.*, DX212 ¶45 [Hart].

106.　████████████████████████████████████

████████████████████████████████████████████████

Case No. 3:23-cv-01710-AMO
Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law



Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law

**PROPOSED CONCLUSIONS OF LAW**

**I.     Legal Standards**

110.   **Preliminary Injunction**: The FTC seeks a preliminary injunction to block the merger under FTC Act § 13(b), which requires proof that an injunction would be in the "public interest." 15 U.S.C. §53(b). The public interest standard involves a "weighing of the equities and a consideration of the Commission's likelihood of success on the merits." *Arch Coal*, 329 F. Supp. 2d at 115; *see also FTC v. Warner Commc'ns Inc*., 742 F.2d 1156, 1159 – 60 (9th Cir. 1984) (per curiam). The government has the burden of proof in seeking the "extraordinary and drastic remedy" of "a preliminary injunction prior to a full trial on the merits." *FTC v. Exxon Corp*., 636 F.2d 1336, 1343–44 (D.C. Cir. 1980).

111.   **Likelihood of success on the merits**: Section 13(b) requires the FTC to show a "likelihood of ultimate success," *FTC v. Affordable Media,* 179 F.3d 1228, 1233 (9th Cir. 1999), *i.e.*, "some chance of probable success on the merits," *FTC v. World Wide Factors, Ltd*., 882 F.2d 344, 347 (9th Cir. 1989). In making that assessment, courts are "charged with exercising their 'independent judgment' and evaluating the FTC's case and evidence on the merits." *FTC v. Meta Platforms Inc*., 2022 WL 16637996, at *5 (N.D. Cal. Nov. 2, 2022) (citation omitted); *see also FTC v. Lab. Corp. of Am*., 2011 WL 3100372, at *15 (C.D. Cal. Mar. 11, 2011) ("serious question" standard does not eliminate "FTC's need to demonstrate a likelihood of success on the merits.").

112.   **Equitable Balancing**: Section 13(b) also requires the FTC to show, with evidence, that a balancing of the equities favors preliminary injunctive relief. *See Lab. Corp*., 2011 WL 3100372, at *15, *21 ("[T]he FTC must present evidence and make an actual showing [that] the equities favor enjoining the transaction."). Equitable balancing under Section 13(b) mandates consideration of both "public equities" and the "private interests of the parties." *Id*. at *21–22.

113.   **Clayton Act, Section 7**: Section 7 prevents an acquisition where its effects "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. "Section 7 deals in probabilities not ephemeral possibilities," *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999), and the "substantial" loss of competition required by Congress must therefore

1    be "sufficiently probable and imminent" for this standard to be met. *United States v. Marine*

2    *Bancorporation, Inc.*, 418 U.S. 602, 623 n.22 (1974).

3        114.   It is well settled that "[t]he antitrust laws are not meant to realign competitors to

4    assist certain competitors over others." *USAirways Grp., Inc. v. Brit. Airways PLC*, 989 F. Supp.

5    482, 489 (S.D.N.Y. 1997). Rather, "[a]ntitrust laws are designed to protect *competition*, not

6    competitors." *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co*., 141 F.3d 947, 951 (9th Cir.

7    1998) (emphasis added).

8        115.   To determine the FTC's likelihood of success on the merits in a Section 7 challenge,

9    courts in this circuit apply the three-step burden-shifting framework established by the D.C. Circuit

10   in *United States v. Baker Hughes, Inc*., 908 F. 2d at 982–93.

11       116.   *First*, the FTC has the burden to define the appropriate product market and make a

12   prima facie showing of anticompetitive effects. *Id.* at 900 n.12 (D.C. Cir. 1990) (Section 7 requires

13   "a judgment whether the challenged acquisition is likely to hurt consumers"); *see also United States*

14   *v. AT&T, Inc*., 916 F.3d 1029, 1032 (D.C. Cir. 2019) (similar). When the parties have amended

15   their merger agreement to include a divestiture, "the new agreement" is what "the Court must

16   evaluate in deciding whether an injunction should be issued." *F.T.C. v. Libbey, Inc.*, 211 F. Supp.

17   2d 34, 46 (D.D.C. 2002); *see also United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-0481, 2022

18   WL 4365867, at *10 n.5 (D.D.C. Sept. 21, 2022) ("[T]reating the acquisition and the divestiture as

19   separate transactions that must be analyzed in separate steps" would allow the government to carry

20   "its *prima facie* burden based on a fictional transaction and fictional market shares."). Proving harm

21   to consumers entails showing that the "combined entities" could "exercise market power by raising

22   prices and restricting the availability of a product or service to customers." *FTC v. Foster*, 2007

23   WL 1793441, at *51 (D.N.M. May 29, 2007). The "outer boundaries of a product market are

24   determined by the reasonable interchangeability of use or the cross-elasticity of demand between

25   the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Courts must "look at whether

26   two products can be used for the same purpose, and, if so, whether and to what extent purchasers

27   are willing to substitute one for the other." *United States v. H&R Block, Inc*., 833 F. Supp. 2d 36,

28   51 (D.D.C. 2011) (citation omitted). The relevant market must also be defined with precision; the

government may neither combine distinct markets into a single market nor artificially subdivide a market into smaller slivers. *See, e.g., Hicks v. PGA Tour, Inc.,* 897 F.3d 1109, 1120 – 21 (9th Cir. 2018); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 294–95 (D.D.C. 2020).

