Abby L. Dennis, DC Bar # 994476
Peter Richman, CA Bar # 149107
Ashley Masters, TX Bar # 24041412
Abigail Wood, DC Bar # 242239

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381

*adennis@ftc.gov; prichman@ftc.gov;*
*amasters@ftc.gov; awood@ftc.gov*

[Additional counsel identified on signature page in accordance with Local Rule 3-4(a)(1)]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION**,<br><br>        Plaintiff,<br><br>    v.<br><br>**INTERCONTINENTAL EXCHANGE, INC.**<br>and<br><br>**BLACK KNIGHT, INC.**,<br><br>        Defendants. | Case No. 3:23-CV-01710-AMO<br><br>**PLAINTIFF FEDERAL TRADE COMMISSION'S PRE-HEARING PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

# TABLE OF CONTENTS

**FEDERAL TRADE COMMISSION'S PROPOSED FINDINGS OF FACT** ..................1

I. The Parties and the Proposed Acquisition..........................................................1

II. Residential Mortgage Origination in the United States.....................................1

    A. The Loan Origination System ...................................................................1

        1. The Role of LOSs in Mortgage Origination .................................3

        2. Commercial v. Proprietary LOSs...................................................4

        3. Barriers to Entry.............................................................................5

    B. The Product, Pricing & Eligibility Engine...............................................6

        1. The Role of PPEs in Mortgage Origination...................................6

        2. Importance of LOS Integration......................................................7

        3. Barriers to Entry.............................................................................8

III. ICE's Encompass and Black Knight's Empower Dominate the LOS Space ....................9

    A. Encompass and Empower Are the ████████████ .............................9

    B. ICE and Black Knight Compete Head-to-Head for LOS Customers .......10

    C. ICE and Black Knight Uniquely Compete to Offer an Integrated Suite of LOS and Ancillary Services ...............................................................11

    D. Lenders Benefit from Competition Between ICE and Black Knight in the Provision of LOS Services.............................................................13

IV. ICE's EPPS and Black Knight's Optimal Blue Dominate the PPE Space.....................15

    A. Optimal Blue and EPPS Are the ████████████ .............................16

    B. ICE and Black Knight Compete Head-to-Head For PPE Customers .......16

    C. Competition Between Defendants Led ICE to ████████████ ...........18

    D. Third-Party PPE Providers Are Dependent on Integration with ICE's Encompass LOS...............................................................................20

        1. ICE Has the Ability to Disadvantage Ancillary Service Providers .................20

        2. ICE Has the Ability to Disadvantage PPE Providers in Particular..................21

        3. Post-Acquisition, ICE Will Have Greater Incentive to Disadvantage Rival PPEs .................................................................23

V. ICE Announces the Acquisition of Black Knight in May 2022 .......................24

    A. ICE Provides Information Regarding Purported Synergies and Merger Benefits to the FTC and Investor Community .......................................24

B. ICE Considered ████████████ .................... 25

VI. Defendants Scramble to Divest Empower in a Self-Made, Slapdash Remedy ................. 26

    A. The Divestiture Conveys an Incomplete Business and Will Create Ongoing Entanglements and Render Constellation Dependent Upon ICE ............................ 26

    B. The ████████ Purchase Price of the Divestiture Assets Reflects that ████████ ████████████—And Defendants Desired to ████████ .................... 30

**FEDERAL TRADE COMMISSION'S PROPOSED CONCLUSIONS OF LAW** .......... 32

I. The FTC Is Likely to Succeed on the Merits of Its § 7 Challenge ................................ 33

    A. The Acquisition Is Presumptively Illegal and Likely to Cause Anticompetitive Effects in the Markets for Commercial LOSs and All LOSs .................................... 35

        1. Commercial LOSs and All LOSs Are Relevant Product Markets ................... 35

        2. The Acquisition Creates a Presumptively Illegal Increase in Concentration in the Relevant LOS Product Markets ................................................................ 37

        3. There Is a Reasonable Probability that the Acquisition Will Result in Anticompetitive Effects in the Relevant LOS Product Markets ...................... 38

    B. The Acquisition Is Presumptively Illegal and Reasonably Likely to Cause Anticompetitive Effects in the Relevant PPE Product Markets ................................ 39

        1. PPEs for Encompass Users and All PPEs Are Relevant Product Markets ....... 39

        2. The Acquisition Creates a Presumptively Illegal Increase in Concentration in the Relevant PPE Product Markets ............................................................... 40

        3. There Is a Reasonable Probability that the Acquisition Will Result in Anticompetitive Effects in the Relevant PPE Product Markets ...................... 41

            a) The Acquisition Will Eliminate Head-to-Head PPE Competition Between ICE and Black Knight .................................................................................... 41

            b) The Acquisition Will Likely Increase ICE's Ability and Incentive to Foreclose Competition from Other PPE Providers .................................... 42

    C. Defendants Cannot Rebut Plaintiff's Prima Facie Case ........................................... 44

        1. Defendants Cannot Demonstrate that the Divestiture Will Restore Competition ................................................................................................... 44

        2. Defendants Cannot Demonstrate that Entry Will Be Timely, Likely, and Sufficient to Counteract the Acquisition's Anticompetitive Effects ............... 48

        3. Defendants Fail to Establish Cognizable, Merger-Specific Efficiencies that Outweigh the Acquisition's Anticompetitive Effects ...................................... 48

        4. The Constitutional Affirmative Defenses Are Irrelevant to the § 13(b) Inquiry ........................................................................................................... 49

II. The Equities Support a Preliminary Injunction ...................................................... 50

**TABLE OF AUTHORITIES**

**<u>Cases</u>**

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ................................................*passim*

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)................................................ 43, 45

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999)................................ 32

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998) ........................... 40

*FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26 (D.D.C. 2009) ........................... 33, 47

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ....................................... 34

*FTC v. Food Town Stores, Inc.*, 539 F.2d 1339 (4th Cir. 1976)............................ 33

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................... 33, 34, 37, 50

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d. Cir. 2022) ............... 38

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986)................................................ 32

*FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996
(N.D. Cal. Nov. 2, 2022) ................................................................................ 49, 50

*FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2023 WL 2346238
(N.D. Cal. Feb. 3, 2023) .................................................................................. 36

*FTC v. Nat'l Tea Co.*, 603 F.2d 694 (8th Cir. 1979) ........................................ 33, 50

*FTC v. Peabody Energy Corp.,* 492 F. Supp. 3d 865 (E.D. Mo. 2020)................... 50

*FTC v. ProMedica Health Sys., Inc.*, No. 3:11-CV-47, 2011 WL 1219281
(N.D. Ohio Mar. 29, 2011) ............................................................................. 50

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ................................... 36, 45

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015)................................*passim*

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)................................. 50

*FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156 (9th Cir. 1984)................................*passim*

*FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ................... 33, 35, 37

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018).......... 39, 50

*In re Illumina, Inc.,* No. 9401, 2023 WL 2823393 (FTC Mar. 31, 2023) ............ 42, 43, 45

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775 (9th Cir. 2015) .................................................................................*passim*

*Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991 (9th Cir. 2008) .................... 37

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ............................ 45, 46, 47, 48

*United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990) ...................................... 34

*United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ...............................................................34, 37, 48, 49

*United States v. Cont'l Can Co.*, 378 U.S. 441 (1964) ...................................................... 39

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ........................... 35, 45

*United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974)..................................... 34, 35

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ............................ 32, 34, 40

**Statutes**

15 U.S.C. § 18.................................................................................................. 32, 33

15 U.S.C. § 18a .......................................................................................................... 45

15 U.S.C. § 45(a)(1)................................................................................................... 32

15 U.S.C. § 53(b) ....................................................................................................... 32

**Other Authorities**

H.R. Rep. No. 94-1373 (1976)..................................................................................... 45

U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies (2004).............. 45

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) ("Merger Guidelines")...........................................................................37, 41

# FEDERAL TRADE COMMISSION'S PROPOSED FINDINGS OF FACT

## I.  The Parties and the Proposed Acquisition

1.  Defendant Intercontinental Exchange, Inc. ("ICE") is a publicly traded corporation incorporated in Delaware, with its headquarters in Atlanta, Georgia, that provides market infrastructure, data services, and technology solutions in three segments: exchanges, fixed income and data services, and mortgage technology. PX0017 (ICE) at 32.

2.  In 2020, ICE acquired Ellie Mae, including its industry-leading Encompass loan origination system ("LOS"). PX6046 (Tyrrell (ICE) Dep.) at 15:12-24.

3.  ICE operates Encompass and its other mortgage-related businesses, including its EPPS product, pricing, and eligibility engine ("PPE"), through its ICE Mortgage Technology business unit (PX6046 (Tyrrell (ICE) Dep.) at 14:1-10, 15:12-24, 69:14-21), headquartered in Pleasanton, California. PX6021 (Lyons (ICE) Dep.) at 13:21-13:25.

4.  Defendant Black Knight, Inc. ("Black Knight") is a publicly traded corporation incorporated in Delaware, with its headquarters in Jacksonville, Florida, that provides software, data, and analytics. PX0017 (ICE) at 32.

5.  Black Knight's mortgage technology products include the Empower LOS, the Mortgage Servicing Platform ("MSP"), and the Optimal Blue PPE[1], which Black Knight acquired in 2020. PX0021 (Black Knight) at 16, 108.

6.  On May 4, 2022, ICE and Black Knight signed an Agreement and Plan of Merger ("Merger Agreement"), whereby ICE agreed to acquire 100% of Black Knight for approximately $13.1 billion (the "Acquisition"). PX0017 (ICE) at 3, 145-46.

## II.  Residential Mortgage Origination in the United States

### A.  The Loan Origination System

7.  Homebuyers obtain mortgages from a variety of mortgage lending institutions, including small and large banks, credit unions, and independent mortgage banks. To finance a home purchase through a mortgage, a homebuyer typically submits a mortgage application to a

---

[1] In addition to its PPE, Optimal Blue offers certain secondary services, including hedging. References to Optimal Blue herein are only to the Optimal Blue PPE unless otherwise specified.

lender. The lender then begins the mortgage loan origination process. PX0042 (ICE) at 11.

8.     Mortgage lenders, regardless of type and size, rely on LOSs, such as ICE's Encompass or Black Knight's Empower, as their primary tool to manage the residential mortgage loan origination process. *E.g.*, PX6048 (███ (Strong Home) Dep.) at 74:10-75:4; PX6038 (███ (Mutual of Omaha) Dep.) at 75:1-12.

9.     Mortgage origination involves many steps between the application and the closing of the loan. Those steps include processing information from the mortgage application, determining the loans and interest rates for which the homebuyer qualifies, locking the interest rate, underwriting the loan, funding the loan, then closing the loan and preparing it to be serviced. *E.g.*, PX0042 (ICE) at 11; PX6038 (███ (Mutual of Omaha) Dep.) at 18:14-19:1; PX6047 (Sahi (ICE) Dep.) at 25:11-26:4.

10.    As a mortgage moves from application to close, it touches on ███ services ("ancillary services") necessary to process, underwrite, fund, and close a loan. PX2519 (Black Knight) at 2 (showing various third-party ancillary service providers in the origination process).

11.    Ancillary services include services such as document vendors, point-of-sale ("POS") systems for interacting directly with borrowers, and PPEs. *E.g.*, PX6038 (███ (Mutual of Omaha) Dep.) at 19:22-20:3, 78:7-21; PX6047 (Sahi (ICE) Dep.) at 25:10-26:13. Other ancillary services include credit reports, identity verification, settlement services (e.g., inspection, appraisal, and flood and title reports and insurance), notary services, and document management. PX2519 (Black Knight) at 2.

12.    Ancillary services can include those owned and offered by the LOS operator itself, as is the case with ICE's EPPS PPE and with Black Knight's Optimal Blue PPE. PX0042 (ICE) at 31-32; PX2063 (Black Knight) at 3. They can also include ancillary services offered by third-party vendors. PX0042 (ICE) at 19.

13.    The LOS coordinates and automates many of the interactions between lenders and ancillary services via software integration. PX6046 (Tyrrell (ICE) Dep.) at 16:22-17:16, 23:4-13; PX6023 (Hart (ICE) Dep.) at 33:17-34:2; PX6047 (Sahi (ICE) Dep.) at 26:22-27:10; PX6038 (███ (Mutual of Omaha) Dep.) at 76:16-78:2.

14.     Technical integrations between an LOS and a third-party provider's ancillary service can be achieved in several ways, including an application programming interface ("API") or a software development kit ("SDK"). PX6045 (Connors (ICE) Dep.) at 121:23-122:6; PX6046 (Tyrrell (ICE) Dep.) at 22:12-19; PX6065 (██████ (Lender Price) Dep.) at 236:11-16.

## 1. The Role of LOSs in Mortgage Origination

15.     The LOS serves as the lender's system of record for each loan and is used to manage a lender's workflow and to perform the various commercial, legal, and compliance tasks required during the lending process. PX6046 (Tyrrell (ICE) Dep.) at 16:22-18:3; PX6045 (Connors (ICE) Dep.) at 106:22-107:10; PX6047 (Sahi (ICE) Dep.) at 24:22-25:6; PX6065 (██████ (Lender Price) Dep.) at 19:15-25.