117.    In making this showing, the FTC cannot "veer into the realm of ephemeral possibilities." *Meta*, 2023 WL 2346238, at *28. Nor can the FTC rely on "assumptions and simplifications that are not supported by real-world" facts, *Am. Booksellers Ass'n v. Barnes & Noble, Inc*., 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), or ignore the "economic reality" of the markets at issue, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004). Instead, taking that economic reality into account, the agency must prove a "reasonable probability of anticompetitive effect." *Warner Commc'ns*, 742 F.2d at 1160. Further, "antitrust theory and speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of the record evidence relating to the market and its probable future." *Arch Coal*, 329 F. Supp. 2d at 116–17; *see also Marine Bancorp.*, 418 U.S. at 622–23; *Adaptive Power Sols.*, 141 F.3d at 952 ("Antitrust claims must make economic sense.")

118.    If the FTC meets its initial burden, the burden shifts to the defendants to produce evidence to rebut the FTC's prima facie case. *Id*. The weight of the defendants' burden varies with the strength of the FTC's prima facie case: "The more compelling the prima facie case, the more evidence the defendant must produce to rebut it successfully." *Baker Hughes*, 908 F.2d at 991. The converse is equally true: a weak prima facie presumption requires less evidence to defeat it. *See Arch Coal*, 329 F. Supp. 2d at 129 ("Certainly less of a showing is required from defendants to rebut a less-than-compelling prima facie case.") (citations omitted).

119.    Defendants can rebut any presumption that a merger will substantially lessen competition in a variety of ways. For example, defendants can show that the FTC failed to properly define the product market where it alleges harm, or that the market-share statistics "produce an inaccurate account of the merger's probable effects on competition in the relevant market." *Arch Coal*, 329 F. Supp. 2d at 116. Defendants can also rebut any presumption by showing strong competition in a relevant market, excess capacity, marketing and sales methods, industry structure,

1   product differentiation, or the prospect of efficiencies from the merger. *See Baker Hughes*, 908

2   F.2d at 985 (collecting cases).

3       120.    After rebutting the FTC's prima facie case, "the burden of producing additional

4   evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden

5   of persuasion which remains with the government at all times." *Baker Hughes*, 908 F.2d at 983.

6       121.    Ultimately, the FTC bears the burden on "every element of [its] Section 7 challenge,

7   and a failure of proof in any respect will mean the transaction should not be enjoined." *Arch Coal*,

8   329 F. Supp. 2d at 116.

9   **II.    The FTC Has Failed to Show That It Is Likely to Succeed on the Merits**

10      **A.  The Merger Will Not Harm Competition in the Alleged LOS Markets**

11      122.    ICE's acquisition of Black Knight will not reduce the number of competitors in the

12  claimed LOS market because the divestiture of Empower to Constellation will ensure that the exact

13  same pre-transaction levels of competition for LOS services are maintained post-transaction.

14      123.    The FTC's speculative concerns that Constellation's Empower will be somehow

15  inferior to Black Knight's Empower are without evidentiary support. The evidence shows that

16  Constellation is well-equipped to acquire the Black Knight Empower assets, continue their

17  operation, grow the business, and provide strong continued competition in the LOS market. *See*

18  *supra* ¶¶64–68. Constellation has a demonstrated record of success with divested assets, already

19  competes in the mortgage industry (including with an LOS), and has the resources and strategy to

20  compete in the marketplace. Constellation's "wealth of experience is an important component" to

21  preserve LOS competition. *RAG-Stiftung*, 436 F. Supp. 3d at 305.

22      124.    The divestiture, ███████████████████████████████████████████

23  ██████████████████████, ensure that the Empower LOS under Constellation's ownership will be

24  able to continue operation with all pertinent features and management in place going forward.

25      125.    The test is whether the "scope of the proposed divestiture" will allow the acquiring

26  party to "effectively run[] the [business]." *RAG-Stiftung*, 435 F. Supp. 3d at 305. ███████████

27  ████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████

Defendants' Proposed Pre-Hearing Findings of Facts and Conclusions of Law

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ███████████████████████████████

5      126.  █████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ███ Constellation will have everything "to run a standalone business," which is more than enough

8 to "preserve the competition that would have been lost through the merger." *RAG-Stiftung*, 436

9 F.3d at 305–06. ██████████████████████████████████████

10 ████████████████████████████████████████████████

11      127.  The FTC speculates without evidence that Constellation's Empower will be unable

12 to compete without Constellation also buying Optimal Blue. But the fact is that ████████████

13 ████████████████████████████████████████████████████

14 ████████████████████, and Empower customers also have the ability to use other third-party PPEs,

15 like Polly. ██████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 █████████████████████████████████████

21      128.  The FTC further speculates that Constellation will be an ineffective competitor

22 because of a risk of "conflicts" or "entanglements" arising from the parties' agreement in the CSA,

23 under which ICE agreed to license certain additional products to Constellation ████████████

24 ███████ and provide technical support for an additional 12-year period. The FTC argues that ICE

25 "may" or "could" take bad faith actions with unidentified consequences to Constellation. Courts

26 have rejected similar arguments where there was "no reason to question" whether the divested

27 assets "will be an independent competitor," despite the FTC's argument that "it has ongoing

28

1    commercial relationships with [the merging companies] as a customer," including leasing land from

2    the acquirer. *RAG-Stiftung*, 436 F. Supp. 3d at 306.