16.     LOSs process large volumes of data and must evolve to keep pace not only with technological developments, but also with changes to the myriad regulations that affect mortgage lending across the United States. PX6046 (Tyrrell (ICE) Dep.) at 129:2-132:7; PX2022 (Black Knight) at 8.

17.     Lenders are subject to federal, state, and local regulatory requirements, and LOSs must support these requirements and respond to regulatory changes from federal regulators, government-sponsored enterprises, states, and counties. PX0021 (Black Knight) at 96; PX6046 (Tyrrell (ICE) Dep.) at 130:25-132:19; PX6048 (██████ (Strong Home) Dep.) at 74:10-75:6.

18.     Given the complexity of regulatory requirements, as well as the large amount of information flowing through LOSs, ████████████████████████████████████ ████████████████████ PX6048 (██████ (Strong Home) Dep.) at 74:10-75:1; PX6038 (██████ (Mutual of Omaha) Dep.) at 71:8-18; PX7001 (██████ (Mutual of Omaha) Decl.) ¶ 5.

19.     In essence, LOSs are the lender's "source of truth" regarding the status of a loan at any given point in the origination process. PX6046 (Tyrrell (ICE) Dep.) at 17:17-18:3; PX6045 (Connors (ICE) Dep.) at 106:22-107:10.

20.     No other software can serve as a replacement for an LOS. PX6043 (██████ (Polly) Dep.) at 116:19-117:17; PX6048 (██████ (Strong Home) Dep.) at 79:12-80:14. Thus, not

surprisingly, ████████████████████████████, routinely recognize LOSs as a distinct product in the ordinary course of their business. *E.g.*, PX2525 (Black Knight) at 7; PX1706 (ICE) at 2; *cf.* PX8000 (Sacher (FTC) Rep.) ¶¶ 129-146 (a hypothetical monopolist of LOSs could profitably impose a small but significant and nontransitory increase in price ("SSNIP")).

21.     LOS providers offer their services and compete on a nationwide basis. PX1102 (ICE) at 57; PX0021 (Black Knight) at 63.

### 2. Commercial v. Proprietary LOSs

22.     LOSs come in two forms: those licensed from third party providers ("commercial LOSs") and those developed and maintained in-house by lenders ("proprietary LOSs"). *See* PX6050 (██████ (Impac) Dep.) at 44:2-14.

23.     A proprietary LOS is designed specifically for and around the needs of a particular lender. PX6014 (Connors (ICE) IH) at 103:5-18. ████████████████████ ████████████████████████████████████████████. PX6055 (████ (Carrington) Dep.) at 91:20-92:17.

24.     Indeed, the ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████. *E.g.*, PX6051 (██████ (Impac) Dep.) at 41:9-42:5; PX7002 (██████ (Impac) Nov. 10, 2022 Decl.) ¶¶ 1, 8.

25.     As Black Knight itself has recognized: ████████████████████ ████████████████████████████████████████████████████ ████████████████████ PX2316 (Black Knight) at 221.

26.     For these reasons, ████████████████ rely on commercial LOSs, rather than proprietary LOSs, PX2022 (Black Knight) at 8, and the trend among those lenders who maintain proprietary LOSs is ████████████████████. PX6065 (████ (Lender Price) Dep.) at 180:16-181:21; PX1709 (ICE) at 8; PX6046 (Tyrrell (ICE) Dep.) at 67:7-68:2.

27.     By way of recent example, in 2023, ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

PX6046 (Tyrrell (ICE) Dep.) at 66:17-68:2.

28. ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████ PX6046 (Tyrrell (ICE) Dep.) at 67:15-24.

29. Lenders using proprietary LOSs do not ████████████████████
████████████ *See* PX6033 (Larsen (Black Knight) Dep.) at 17:11-16.

30. On the other hand, firms such as ICE and Black Knight ████████████
████████████████████████████████ *E.g.*, PX2523 (Black Knight) at 3; PX6046 (Tyrrell (ICE) Dep.) at 128:18-132:19.

31. ICE's Encompass has maintained ████████████ among LOSs (PX1711 (ICE) at 5; PX2319 (Black Knight) at 7) despite ████████████████████ ████████ *E.g.,* PX6046 (Tyrrell (ICE) Dep.) at 36:17-24; PX1096 (ICE) at 13; *cf.* PX8000 (Sacher (FTC) Rep.) ¶¶ 154-59 (SSNIP by a hypothetical monopolist of commercial LOSs would not be defeated by lenders switching to proprietary LOSs).

### 3. Barriers to Entry

32. Building a successful LOS is no small undertaking. Black Knight itself estimates that it would cost ████████████ to develop an LOS plus ████████████ to support developing regulatory requirements. PX0021 (Black Knight) at 97.

33. A potential LOS entrant has limited opportunities to persuade a lender to switch LOSs because LOS contracts typically have a multiyear term. ████████████ ████████████ PX6012 (Tyrrell (ICE) IH) at 63:20-65:8. As of July 2022, ████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████ PX0019 (ICE) at 3.

34. Any potential LOS entrant must also overcome lenders' costs of switching LOSs. *E.g.*, PX6055 (████ (Carrington) Dep.) at 85:20-86:22 (████████████████ ██████████████████████████████████████████████████████████); PX6050 (████████ (Impac) Dep.) at 44:21-45:10 (████████████████████████

█████████████████████████████████████); PX1158 (ICE) at 4-6.

35.     Furthermore, switching an LOS ████████████████████████████

████. PX7002 (████████ (Impac) Dep.) at 47:1-21.

**B.     The Product, Pricing & Eligibility Engine**

**1.     The Role of PPEs in Mortgage Origination**

36.     One of the most important ancillary services in mortgage origination is the pricing engine—or PPE. PX6007 (████ (Lender Price) IH) at 27:21-30:5, 30:16-32:13; PX6043 (████ (Polly) Dep.) at 115:14-117:17.

37.     Mortgage lenders use PPEs to price and to lock a mortgage. PX6021 (Lyons (ICE) Dep.) at 31:12-32:10; PX6045 (Connors (ICE) Dep.) at 132:22-133:7.

38.     First, a loan officer or borrower inputs the borrower's financial, property, and other application data. The PPE then analyzes that data and returns products (i.e., mortgage terms, such as fixed or adjustable rates) and prices (i.e., interest rates) for which the borrower is eligible. *E.g.*, PX6035 (████ (Umpqua) Dep.) at 20:5-21:1; PX6038 (████ (Mutual of Omaha) Dep.) at 19:22-20:3; PX6048 (████ (Strong Home) Dep.) at 79:12-80:7.

39.     Once a borrower has settled on mortgage terms, the loan officer can use the PPE to lock in the interest rate pending closing of the underlying real estate transaction. PX6021 (Lyons (ICE) Dep.) at 47:22-48:18.

40.     A PPE replaces manual review of various rate sheets and calculations. A seasoned loan officer might take ████████ to generate a quote for a customer, whereas a PPE can compile that information in █████████████████████████ ██████████████████████ PX6048 (████ (Strong Home) Dep.) at 79:12-81:12.

41.     No other product can serve as a replacement for a PPE. PX6043 (████ (Polly) Dep.) at 115:14-117:17; PX6041 (████ (SouthPoint) Dep.) at 20:8-21:15, 63:14-64:9; PX7008 (████ (SouthPoint) Decl.) ¶ 6; PX6048 (████ (Strong Home) Dep.) at 79:12-80:20; *cf.* PX8000 (Sacher (FTC) Rep.) ¶ 201 (in the event of a SSNIP on all PPEs by a hypothetical monopolist, lenders would not switch to alternate methods of pricing and locking loans in sufficient numbers to render the price increase unprofitable).

42. ███████████████████████████████, recognize PPEs as a distinct product. *See* PX6035 (██████ (Umpqua) Dep.) at 122:25-123:19; PX7007 (██████ (Umpqua) Feb. 14, 2023 Decl.) ¶ 7 (███████████████████████████████████████ ███████████████████████); PX6007 (████ (Lender Price) IH) at 27:21-30:5 (████████████████████████████████████████████ █████████████████████); PX1166 (ICE) at 42; PX2259 (Black Knight) at 8.

43. PPE providers offer their services and compete on a nationwide basis. PX1102 (ICE) at 57; PX0021 (Black Knight) at 63.

44. As with LOSs, some lenders may use proprietary PPEs, ████████████ ███████████████████ PX6024 (McMahon (Black Knight) Dep.) at 116:5-12.

45. The President of Black Knight's Origination Technology business ████████ ████████████████████████████████████████ █████████. PX6008 (Gagliano (Black Knight) IH) at 123:20-24.

**2. Importance of LOS Integration**

46. Software integration between a PPE and a lender's LOS enables a PPE's full functionality, enabling loan and application data to flow automatically between the LOS, PPE, and other ancillary services. PX6021 (Lyons (ICE) Dep.) at 32:11-33:16; PX6025 (Anderson (Black Knight) Dep.) at 68:15-70:1; PX6065 (████ (Lender Price) Dep.) at 20:1-21:3.

47. ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████ PX6065 (████ (Lender Price) Dep.) at 20:1-21:3, 178:18-180:12, 186:4-187:2; PX6052 (Batt (Black Knight) Dep.) at 75:12-22.

48. Lenders thus █████████████████████████████████████ █████████ *E.g.*, PX6048 (██████ (Strong Home) Dep.) at 85:5-14; PX6041 (██████ (SouthPoint) Dep.) at 33:10-15, 72:18-74:2; 80:2-6.

49. Nearly all lenders using a PPE ███████████████████. PX6065 (████ (Lender Price) Dep.) at 21:17-22:6, 17:9-20, 176:13-17; PX6043 (██████ (Polly) Dep.) at 78:13-79:22.

50. Integrating a PPE with an LOS is a significant software engineering undertaking ███████████████. PX1701 (ICE) at 1. Most mortgage lenders ████████████ ████████████████████████████████████. PX6041 (██████ (SouthPoint) Dep.) at 33:10-15; PX6007 (████ (Lender Price) IH) at 205:15-25.

51. Because it is a ████████████████████████████████ ████████ few lenders ████████████████████████. PX6007 (████ (Lender Price) IH) at 205:15-25. Indeed, lenders ████████████████████ ████████████████████████████. PX1698 (ICE) at 3-5; *cf.* PX8000 (Sacher (FTC) Rep.) ¶¶ 202-215 (in event of a SSNIP for PPEs for users of ICE's Encompass LOS, lenders would not switch to alternative LOSs or PPEs not integrated with Encompass in sufficient volumes to render the price increase unprofitable).

52. As such, ICE itself has ████████████████████████ ████████████████████████████████████████ ████████████████. PX1640 (ICE) at 8.

**3. Barriers to Entry**

53. ICE's EPPS and Black Knight's Optimal Blue are two PPEs in ████████ ████████████████████████ due to acquisitions and consolidation, PX1640 (ICE) at 6, and is characterized by high barriers to entry.

54. Black Knight has estimated that it would take approximately ████████ ████████████ to develop a commercial pricing tool comparable to the capability of the Optimal Blue. PX0021 (Black Knight) at 102. Altogether, Black Knight has further estimated it would take ████████████ for a competitive pricing tool to compete profitably. *Id.* at 103.

55. In part, this is because once development of the pricing tool is complete, a new PPE entrant would need to ████████████████████████████████ ████████████████████████. PX0021 (Black Knight) at 101-02.

56. Importantly, a new PPE entrant would also need to ████████████████ ████████████████. PX0021 (Black Knight) at 102; PX6065 (████ (Lender Price) Dep.) at 176:2-17. In particular, integration with ICE's Encompass is ████████████████

. *Infra* Findings of Fact ("FOF") ¶¶ 134-37; PX6043 (█████ (Polly) Dep.) at 25:22-27:12, 64:22-65:21 ████████████████████████████████████████ ████████████████████████████████████

57.     Lender Price has raised roughly ██████████████████, and today has ██████████████. PX6065 (████ (Lender Price) Dep.) at 165:23-167:2, 175:9-21.

### III.     ICE's Encompass and Black Knight's Empower Dominate the LOS Space

58.     ICE's Encompass is the dominant LOS in the United States and processes █████ of all residential mortgages originated across the nation each year. Black Knight's Empower is the █████████ LOS in the United States. *Infra* FOF ¶¶ 60-64.

59.     ICE and Black Knight compete vigorously to provide their respective LOSs to the same mortgage lender customers. *Infra id.* ¶¶ 65-74. As stated by Black Knight's CFO, "[W]e have one primary competitor in each business. . . . In [o]rigination, it's ICE . . . ." PX2316 (Black Knight) at 56. This competition has resulted in tangible benefits for lenders and the marketplace more generally, including ██████████████████████████████ ███████████████████. *Infra* FOF ¶¶ 75-86.

### A.     Encompass and Empower Are the ████████████

60.     The Home Mortgage Disclosure Act (HMDA) is used by lenders and regulators to evaluate loan volumes. HMDA requires financial institutions that originate mortgage loans to maintain and report loan-level mortage data. PX6046 (Tyrrell (ICE) Dep.) at 50:4-24.