3           129.   █████████████████████████████████████████████████████████

4    █████████████████████████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████████████████████

6    █████████████████████████████████████████████████████████████████████████

7    ████████████████████████████████   The FTC cannot replace Constellation's considered business

8    judgment with the FTC's unsupported preference for how Constellation might do business. The

9    FTC has simply not offered anything more than vague predictions that ICE would renege on its

10   contractual requirements and take actions that could impede Constellation. That is not enough.

11          130.   Finally, the LOS market already sees rigorous competition from a large number of

12   LOS providers: for example, Blue Sage, Byte, Calyx, Finastra, Fiserv, Integra, Mortgage Cadence,

13   and Wirpo—each of which has won and continues to win business from lenders of every size. These

14   providers will be unaffected by the transaction.

15          **B.   The FTC's Alleged PPE Markets Are Flawed**

16          131.   Demonstrating a relevant product market "is a 'necessary predicate' to a successful

17   challenge under the Clayton Act and thus to establishing a likelihood of ultimate success for

18   preliminary injunction purposes." *California v. Sutter Health Sys*., 84 F. Supp. 2d 1057, 1081 (N.D.

19   Cal. 2000). The FTC claims there will be anticompetitive effects (a) in a market for "PPEs for

20   Encompass Users" and (b) in a market for all PPEs. The FTC's alleged markets are not supported

21   by law or the overwhelming evidence.

22          132.   First, the FTC cannot pursue a single-brand market claim, and the FTC effectively

23   conceded that they cannot and did not make this showing in their Reply Brief. Courts "disfavor"

24   single-brand markets for antitrust purposes. *See Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107

25   (N.D. Cal. 2022). Only in "rare instances" is the relevant market "an aftermarket—where demand

26   for a good is entirely dependent on the prior purchase of a durable good in a foremarket." *Epic*

27   *Games, Inc. v. Apple, Inc*., 67 F.4th 946, 976 (9th Cir. 2023) (rejecting single brand market). The

28

FTC was required to show four separate factors, see *id*. at 981, but did not plead or provide evidence on any of them, and its alleged market of "PPEs for Encompass Users" fails.

133.    Second, EPPS and Optimal Blue do not compete in the same relevant product markets. Products only belong in the same product market if they are "reasonably interchangeable, such that there is cross-elasticity of demand," *Gorlick Dist. Ctrs., LLC v. Car Sound Exhaust Sys*., Inc., 723 F.3d 1019, 1025 (9th Cir. 2013), *i.e.*, "consumers would respond to a slight increase in the price of one product by switching to another product," *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999). The Supreme Court in *Brown Shoe* identified several "practical indicia" to help determine whether products are reasonably interchangeable, such as "the product's peculiar characteristics and uses," "distinct customers," "distinct prices," and "sensitivity to price changes." 370 U.S. at 325.

134.    The evidence demonstrates that EPPS and Optimal Blue have dramatically different functionalities, fundamentally different customer bases, and charge very different prices.

135.    The products are functionally distinct. EPPS is a basic pricing engine. ████████

████████████████████████████████████████████████████████████

████████████████████████████████ *See supra* ¶32; DX648 27:13–19. Optimal Blue is a highly configurable, feature-rich, standalone PPE that offers vastly more functionality than EPPS, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ *see also supra* at ¶37; ████████████ at 150:10–23 (████████

████████████████████████████████████████████████████████);

PX3159-002 (████████████████████████████████████████). EPPS simply cannot do what Optimal Blue can.

136.    ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

1                                ). The FTC has conceded that it would take "as much as six to seven years to

2 build a product truly competitive with Optimal Blue's pricing tool." FTC Br. at 29.

3          137.     Given these significant functional differences, EPPS and Optimal Blue are used by

4 fundamentally different types of customers. *See Brown Shoe Co.*, 370 U.S. at 325 ("distinct

5 customers" is a factor in determining accuracy of the proposed market).

6

7

8 . DX462

9 ¶¶144–48.

10                             DX11 120:14–122:10.

11

12          138.     The             price differential between EPPS and Optimal Blue, *see supra*

13 ¶45, is also sufficient evidence enough to conclude that the two products are not "reasonably

14 interchangeable." *See Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496–97 (2d

15 Cir. 2004) (holding that "Coumadin's substantially higher prices is evidence of a distinct customer

16 group.").

17                                          *See, e.g.*, DX462 ¶¶20(b),

18 153–57.

19                             ;      175:12–20 (

20                            ).

21                                        *See* DX462

22 ¶¶21(a), 154–57.

23          139.     The FTC did not meet its burden to show that EPPS and Optimal Blue are reasonably

24 interchangeable and thus in the same product market.