61.     HMDA data is ████████████████ data source for the number of mortgage loans originated by lenders and ████████████ of loan origination volume available. PX6046 (Tyrrell (ICE) Dep.) at 50:14-17, 55:1-6; PX1091 (ICE) at 1 ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████. ICE has ████████████████████████ ████████████ PX1046 (ICE) at 5-7; PX6046 (Tyrrell (ICE) Dep.) at 50:14-24.

62.     ████████████████████████████████████ place ICE's share among commercial LOSs ████████ and its share among all LOSs ████████

PX1046 (ICE) at 6; PX2319 (Black Knight) at 7; PX8000 (Sacher (FTC) Rep.) Tables 9-12.

63. Black Knight's share among commercial LOSs ███████ and its share among all LOSs is ██████ PX1046 (ICE) at 6; PX2319 (Black Knight) at 7; PX8000 (Sacher (FTC) Rep.) Tables 9-12.

64. No other commercial LOS has captured more than ██ among commercial LOSs or more than ██ among all LOSs. PX8000 (Sacher (FTC) Rep.) Tables 9-12.

**B. ICE and Black Knight Compete Head-to-Head for LOS Customers**

65. ICE and Black Knight █████████████████████████████████████████████████████████, *e.g.*, PX6047 (Sahi (ICE) Dep.) at 121:4-8, and ██████████████████████████████████████. *E.g.*, PX2002 (Black Knight) at 5-10; PX6040 (Dugan (Black Knight) Dep.) at 41:8-17, 46:1-47:17; PX1656 (ICE) at 12.

66. In 2020, Black Knight's former CEO and current Chairman, Anthony Jabbour, called Ellie Mae (now ICE's Encompass) ████████████████████████████████████ ████████████ PX6058 (Jabbour (Black Knight) Dep.) at 31:3-33:12 (discussing PX2033 (Black Knight) at 19).

67. Kirk Larsen, Black Knight CFO, was more direct later that year:

[H]istorically, Black Knight was focused on the high end of the market. And so we were selling in the top 50 … until about probably two years ago where we started going down market in earnest …. As you go - as we started going down market, say to the top 500 lenders, that's where Ellie Mae has their primary market share and there's other players there. But really it's Ellie Mae with Encompass that is the primary competitor there. So, we really went after that market in earnest, like I said, starting a couple of years ago . . . .

PX2316 (Black Knight) at 39.

68. Similarly, Joe Tyrrell, former ICE Mortgage Technology President, noted that, for ████████████████████████████████████████████████████████ PX6046 (Tyrrell (ICE) Dep.) at 11:7-22, 63:7-64:11; PX1076 (ICE) at 1.

69. And Black Knight, in █████████████████████████████████, noted: ██████████████████████████████████████████████████████ ████████████████████████ PX2316 (Black Knight) at 169.

70. While Encompass and Empower may have traditionally targeted certain sized customers in the past, PX2316 (Black Knight) at 39, ███████████████████████ ██████ PX6045 (Connors (ICE) Dep.) at 108:22-109:5; PX0019 (ICE) 2-3.

71. ████████████████████████████████████. Black Knight's ██████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████ PX8000 (Sacher (FTC) Rep.) at ¶¶ 297-300.

72. Many lenders consider ICE's Encompass LOS and Black Knight's Empower LOS ████████████████████. For example, ████████████████████████ ██████████████████████████████████████████████ ██████████████████████████ PX6055 (████ (Carrington) Dep.) at 67:21-68:11 (discussing PX7000 (████ (Carrington) Oct. 31, 2022 Decl.) ¶ 7).

73. Lender ████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████ PX6055 (████ (Carrington) Dep.) at 88:7-10, 88:13-90:2; PX6050 (██████ (Impac) Dep.) at 57:14-58:4, 58:10-25; PX7002 (██████ (Impac) Nov. 10, 2022 Decl.) at ¶ 13.

74. ████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████ PX6050 (██████ (Impac) Dep.) at 47:1-3, 47:11-21, 57:14-58:4, 58:10-25; PX7002 (██████ (Impac) Nov. 10, 2022 Decl.) ¶ 10. Notably, when ████████████████████████████████ ██████████████████████████████████. PX6050 (██████ (Impac) Dep.) at 49:9-15, 49:18-50:4; PX7002 (████ (Impac) Nov. 10, 2022 Decl.) ¶ 11.

**C. ICE and Black Knight Uniquely Compete to Offer an Integrated Suite of**

**LOS and Ancillary Services**

75.     Today, ICE and Black Knight have the broadest range of ancillary offerings available—either owned and offered by one of the parties or integrated with the parties' platforms—providing them with the unique ability to provide lenders with a full set of tools that obviate the need to go outside their respective ecosystems for ancillary services.

76.     ICE boasts that it has "███████████████████████" *See* PX9050 at 1.

77.     For its part, Black Knight supplements functionality of its Empower LOS with a host of ancillary services aimed at one or more of the discrete steps in the mortgage origination workflow, including POS, marketing, compliance, fees, closing, funding, and business intelligence. PX6040 (Dugan (Black Knight) Dep.) at 14:24-15:3, 17:4-19, 22:1-14 (discussing PX2063 (Black Knight)); PX2063 (Black Knight) at 3; PX2521 (Black Knight) at 11, 14.

78.     In addition to offering third-party ancillary services on their LOSs, ICE and Black Knight own or resell a number of ancillary services that they offer to their LOS lender customers. PX2063 (Black Knight) at 3; PX1582 (ICE) at 28-29.

79.     ICE and Black Knight's ownership of certain ancillary services allows for ███ ██████████████████████████████████████████████ PX6020 (Moreno (Black Knight) Dep.) at 46:1-3 ("█████████████████████████████████ ███████████████████████."); PX6045 (Connors (ICE) Dep.) at 132:10-14, 135:9-137:2 (██████████████████████).

80.     Having these services at their disposal also means ICE and Black Knight are uniquely positioned to offer lenders ██████████████████████████████ ████████████████████████████████████████████ PX2023 (Black Knight) at 13-14 (███████████████████████████████████ █████████████████████).

81.     ICE and Black Knight also can ███████████████████ into their respective LOS offerings. Black Knight ████████████████████████ ████████████████████████████████████████████████ ██████████████████. PX6040 (Dugan (Black Knight) Dep.) at 14:24-15:3, 20:7-21:4,

23:14-25:19; PX2063 (Black Knight) at 3.

82. Bundling mortgage technologies appeals to lenders because it simplifies their pricing, contracts, and vendor management. PX6040 (Dugan (Black Knight) Dep.) at 94:25-95:13; *see also id.* at 112:17-23 ("████████████████████████████████████ ███████████████████████████████████████."); PX6030 (Gagliano (Black Knight) Dep.) at 64:8-18, 64:20.

83. According to former ICE Mortgage Technology President Joe Tyrrell, ████ ███████████████████████████████████████████████████████████ ██████████████████████████████ PX1073 (ICE) at 1. And ICE's ███████████████████████████████████████████████. PX6065 (████ (Lender Price) Dep.) at 134:22-24, 135:1-15.

84. The threat of Black Knight's ████████████████████████ ███████████████████████████████████████████████ . *E.g.*, PX1085 (ICE) at 3 ███ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████).

**D.** **Lenders Benefit from Competition Between ICE and Black Knight in the Provision of LOS Services**

85. Head-to-head competition between Encompass and Empower has resulted in ████████████████, including in the form of ████████████████████. *See, e.g.*, PX1077 (ICE) at 10-11 (████████████████████████████████████ ████████████████); PX1012 (ICE) at 4 (████████████████████████ ████████); PX1059 (ICE) at 2-4 (████████████████████████████ ████████); PX2524 (Black Knight) at 2; PX6035 (████ (Umpqua) Dep.) at 121:10-14, 121:16-20; *see also* PX6046 (Tyrrell (ICE) Dep.) at 56:14-18 (████ ███████████████████████████████████████████████████).

86. Indeed, Black Knight's Empower currently serves as ████████████████████

1 ██████████████████████. PX6055 (█████ (Carrington) Dep.) at 72:25-74:2 (discussing PX7000

2 (█████ (Carrington) Oct. 31, 2022 Decl.) ¶ 9) and █████████████████████████

3 ████████████████████████████████████████████████████████

4 ██████); PX6047 (Sahi (ICE) Dep.) at 129:21-24, 129:24-131:1; PX6046 (Tyrrell (ICE)

5 Dep.) at 25:12-21, 26:19-27:1 (███████████████████████████████████████

6 ██████████████████████████████).

7     87.    At ICE, ████████████████████████████. When ICE

8 acquired Ellie Mae, ICE announced ████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ████████████████████ PX6046 (Tyrrell (ICE) Dep.) at 33:8-34:3; PX1096 (ICE) at 9-10.

11     88.    ████████████████████████████████████████

12 ██████████████████████ PX1096 (ICE) at 13.

13     89.    To meet its ███████████████████████████████████

14 ████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████

16 ██████████████ PX6046 (Tyrrell (ICE) Dep.) at 36:2-10, 36:17-24.

17     90.    ████████████████████████████████████████

18 ████████████████████████████████████████████████████.

19 PX6045 (Connors (ICE) Dep.) at 130:20-132:6; PX6046 (Tyrrell (ICE) Dep.) at 45:11-46:3.

20     91.    One way that ICE justifies ████████████████████████

21 ████████████████████████████████████████████████. PX6046

22 (Tyrrell (ICE) Dep.) at 30:11-21, 31:2-13, 37:3-21, 38:12-24 (discussing PX1596 (ICE));

23 PX1596 (ICE) at 4; PX1082 (ICE) at 1.

24

25

26

27

28

92. ICE's enthusiasm for ██████████ is evident in its internal documents, such as a ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████: 

██████████████████████████████████████████████

PX1365 (ICE) at 8, 10-11.

93. Lenders have ████████████████████████████████████████████████████████████████. *E.g.*, PX6038 (███████ (Mutual of Omaha) Dep.) at 92:10-93:12, 99:18-100:15; PX7001 (█████ (Mutual of Omaha) Nov. 10, 2022 Decl.) ¶ 14; PX6069 (██████ (loanDepot) Dep.) at 106:3-107:5; PX7003 (███████ (loanDepot) Nov. 14, 2022 Decl.) ¶ 15; PX6051 (████████ (Impac) Dep.) at 28:9-29:14; PX6035 (█████████ (Umpqua) Dep.) at 121:10-20 (██████ PX4154 (Umpqua) at 1).

## IV. ICE's EPPS and Black Knight's Optimal Blue Dominate the PPE Space

94. As explained above, ICE and Black Knight each offer a broad array of ancillary services in addition to their LOSs. *Supra* FOF ¶¶ 75-84. Most notably, Black Knight owns the Optimal Blue PPE, the clear industry leader, serving lenders that originate as much as ███ of the nation's residential mortgages each year. ██████ Optimal Blue is its close competitor, EPPS, currently available ████████████████████████████. *Infra* FOF ¶¶ 97-101.

95. ICE and Black Knight are two of few competitors offering PPEs in what ICE has ████████████████████████████████████████ due to acquisitions and consolidation. PX1640 (ICE) at 6. Since 2019, Black Knight has driven this consolidation through its acquisitions of the Compass Analytics and Optimal Blue PPEs. PX0021 (Black Knight) at 108.

96. Like the competition between ICE's and Black Knight's LOSs, the competition

between ICE's EPPS and Black Knight's Optimal Blue also benefits lenders and the marketplace more generally. Defendants' efforts to win PPE customers from one another have led to ███████████████████████████████████████████████████████ ███████████████. *Infra* FOF ¶¶ 102-118.

**A.** **Optimal Blue and EPPS Are the** ████████████████████████

97. ICE's data reflects that Optimal Blue commands a ██████ share of PPE users on Encompass, and ICE's EPPS claims ██████. *See* PX8000 (Sacher (FTC) Rep.) ¶¶ 259-62 & Table 15; *accord* PX1270 (ICE) at 1 ███████████████████████████████████ ████████████████████████████████████); *see also* PX6046 (Tyrrell (ICE) Dep.) at 71:1-16, 71:22-72:25; PX1589 (ICE) at 1.

98. Black Knight estimates that its Optimal Blue boasts a ██████ share among all PPEs. PX2311 (Black Knight) at 5.

99. Although EPPS is ██████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████ among all PPEs—irrespective of LOS platform. PX1166 (ICE) at 42.

100. ████████████████████████████████ widely recognize Optimal Blue and EPPS as the most used PPEs. *E.g.*, PX6047 (Sahi (ICE) Dep.) at 91:9-20; PX6065 (███ (Lender Price) Dep.) at 113:22-114:23.

101. No other PPE provider can claim more than ██████████ of PPEs on Encompass, no matter how concentration is measured. PX8000 (Sacher (FTC) Rep.) Table 15-19.