25        **C. The Merger Will Not Harm Competition in the Alleged PPE Markets**

26          140.     Absent a properly defined relevant product market, the FTC cannot make any

27 showing of competitive harm. *See Baker Hughes*, 908 F.2d at 982. The FTC's contention that

28 "Defendants' combined post-Acquisition PPE market share" will purportedly exceed 30% is not

1    supported by the evidence. The calculation is based on "shares" in a market that does not exist. The

2    FTC failed to carry its burden that EPPS and Optimal Blue operate within the same relevant market.

3    *See California*, 84 F. Supp. 2d at 1081. This is also true for the alleged single-brand market of

4    "PPEs for Encompass Users."

5           141.    Even if EPPS and Optimal Blue's PPE were in the same product market, the FTC

6    cannot show that the combination will substantially lessen competition because, as discussed above,

7    the two products are highly differentiated and do not constrain each other. The FTC also cannot

8    show a lessening of competition when the evidence demonstrates active and significant competition

9    against Optimal Blue's PPE by third-party competitors.

10          142.    Commercial PPE markets are dynamic, evolving, and highly competitive. The PPE

11   space has seen significant new and ongoing investments, expansion, and entry by new competitors.

12   *See, e.*g., DX462 ¶¶57(f), 173–87 (█████████████████████████████████████████

13   ████████████████████████████). Within Encompass specifically, Optimal Blue's PPE

14   faces significant competition from many other PPEs that are integrated into Encompass and into

15   other LOSs, including Polly, Lender Price, and Zillow's Mortech. The evidence shows that the

16   companies have features that directly compete with Optimal Blue's PPE, ██████████████

17   ████████████████████████████. *See, e.g.*, DX462 ¶¶173–87.

18          143.    Polly, for example, is an aggressive ████████████ competitor to Optimal Blue's

19   PPE, with an approximately ███ increase in annual recurring revenue from Q4 2021 to Q4 2022.

20   *See* DX51 41:13–17. Optimal Blue competes with Polly ███████████████████████████

21   ███ DX12 61:17–21. Other customers of Optimal Blue have described Polly as ████████

22   ████████████ *see* ███████████ at 147:11–148:1.█████████████████████

23   ████████████████████. *Id.*

24          144.    ███████████████████████████████████████

25   ████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████

1 ███████████████████████████████████████████████████

2 ████████████████████████████████████████ More new entrants to the commercial PPE

3 market include Milos, LoanNEX, and LoanPASS, showing that the PPE space is dynamic. *Id*.

4 ¶¶184–87.

5       145.    The evidence does not support the FTC's contention that ICE, post-merger, could

6 raise prices on Optimal Blue's PPE without facing significant competition or customer losses. *See,*

7 *e.g.*, *Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 WL 3790296, at *6 (N.D. Cal. Sept.

8 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011); *see also Gen. Comm'cns Eng'g, Inc. v. Motorola*

9 *Commc'ns & Elecs., Inc.*, 421 F. Supp. 274, 292 (N.D. Cal. 1976).

10       146.    The FTC also speculates, without evidence, that there will be harm if ICE planned

11 to discontinue EPPS after the transaction. The fact and expert evidence is the opposite: ICE has no

12 plans to discontinue its native EPPS PPE within Encompass. See DX34 177:9–11 ████████████

13 ██████████████████████████████████████████████████████████; DX42

14 153:20–21 ████████████████████████████████████████████████

15 ██████████████████████████████████████. ICE instead is more likely to

16 continue its existing operations and invest additional resources to improve quality and reduce costs

17 for this specific group of customers.

18       147.    ICE's plans are rational because EPPS is a different type of product with different

19 customers. ████████████████████████████████████████████████

20 ████████████████████ See DX42 80:6–8 ███████████████████

21 ████████████████████; DX14 127:18–20 ███████████████

22 ████████████████████████████████████████████████

23 ██████████. ICE is incentivized to continue serving customers who want EPPS, and do not want

24 and will not pay for Optimal Blue, Polly, Lender Price, Mortech, or the other feature-rich PPEs.

25 Otherwise, those customers will move to one of Encompass's many LOS competitors that offer

26 their own native PPEs at a fraction of the price.

27

28

**D.  The FTC Did Not Prove Its Vertical Foreclosure Theory**

148.    The FTC is required to establish a relevant product market for its vertical foreclosure theory within with the combined entity's market power can be assessed. *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998); *see also United States v. Marine Bancorp.*, 418 U.S. 602, 618 (1974) (explaining that defining a market is a "necessary predicate to deciding whether a merger contravenes the Clayton Act"). A vertical merger, in particular, "will not have an anticompetitive effect" where "substantial market power is absent at any one product or distribution level." *Auburn News Co. v. Providence Journal Co.*, 659 F.2d 273, 278 (1st Cir. 1981). The FTC's vertical foreclosure theory thus fails at the outset because no relevant PPE product market has been properly defined, as explained above.

149.    Beyond this threshold failing, the proposed transaction does not present meaningful vertical concerns. The FTC's speculation that the combined firm would decide to change course and foreclose third-party PPE providers from integrating on Encompass is without merit because it would be against ICE's interests to limit or degrade third-party users, and inconsistent with how Encompass has always operated.