**B.** **ICE and Black Knight Compete Head-to-Head For PPE Customers**

102. ███████████████████████████████████████████████████████ ████████████████████████████████████. PX6041 ██████ (SouthPoint) Dep.) at 24:25-25:15, 77:11-78:5; PX6065 (███ (Lender Price) Dep.) at 116:19-117:11, 129:21-131:12, PX6021 (Lyons (ICE) Dep.) at 45:4-46:8, 193:12-194:24, 196:3-9.

103. Even though there may be differences in functionality between EPPS and OB, ████████████████████████████████████. PX1640 (ICE) at 4, 10-11.

104. Thus, not surprisingly, Optimal Blue regularly ██████████████████████. *E.g.*,

PX6020 (Moreno (Black Knight) Dep.) at 57:5-12, 14-15; PX2359 (Black Knight) at 1; PX2360 (Black Knight) at 1; PX2327 (Black Knight) at 1; PX2361 (Black Knight) at 2; PX2364 (Black Knight) at 1-2; PX2372 (Black Knight) at 1.

105.    Indeed, Black Knight's PPE ████████████ shows that between ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ PX6052 (Batt (Black Knight) Dep.) at 143:2-144:20, 148:22-149:25; PX2517 (Black Knight) at 2.

106.    Defendants' documents show that ████████████████████████ ████████████████████████████████████████████. *Infra* FOF ¶¶ 107-110.

107.    For example, when ██████████████████████████████ ████████████████████████████████████ PX6035 (████ (Umpqua) Dep.) at 122:25-123:19; PX7007 (████ (Umpqua) Feb. 14, 2023 Decl.) ¶¶ 10-11.

108.    To ████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████, *see infra* at FOF ¶¶ 113-122—████████████ ████ PX6035 (████ (Umpqua) Dep.) at 122:25-123:19; PX7007 (████ (Umpqua) Feb 14, 2023 Decl.) ¶ 11. ████████████████████████████ ████████████████████████. PX7007 (████ (Umpqua) Feb 14, 2023 Decl.) ¶ 11.[2]

109.    ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ PX2212 (Black Knight) at 2. ████████████████████████████████████████ ████ *Id.* ████████████████████████████████

---

[2] ████████████████████████████████████████████████████████ ██████ PX6035 (████████ (Umpqua) Dep.) at 97:24-98:6. ████████████████ *Id.* at 103:18-104:1, 122:25-123:19; PX7007 (████ (Umpqua) Feb 14, 2023 Decl.) ¶ 13.

1    *Id.* at 1. ███████████████████████████

2    ██████████████████████. *Id.* at 2; PX2218 (Black Knight) at 12.

3        110.    Additional examples of ██████████████████████

4    █████████████████████████████████ (PX2131 (Black

5    Knight) at 1-2; PX2123 (Black Knight) at 1-2); ████████ (PX2098 (Black Knight) at

6    1-5; PX2509 (Black Knight) at 1-2); ████████. (PX2092 (Black Knight) at 1-2);

7    and █████ (PX2094 (Black Knight) at 1-2).

8        111.    Consistent with this documentary evidence of head-to-head competition, Black

9    Knight's ████████████████████████████

10   ███████████████. PX8000 (Sacher (FTC) Rep.) ¶¶ 433-37.

11       112.    ██████████████, the FTC's expert Dr. Seth Sacher modeled that

12   PPE prices for Encompass users may increase ████████ post-Acquisition due to the

13   elimination of competition between EPPS and Optimal Blue, depending on the methodology

14   and assumptions applied. *Id.* ¶¶ 32-38.

15       **C.      Competition Between Defendants Led ICE to** ███████████

16       113.    The competition between Optimal Blue and EPPS █████████████

17   ████████████████████████████████

18   ████████████████. PX1553 (ICE) at 8-10.

19       114.    ICE feared that ████████████████████

20   ████████████████████████████████████

21   ████████████████████████████████████

22   ████████████████████████████████

23   █████ PX6014 (Connors (ICE) IH) at 164:15-167:14; *see also* PX6045 (Connors (ICE)

24   Dep.) at 58:6-59:23, 60:7-12.

25       115.    In response, ICE ████████████████████████

26   ████████████ (PX1556 (ICE) at 1), to ██████████████

27   ████████████ PX1553 (ICE) at 10.

28       116.    One pillar ████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████. PX1553 (ICE) at 15-19; PX1116 (ICE) at 4; PX6045 (Connors (ICE) Dep.) at 46:5-8; PX6047 (Sahi (ICE) Dep.) at 91:9-92:16; PX6027 (Davis (ICE) Dep.) at 49:15-50:10.

117. Beginning in 2021, ██████████████████████████████████ PX1116 (ICE) at 7; PX1588 (ICE) at 4; PX6027 (Davis (ICE) Dep.) at 55:22-56:3.

118. ICE continued to ██████████████████████████████ (PX1238 (ICE) at 1) and ███████████████████████████████████████████. *E.g.*, PX1718 (ICE) at 1; PX6035 ██████ (Umpqua) Dep.) at 97:6-19).

119. ICE further ███████████████████████████████████████████████████████████████████████ PX6047 (Sahi (ICE) Dep.) at 97:21-98:10, 98:23-99:11.

120. However, on █████████████████████████████████████████████████████████████ PX1267 (ICE) at 2.

121. ICE ██████████████████████████████████████. PX6027 (Davis (ICE) Dep.) at 55:22-56:3, 56:18-57:2, 57:8-13.

122. By ████████████████████████████████████████████████████████████████████████████████████. PX1588 (ICE) at 3; *see also* PX1096 (ICE) at 42; PX1241 (ICE) at 1. █████████████████████ PX6045 (Connors (ICE) Dep.) at 138:21-23.

123. Industry participants have noticed ████████████████████████████████████. PX6065 (████ (Lender Price) Dep.) at 129:21-131:12; PX6035 (████ (Umpqua) Dep.) at 97:24-98:6.

**D.    Third-Party PPE Providers Are Dependent on Integration with Encompass**

124.    Lenders use various ancillary services to originate mortgages. These services are typically integrated with a lender's LOS. PX6047 (Sahi (ICE) Dep.) at 26:22-27:10; PX6046 (Tyrrell (ICE) Dep.) at 23:4-13; PX6038 (███ (Mutual of Omaha) Dep.) at 76:16-78:2.

**1.    ICE Has the Ability to Disadvantage Ancillary Service Providers**

125.    LOSs make the determination of █████████████████████████ ████████████████████ *E.g.*, PX6023 (Hart (ICE) Dep.) at 43:15-18, 52:1-12, 58:9-12, 59:7-25; PX6045 (Connors (ICE) Dep.) at 121:23-122:6, 122:16-123:2; PX6065 (███ (Lender Price) Dep.) at 195:10-199:15; PX2115 (Black Knight) at 1 (███ ███████████████).

126.    One factor in that determination can be whether ██████████ ████████ PX6047 (Sahi (ICE) Dep.) at 29:22-30:21, 52:7-13, 68:13-16. For instance, Black Knight has ██████████████████████. PX6065 (███ (Lender Price) Dep.) at 45:5-16, 217:7-219:15.

127.    ██████████████████████ ████████████████████ . PX6046 (Tyrrell (ICE) Dep.) at 23:14-24:18; PX6065 (███ (Lender Price) Dep.) at 196:25-198:18, 213:19-215:1; PX6047 (Sahi (ICE) Dep.) at 39:23-41:4.

128.    Ancillary service providers have ████████████ ████████████████████. *See* PX6043 (███ (Polly) Dep.) at 75:5-21, 88:17-90:3; PX6065 (███ (Lender Price) Dep.) at 196:25-199:15 (███████ ████████████████████); *see also* PX6037 (███ (Blend) Dep.) at 44:11-45:17.

129.    One manifestation of this ████████████████ ████████████████████ ████████████████████ ██████████████████████ PX6037 (███ (Blend) Dep.) at 29:16-30:17.

130. ████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████ *E.g.*, PX6043 (████ (Polly) Dep.) at 86:14-89:25; PX6007 (████ (Lender Price)
IH) at 156:4-24. ICE's contracts, ████████████████████████████████
████████████████████████████████████████████████ PX6046 (Tyrrell
(ICE) Dep.) at 25:4-14; PX6065 (████ (Lender Price) Dep.) at 228:18-25, 229:10-21.

131. ICE's contracts with ancillary service providers ██████████████████████
████████████████████████████████ PX6047 (Sahi (ICE) Dep.) at 82:15-84:2.
For example, ██████████████████████████████████████████████
████████████████████████████████████. PX6037 (████ (Blend) Dep.) at
23:18-25:6, 50:19-51:5; PX6047 (Sahi (ICE) Dep.) at 55:18-56:12; PX6023 (Hart (ICE) Dep.)
at 133:24-134:7; PX2526 (Black Knight) at 15. ICE's goal is ████████████████████████
████████████. PX6047 (Sahi (ICE) Dep.) at 57:20-58:17.

132. Ellie Mae, developer of the Encompass LOS acquired by ICE in 2020, clearly
understood ██████████████████████████████████████████
██████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
PX1026 (ICE) at 7.

133. ICE also has ████████████████████████████████████
██████████████████ PX6043 (████ (Polly) Dep.) at 75:13-21.

**2. ICE Has the Ability to Disadvantage PPE Providers in Particular**

134. PPE providers in particular ████████████████████████████████
██████████████████. PX6043 (████ (Polly) Dep.) at 78:13-79:10 (████████████
████████████████████████████████████); PX6065 (████ (Lender Price) Dep.) at
27:23-28:8 (████████████████████████████████████████████

1 ████████), 204:2-7. This is especially so because ████████████████

2 ██████████████. *See* PX6065 (████ (Lender Price) Dep.) at 45:5-16, 217:7-219:15.

3     135.    According to one PPE provider: ████████████████████

4 ████████████████████████████████████

5 ████████ PX6043 (████ (Polly) Dep.) at 26:16-20.

6     136.    Another PPE provider noted, ████████████████████

7 ████████████████████████████████████

8 ████████████████████ PX6065 (████ (Lender Price) Dep.) at 204:2-19.

9     137.    Indeed, PPE providers describe ██████████████████

10 ████████████████ PX6043 (████ (Polly) Dep.) at

11 128:12-131:6; *accord id.* at 64:22-65:21 ████████████████████

12 ████████████████████████ PX6007 (████ (Lender Price) IH)

13 at 181:1-12 ████████████████████████████████

14 ████████████████████████████████

15 ████████████████

16     138.    Even when ICE allows ██████████████████

17 ████████████████████████████████████

18 ████████████████████████████████████

19 ████████████ *E.g.*, PX6047 (Sahi (ICE) Dep.) at 32:17-34:1, 66:5-25, 71:10-18,

20 71:24-72:8, 73:14-19; PX6065 (████ (Lender Price) Dep.) at 195:10-199:15 (████

21 ██████████████████); PX6043 (████ (Polly) Dep.) at 79:11-22, 81:8-18

22 (████████████████████████████████); *see also*

23 PX6045 (Connors (ICE) Dep.) at 122:16-123:2 (████████████████

24 ████████████████████████).

25     139.    ████████████████████████████.

26 PX6047 (Sahi (ICE) Dep.) at 112:2-23; PX6065 (████ (Lender Price) Dep.) at 195:10-199:15.

27     140.    ICE's response to ██████████████████████

28 ████████████████████████████████

141. After Black Knight acquired Optimal Blue, ICE ███████████
████████████████ (PX1025 (ICE) at 1), ███████████████████████
███████████████████████████████████ (PX1346 (ICE)
at 16). ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████ PX1025 (ICE) at 1.

142. To do so, ███████████████████████████████████████
(PX1346 (ICE) at 16), and began ████████████████████████████
███████████████████████████████ PX1132 (ICE) at 1 ██████
████████████████████████████████████████████████
████████████████████); PX1452 (ICE) at 1 (███████████
████████████████████████████████████████████████
███████████); PX1411 (ICE) at 1-2; *see also* PX6043 (█████ (Polly) Dep.) at 81:24-
83:18 (████████████████████████████████████████████);
PX6065 (█████ (Lender Price) Dep.) at 204:21-205:23, 207:1-208:9; PX6047 (Sahi (ICE) Dep.)
at 110:21-111:13, 114:10-115:1 (████████████████████████████
██████████████████).

143. ████████████████████████████████████████████████
██████ PX1346 (ICE) at 26.

144. ICE ████████████████████████████████████████
████████████████████████████████████. PX1394 (ICE) at 1;
PX1392 (ICE) at 1 ██████████████████████████████████████).

**3. Post-Acquisition, ICE Will Have Greater Incentive to Disadvantage Rival PPEs**

145. Despite ICE's ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

1  █████████████. PX6012 (Tyrrell (ICE) IH) at 254:7-24, 338:16-339:10.

2      146.    Thus, ██████████████████████████

3  █████████████████████████████████████████

4  ██████████████████████████████████████████

5  ████████████ PX8000 (Sacher (FTC) Rep.) ¶¶ 494-505.

6      147.    █████████████████████████████

7  ██████████████████████████████, ICE's incentive to

8  disadvantage those PPEs in favor of its own PPEs, to include Optimal Blue, will increase after

9  the Acquisition. PX8000 (Sacher (FTC) Rep.) ¶ 505.