150.    Vertical merger challenges are subject to an exacting standard: the FTC carries a particularly heavy burden because "[v]ertical mergers often generate efficiencies and other procompetitive effects" and the FTC must make a "fact-specific showing that the proposed merger is likely to be anticompetitive." *United States v. AT&T, Inc.*, 310 F.Supp.3d 161, 192 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

151.    The FTC offered only speculation that ICE will close Encompass to non-Optimal Blue PPEs or otherwise make it more expensive or difficult for third-party PPEs to integrate on Encompass. There is no evidence of any plan to close Encompass or disadvantage third-party PPEs. Courts have repeatedly concluded that the government cannot meet its burden when it relies on an unsupported assumption about a speculative future change in business strategy. *See, e.g., AT&T*, 310 F. Supp. 3d at 241 n.51; *UnitedHealth*, 2022 WL 4365867 at *16.

152.    The evidence shows the opposite. Encompass has been an open platform since its launch in 2004, allowing third parties to integrate with and add functionality to the platform, and

1  ICE publicly recognizes its incentivizes to keep operating it in the same manner. *See, e.g.*, DX16-

2  009 ("At ICE Mortgage Technology, partnerships are in our DNA. They have been from the start

3  and continue to this day as we team with organizations up and down the mortgage ladder to help

4  the industry stay efficient, connected, and innovative.")

5      153.   Encompass's open platform is currently integrated with more than 300 third-party

6  vendors, many of which provide solutions that compete with ICE. The proposed transaction will

7  not change that fact: Encompass will continue to maintain an open platform for PPEs, providing its

8  users with access, as it does now, to many PPEs besides just EPPS and Optimal Blue. Even while

9  owning EPPS, ICE has added new PPEs to Encompass to provide more choices to its LOS

10 customers. *See* DX36; DX37; DX38. This is competition-enhancing conduct.

11     154.   Basic economic incentives also contradict the FTC's theory. ICE's existing

12 Encompass LOS generates substantially more revenue than what Optimal Blue could generate for

13 ICE post-acquisition, both at the product level and on a per customer basis. Lost revenue from an

14 existing LOS customer that leaves for a different LOS, or a potential new customer that does not

15 join Encompass in the first place, would cost more to ICE than the incremental gain in revenue that

16 the FTC hypothesized. DX45 at 117:23–119:24.

17 **III.   The FTC's Internal Administrative Procedures Are Unconstitutional**

18     155.   The Supreme Court's decision in *Axon Enterprises, Inc. v. FTC*, 143 S. Ct. 890

19 (2023) confirms this Court's jurisdiction to adjudicate Defendants' claims that the FTC's internal

20 administrative proceedings are unconstitutional.

21     **A.   The FTC's Adjudication Process Violates Due Process**

22     156.   The FTC's adjudication process fails to deliver on the "basic requirement" of due

23 process by depriving ICE and Black Knight of a fair proceeding before an impartial tribunal. *In re*

24 *Murchison*, 349 U.S. 133, 136 (1955). This applies to any adjudicative body, including

25 administrative tribunals. *Gibson v. Berryhill*, 411 U.S. 564, 579 n. 17 (1973).

26     157.   The FTC improperly acts as investigator, prosecutor, and judge in its own

27 proceeding. *E.g.*, 15 U.S.C. §46(a), §45(b); 16 C.F.R. §3.11, §3.51(b), §3.52. The FTC investigated

28 the transaction, 16 C.F.R. §§0.16-.14, voted to file the complaint, *id.* at §3.11(a), and directed its

prosecution, *id.* at §§3.1, 3.51. The FTC's appointed Administrative Law Judge ("ALJ") will conduct an administrative trial and make a "recommendation" to the Commission, DX24-003–4; 16 C.F.R. §0.14; but only the Commissioners can enter a decision and can completely set aside the factual findings and conclusions of the ALJ. 16 C.F.R. §§3.52, 3.54 (empowering Commission to "exercise all the powers which it could have exercised if it had made the initial decision").

158.     Thus, the FTC Commissioners, who decided to sue Defendants in the first place, get to make a *de novo* ultimate merits decision in their own case. This one-sided system, constrained only by limited appellate review—where the FTC commands substantial deference to its "findings," *see* 18 U.S.C. §45(c) (factual findings "conclusive" if "supported by evidence")—does not afford due process. "[A]n unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case." *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).

159.     Unsurprisingly, the FTC fares remarkably well with its home-field advantage before the ALJ. As the Ninth Circuit noted in *Axon*, "the FTC has not lost a single case in the past quarter-century. Even the 1972 Miami Dolphins would envy that type of record." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 986 F.3d 1173, 1187 (9th Cir. 2021), *cert. granted in part*, 142 S. Ct. 895 (2022), *and rev'd and remanded*, 143 S. Ct. 890 (2023).