10     148.    ██████████████████████████████

11 ████████████████████████████████████████████

12 █████████████ PX5102 (Lender Price) at 3; PX6007 (███ (Lender

13 Price) IH) at 175:24-176:25.

## V.    ICE Announces the Acquisition of Black Knight in May 2022

15     149.    ICE announced the Acquisition of Black Knight on May 4, 2022. PX1728 (ICE)

16 at 1. Following ICE's and Black Knight's required Hart-Scott-Rodino ("HSR") Act filings, the

17 the FTC began a nearly 10-month investigation.

### A.    ICE Provides Information Regarding Purported Synergies and Merger
###        Benefits to the FTC and Investor Community

20     150.    In response to inquiries by the FTC during its investigation, ICE provided ███

21 ██████████████████████████████████████████

22 PX1102 (ICE) at 90-92; PX1723 (ICE) at 1.

23     151.    Joe Tyrrell, former President of ICE's Mortgage Technology division, was ███

24 ████████████████████████████████████████ PX1102 (ICE)

25 at 92, and ███████████████████████████████████

26 PX6012 (Tyrrell (ICE) IH) at 163:7-164:12; PX1102 (ICE) at 91; PX1100 (ICE) at 3.

27     152.    Tyrrell conceded that much of the basis for ████████████████

28 ████████ PX6046 (Tyrrell (ICE) Dep.) at 158:24-159:6, 160:11-162:9; PX6012 (Tyrrell (ICE)

IH) at 158:18-159:21. ██████████████████████████████████ PX6046 (Tyrrell
(ICE) Dep.) at 162:6-9.

153. Notably, ICE's ████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████ PX1100 (ICE) at 4; PX6046 (Tyrrell (ICE) Dep.) at
140:16-142:13 (discussing PX1100).

154. ICE's analysis of ███████████████████████████████████
██████████████████████████ . PX6034 (Jackson (ICE) Dep.) at 120:19-121:18.

155. ICE touted to the investment community that █████████████████
██████████████████████████████. PX1582 (ICE) at 35.

156. ICE made similar representations to the FTC. PX1102 (ICE) at 91 ████
███████████████████████████████████████████████████████████
███████████████████████████████████).

157. ICE's estimate of █████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████
PX6046 (Tyrrell (ICE) Dep.) at 121:18-123:6, 123:16-22, 125:5-9.

158. ICE never calculated ████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████. PX6012 (Tyrrell
(ICE) IH) at 249:16-250:18; PX6034 (Jackson (ICE) Dep.) at 49:21-53:10, 200:24-201:7.

**B.      ICE Considered** █████████████████████████████████████

159. As part of the Acquisition, ICE will acquire MSP, Black Knight's loan servicing
technology and ████████████████████████████████████████. PX1582 (ICE) at 9; PX6033
(Larsen (Black Knight) Dep.) at 19:22-20:6.

160. Defendants claim certain efficiencies and benefits from the Acquisition will
occur as a result of █████████████████████████████████████ (Dkt. 145 at 1), but
ICE █████████████████████████████████████████████████████

██████████████████████████████:

    a. ████████████████ (PX6046 (Tyrrell (ICE) Dep.) at 74:2-7; PX6012 (Tyrrell (ICE) IH) at 260:11-25, 262:10-263:5);

    b. ████████████████████████ (PX1568 (ICE) at 19); and

    c. ████████████████████████████████. PX6046 (Tyrrell (ICE) Dep.) at 74:12-75:15; PX1085 (ICE) at 2-3; PX6014 (Connors (ICE) IH) at 89:11-89:18; PX6068 (████ (Warburg) Dep.) at 167:13-170:3, 147:17-152:8.

161.    ICE, however, did not ██████████████████████████ ████████████████████████████████████████████ ███ PX6047 (Sahi (ICE) Dep.) at 140:10-23.

## VI.    Defendants Scramble to Divest Empower in a Self-Made, Slapdash Remedy

162.    On March 7, 2023, ████████████████████████, ICE, Black Knight, and Constellation Software, Inc. (together with its subsidiaries and affiliates, "Constellation"), ██████████ an agreement for the sale of certain assets including Black Knight's Empower to Constellation. PX6029 (Wilhelm (Constellation) Dep.) at 89:2-16; PX6054 (Hubbard (Truist) Dep.) at 23:13-24:21. Notably, these assets do not include Optimal Blue. PX4097 (Constellation) at 117.

163.    Constellation ████████████████████ PX6054 (Hubbard (Truist) Dep.) at 31:6-19, and offers a small LOS called MortgageBuilder ████████████████ ████████████ PX6055 (████ (Carrington) Dep.) at 101:5-13; PX6051 (████ (Impac) Dep.) at 54:25-55:11.

164.    Constellation ██████████████████████████ ████████████████████████. PX6032 (George (Constellation) Dep.) at 161:21-23. And according to the head of Constellation's mortgage business, the deal team ████████ ████████████████████████████████████████ ███ PX6049 (Ryczek (Constellation) Dep.) at 112:22-113:5.

    **A.**    **The Divestiture Conveys an Incomplete Business and Will Create Ongoing**

**Entanglements and Render Constellation Dependent Upon ICE**

165. Under the terms of the proposed divestiture, Constellation, unlike Black Knight, will not own many of the ancillary products integrated with Empower, and can only resell, ███████████████, some of those products under a Commercial Agreement with ICE (the "Resale Products"). *See* PX4097 (Constellation) at 100, 104, 117-19, 128-33.

166. Owning a broad portfolio of mortgage technologies that can be sold together with Empower allows Black Knight to ██████████████████████████████ ████████████████████████████████. PX6040 (Dugan (Black Knight) Dep.) at 14:24-15:16, 23:14-25:14; PX8001 (Sacher (FTC) Rebuttal) ¶ 234.

167. Under the Commercial Agreement, however, Constellation ██████████ ███████████████████████████████. PX4097 (Constellation) at 104, 128-33. That ██ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████. PX8001 (Sacher (FTC) Rep.) ¶ 235.

168. Today, Black Knight only offers ████ products in Empower bundles ████████ ████████████████████████████████████████████████████ ██████████████ Constellation will have ██ additional resale products in its Empower bundles. PX6040 (Dugan (Black Knight) Dep.) at 23:14-25:14, 28:12-29:1, 107:8-109:18.

169. Constellation's founder and president recognized that ███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ PX4189 (Constellation) at 1.

170. Under the Commercial Agreement, Constellation will also rely on ICE to provide ██████████████████████████████████ for the Resale Products, but ICE is only obligated to provide these services for ███████████████████████████████████ ██████ PX4097 (Constellation) at 107-08; PX6029 (Wilhelm (Constellation) Dep.) at 110:21-112:17; 124:4-125:9; PX6032 (George (Constellation) Dep.) at 83:17-22.

171. The Commercial Agreement requires Constellation to rely on ICE in other ways

to continue to sell Black Knight's bundle: ██████████████████████
███████████████████████████████████████████████████████████
███████████████████████ PX4097 (Constellation) at 101-02.

172. Because ICE will retain these key Empower-integrated services, Constellation

and its customers will depend on ICE for ███████████████████████████

*Id.* at 100, 107, 122-27; PX6029 (Wilhelm (Constellation) Dep.) at 124:4-125:9; PX6032

(George (Constellation) Dep.) at 83:17-22; PX4097 (Constellation) at 100, 107, 122-27.

173. Constellation executives recognize this arrangement represents ██████████
███████████████████████████████████████████████████████████
████████████████████ PX4138 (Constellation) at 5; PX4142 (Constellation) at 4
███████████████████████████████████████████████████████████
██ PX6032 (George (Constellation) Dep.) at 73:22-75:4, 76:14-25, 88:2-24.

174. Further, the Commercial Agreement provides Constellation the ability to

██████████████████████████████████████████████. PX4097

(Constellation) at 109. ███████████████████████████████████

███████████████████████████████████████. *Id.*

175. The resale fee provisions of the Commercial Agreement will also provide

██████████████████ to ICE regarding █████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████. PX4097 (Constellation)

at 105; PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 230:6-15; PX6032 (George

(Constellation) Dep.) at 82:14-83:7; PX6047 (Sahi (ICE) Dep.) at 95:20-96:7.

176. Constellation's president of its mortgage product line ████████████████
███████████████████████████████████████████████████████████
███████████████ and that ICE ███████████████████████████████
PX4134 (Constellation) at 1. ███████████████████████████████████
██████████████████. PX6049 (Ryczek (Constellation) Dep.) at 114:8-23.

177. The proposed divestiture further contemplates a Transition and Separation

Services Agreement ("TSSA") under which ICE would provide Constellation services to ensure that Empower does not ████████████████████████████ PX4097 (Constellation) at 135-177; PX6029 (Wilhelm (Constellation) Dep.) at 99:14-20. These services include ███████████████████ ██████████████████████████████████████ PX6029 (Wilhelm (Constellation) Dep.) at 100:23-103:2, 103:25-106:9.

178. One Constellation board member ████████████████████ ████████ in a transition services agreement because ██████████████ ██████████████ PX4104 (Constellation) at 1. The executive charged with negotiating the Empower acquisition ███████████████████████. PX6029 (Wilhelm (Constellation) Dep.) at 110:21-111:11.

179. Constellation's founder ████████████████████ ████████████████████████ and that Constellation ████████████ ███████████████████ PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 293:17-294:3; PX4099 (Constellation) at 1. The parties ███████████████ ██████████████████ PX6029 (Wilhelm (Constellation) Dep.) at 91:12-15; PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 393:17-394:22.

180. Bonnie Wilhelm, ██████████████████████, PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 239:18-21, noted to her supervisor ███████████████ ██████████████████████████████████ because of ██████████ PX4107 (Constellation); PX6029 (Wilhelm (Constellation) Dep.) at 193:23-195:10, 195:23-196:7.

181. Constellation's chief investment officer ████████████████ ███████████████████ which Wilhelm understood to mean that ████████ ██████████████████████████████████ and to which she responded ████████████ PX4224 (Constellation) at 1; PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 258:7-259:25.

**B.** The ███ Purchase Price of the Divestiture Assets Reflects ███
█████████████████████████████████████████████████—And
Defendants Desired to ████████████████████

182. Although ICE valued Empower at ████████████ PX6042 (Clifton (ICE) Dep.) at 212:14-22, and the amended merger agreement (accounting for divestiture of Empower) reduces the purchase price by about $1.4 billion, PX1697 (ICE) at 2, Defendants agreed to sell Empower and the other divestiture assets for ████████ PX6029 (Wilhelm (Constellation) Dep.) at 72:17-20.

183. Wilhelm quipped to another executive: ████████████████████ PX4224 (Constellation) at 1; PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 249:24-250:18.

184. ██████████████████████████████ is one consideration that resulted in Constellation offering ██████████████████ ████. *See, e.g.*, PX6029 (Wilhelm (Constellation) Dep.) at 48:11-19 ████████ ███████████████████████████████████████████████ ████████████████████, 58:2-3 ██████████████████████ █████████████████████████████████████ PX4222 (Constellation) at 1 ████████████████████████████████████ ████████████████

185. At a ████████ purchase price, Constellation's models showed that ████ ██████████████████████████████████ PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 223:23-224:7.

186. Constellation ████████████████████████████████ ██████████ PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 238:3-239:5; *see also* PX6029 (Wilhelm (Constellation) Dep.) at 72:22-73:23 ███████████████████████ ████████████████████████████████████

187. Fundamentally, Defendants' goal in marketing the divestiture assets was ████ ████████████████████████████████████████████████████ ████████████████████████████████████████

███████████████████████████. *See* PX4116 (Constellation) at 8; PX4219 (Constellation) at 1.

188.　Moreover, ICE instructed its investment bank to ███████████████
████████████████████████████████████████████████████████████
████ PX6054 (Hubbard (Truist) Dep.) at 68:22-69:19, 143:15-145:8; PX6061 (Hubbard (Truist) Dep. Vol. II) at 167:4-171:9.

189.　Numerous persons at Constellation, including its board members, have expressed
██████████████████████████████████████████████████████████
████████████ PX6029 (Wilhelm (Constellation) Dep.) at 109:3-112:17; PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 287:1-25, 290:3-291:19, 296:13-305:5.

190.　Constellation's founder and chairman of the board expressed ███████
██████████████████████████████████████████████████████████
████████████████████████████████████████ PX4288 (Constellation) at 2.

191.　And Constellation's former chief financial officer ███████████████
██████████████████████████████████████████████████████████
████████████ PX4099 (Constellation) at 2.

192.　Indeed, the Empower acquisition would be █████████████████████
██████████████████████████████████████████████████████████
████████ PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 342:2-11, 343:5-10; *see also* PX6032 (George (Constellation) Dep.) at 65:2-21; PX4136 (Constellation) at 3.

193.　██████████████████████████, Constellation's "goal" is to █████████
██████████████████████████████████████████████████████████
████████████████████████████. PX6029 (Wilhelm (Constellation) Dep.) at 200:4-19. Constellation has also considered ████████████████████████████████████
████████████████████████ PX6032 (George (Constellation) Dep.) at 69:1-70:8.