160.     Recently, the FTC did suffer a setback after the Ninth Circuit's opinion in *Axon*, when an ALJ ruled for the merging parties after a five-week administrative trial. *See In the Matter of Illumina, Inc. and Grail, Inc.*, Docket No. 9401. But the FTC ensured that setback was only temporary. On "appeal," the FTC Commissioners *reversed* the ALJ's decision, disregarded his factual findings, and entered an order with its own factual findings, ratifying the allegations in the FTC's complaint. The FTC's undefeated record in its own adjudicatory process remains intact.

161.     After that experience in *Illumina* and while this case has been before this Court, the FTC quietly changed its administrative rules (without notice and comment) to further entrench the one-sided nature of its proceedings. DX24-003–4. The FTC's ALJ, the only theoretical independent check, will no longer even issue an "initial decision" that can become the decision of the Commission absent an appeal. Rather, the ALJ will now make only a "recommended decision" to

1    the Commission, which may reject the recommendation "in whole or in part, and issue its own

2    decision adopting different findings of fact or conclusions of law." DX24-003–4.

3            **B.  The "Clearance Process" Violates Equal Protection, Due Process, and Article I**

4            162.    The FTC and the Department of Justice share overlapping responsibility for

5    enforcing federal antitrust laws. But the decision as to which agency will lead the investigation

6    results in separate tracks with different types of treatment that can be outcome-determinative and

7    is unrelated to any legitimate government process in violation of the Defendant's equal protection

8    and due process rights. *Heller v. Doe*, 509 U.S. 312, 320 (1993). The Equal Protection Clause of

9    the Fifth Amendment commands that the government shall not "deny to any person within its

10   jurisdiction the equal protection of the laws." U.S. Const. amend. V. & XIV, §1; *United States v.*

11   *Windsor*, 570 U.S. 744, 774 (2013). The Equal Protection Clause protects against "arbitrary and

12   irrational discrimination" by the Government, *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71,

13   83 (1988), and demands that "all persons similarly situated should be treated alike," *Tennessee v.*

14   *Lane*, 541 U.S. 509, 522 (2004). Any difference in treatment "run[s] afoul of the Equal Protection

15   Clause" when there is no "rational relationship between the disparity of treatment and some

16   legitimate governmental purpose." *Montgomery v. Louisiana*, 577 U.S. 190, 231 (2016).

17           163.    The decision to assign this case to the FTC, rather than the DOJ, was made as part

18   of an informal, nonpublic, unwritten, black-box "clearance" process that sometimes involves the

19   flip of a coin to determine which agency will pursue an action. DX25-001. That arbitrary

20   assignment decision has no rational basis and is unrelated to any legitimate governmental purpose

21   but it has major consequences.

22           164.    DOJ-led merger challenges occur exclusively in federal court, from complaint

23   through final judgment. They are decided by impartial and independent Article III judges, who

24   apply the Federal Rules of Evidence and Civil Procedure and make *de novo* factual findings that

25   cannot simply be rejected and replaced by the factual findings of a different, non-judicial body that

26   did not observe any witnesses.

27           165.    By contrast, as described above, parties under FTC review are subject to an

28   administrative process in which the FTC acts as investigator, prosecutor, and judge. The appointed

ALJ conducts the trial with the FTC's rules, *see* 16 C.F.R. § 3.43, instead of the Federal Rules. The ALJ makes a "recommendation" but a decision is only rendered by the FTC Commissioners, who can and do reject the ALJ's findings in favor of their own preferred findings for which they demand deference when their final decision ultimately reaches Article III appellate review. *See* 15 U.S.C. §§ 45(b)-(c), 53(b); 16 C.F.R. §§ 3.42(a), 3.54(b).

166.     There is no rational basis for these stark and often outcome-determinative differences. The arbitrary assignment of this case to the FTC violated Defendants' equal protection and due process rights.

167.     The FTC's unfettered discretion to decide whether to bring enforcement actions in its administrative process rather than in Article III courts, *see* 15 U.S.C. §§ 45(b), 53(b), violates Article I. The "power to assign disputes to agency adjudication" is a "legislative power," and Congress cannot delegate legislative power to an executive agency unless it "provides an 'intelligible principle' by which the [agency] can exercise it." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) *cert. granted* (June 30, 2023) (U.S. No. 22-859) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989); *see also Crowel v. Benson*, 285 U.S. 22, 50 (1932) ("[T]he mode of determining" which cases are assigned to administrative tribunals "is completely within congressional control")). In *Jarkesy*, the court held that Congress failed to provide an intelligible principle by granting the SEC "absolute discretion to decide whether to bring securities enforcement actions within the agency instead of in an Article III court," without "indicating how the SEC should make that call in any given case." *Id.* at 462. The same is true of the FTC, which Congress gave the same unlimited discretion to decide whether to bring antitrust enforcement cases in administrative proceedings rather than in Article III courts. *See* 15 U.S.C. §45(b), 53(b); *Cf. Axon*, 143 S. Ct. at 897 (equating FTC and SEC authority in this respect). The FTC initiated its administrative process in this case (which it now seeks equitable relief in favor of) under an unconstitutional delegation of legislative power.