194.　One Constellation executive ███████████████████████████████████
██████████████████████████████████████████████████████—where Encompass is particularly dominant. PX4133 (Constellation) at 1; PX6032 (George (Constellation) Dep.) at 33:16-36:6; PX2316 (Black Knight) at 39.

# FEDERAL TRADE COMMISSION'S PROPOSED CONCLUSIONS OF LAW

1.      Clayton Act § 7 prohibits mergers when "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

2.      Section 7 analysis "necessarily focuses on 'probabilities, not certainties.'" *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)). This entails "'a prediction of [the merger's] impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their incipiency.'" *Id.* (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963)).

3.      Section 5 of the FTC Act proscribes "[u]nfair methods of competition in or affecting commerce." 15 U.S.C. § 45(a)(1). An acquisition that violates § 7 of the Clayton Act, by definition, is a violation of Section 5 of the FTC Act. *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986).

4.      Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), authorizes the FTC, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the Commission has the opportunity to adjudicate the merger's legality in an administrative proceeding.

5.      Specifically, § 13(b) "allows a district court to grant the Commission a preliminary injunction '[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest.'" *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) (quoting 15 U.S.C. § 53(b)).

6.      The statute "places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1159 (9th Cir. 1984). "Under this more lenient standard, 'a court must 1) determine the likelihood that the Commission will ultimately succeed on the merits and 2) balance the equities.'" *Affordable Media*, 179 F.3d at 1233 (quoting *Warner Commc'ns*, 742 F.2d at 1160).

7.      In weighing the equities under § 13(b), "public equities receive far greater weight" than private equities. *Warner Commc'ns*, 742 F.2d at 1165.

8. Public equities include effective enforcement of the antitrust laws and ensuring the Commission's ability to obtain adequate relief if it ultimately prevails on the merits. *Id.*

9. Preliminary injunctions under § 13(b) "are meant to be readily available to preserve the status quo while the FTC develops its ultimate case." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir. 2008); *accord FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976) ("The only purpose of a proceeding under § 13 is to preserve the status quo until FTC can perform its function.").

10. The FTC has shown a likelihood of success on the merits of its § 7 challenge in the administrative court, and the equities favor issuing a preliminary injunction.

## I. The FTC Is Likely to Succeed on the Merits of Its § 7 Challenge

11. In evaluating the FTC's likelihood of success on the merits, the Ninth Circuit has explained that the FTC satisfies its burden if it raises questions on the merits "serious" enough to make them "fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Warner Commc'ns*, 742 F.2d at 1162 (quoting *FTC v. Nat'l Tea Co.*, 603 F.2d 694, 698 (8th Cir. 1979)).

12. "[A]t this preliminary phase [the FTC] just has to raise substantial doubts about a transaction." *Whole Foods Mkt., Inc.*, 548 F.3d at 1036.

13. The Court's task "is not 'to determine whether the antitrust laws have been or are about to be violated.'" *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 67 (D.D.C. 2009) (quoting *Whole Foods Mkt.*, 548 F.3d at 1042 (Tatel, J., concurring)). "That adjudicatory function is vested in the FTC in the first instance." *Id.*

14. Rather, this Court is required only to consider the likelihood that "after an administrative hearing . . . the Commission will succeed in proving that the effect of the [proposed] merger 'may be substantially to lessen competition, or to tend to create a monopoly' in violation of section 7 of the Clayton Act." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) (quoting 15 U.S.C. § 18).

15. "[A] section 7 violation is proven upon a showing of reasonable probability of anticompetitive effect." *Warner Commc'ns*, 742 F.2d at 1160.

16.     In the merits proceeding—the administrative proceeding—the FTC "must first establish a prima facie case that a merger is anticompetitive." *St. Alphonsus*, 778 F.3d at 783.

17.     The FTC may make this showing "by establishing that the merger would produce a 'firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market.'" *United States v. Bazaarvoice, Inc.,* No. 13-CV-00133-WHO, 2014 WL 203966, at *64 (N.D. Cal. Jan. 8, 2014) (quoting *Phila. Nat'l Bank*, 374 U.S. at 363).[3]

18.     "Such a showing establishes a 'presumption' that the merger will substantially lessen competition." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 23 (D.D.C. 2015) (quoting *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990)).

19.     This presumption of illegality will be dispositive unless Defendants "clearly show[]" that the Acquisition "is not likely to have such anticompetitive effects." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 497 (1974) (quoting *Phila. Nat'l Bank*, 374 U.S. at 363).

20.     If Defendants do make such a showing, the FTC may nevertheless carry its burden by presenting "additional evidence of anticompetitive effect." *Bazaarvoice, Inc.*, 2014 WL 203966, at *64 (quoting *H.J. Heinz Co.*, 246 F.3d at 715).

21.     Under § 13(b), the Court's task is to assess the FTC's likelihood of success in the administrative proceeding under this burden-shifting framework. *Sysco Corp.*, 113 F. Supp. 3d at 22-23.

22.     Because the issue of whether the FTC has presented evidence to raise substantial doubts about the Acquisition is a "narrow one," the Court need not "resolve the conflicts in the evidence, compare concentration ratios and effects on competition in other cases, or undertake an extensive analysis of the antitrust issues." *Warner Commc'ns Inc.*, 742 F.2d at 1164.

23.     "[D]oubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (citing *Phila. Nat'l Bank*, 374 U.S. at 362-63).

24.     Although the standard at this preliminary stage requires only that the FTC raise

---

[3] Like other DOJ federal-court merger challenge cases cited herein, *Bazaarvoice, Inc.* was decided after a full merits trial. 2014 WL 203966, at *2. Unlike the FTC, the DOJ does not house an adjudicatory and remedial function akin to that embedded in the FTC's statutory construction.

"substantial doubts" about the Acquisition, the evidence here indicates that the Acquisition (1) may substantially lessen competition in both the commercial LOS and broader all-LOS markets by combining the two dominant LOSs in the United States; (2) may substantially lessen competition in the markets for PPEs for Encompass users and all PPEs by combining ownership of the two leading PPEs in the United States; and (3) by cementing ICE's dominant LOS and PPE position, will likely increase ICE's ability and incentive to disadvantage competing PPE providers who depend upon access to Encompass to serve their own customers.

25.     Defendants thus cannot "clearly show" that the Acquisition "is not likely to have such anticompetitive effects," *see Gen. Dynamics Corp.*, 415 U.S. at 497, let alone dispel the "substantial doubts" raised by the ample evidence. *See Whole Foods Mkt.*, 548 F.3d at 1036.

26.     The FTC is thus likely to succeed at the administrative hearing in proving that the effect of the Acquisition may be substantially to lessen competition or to tend to create a monopoly.

**A.     The Acquisition Is Presumptively Illegal and Likely to Cause Anticompetitive Effects in the Markets for Commercial LOSs and All LOSs**

**1.   Commercial LOSs and All LOSs Are Relevant Product Markets**

27.     The Supreme Court has recognized that § 7 prohibits acquisitions that may "substantially lessen competition within the area of effective competition." *Brown Shoe*, 370 U.S. at 324 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (internal quotations omitted).

28.     To determine the "area of effective competition," courts "reference . . . a product market (the 'line of commerce') and a geographic market (the 'section of the country')." *Brown Shoe Co.*, 370 U.S. at 324.

29.     At the § 13(b) preliminary injunction stage, the FTC need not prove the exact delineations of a market, and rather must only "rais[e] some question of whether [the candidate market] is a well-defined market." *Whole Foods Mkt., Inc.*, 548 F.3d at 1036-37, 1041.

30.     A relevant product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities

considered." *du Pont*, 351 U.S. at 404.

31.     In defining relevant product markets, courts evaluate "such practical indicia as industry or public recognition of the [relevant market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co.* 370 U.S. at 325; *accord, e.g.*, *FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2023 WL 2346238, at *9 (N.D. Cal. Feb. 3, 2023). Relevant markets "can exist even if only some of these [*Brown Shoe*] factors are present." *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997).

32.     Courts also can look to quantitative evidence of interchangeability derived from the hypothetical monopolist test. *E.g.*, *Sysco Corp.*, 113 F. Supp. 3d at 27, 33-34.

33.     In this case, the *Brown Shoe* practical indicia and hypothetical monopolist test both reflect that markets comprising (1) commercial LOSs and (2) all LOSs are appropriate product markets in which to evaluate the Acquisition.

34.     Commercial LOSs, and LOSs more generally, exhibit several of the *Brown Shoe* factors, *see supra* FOF ¶¶ 15-31.

    a.  *Peculiar characteristics and uses*. Lenders rely on LOSs as their system of record and to coordinate their workflows with the many ancillary services they use in connection with loan origination. PX6046 (Tyrrell (ICE) Dep.) at 17:20-18:9, 23:4-13; PX6047 (Sahi (ICE) Dep.) at 25:7-26:4. No other software serves the same purpose. PX6043 (███ (Polly) Dep.) at 115:23-117:17.

    b.  *Industry recognition*. ████████████████████████, routinely recognize LOSs as a distinct market in the ordinary course of their business. *E.g.*, PX2525 (Black Knight) at 7; PX1706 (ICE) at 2.

    c.  *Specialized vendors and unique production facilities*. Firms such as ICE and Black Knight specialize in developing, optimizing, and maintaining LOSs. *E.g.*, PX2523 (Black Knight) at 3; PX6046 (Tyrrell (ICE) Dep.) at 128:18-132:19.

    d.  *Distinct customers*. ███████████████ rely on commercial LOSs, rather than proprietary LOSs. PX2022 (Black Knight) at 8. In practical terms, that ███

██████████ rely on commercial LOSs reflects that these customers have unique needs and preferences satisfied by commercial LOSs. *See, e.g., Whole Foods Mkt.*, 548 F.3d at 1037-40 ("In short, a core group of particularly dedicated distinct customers paying distinct prices may constitute a recognizable submarket.").

35.     Further, both the commercial LOS market and the broader market for all LOSs satisfy the hypothetical monopolist test.

36.     This test asks whether a hypothetical monopolist of products within a proposed market could profitably impose a small but significant and nontransitory increase in price ("SSNIP"). Merger Guidelines § 4.1.1; *see also Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008); *Bazaarvoice, Inc.*, 2014 WL 203966, at *28.

37.     As discussed in the expert report of Dr. Sacher, because of the challenges associated with developing and operating a proprietary LOS, a SSNIP by a hypothetical monopolist of commercial LOSs would not be defeated by lenders switching to proprietary LOSs. PX8000 (Sacher (FTC) Rep.) ¶¶ 154-59.

38.     Consistent with this conclusion, ICE's Encompass LOS has maintained a ██████ ███████████, PX1711 (ICE) at 5; PX2319 (Black Knight) at 7, despite ███████ ███████████████████████. *E.g.*, PX6046 (Tyrrell (ICE) Dep.) at 36:17-24; PX1096 (ICE) at 13.

39.     Similarly, because mortgage lenders lack an adequate substitute for LOSs, a hypothetical monopolist of LOSs could profitably impose a SSNIP, thus the broader market for all LOSs constitutes a relevant antitrust market. PX8000 (Sacher (FTC) Rep.) ¶¶ 129-146.

## 2.     The Acquisition Creates a Presumptively Illegal Increase in Concentration in the Relevant LOS Product Markets

40.     In assessing a proposed merger's effects on competition, courts commonly employ a statistical measure of market concentration called the Herfindahl-Hirschman Index ("HHI"). "Mergers that increase the HHI more than 200 points and result in highly concentrated markets are 'presumed to be likely to enhance market power.' Sufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive." *St. Alphonsus*, 778 F.3d

at 786 (quoting Merger Guidelines § 5.3 and *H.J. Heinz*, 246 F.3d at 716).

41.     Based on HMDA data and Defendants' own documents, the Acquisition will result in an HHI of at least ▇▇▇ and an increase of at least ▇▇▇ points in the commercial LOS market. PX8000 (Sacher (FTC) Rep.) Tables 11-12.

42.     In the broader all-LOS market, the Acquisition will result in an HHI of at least ▇▇▇ and an increase of at least ▇▇ points. *Id.* at Tables 9-10.

43.     In both markets, the Acquisition therefore leads to a highly concentrated market and a presumption of illegality. *See St. Alphonsus*, 778 F.3d at 786; Merger Guidelines § 5.3.

### 3.     There Is a Reasonable Probability that the Acquisition Will Result in Anticompetitive Effects in the Relevant LOS Product Markets

44.     The presumption of illegality based on market concentration for the relevant LOS product markets is reinforced by ample evidence demonstrating that the Acquisition will eliminate head-to-head LOS competition that benefits Defendants' customers today. *See, e.g.*, *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 173 (3d. Cir. 2022).

45.     Black Knight's former CEO and current chairman described Encompass developer Ellie Mae, just prior to its 2020 acquisition by ICE, as ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ PX2033 (Black Knight) at 19; *see also* PX6033 (Larsen (Black Knight) Dep.) at 39:21-40:7; PX6053 (Eagerton (Black Knight) Dep.) at 105:19-106:5; *supra* FOF ¶¶ 65-72.