## C.  The FTC's Adjudicatory Process Violates Article II

168.     The structure of the FTC's adjudicatory process violates Article II. The FTC's ALJs and Commissioners exercise executive powers but enjoy for-cause removal protections that

1    improperly insulate them from accountability to the President—and ultimately the People. *See*

2    *Axon*, 986 F.3d at 1188 ("Axon raises substantial questions about whether the FTC's dual-layered

3    for-cause protection for ALJs violates the President's removal powers under Article II."). Article

4    II grants the President the whole "executive Power" and charges the President with "tak[ing] Care

5    that the Laws be faithfully executed." U.S. Const., art. II, §1, 3. The President must be able to

6    exercise the "power to remove—and thus supervise—those who wield executive power on its

7    behalf." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020).

8              169.   But that is not the case with the FTC Commissioners. They are shielded from at-will

9    Presidential removal (and from political accountability) because they serve a 7-year term and are

10   removable absent a finding of "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C.

11   § 41. These protections rest on the premise that the FTC—"as it existed in 1935"—exercised "no

12   part of the executive." *Seila Law*, 140 S. Ct. at 2198. But the modern FTC no longer represents the

13   "nonpartisan" and "'quasi-legislative' or 'quasi-judicial'" body described in *Humphrey's Executor*

14   *v. United States*, 295 U.S. 602 (1935). The FTC today is primarily an enforcement agency

15   composed of commissioners that come from one party. It wields substantial executive power,

16   deciding the actions to bring and prosecuting those actions for injunctive and monetary relief, "a

17   quintessentially executive power." *Seila Law*, 140 S. Ct. at 2200; 15 U.S.C. §45(l)-(m). Thus, the

18   traditional limits on restricting the President's power to remove executive officers govern, and the

19   for-cause protection for FTC Commissioners violates Article II. *See Seila Law*, 140 S. Ct. at 2192.

20             170.   That constitutional problem is compounded for the FTC's ALJs, who receive an

21   additional layer of protection from Presidential removal. FTC-appointed ALJs can only be removed

22   for "good cause" by FTC Commissioners. *See* 5 U.S.C. § 7521(a), (b)(1). This creates a dual layer

23   of protection for these ALJs, because they are removable only in an action brought by the FTC "for

24   good cause," and the Commissioners, in turn, are only removable by the President for cause. Such

25   dual-layered protection from removal is unconstitutional. See *Free Enter. Fund v. PCAOB*, 561

26   U.S. 477, 483, 492-93 (2010) (holding unconstitutional similar multi-layer tenure protection).

27

28

### D.  The FTC Adjudicatory Process Violates Article III and the Seventh Amendment

171.    The FTC's administrative process also violates constitutional protections by adjudicating private rights, without trial by jury and Article III safeguards. "The judicial Power of the United States" is "vested in one supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." U.S. Const. Art. III, § 1. "Congress cannot confer the Government's 'judicial Power' on entities outside Article III." *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 545 U.S. 462, 484 (2011). The FTC's administrative process will decide *private* rights, including the right of parties to engage in private commercial transactions, and to avoid civil penalties. *See Tull v. United States*, 481 U. S. 412, 422 (1987) ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law"). The FTC's ALJ process is constrained only by limited review by a federal court where the FTC commands substantial deference to its "findings," *see* 18 U.S.C. §45(c) (findings "conclusive" if "supported by evidence"). This does not allow federal courts to truly render "the ultimate decision" on private rights as required by Article III. *See United States v. Raddatz*, 447 U.S. 667, 683 (1980).

172.    The FTC's adjudication of private rights without a jury during its internal administrative proceeding, given the circumscribed judicial review on appeal, violates Article III, the Seventh Amendment, and due process.

173.    The FTC's internal administrative adjudication will inflict on Defendants the "here and now injury," *Seila Law*, 140 S. Ct. at 2196, of subjection "to an illegitimate proceeding, led by an illegitimate decisionmaker," *Axon*, 143 S. Ct. at 903. As the Supreme Court recognized, that injury "is impossible to remedy once the proceeding is over." *Id.*

### IV.    The Equities Weigh Against a Preliminary Injunction

174.    Because the FTC has failed to demonstrate the requisite likelihood of ultimate success, there is no need for the Court to reach the equities. *Meta*, 2023 WL 2346238, at *33. Even assuming that they did, the equities—both public and private—weigh against granting the "extraordinary and drastic remedy" of a preliminary injunction. *FTC v. Staples*, 190 F. Supp. 3d 100, 115 (D.D.C. 2016).

175.    The Court considers both the public interest and the private parties' private interests. Both equitable considerations here disfavor a preliminary injunction, because granting it will kill the transaction. That makes the relief the FTC seeks particularly dramatic—and the equities weighing against it significant. *See FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 99 (N.D. Ill. 1981) ("the usual rule that a preliminary injunction is an extraordinary and drastic remedy is particularly true in the acquisition and merger context" because the "'preliminary' relief sought by the FTC would doom this transaction"); *Exxon Corp.*, 636 F.2d at 1343 (similar).