46.     The combination of ICE and Black Knight will eliminate this direct, frequent, head-to-head competition to provide ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ for their LOS customers. *See supra* FOF ¶¶ 75-86.

47.     The diminished competitive pressure on ICE post-Acquisition also will allow it to act more freely on ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See supra* FOF ¶¶ 85-93.

48.     ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *E.g.*, PX6038 ▇▇▇ (Mutual of Omaha) Dep.) at 71:8-18, 92:10-93:12, 99:18-101:2; PX7001 (▇▇▇ (Mutual of Omaha) Nov. 10, 2022 Decl.) ¶ 14; PX6069 (▇▇▇ (loanDepot) Dep.) at 106:3-107:5; PX7003 (▇▇▇

(loanDepot) Nov. 14, 2022 Decl.) ¶ 15; PX6051 ██████ (Impac) Dep.) at 28:9-29:14;

PX6035 (████ (Umpqua) Dep.) at 121:10-20 (discussing PX4154 (Umpqua) at 1).

49.     In sum, the Acquisition is presumptively illegal because of the increase in concentration in the commercial LOS and all LOS markets. Beyond this presumption, the Acquisition will eliminate head-to-head LOS competition that directly benefits Defendants' customers today.

**B.     The Acquisition Is Presumptively Illegal and Reasonably Likely to Cause Anticompetitive Effects in the Relevant PPE Product Markets**

**1.     PPEs for Encompass Users and All PPEs Are Relevant Product Markets**

50.     "[A]ntitrust markets can be based on targeted customers." *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 46 (D.D.C. 2018).

51.     Moreover, "[t]wo products that are differentiated from one another may nonetheless compete." *E.g.*, *United States v. Cont'l Can Co.*, 378 U.S. 441, 449-53 (1964).

52.     The markets for PPEs for Encompass users and all PPEs both exhibit multiple *Brown Shoe* practical indicia, *see supra* FOF ¶¶ 36-52:

a.  *Peculiar characteristics and uses*. Mortgage lenders use PPEs to determine how to price a mortgage and to lock the mortgage. PX6035 (████ (Umpqua) Dep.) at 20:9-21:1; PX6038 (████ (Mutual of Omaha) Dep.) at 19:22-20:3; PX6021 (Lyons (ICE) Dep.) at 47:22-48:18. No other product performs this service. PX6043 (████ (Polly) Dep.) at 117:3-17.

b.  *Industry recognition*. ████████████████████████ PPEs as a distinct product. *See* PX6035 (████ (Umpqua) Dep.) at 122:25-123:19; PX7007 (████ (Umpqua) Feb. 14, 2023 Decl.) ¶ 7 (████████████████████ ████████████████████████████ PX6007 (████ (Lender Price) IH) at 27:21-30:5 ████████████████████████ ████████████████████ 31:18-32:13; PX1166 (ICE) at 42; PX2259 (Black Knight) at 8. ████████████████ ████████████████████████

█████████████████████████████████████████. PX1640 (ICE) at 8.

c.  *Distinct customers*. Mortgage lenders constitute distinct customers who use PPEs. Further, these lenders ████████████████████████████████████████ ████████████████████████████████████████ PX1698 (ICE) at 3-5. Users of Encompass thus are a distinct set of customers for PPEs on the Encompass LOS.

d.  *Specialized vendors.* PPEs integrated with Encompass thus exhibit peculiar characteristics and uses—namely offering the functionality of a PPE and integration with Encompass—and are furnished by a limited selection of specialized vendors integrated with Encompass, which supports a finding that PPEs for users of Encompass constitute a relevant product market.

53.  The hypothetical monopolist test confirms that PPEs for Encompass users constitute a relevant product market: In the event of a SSNIP for PPEs for Encompass users, lenders would not switch to alternative LOSs, PPEs not integrated with Encompass, or other methods of performing the origination-related functions for which they use PPEs in sufficient volumes to render the price increase unprofitable. PX8000 (Sacher (FTC) Rep.) ¶¶ 202-215.

54.  Likewise, in the event of a SSNIP on all PPEs by a hypothetical monopolist, lenders would not switch to alternate methods of pricing and locking loans in sufficient numbers to render the price increase unprofitable. *Id.* ¶ 201.

**2.  The Acquisition Creates a Presumptively Illegal Increase in Concentration in the Relevant PPE Product Markets**

55.  "[A] merger which significantly increases the share and concentration of firms in the relevant market is 'so inherently likely to lessen competition' that it must be considered presumptively invalid and enjoined in the absence of clear evidence to the contrary." *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 52 (D.D.C. 1998) (quoting *Phila. Nat'l Bank*, 374 U.S. at 363).

56.  In *Philadelphia National Bank*, the Supreme Court wrote: "Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." 374 U.S. at 364.

57.     The PPE market shares at issue take this case well beyond the thresholds discussed in *Philadelphia National Bank*, and lead to a clear presumption of illegality.

58.     These shares result in a combined post-Acquisition market share of ████ with an HHI over ████ and an increase of more than ████ points (PX8000 (Sacher (FTC) Rep.) Table 15), far in excess of the thresholds that create a presumption of enhanced market power and illegality. *See St. Alphonsus*, 778 F.3d at 786, 788; Merger Guidelines § 5.3.

59.     The same is true of the broader market for all PPEs, where Black Knight estimates that its Optimal Blue boasts a ████ market share. PX2311 (Black Knight) at 5.

60.     Although EPPS is ████████████████████████████, Encompass's dominance combined with ████████████████████████████████████ ████████████████ even in an all-PPE market. PX1166 (ICE) at 42.

61.     Defendants' combined post-Acquisition all-PPE market share thus significantly exceeds the combined shares found sufficient to trigger a presumption of undue concentration and illegality under *Philadelphia National Bank* and its progeny.

### 3.     There Is a Reasonable Probability that the Acquisition Will Result in Anticompetitive Effects in the Relevant PPE Product Markets

#### a)     The Acquisition Will Eliminate Head-to-Head PPE Competition Between ICE and Black Knight

62.     The Acquisition also is likely to violate § 7 because it will eliminate significant, head-to-head PPE competition that benefits Defendants' customers today and which has resulted in ████████████ and other value for lenders. *See also supra* FOF ¶¶ 102-118.

63.     ████████████████████████████ analyzed by the FTC's economic expert ████████████████████████████████████████████████████. PX8000 (Sacher (FTC) Rep.) ¶¶ 433-37.

64.     ████████████████████████████, the FTC's expert, Dr. Sacher, modeled that PPE prices for Encompass users may increase ████████████ post-Acquisition due to the elimination of competition between EPPS and Optimal Blue, depending on the methodology and assumptions applied. *Id.* ¶¶ 32-38.

65.     The loss of competitive pressure on ICE has already manifested in ███████ ████████████████████████████████████████████████████████ illustrates the ███████████ competition already lost due to the Acquisition. *See supra* FOF ¶¶ 113-123.

66.     Moreover, ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ . PX1100 (ICE) at 4; PX6046 (Tyrrell (ICE) Dep.) at 141:20-142:13 (discussing PX1100 (ICE)).

67.     In light of the evidence of head-to-head PPE competition that will cease to exist post-Acquisition, coupled with ████████████████████████████████████████ ███████████ Defendants will not be able to overcome the presumption of competitive harm from the consolidation of the markets for PPEs for Encompass users and all PPEs.

### b) The Acquisition Will Likely Increase ICE's Ability and Incentive to Foreclose Competition from Other PPE Providers

68.     As the Supreme Court has explained, "[t]he primary vice of a vertical merger . . . is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition, . . . which deprives rivals of a fair opportunity to compete." *Brown Shoe Co.*, 370 U.S. at 323-24 (cleaned up).

69.     Complete foreclosure is not required for a merger to run afoul of the Clayton Act. *See id.* at 323 n.39 (explaining that goal of § 7 is "to arrest restraints of trade in their incipiency"). "Such foreclosure may be achieved by increasing prices, withholding or degrading access, reducing service or support, or otherwise increasing the costs or reducing the efficiency or efficacy" of rival products. *In re Illumina, Inc.,* No. 9401, 2023 WL 2823393, at 32 (FTC Mar. 31, 2023).

70.     "Case law provides two different . . . standards for evaluating the likely effect of a vertical transaction." *In re Illumina, Inc.*, 2023 WL 2823393, at *32. Courts may evaluate a vertical transaction through a set of factors discussed by the Supreme Court in *Brown Shoe Co.*, 370 U.S. at 328-34. More recently, "courts . . . have focused on whether a transaction is likely to increase the ability and/or incentive of the merged firm to foreclose rivals." *In re Illumina,*

*Inc.*, 2023 WL 2823393, at *33.

71.     Factors discussed by the Supreme Court in *Brown Shoe Co.* to assess the effects of a vertical merger include any "trend toward concentration in the industry" and entry barriers, among others. 370 U.S. at 328-34; *Ford Motor Co.*, 405 U.S. at 566-70; *see also In re Illumina, Inc.*, 2023 WL 2823393, at *33.

72.     The multifactor analysis of *Brown Shoe* is not a "precise formula[]," and not every factor must be present or even considered for a finding of liability. *In re Illumina, Inc.*, 2023 WL 2823393, at *33; *see Ford Motor Co.*, 405 U.S. at 566-71 (affirming finding of illegality and considering trend of concentration, amount of foreclosure, and barriers to entry).

73.     The ability and incentive analysis focuses "on whether a transaction is likely to increase the ability and/or incentive of the merged firm to foreclose rivals." *In re Illumina, Inc.*, 2023 WL 2823393, at *33.

74.     Satisfying both the *Brown Shoe* and ability and incentive standards is not required to find liability—either method can provide the basis for a liability determination. *See In re Illumina, Inc.*, 2023 WL 2823393, at *33.

75.     Here, there is a "trend toward concentration in the industry." *Brown Shoe Co.*, 370 U.S. at 332-33; *supra* FOF ¶ 95; *cf. Warner Commc'ns Inc.*, 742 F.2d at 1162–63 (listing "industry trends toward concentration, the degree of concentration within the industry, prior mergers by the firms in question and the barriers to entry in the industry" among "[f]actors to consider when determining the impact on competition" in case involving horizontal merger)."

76.     The Acquisition also would increase entry barriers in the relevant PPE product markets. *See Ford Motor Co.*, 405 U.S. at 568-72; *supra* FOF ¶¶ 53-57, 145-48.

77.     Moreover, the Acquisition may substantially lessen competition in the relevant PPE markets by increasing ICE's ability and incentive to disadvantage competing third-party PPE providers. *In re Illumina, Inc.*, 2023 WL 2946882 at *35, *39-43.

78.     PPEs depend on LOS integration to automate and enable aspects of PPE functionality, and ███████████████████████████████████████████████████ ████████████. *Supra* FOF ¶¶ 46-52.

79. Third-party PPE providers integrated with Encompass today ███████████ █████████████████████████. PX6043 (████ (Polly) Dep.) at 85:18-88:1; PX6007 ███ (Lender Price) IH) at 176:11-25, 181:1-12; *see also supra* FOF ¶¶ 46-52, 134-37.

80. After acquiring Black Knight and Optimal Blue, however, ICE's ████████ █████████████████████████████████, freeing ICE to disadvantage competing PPEs that rely on integration with Encompass. *See supra* FOF ¶¶ 141-42, 146-48.

81. ICE currently possesses the technical ability to disadvantage competing PPEs integrated with Encompass. *See supra* FOF ¶¶ 134-144. ICE also has contractual levers to disadvantage competing PPEs who rely on Encompass integration. *Supra id.* ¶¶ 127-133.

82. By eliminating Black Knight's Optimal Blue as a competitive threat, however, the Acquisition will remove the current competition that has motivated ICE to collaborate ███ ███████. *See supra id.* ¶¶ 141-42.

83. The Acquisition will also amplify ICE's financial incentives to disadvantage competing Encompass-integrated PPEs. *See supra id.* ¶¶ 145-48.

84. Because of Optimal Blue's █████████ share among Encompass users, after the Acquisition ICE will stand to recapture via Optimal Blue █████████████ of business lost by competing PPE providers as a result of any foreclosure or other disadvantages that ICE may inflict. PX8000 (Sacher (FTC) Rep.) ¶¶ 494-505; *see also supra* FOF ¶¶ 145-48.

85. When a third-party PPE's customer switches to Optimal Blue after the Acquisition, ICE will realize █████████████ associated with the customer's PPE use. Because ICE will stand to gain a larger proportion of third-party PPE providers' lost business and revenue after the Acquisition, its incentive to disadvantage those PPE competitors will increase. PX8000 (Sacher (FTC) Rep.) ¶ 505; *see also supra* FOF ¶¶ 145-48.

### C. Defendants Cannot Rebut Plaintiff's Prima Facie Case

86. Under the § 7 burden-shifting framework, once the FTC establishes its prima facie case, the burden shifts to Defendants to rebut that case. *St. Alphonsus*, 778 F.3d at 783.

### 1. Defendants Cannot Demonstrate that the Divestiture Will Restore Competition

87. When a merger violates § 7, an injunction prohibiting the merger is the "default

remedy." *In re Illumina, Inc.*, 2023 WL 2946882, at *53; *see also du Pont*, 366 U.S. at 329 ("The very words of § 7 suggest that an undoing of the acquisition is a natural remedy.").