176.    The public equities—which "include improved quality, lower prices, increased efficiency, [and] realization of economies of scale"—disfavor killing a pro-competitive transaction. *Lab. Corp.*, 2011 WL 3100372, at *22; *see also Warner Commc'ns*, 742 F.2d at 1165 (public interest in "beneficial economic effects and pro-competitive advantages"). The evidence demonstrates that the combined firm will be able to offer an unprecedented "life of loan" mortgage generation and servicing software that is projected to bring real and tangible cost savings to future and existing borrowers. This is a primarily vertical acquisition that creates new efficiencies that are not achievable under the current status quo, and which will create new opportunities for cost savings for the general public of new homebuyers and existing borrowers.

177.    ICE and Black Knight's private interests also strongly weigh against preliminary injunctive relief. *See FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1089 (9th Cir. 1985) (denying injunction given defendant's "precarious financial position"); *FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 717 (9th Cir. 1976 (Kennedy, J.) (similar). This transaction involved significant financial and personnel resources by both companies to achieve, including the efforts involved to create and negotiate the additional Empower divestiture to Constellation. Individuals at both companies have made personal financial and other decisions in reliance on an anticipated closing to occur by that date. DX209 ¶31 [Sprecher]. Preventing the acquisition beyond the November 4, 2023 close date will kill it.

178.    The Court concludes that the equities do not favor granting an injunction to stay the transaction.

1

## **CONCLUSION**

2

The FTC's motion for a preliminary injunction is denied.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Dated: June 30, 2023                    SUSMAN GODFREY L.L.P.

2                                       By:  */s/ Kalpana Srinivasan*

3                                            Kalpana Srinivasan

4                                            Kalpana Srinivasan, Bar No. 237460
                                             ksrinivasan@susmangodfrey.com
5                                            Michael Gervais, Bar No. 330731
                                             mgervais@susmangodfrey.com
6                                            Jesse-Justin Cuevas, Bar No. 307611
                                             jcuevas@susmangodfrey.com
7                                            **SUSMAN GODFREY L.L.P.**
                                             1900 Avenue of the Stars, Suite 1400
8                                            Los Angeles, CA 90067
                                             Telephone: (310) 789-3100
9                                            Facsimile: (310) 789-3150

10                                           Shawn L. Raymond, *pro hac vice*
                                             sraymond@susmangodfrey.com
11                                           Alexander L. Kaplan, *pro hac vice*
                                             akaplan@susmangodfrey.com
12                                           Adam Carlis, *pro hac vice*
                                             acarlis@susmangodfrey.com
13                                           Michael C. Kelso, *pro hac vice*
                                             mkelso@susmangodfrey.com
14                                           Abigail Noebels, *pro hac vice*
                                             anoebels@susmangodfrey.com
15                                           Alejandra C. Salinas, *pro hac vice forthcoming*
                                             asalinas@susmangodfrey.com
16                                           Krisina J. Zuñiga, *pro hac vice*
                                             kzuniga@susmangodfrey.com
17                                           **SUSMAN GODFREY L.L.P.**
                                             1000 Louisiana, Suite 5100
18                                           Houston, TX 77002-5096
                                             Telephone: (713) 651-9366
19                                           Facsimile: (713) 654-6666

20
                                             Michelle Park Chiu, Bar No. 248421
21                                           michelle.chiu@morganlewis.com
                                             Minna Lo Naranjo, Bar No. 259005
22                                           minna.naranjo@morganlewis.com
                                             **MORGAN, LEWIS & BOCKIUS LLP**
23                                           One Market, Spear Street Tower
                                             San Francisco, CA 94105-1596
24                                           Telephone: (415) 442-1000
                                             Facsimile: (415) 442-1001
25
                                             J. Clayton Everett Jr., *pro hac vice*
26                                           clay.everett@morganlewis.com
                                             Ryan M. Kantor, *pro hac vice*
27                                           ryan.kantor@morganlewis.com
                                             **MORGAN, LEWIS & BOCKIUS LLP**
28

---

48

1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Telephone: (202) 739-3000
Facsimile: (202) 739-3001

John C. Dodds, *pro hac vice*
john.dodds@morganlewis.com
Zachary M. Johns, *pro hac vice*
zachary.johns@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: (215) 963-5000
Facsimile: (212) 309-6001

Harry T. Robins, *pro hac vice*
harry.robins@morganlewis.com
Susan Zhu, *pro hac vice*
susan.zhu@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Attorneys for Defendant*
*Intercontinental Exchange, Inc.*

and

Elliot R. Peters, Bar No. 158708
epeters@keker.com
R. James Slaughter, Bar No. 192813
rslaughter@keker.com
Khari J. Tillery, Bar No. 215669
ktillery@keker.com
**KEKER, VAN NEST & PETERS LLP**
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Jonathan M. Moses, *pro hac vice*
jmmoses@wlrk.com
Adam L. Goodman, *pro hac vice*
algoodman@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

*Attorneys for Defendant*
*Black Knight, Inc.*

49

**<u>Local Rule 5-1(h)(3) Attestation</u>**

Pursuant to N.D. Cal. Local Rule 5-1(h)(3), the undersigned attests that each of the other signatories to this document have concurred in the filing of this document.

Dated: June 30, 2023       By:   */s/ Kalpana Srinivasan*

Kalpana Srinivasan
SUSMAN GODFREY L.L.P.

*Attorney for Defendant
Intercontinental Exchange, Inc.*