88.     Further, "it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of the law, all doubts as to the remedy are to be resolved in its favor." *St. Alphonsus*, 778 F.3d at 793 (quoting *du Pont*, 366 U.S. at 334).

89.     The HSR Act requires merging parties to file notification of transactions exceeding certain thresholds. 15 U.S.C. § 18a. In enacting the HSR Act, one goal of Congress was to give the FTC advance notice of an impending merger, to provide a "meaningful chance to carry its burden of proof, and win a preliminary injunction against a merger that appears to violate [Clayton Act] section 7." H.R. Rep. No. 94-1373, at 8 (1976).

90.     Some courts thus recognize that when merging parties propose a divestiture to address antitrust concerns, they are proposing a solution to problems created by the merger rather than a wholly new transaction, and thus bear the burden of showing the divestiture will restore competition. *See United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 59-60 (D.D.C. 2017).

91.     At the administrative proceeding, consideration of a remedy generally comes only after a determination of the reasonably likely competitive effects of the Acquisition. *In re Illumina, Inc.*, 2023 WL 2946882, at *51.

92.     While some courts have inquired into the merits of a divestiture at the rebuttal stage of the § 7 burden-shifting analysis, *see id.* at *60, under either approach, Defendants bear the heavy burden to establish that their proposed divestiture would "'restore competition,' 'eliminate the effects' of the Acquisition, and replace the lost competitive intensity*." Id.* at *53 (quoting *Ford Motor Co.*, 405 U.S. at 573 & n.8); *accord Staples*, 190 F. Supp. 3d at 137 n.15.

93.     "Restoring competition requires replacing the competitive intensity lost as a result of the merger rather than focusing narrowly on returning to premerger HHI levels." *Sysco Corp.*, 113 F. Supp. 3d at 72 (quoting Antitrust Div., U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 5 (2004)).

94.     To assess whether merging parties have met their burden to show that a remedy will restore competition, courts consider factors including whether a divestiture transfers an

intact business or a "lesser set of assets," results in continuing entanglement between the seller and divestiture buyer, or involves a low purchase price. *Aetna*, 240 F. Supp. 3d at 60, 72-73.

95. Defendants will not be able to make the required showing in the Administrative Proceeding that the proposed divestiture will restore competition.

96. *First*, Defendants' proposed divestiture fails outright as a remedy because it does not address the anticompetitive harms the Acquisition likely will cause in the markets for PPEs for Encompass users and for all PPEs. As explained above, the Acquisition is likely to result in competitive harms in these PPE markets largely as a result of ICE's acquisition of Black Knight's Optimal Blue PPE. *Supra* COL ¶¶ 55-85. The proposed divestiture, however, does not include Optimal Blue. *Supra* FOF ¶ 162.

97. *Second*, because Constellation would receive only a fragment of Black Knight's business, the divestiture would fail to replace the competitive intensity lost as a result of the Acquisition. Although Constellation would acquire some of the Black Knight services integrated with Empower through the divestiture, it would rely on contracts with ICE to provide the remainder, including the industry-leading Optimal Blue PPE. *See supra* FOF ¶¶ 165-69. Constellation will be unable to offer the single point of contact for pricing, contracts, and vendor management that Black Knight ███████████████████████████. *See id.* ¶¶ 170-74. Between its diminished flexibility to ███████████████ and its inability to provide lenders the convenience of a single point of contact, Constellation will be unable to replicate Black Knight's current competitive intensity.

98. *Third*, Defendants' proposed divestiture also is fundamentally flawed because it would create myriad contractual entanglements between ICE and Constellation ████. *Supra id.* ¶¶ 165-181. "Courts are skeptical of a divestiture that relies on a 'continuing relationship between the seller and buyer of divested assets' because that leaves the buyer susceptible to the seller's actions—which are not aligned with ensuring that the buyer is an effective competitor." *Aetna*, 240 F. Supp. 3d at 60 (quoting *Sysco Corp.*, 113 F. Supp. 3d at 77).

99. As part of the proposed divestiture, Defendants and Constellation contemplate executing an array of ongoing agreements. Of particular concern, Constellation will depend on a

Commercial Agreement with ICE to provide its customers with many Empower-integrated services that Black Knight owns today but that ICE will own after the Acquisition, including Optimal Blue. PX4097 (Constellation) at 100, 117-19. *Supra* FOF ¶¶ 165-69.

100. Constellation executives have acknowledged that these agreements will █████ ████████████████████ (PX4138 (Constellation) at 5) and █████████████████ ██████████████████████████ PX6032 (George (Constellation) Dep.) at 76:14-25, 88:18-24; PX4142 (Constellation) at 4 ████████████████████████████ ████████████████████████████████████ PX4224 (Constellation) at 1 (after the deal closes, Constellation will be ███████████████████ PX6062 (Wilhelm (Constellation) Dep. Vol. 2) at 253:22-256:2 (same). ███████████████████████████ █████████████████████████████████████████████. PX4097 (Constellation) at 105 §§ 9.5-9.6; PX6032 (George (Constellation) Dep.) at 82:14-83:7.

101. In this case, a divestiture so likely to ensure that the buyer never becomes a credible competitive threat should not be endorsed. *Sysco Corp.*, 113 F. Supp. 3d at 77-78. Indeed, the court in *Sysco Corp.* rejected ████████████████████████████████████████, finding that ongoing entanglement between the merged company and divestiture buyer rendered them "not . . . truly independent." *Id.*; *accord CCC Holdings Inc.*, 605 F. Supp. 2d at 59 (it is a "problem" to allow "continuing relationships between the seller and buyer of divested assets after divestiture, such as a supply arrangement or technical assistance requirement, which may increase the buyer's vulnerability to the seller's behavior").

102. *Fourth,* the ████████ purchase price of the divestiture assets reflects █████ █████████████████████████████████████. *See supra* FOF ¶¶ 182-194. "An extremely low purchase price reveals the divergent interest between the divestiture purchaser and the consumer: an inexpensive acquisition could still 'produce something of value to the purchaser' even if it does not become a significant competitor and therefore would not 'cure the competitive concerns.'" *Aetna*, 240 F. Supp. 3d at 72 (quoting Antitrust Div., U.S. Dep't of Justice, Policy Guide to Merger Remedies 9 (2011)).

103. Constellation has agreed to pay ██████████████ for Empower and the

divestiture assets, though ██████████████████████████████ (PX6032
(George (Constellation) Dep.) at 29:19-22; PX6042 (Clifton (ICE) Dep.) at 212:14-22), and the
amended merger agreement (accounting for divestiture of Empower) reduces the purchase price
by about $1.4 billion (PX1697 (ICE) at 2). ███████████████████████
████████████████████████████████████████████████
███████████████████████████████████████. *Supra* FOF ¶¶ 182-194.

104. ██████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████. PX6032 (George (Constellation)
Dep.) at 69:1-70:8. ████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████ *Aetna*, 240 F. Supp. 3d at 72, and thus
the divestiture is unlikely to restore lost competition. *See id.*

### 2. Defendants Cannot Demonstrate that Entry Will Be Timely, Likely, and Sufficient to Counteract the Acquisition's Anticompetitive Effects

105. Defendants also cannot rebut the FTC's prima facie case by showing that entry
will be timely, likely, and sufficient to counteract the competitive harms of the Acquisition. *See
Bazaarvoice*, 2014 WL 203966, at *71.

106. LOS and PPE markets are characterized by high barriers to entry. Black Knight
itself has estimated that to develop a new commercial LOS would cost at least ███████ and
take at least ███████. PX0021 (Black Knight) at 95-97; *see also supra* FOF ¶¶ 32.

107. Any LOS entrant or existing provider seeking to reposition also must overcome
lenders' high switching costs, lengthy switching timelines, and general reluctance to switch to
untested LOSs. *E.g.*, PX1158 (ICE) at 4-6; PX8000 (Sacher (FTC) Rep.) ¶¶ 567-69, 575-80; *see
also supra* FOF ¶¶ 33-35.

108. New entry or repositioning of PPEs is similarly unlikely. *Supra* FOF ¶¶ 53-57.

### 3. Defendants Fail to Establish Cognizable, Merger-Specific Efficiencies that Outweigh the Acquisition's Anticompetitive Effects

109.     The "Supreme Court has never expressly approved an efficiencies defense to a § 7 claim," and the Ninth Circuit "remain[s] skeptical about the efficiencies defense in general and about its scope in particular." *St. Alphonsus*, 778 F.3d at 788-90.

110.     To the extent efficiencies supply any defense of an otherwise anticompetitive transaction, the burden would be on Defendants to "clearly demonstrate" proof of "extraordinary efficiencies" that are merger-specific and verifiable. *Id*. at 790-91.

111.     Here, ICE has claimed a shifting set of loosely defined efficiencies of varying amounts that fail to satisfy the applicable standard. *See supra* FOF ¶¶ 150-161.

112.     Joe Tyrrell, former President of ICE's Mortgage Technology division, stated much of the basis for ███████████████████████ PX6046 (Tyrrell (ICE) Dep.) at 158:24-159:6, ██████████████████████████████████ *Id.* at 162:6-9. And ICE's analysis of ███████████ is only a ███████████████████████████████████████ ████████████████████ PX6034 (Jackson (ICE) Dep.) at 120:19-121:18.

113.     These ███████ and ███████████ do not clearly demonstrate proof of extraordinary, merger-specific, verifiable efficiencies.

### 4.     The Constitutional Affirmative Defenses Are Irrelevant to the § 13(b) Inquiry

114.     Defendants have raised various affirmative defenses concerning the FTC's process and powers.

115.     As one court in this District concluded, it follows from the limited scope of the inquiry in a § 13(b) case that determining the likelihood of success "on the merits" means determining "the action's Section 7 antitrust merits, as distinguishable from any procedural due process issues arising from the FTC's proceedings." *FTC v. Meta Platforms Inc.*, No. 5:22-CV-04325-EJD, 2022 WL 16637996, at 6 (N.D. Cal. Nov. 2, 2022).

116.     Indeed, the "oft-cited standard for 'likelihood of ultimate success' describes merits questions [in a § 13(b) proceeding] as those that would require 'thorough investigation, study, deliberation, and determination by the FTC,' a characterization that is consistent with a 'preliminary assessment of a merger's impact on competition.'" *Id.* at *6 (quoting *Warner*, 742 F.2d at 1162).

117.     Accordingly, affirmative defenses arising out of alleged procedural defects (even constitutional procedural defects) are not pertinent to deciding whether to grant preliminary relief pursuant to § 13(b) of the Federal Trade Commission Act. *See id.* at *7. ("[T]o the extent Defendants' constitutional defenses are predicated on . . . bias or procedural deficiencies, these defenses would likewise be stricken without leave to amend.").

## II.     The Equities Support a Preliminary Injunction

118.     Under § 13(b), this Court must also "balance the equities." *Warner Commc'ns*, 742 F.2d at 1165. If the FTC has shown a likelihood of success, "a countershowing of private equities alone does not justify denial of a preliminary injunction." *Id.*

119.     The "principal public equity" favoring a preliminary injunction is "the public interest in effective enforcement of the antitrust laws." *H.J. Heinz*, 246 F.3d at 726.

120.     Without preliminary relief, the Commission may face the "daunting and potentially impossible task" of "unscrambling the eggs" if the Acquisition is deemed unlawful. *FTC v. Peabody Energy Corp.,* 492 F. Supp. 3d 865, 918 (E.D. Mo. 2020) (quoting *Sysco*, 113 F. Supp. 3d at 87). As such, "[n]o court has denied relief to the FTC in a 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits." *FTC v. ProMedica Health Sys., Inc.*, No. 3:11-CV-47, 2011 WL 1219281, at *60 (N.D. Ohio Mar. 29, 2011).

121.     Defendants' consideration of how long they will wait to merge is a private concern outweighed by public interests in effective enforcement of the antitrust laws. *E.g.*, *Wilh. Wilhelmsen Holding*, 341 F. Supp. 3d at 74. Such private concerns receive "little weight" in § 13(b) proceedings, to avoid undermining the statute's "purpose of protecting the 'public-at-large, rather than individual private competitors.'" *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) (quoting *Nat'l Tea Co.*, 603 F.2d at 697 n.4).

122.     On the other hand, allowing Defendants to merge could prevent the FTC from ordering relief to preserve competition and enforce the antitrust laws were it to prevail in the administrative proceeding.

123.     Here, the equities support entry of a preliminary injunction pending resolution of the administrative proceeding.

Dated: June 30, 2023

Respectfully submitted,

/s/ Abby L. Dennis
Abby L. Dennis
Peter Richman
Ashley Masters
Abigail Wood
Daniel Aldrich
Laura Antonini
Catharine Bill
Caitlin Cipicchio
Steven Couper
Janet Kim
Christopher Lamar
Christopher Megaw
Lauren Sillman
Neal Perlman
Nicolas Stebinger
Nina Thanawala
Taylor Weaver

Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-2381

*Counsel for Plaintiff Federal Trade Commission*